1  EUGENE G. IREDALE: SBN 75292
2  JULIA YOO: SBN 231163
   CHELSEA REHERMAN: SBN 343446
3  IREDALE & YOO, APC
4  105 West F Street, Fourth Floor
   San Diego, CA 92101-6036
5  TEL: (619) 233-1525
6  Attorneys for Plaintiffs

7
               **UNITED STATES DISTRICT COURT**
8              **SOUTHERN DISTRICT OF CALIFORNIA**
9

10 THE ESTATE OF BRANDON          CASE NO. '25CV0410 W   MMP
   YATES by and through its
11 successors-in-interest Dan Yates and   **COMPLAINT**
   Andrea Carrier; DAN YATES and
12 ANDREA CARRIER,                 **(1)  Deliberate Indifference (42 U.S.C.
13                                       §1983)**
                                   **(2)  Failure to Properly Train,
14         Plaintiffs,                   Supervise and Discipline (42
   v.                                    U.S.C.§1983)**
15                                 **(3)  *Monell* (42 U.S.C. §1983)**
   COUNTY OF SAN DIEGO,           **(4)  Right of Association (42 U.S.C.
16 KELLY MARTINEZ, in her               §1983)**
   individual capacity, RICH       **(5)  Violation of Cal. Civ. Code §52.1
17 WILLIAMS, in his individual          (Bane Act)**
   capacity, MATTHEW               **(6)  Negligence**
18 BLACKBURN, in his individual    **(7)  Wrongful Death (CCP §377.60)**
   capacity, TONY GANZALEZ in his
19 individual capacity and DOES 1-51,
20
21
                                   **JURY TRIAL DEMANDED**
22         Defendants.
23
24
25
26
27
28

## I. INTRODUCTION

On January 15, 2024, Brandon Yates was arrested and booked into San Diego Central Jail ("Jail"). Within 24 hours, Brandon was found face down on the floor of his cell, naked with his hands and feet bound behind his back. His cellmate Alvin Ruis had tortured and sexually assaulted Brandon. Ruiz had choked and smothered Brandon to death.

Alvin Ruis was a "bypass inmate" who was not allowed to be with other detainees. He was not even allowed to have yard time with others as a result of his behavior. Ruis had been arrested for assaulting his wife and children on two separate occasions. He had told his family that he had intentions of killing other people. Ruis had threatened multiple cellmates and had assaulted a deputy. He was not to be housed with others in his cell.

In the approximately 60-minute time period after Brandon had been placed unmonitored in Ruis' cell, Brandon was heard screaming for help. Brandon pushed the panic button in his cell multiple times for the deputies in the control tower to save his life, telling them he was going to be killed. The control tower deputies either ignored the desperate calls or put the intercom on "bypass" meaning they turned the sound off from Brandon's cell. Other inmates heard Ruis threatening Brandon and Brandon screaming for help. The deputies who entered the module ignored those screams. No one came as Brandon was being tortured, stripped naked, bound, sexually assaulted, and murdered. Brandon Yates was 24 years old.

## II. GENERAL ALLEGATIONS

1.    Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §1331 and 28 U.S.C. § 1343(3) and (4), *et. seq*.

- 1 -

2.    Venue is proper in the Southern District of California because the acts or omissions which form the basis of the Plaintiffs' claims occurred in San Diego, California, within the Southern District.

3.    At all times relevant to this complaint, decedent Brandon Yates was an individual residing in San Diego County, California.

4.    Brandon and his fraternal twin were born prematurely.  Brandon faced tough physical challenges from birth but grew to excel in sports.  Brandon was involved with the youth ministry at church and  junior guard.  Brandon loved to surf.  Brandon excelled academically.

5.    After graduating from high school, Brandon began suffering from extreme anxiety and other mental health issues.  Brandon began using heroin and methamphetamine.

6.    When his addiction took control over him, Brandon would become homeless, struggling with his mental illness and increasing religious ideations and grandiosity.

7.    When Brandon was in rehab, he thrived. He was a loving and kind son and brother.  He was known for his generosity.  He loved his family and his life.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





8.    At the time of his death, Brandon Yates was not married. He had no children. He did not leave behind any will or other testamentary documents. Brandon Yates died intestate. For this reason, there is no probate proceeding pending related to Brandon Yates.

9.    Because Brandon died intestate, was not married, and had no children, his surviving parents, Dan Yates and Andrea Carrier, are Brandon's heirs and sole beneficiaries. Thus, they are Brandon's successors-in-interest. (See Declarations of Dan Yates and Andrea Carrier, attached hereto as Exhibit A).

10.    There is no other person with a superior right to commence the action.

11.    Dan Yates and Andrea Carrier bring this action in their own right, as well, for the loss of their son, Brandon Yates.

12.    Plaintiffs properly complied with the Government Claim Act. The claims were submitted to the County of San Diego on June 26, 2024.

13.    The County of San Diego rejected the claims on January 27, 2025.

### III. PARTIES

14.    Defendant County of San Diego is a public entity, duly organized and existing under the laws of the State of California. Under its authority, Defendant County of San Diego operates and manages the San Diego Central Jail, and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures and practices/customs of the Central Jail, and its respective employees, contractors and/or agents.

15.    Defendant Kelly Martinez ( "Martinez") was, at all times mentioned herein, the Sheriff of the County of San Diego, the highest position with the San Diego County Sheriff's Department. As Sheriff, Defendant Martinez was responsible for hiring, screening, training, retention, supervision, discipline, counseling, and control of all San Diego County Sheriff's Department custodial employees and/or agents, medical staff, contractors, and DOE Defendants.

16.     At all times relevant to this complaint, Defendant Kelly Martinez was a policymaker for the San Diego County Sheriff's Department and was responsible for the promulgation of policies and procedures to comply with the California state mandates and the state and federal Constitutions. Defendant Martinez was the Title 15 officer and was also responsible for the noncompliance with California state law. Having had the opportunity to comply with state law, she failed to do so. She was responsible for the supervision and control of officers who are or were employed by the Sheriff's Department, who are under her command and/or who report to her, including the Defendants to be named.

17.     Before taking office as Sheriff in January 2023, Defendant Martinez was the Undersheriff for the San Diego County Sheriff's Department, under then-elected Sheriff William Gore. In her capacity as Undersheriff, Martinez was a policymaker for the Sheriff's Department and the County on matters relating to the Sheriff's Department, the Jail, and its deputies, employees, and agents. She was also responsible for the County's compliance with state and federal laws and constitutions and for the training and supervision of County employees and agents.

18.     Defendant Rich Williams ("Williams") was, at all times mentioned herein, the Undersheriff of the County of San Diego, the highest position with the San Diego County Sheriff's Department. As Undersheriff, Defendant Williams was responsible for overseeing all department operations and ensuring the Sheriff's Office "provides the highest quality public safety service to everyone in San Diego County." Defendant Williams was also responsible for the more than 4,700 employees of the San Diego County Sheriff's Office.

19.     At all times relevant to this complaint, Defendant Deputy Mathew Blackburn was a housing deputy at the San Diego Central Jail, assigned to floor 4. As a housing deputy, Defendant Deputy Blackburn was responsible for conducting cell checks in compliance with Title 15 and San Diego County Sheriff policies and procedures, and ensuring inmate safety.

20.    At all times relevant to this complaint, Defendant Deputy Tony Gonzalez was a housing deputy at the San Diego Central Jail, assigned to floor 4. As a housing deputy, Defendant Deputy Gonzalez was responsible for conducting cell checks in compliance with Title 15 and San Diego County Sheriff policies and procedures, and ensuring inmate safety.

21.    At all times relevant to this complaint, Defendant Does 1-10 were the Jail Population Management Unit deputies and/or Classification deputies, Sergeants or Lieutenants at the San Diego Central Jail who were responsible for classifying and housing Brandon Yates and Alvin Ruis.

22.    At all times relevant to this complaint, Defendant Does 11-21 were housing deputies at the San Diego Central Jail during the days in which Brandon was in custody at the Jail. Does 11-21 were tasked with conducting security checks in compliance with Title 15 and San Diego County Sheriff policies and procedures and ensuring inmate safety.

23.    At all times relevant to this complaint, Defendant Does 22-26 were Control Deputies and/or Control Tower Deputies on January 16, 2024. Does 22-26 were responsible for ensuring that the intercoms in each cell were functioning properly, responding to intercom calls, and maintaining a safety watch from the watchtower.

24.    At all times relevant to this complaint, Supervisory Doe Defendants 27-36 were supervisors at the San Diego County Sheriff's Department who were responsible for supervising, disciplining, and training the staff at the Central Jail.

25.    At all times relevant to this complaint, Defendant Medical Does 37-46 were medical and mental health personnel responsible for assessing inmates and providing psychiatric care. Does 37-46 knew of the lengthy history of mental illness and reports of serious psychiatric problems Ruis was experiencing but failed to treat or monitor him.  They failed to place him in a housing unit where he could

be monitored and/or medicated. They failed to notify the classification staff and housing deputies of the dangers Ruis posed to others.

26.    At all times relevant to this complaint, Medical Supervisory Does 47-51 were supervisory medical and mental health personnel Does 47-51  were responsible for training, supervising, disciplining, and overseeing medical and mental health personnel.

27.    At all times relevant to this complaint, all individual defendants and Does 1-51 were San Diego Sheriff's civilian employees, deputies, supervisory officials, or medical and mental health care providers. Does 1-51 were agents of Defendant County of San Diego, including contractors or subcontractors authorized to work at the Jail.

28.    Plaintiffs are truly ignorant of the true names and capacities of Does 1-51 and/or are truly ignorant of the facts giving rise to their liability. Plaintiffs will amend this complaint once their identities have been ascertained as well the facts giving rise to their liability.

29.    These defendants were agents, servants, and employees of each other of the other named defendants and were acting at all times within the full course and scope of their agency and employment, with the full knowledge and consent, either express or implied, of their principal and/or employer and each of the other named defendants, thereby making the currently named defendants herein liable for the acts and/or omissions of their agents, servants, and/or employees

## IV.  FACTS REGARDING THE MURDER OF BRANDON YATES

30.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

31.    Alvin McDonald Ruis III ("Ruis") was a gravely mentally ill individual who had an extensive treatment history. Ruis had been involuntarily

committed on multiple occasions prior to his imprisonment in San Diego Central Jail.

32.    One month before his December 2023 arrest, Ruis was hospitalized in Montana after suffering a psychotic episode which led him to act erratically. Ruis was involuntarily committed to the Montana Mental Hospital from November 21, 2023, until November 28, 2023. After his release from the Montana Mental Hospital, he returned to San Diego.

33.    On or about December 2, 2023, Ruis physically assaulted his wife and one of his minor children. Shortly thereafter, Ruis believed God was telling him to travel to Rome.

34.    While on a plane en route to Rome, Ruis had a manic episode and assaulted a flight attendant. He was detained in London and involuntarily hospitalized at a mental hospital from around December 7, 2023, to around December 20, 2023, when he was permitted to leave Great Britain.

35.    On December 27, 2023, the Chula Vista Police Department arrested Ruis on the following charges: Domestic Violence, Willful Cruelty to a Child, Stalking, Burglary, Violation of a Court Order, Committing a Felony while out on Bail, and Violation of a Domestic Violence Temporary Restraining Order ("DV-TRO"). CVPD arrested Ruis after he again assaulted his children and wife.

36.    At his December 27, 2023, arraignment, Ruis's family, including his father and mother, requested help for Ruis. Ruis's family feared Ruis would commit suicide or murder someone as he had threatened on multiple occasions.

37.    As a result of these charges, Ruis was booked into the San Diego Central Jail.

38.    On numerous occasions during his 19-day incarceration at the Central Jail, Ruis had been declared a danger to himself and others.

39.    Deputies had placed Ruis in the Sixth Floor Enhanced Observation Housing ("EOH") multiple times.

40.    EOH provides close observation and assessment of incarcerated persons who may be at an elevated risk for suicide.

41.    Upon information and belief, while in EOH, Ruis displayed heightened aggressive behavior, verbally attacking EOH employees and threatening suicide and violence to others.

42.    Within the first few days of his incarceration at SDCJ, Ruis was sent to EOH for fashioning a rope out of jail-supplied clothing and attempting to hang himself with it. Ruis was sent back to the Module 4C shortly after.

43.    No one admitted Ruis to the Psychiatric Stabilization Unit (PSU) where mentally ill patients can be monitored and involuntarily medicated if necessary.

44.    Ruis began having auditory hallucinations, including the voices of his children yelling at him through the walls.

45.    Ruis grabbed a deputy through his cell's food flap resulting in the deputy using force on Ruis.

46.    Later that same day, Ruis threatened to hang himself. Deputies placed Ruis in EOH once more.

47.    Throughout his time at San Diego Central Jail, it was clear that Ruis suffered from a significant mental illness that manifested in violent outbursts toward inmates and deputies.

48.    Ruis engaged in non-stop, compulsive talking about God and spoke in indecipherable nonsense.

49.    Ruis would frequently make erratic statements and stay awake through the night, yelling out his cell door, upsetting and angering other inmates.

50.    For some reason, no one placed Ruis in administrative segregation even after he assaulted a deputy.

51.    Each time Ruis was placed in EOH, defendants would release him instead of treating or monitoring him for his serious mental health problems.

- 9 -

52.     Ruis's dangerous propensities were known to Defendants, including Defendant Blackburn, Defendant Gonzalez, and Does 1-51.

53.     Ruis's inability to share a cell was known to deputies in the Module.

54.     On at least one occasion before murdering Brandon, Ruis had to be removed from shared housing with other inmates due to threats he made against those cellmates.

55.     In the days leading up to Brandon's murder, Ruis' psychosis was becoming increasingly more acute.

56.     He was placed in EOH and safety cells as a result of his dangerous and psychotic behavior putting himself and others in danger.

57.     Despite showing heightened violent tendencies, Does 37-46, under the supervision of Medical Supervisory Does 47-51, released Ruis from EOH to mainline after every EOH placement without further evaluation, medication, or monitoring.

58.     Ruis was threatening not only other inmates but the deputies on the floor.

59.     While at SDCJ, Ruis was a "bypass" inmate, a designation for someone who must be kept separate because they cannot get along with others. As a bypass, Ruis had to be let out to the dayroom separate and apart from every other inmate. This was for everyone's safety.

60.     A "bypass inmate" refers to people who could suffer or inflict harm on other inmates.

61.     If a line deputy requests a "keep separate" be added to an inmate's record, an Inmate Status Report ("ISR") is required per Detentions P&P Section F.5. An inmate status report details an incarcerated person's movements and notable incidents. For example, an ISR would be used when there is a housing movement due to an individual request, when a person's status is changed to "keep

separate," or when there is a change of classification due to disciplinary action. This report is reviewed, approved, forwarded, and disseminated among jail staff.

62.    The ISR would have been available to supervisory Does 27-36.

63.    Ruis's "keep separate" status meant that all sworn staff and their supervisors knew that it was not safe to place someone in a cell with him.

64.    Here, either Doe defendants 11-21 and their supervisors Does 27-36 failed to properly record and communicate the "Keep Separate" requirement in the ISR to the housing deputies or Defendant Blackburn ignored the requirement in placing Brandon in Ruis' cell.

65.    Upon information and belief, despite Ruis continuing to display aggressive and violent behavior, Does 37-46 continued to clear him from EOH back to Module 4C.

66.    Despite the escalating level of threat and actual assault on a deputy, no one placed Ruis in segregation housing or in the PSU where he could be monitored constantly.

67.    On January 15, Ruis was manifesting symptoms of serious mental illness threatening people, and continuing to engage in self-harming behavior. Despite this behavior, he was cleared to go back to mainline housing.

68.    Brandon Yates was arrested on suspicion of burglary and booked into the San Diego Central Jail ("SDCJ") on January 15, 2024, after he had been found sleeping in someone's backyard shed.

69.    At the time, Brandon was 24 years old.

70.    Brandon had struggled with mental illness for many years.

71.    Brandon was placed in cell 2 of Module 4C, on the fourth floor. While in cell 2, Brandon's mental health issues were causing his cellmates to get aggressive toward him.

72.    Brandon was speaking nonsensically and babbling nonstop.

73.    On January 16, 2024, his cellmates called Defendant Deputy Blackburn over and threatened that "there would be trouble" if deputies did not remove Brandon from their cell.

74.    Blackburn took Brandon out of cell 2.

75.    Blackburn knew that Brandon was a vulnerable inmate as a result of his mental illness and that others had threatened him.

76.    Defendant Blackburn also knew Ruis had just been released from EOH, was classified as a bypass inmate who needed to be kept separate from other inmates during communal periods, and that Ruis had never been assigned any cellmates because of his violent propensities.

77.    Despite this knowledge, Defendant Blackburn moved Brandon into Ruis's cell.

78.    Within minutes of being moved into Ruis's cell, Brandon and Ruis began having a conversation about God. That conversation quickly became contentious, and Ruis decided Brandon was the devil.

79.    Both Brandon and Ruis suffered from hyper-religiosity. They both spoke obsessively about God. Brandon believed he was Jesus. Ruis believed he was chosen by God and that all of his actions were direct orders from God.

80.    Ruis believed Brandon was the devil because Brandon's pupils were dark in color and Ruis had seen the same in his wife's eyes. This meant that the devil was inside Brandon and the devil was inside Ruis' wife.

81.    Ruis referred to himself as God's soldier on earth, a God on earth and a pure being. Ruis sat next to Brandon and placed his hand on Brandon's thigh.

82.    Brandon immediately jumped down from the bed to get away from Ruis.

83.    Ruis believed that this was a sign that Brandon had the devil inside of him.

84.    Ruis told Brandon that he was going to kill him.

- 12 -

85.     Brandon went to the door of the cell and began pressing the call button to try to summon help, pressed the emergency intercom, multiple times saying, "They are going to kill me".

86.     At one point, Ruis pressed the emergency button himself.

87.     Defendants, Does 22-26,  who were in the control tower ignored the multiple calls for help or placed Brandon's intercom on "bypass." Upon information and belief, Defendants muted cell 9's intercom for at least 15 minutes, silencing Brandon and ignoring his call for help.

88.     No deputy came to the cell to respond to the call for help for nearly an hour.

89.     Brandon and Ruis's exchange became loud enough for other inmates in Module 4C to hear shouting and banging.

90.     Other inmates in the module notified the control tower by pressing the panic button.  It was ignored.

91.     During this time, Ruis began punching Brandon so that he could kill Brandon and remove the devil.

92.     Ruis kicked Brandon, and punched him in the face with his left hand.

93.     Ruis told Brandon to hit him back.  Brandon attempted to swing at Ruis but Ruis ducked.

94.     Ruis got on Brandon's back and used his right arm around Brandon's neck in a chokehold.  He then placed his left arm on top of Brandon's head.

95.     As Brandon struggled to breath, Ruis took his left hand, put his fingers into Brandon's mouth, and pulled up on his mouth to expose Brandon's neck.

96.     Ruis squeezed Brandon's neck until it rendered him unconscious.

97.     Ruis had been a competitive wrestler who had competed in state championships and achieved a significant winning record.

- 13 -

98.    At one point when Brandon was unconscious, Ruis had a conversation with God in which God was telling him, "You can take your time. You can do whatever you want."

99.    At one point, God told Ruis he could eat Brandon's face if that is what he wanted to do.

100.    Ruis then saw Brandon was still alive.  Ruis poured liquid soap into Brandon's nose and mouth.  Ruis took a green jail blanket and smothered Brandon with it to make him stop breathing.

101.    During this time, Ruis could see Brandon's chest rise and fall and knew that he was still breathing.

102.    Ruis continued to block Brandon's nose and mouth.  Eventually, Bradon stopped moving.

103.    After Brandon stopped moving, Ruis took Brandon's clothes off.

104.    When Brandon was completely naked, Ruis put a bar of soap in Brandon's anus.

105.    Ruis had a conversation with God and he tried to replicate Jesus on the cross and the pain that Jesus had gone through by staging Brandon's body.

106.    Ruis tore up Brandon's shirt and tied his hands behind his back and crossed his legs.

107.    Ruis tied a strip of cloth around Brandon's neck.

108.    He was in the process of tying Brandon's neck to the metal stool inside the cell when the deputies finally arrived for their hourly cell check.

109.    Brandon's cause of death was asphyxiation consistent with manual and ligature strangulation and smothering.

110.    The hyoid bone in Brandon's neck was broken.  There was hemorrhaging into the muscles of the anterior and posterior neck.

111.    Additional autopsy findings included abrasions and contusions of the head, neck, torso, and extremities.

112.   Ruis told the investigators that this was "one hundred percent" premediated and he staged Brandon's body to prove that his death was not a suicide.

113.   Ruis timed his torture because he knew that the deputies only did rounds once every hour at 60 minute intervals.

114.   There were multiple torn ligatures around the cell.  They found the liquid soap used to smother Brandon on the second bunk of the cell and on the blanket.

115.   Ruis told the investigators that he had seen the devil and the antichrist a thousand times.  Ruis stated that he spoke with Travis Barker telepathically.

116.   Ruis told the investigators that Kim Kardashian illuminati were taking his blood and that the CIA was coming through the vents.

117.   When deputies finally found Brandon, at around 1:30 p.m., he was already dead.

## V.  INDIVIDUAL DEFENDANTS' VIOLATION OF POLICY, TRAINING AND THE CONSTITUTION

118.   Defendants were aware that Alvin Ruis was a dangerous inmate with violent propensities.

119.   Ruis was arrested and booked on a litany of violent crimes, including PC § 243(e)(1), Battery of a Current or Former Significant Other, and three counts of PC § 273a(b) Cruelty to a Child by Endangering Heath.

120.   The purpose of the Inmate Classification System is to screen, assess, and house inmates in a manner that will protect the safety of the community, staff, and other inmates. It also assists detention managers and staff in making sound decisions regarding inmate population management. Proper inmate classification promotes impartial and consistent classification evaluations and keeps inmates safe.

121. An individual's housing assignment is critical to safety and care because it indicates to detention staff whether that individual has special needs or characteristics that warrant precaution.

122. Inmate classification consists of several components including a custody assessment inmate interview by Jail Population Management Staff ("JPMU") staff, and the periodic reclassification of inmates upon changes in their custody status.

123. Per the San Diego County Sheriff's Department Detention Services Bureau–Manual of Policies and Procedures Number R.3 ("Sheriff's Manual"), inmates are classified at one of six levels of security, determined by the parameters of the Classification Navigator within JIMS:

- **6–HIGH MAXIMUM**: This incarcerated person must have a combination of current assaultive charges, a prior assaultive history or to be an institutional behavior problem. In addition, they may have a high-profile case or extreme act of violence which jeopardizes public safety or provides an incarcerated person with status that would allow them to have power or authority over other incarcerated persons. Level 6 incarcerated persons will be housed individually; any exception must be approved by the JMPU in command.

- **5–MAXIMUM**: This incarcerated person must have a combination of two of the following: current assaultive charges, prior assaultive history, are deemed an institutional behavior or problem, or an escape risk. Incarcerated persons classified as assaultive or escape risks (Greenbander) will be classified as a minimum level 5.

- **4–HIGH**: This incarcerated person must have one of the following: current assaultive charges, a prior assaultive history, or are deemed an institutional behavioral problem.

- **3–MEDIUM**: This incarcerated person has no current or significant assaultive history. The incarcerated person also has no escape history or known disciplinary problems, but is somewhat more criminally sophisticated than a Level 2 incarcerated person. This incarcerated person can be on active parole, active Post-Release Community Supervision, sentenced to local prison, or out to court for further proceedings from federal or state prison.

- **2–LOW**: The incarcerated person has no current or significant prior assaultive history. This incarcerated person also has no escape history or known disciplinary problems. Incarcerated persons sentenced to local prison time "IJC" or "ICS" will be classified as a minimum of a level 2.
- **1–MINIMUM**: An incarcerated person classified at this level poses the lowest risk to staff and other incarcerated persons. This incarcerated person is non-assaultive with no known disciplinary problems, lacks criminal sophistication, and is sentenced.

124. Inmates with custody levels 1,2 or 3 can be housed together. Levels 4 and 5 can be housed together. Level 6 inmates will be housed in Administrative Segregation.

125. Ruis had multiple assaultive charges: one (PC § 243(e)(1), Battery of a Current or Former Significant Other, and three counts of PC § 273a(b), Cruelty to a Child by Endangering Heath). He had assaulted a deputy who was walking by Ruis's cell. Ruis was at a minimum a Level 4. Because Brandon had no assaultive charges and had presented no threat to anyone at the jail, Brandon was not permitted to be housed with Ruis according to the County's own policies and procedures.

126. Exceptions to the housing assignments are inmates housed in Administrative Segregation, Protective Custody, Psychiatric Stabilization Unit (PSU), and designated medical or psychiatric housing.

127. Additionally, the Sheriff's Manual Number J.3 provides:

The following are types of incarcerated persons who may be placed into administrative separation housing:

…

2. Those who displayed a continual failure to adjust and conform to the minimum standards expected of those in mainline housing or designated special housing. The incarcerated person's behavior is either criminal in nature or disruptive to the safe operation of the facility.

- 17 -

3. Those persons have shown a propensity for violence towards other incarcerated persons and/or staff, or participatory action in conspiracy, or known premeditated thoughts or indications by a single incarcerated person, to assault or harm other incarcerated persons and/or staff.

128.  Inmates may be reclassified upon different occurrences while in custody, including, but not limited to, displaying suicidal or homicidal ideation, behaving assaultive or threatening to assault staff, becoming disruptive to day-to-day operations, and/or being deemed vulnerable. An employee who receives information that could change an inmate's classification code and/or housing assignment has the responsibility of advising a JPMU deputy. The JPMU deputy will evaluate the information to determine whether it requires the inmate to be reclassified.

129.  Upon information and belief, on multiple occasions, housing deputies, including Defendant Does 11-21 recommended Alvin Ruis be placed in EOH and/or solitary confinement due to his erratic, disruptive, and violent behavior. Defendants witnessed Ruis harassing and attacking other inmates and jail staff.

130.  Upon information and belief, Defendant Does 11-21 knew Ruis was violent and a danger to himself and others.

131.  Upon information and belief, while EOH housed Ruis, Defendant Does 37-46 and Medical Supervisory Does 47-51 observed Ruis continuing to be violent and aggressive.

132.  Upon information and belief, Does 11-21, 37-46 and Medical Supervisory Does 47-51 had a responsibility to advise JPMU deputies about Ruis's continual danger. Defendants had the responsibility to advise JPMU deputies to reclassify Ruis according to his violent propensities.

133.   Either deputies failed to advise JPMU deputies regarding these alarming incidents or the JPMU staff failed to take proper action to classify or reclassify Ruis.

134.   Had Does 11-21, 37-46 and Medical Supervisory Does 47-51 followed their policies and procedures, Ruis would have been properly classified and Brandon would have never been placed in cell 9.

135.   All defendants had a legal duty to protect Brandon Yates from foreseeable harm.  They had an affirmative duty to protect Brandon from the conduct of would-be third-party attackers including Ruis.  There exists a "special relationship" between a jailer and prisoner which imposes a duty on prison officials to protect prisoners from foreseeable harm by other prisoners.

136.   The failure of the defendants to properly classify and house Ruis and Brandon Yates led to the foreseeable harm of Ruis attacking Brandon and killing him.

## VI. *MONELL* ENTITY AND SUPERVISORY LIABILITY

### A.  The County of San Diego and Sheriff's Department Officials Knew San Diego County Suffers the Highest Rate of Inmate Deaths in California.

137.   For years, Defendants Martinez, Williams, and Supervisory Does 27-36 have been aware of the pervasive pattern of inmates dying in their institutions. Before taking on her role as Sheriff, Defendant Martinez served as Undersheriff, overseeing the day-to-day operations under Sheriff William Gore's leadership.

138.   Doe Defendants 27-36 were exposed to the litany of claims and lawsuits against Sheriff Gore and the County due to the systemic and inhumane mistreatment of inmates.

139.   Having worked for the San Diego Sheriff's Department since 1985, Defendant Martinez was aware of the multitude of problems making San Diego one of the deadliest jails in California.

140.    Defendant Martinez acknowledged this pattern of the disturbingly high number of in-custody deaths. Indeed, after being sworn in as Sheriff in 2022, Defendant Martinez met with the Attorney General of California, Rob Bonta, and assured him she was working to solve the problem. The Attorney General stated he hoped the Sheriff's Department would be able to solve the problem by having a "collaborative partnership." If not, the Attorney General warned, "A lawsuit is always possible."

141.    Defendant Martinez acknowledged the Attorney General's ability to file a lawsuit or investigate civil rights violations. (AG Says Sheriff Must Find Solution to Jail Deaths–Or Fact Consequences, Voice of San Diego, Oct. 10, 2023, Available at: https://voiceofsandiego.org/2023/10/10/ag-says-sheriff-must-find-solution-to-jail-deaths-or-face-consequences/).

142.    On February 3, 2022, the California State Auditor published a report ("State Auditor Report") detailing the San Diego County Sheriff's failure to prevent and respond to inmate deaths. In its introduction, the Acting California State Auditor, Michael Tilden, found,

> From 2006 through 2020, 185 people died in San Diego County's jails–one of the highest totals among counties in the State. The high rates of deaths in San Diego County's jails compared to the other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices. In fact, our review identified deficiencies in how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in-custody deaths.

(San Diego County Sheriff's Department: It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody, Auditor of the State of California, Feb. 3, 2022, available at: https://information.auditor.ca.gov/reports/2021-109/index.html#section2.)

143. The State Auditor Report highlights, "In the Past 15 years, More Individuals Died while in the San Diego Sheriff's Department's Custody Than in the Custody of Nearly any comparable County in the State." (sic).

144. The State Auditor Report also criticized the San Diego Sheriff's Department for "not updating equipment for monitoring the safety of incarcerated individuals." The report recommended the Sheriff's Department "prioritize implementing or resolving all recommendations intended to keep individuals in custody safe."

## B. Defendants Were of Aware of the Danger in Housing Violent Inmates with Other Inmates

145. From 2010 to 2020, eight inmates died by homicide at the hands of another inmate. (Explore Data on In-Custody Deaths, Auditor of the State of California, Last Accessed: Oct. 18, 2024, Available At: https://information.auditor.ca.gov/reports/2021-109/supplemental.html).

146. Russell Hartsaw, a mentally ill 70-year-old arrested on a probation violation was beaten to death in 2010 by other inmates. Hartsaw was classified as a "Keep Separate All" inmate due to his vulnerability amongst other inmates. Knowing his vulnerability and his classification status, George Bailey Detention Facility deputies nonetheless placed him in a room with Mario Lopez, a 6-foot-4 gang member nicknamed "Evil" who rallied four other inmates to join in an attack and brutally beat Hartsaw to death. Autopsy and court records showed Hartsaw was moved into the jail's general population despite his high-risk designation.

147. On December 3, 2016, Lyle Woodward, an African-American man, was strangled to death by his cellmate, Clinton Thinn, a violent member of the white supremacist prison gang known as the Aryan Brotherhood. According to the complaint filed by The Estate of Lyle Woodward, jail personnel received radio intercom communications from the cell block indicating that an inmate was seriously injured and needed immediate medical attention. However, personnel did

not immediately call medical personnel. Lyle died from his injuries on December 10, 2016.

148.   On August 22, 2021, Richard Lee Salyers was strangled to death by his cellmate.  Mr. Salyers had only been at the jail for four days before he was found dead in his cell by San Diego County Deputies during a late cell check. His cellmate, Steven Young, had murdered him.

149.   On December 29, 2021, on the same day a court ordered him to be released, Dominique McCoy was brutally beaten and murdered by John Roman Medina, another inmate, after deputies placed McCoy in a cell with Medina knowing he was violent and prone to assaulting others. The CLERB report generated after his death found, "Based on Medina's documented propensity towards violence, the department failed to implement reasonable measures to prevent him from doing harm to others, a shortcoming that attributed to IP McCoy's death. The lack of protection to IP McCoy cannot be attributed (to) one individual, but as a department, the SDSD failed to provide a safe environment for McCoy." The report continued, stating, "The Department was responsible for arranging a safe environment for those in its custody and to identify and facilitate proactive ways in safeguarding individuals in housing units with mixed classification/security levels. The evidence showed a systematic family of a combination of issues, which ultimately accounted for IP McCoy being placed in an unsafe environment. Inadequate housing availability led to the SDSD's inability and failure to provide McCoy with a safe environment."

150.   On March 12, 2022, Derek Baker, an inmate at the San Diego Central Jail, was beaten by his cellmate, Patrick James Ferncase. Derek later died from his injuries. The CLERB report detailing this incident found that "Baker was subsequently housed with another cellmate, but one who was a violent offender. While there was no violation of the classification policy, the SDSD failed to implement reasonable measures in housing two PC inmates, one an elderly low-

level (3) sex offender with another, a high-level (5) violent offender. The evidence supported the allegation and the act was not justified."

151.    In 2022, deputies placed Raymond Vogelman back in the housing module where he had been attacked in his sleep by multiple people just one month before.  There was a report by a dᶦeputy that Mr. Vogelman should not return to that module for his safety.  Mr. Vogelman was known to have suicidal ideations and a serious mental illness, which made him vulnerable to assault by others, yet no one reclassified him to go into protective custody even after multiple beatings. Because deputies were not monitoring the module, they never discovered who attacked Mr. Vogelman. All too predictably, back in this module, Mr. Vogelman was found laying on his bed with a blood soaked towel over his head.  For twelve minutes, deputies and a sergeant watched Mr. Vogelman, who had multiple visible injuries to his face, collapse to the floor and cough up blood.  For these twelve minutes, no one called 911.  They only called for an ambulance when Mr. Vogelman's face  started to turn grey.  Mr. Vogelman stopped breathing in the ambulance.  He died from his injuries and internal bleeding.

152.  On December 2, 2023, Eric Van Tine, who suffered from schizophrenia, was placed in a cell with two other mentally ill inmates in a triple bunk.  Triple bunking was impermissible at the Jail because it violates California state law.  The cellmate beat Eric into a coma where he remained for months.  Eric suffered a permanent brain injury and died as a result of these injuries.

153.  Defendants knew of these persistent problems from *Lucas v. County of San Diego et al.*, 20-cv-1735-CAB-JLB (S.D. Cal. 2020), which alleged that the plaintiff, a "lower-level offender[]," was placed in a cell with a mentally ill inmate—who then assaulted the plaintiff—due to a classification error by the County.

154.  Defendants' failure to properly classify and house inmates had resulted in sexual assaults of inmates by aggressive predators.  In the case of one

- 23 -

victim, two cellmates pled guilty to one count of sexual penetration by force and one count of sexual battery by restraint.

155.   Defendants' failure to properly classify and house inmates also resulted in the brutal beating of Kristina Frost in 2020.  CLERB found "The assault and injury were the result of a systemic failure on the part of (the Sheriff's Department) exemplified by insufficient policies and procedures, a lack of sensible and appropriate communication among numerous staff members and no apparent forethought by several employees as to the ramifications of placing a transgender female in a cell with three cisgender men."

### C.   Defendants Were Aware of Previous Deaths and Injuries Resulting from the Neglect and Misconduct Associated with Intercom Systems.

156.   For years, Defendants Martinez, Williams, and Supervisory Does 27-36 were aware that their correctional staff were silencing inmates, neglecting emergency intercom calls, and, in some cases, allowing emergency buttons to remain entirely nonfunctional.

157.   The Citizen's Law Enforcement Review Board ("CLERB") has reported for years that jail intercom systems are too often inoperable.

158.   On February 14, 2016, Richard Boulanger committed suicide in his cell while housed in the San Diego Central Jail. Richard's cellmate reported that upon discovering Richard's body hanging from the bunk bed he pressed the intercom button between four and ten times to call for help, but no one answered. The cellmate further stated that it took approximately 10 to 20 minutes before deputies arrived.

159.   An investigation into Richard Boulanger's death revealed concerns about the deputy's failure to make sure the intercom system was operational and not muted to provide the proper emergency medical response. At the time of Mr. Boulanger's death, the deputies on duty claimed to not receive intercom calls

although the system was functional. Prior to Mr. Boulanger's incident, another incident occurred in 2016 when the intercom was reportedly at a low volume and ineffective. After a second review of Richard Boulanger's case, CLERB made the following policy recommendations:

- It is recommended that the San Diego Sheriff's Department ensure compliance with Sheriff's Policy I.1, Emergency Alarms Systems that explicitly direct the Control Deputy to dispatch assistance when an inmate emergency alarm is activated. To address an unspecified element of this policy, it is recommended that an addendum to the existing policy be drafted that directs the Control Deputy to immediately check the inmate intercom monitor for visual alerts at the beginning of each shift and to ensure that the audio alerts on the monitor have not been disabled.
- It is further recommended that a policy be drafted that strictly prohibits detention staff from muting or otherwise disabling the audio component of the inmate intercom monitor or lowering its volume to an audible level.

160. On January 31, 2018, Frankie Greer was arrested and booked into Central Jail. During the booking and intake process, Mr. Greer explained to the intake personnel that he had a seizure disorder and that he needed to be placed on a bottom bunk. Medical staff noted the need for a lower bunk assignment in his medical file but failed to place the order in the Jail Information Management System ("JIMS"), which notified other jail staff. After intake, Mr. Greer was assigned a top bunk. While on his bunk, Mr. Greer fell from a height of approximately 6 feet, lost consciousness, and experienced a seizure. Mr. Greer's cellmates frantically called "mandown" and continuously pressed the emergency intercom, but the control tower deputies either ignored the call or had muted the sound.  Frankie Greer continued to bleed out for over half an hour while suffering several seizures because the deputies ignored the call.  By the time he was taken to the hospital, the doctors had to drill a hole in his brain to drain the blood that had

pooled in his skull. As of today, Mr. Greer still suffers from a permanent brain injury.

161. An investigation of intercoms 19 days after Frankie Greer's severe injury found that intercoms were still not functioning properly.

162. Three days after the investigation of Mr. Greer's injury, Homicide detectives investigating the death of Paul Silva conducted another death investigation at SDJC. Detectives assessed the holding cell's intercom where Mr. Silva was held at the San Diego Central Jail. When detectives pressed the button, no sound or alert was heard in the control center.

163. On May 2, 2022, a group of civil rights attorneys, including the San Diego and Imperial County ACLU affiliate, filed an emergency request in the Southern District of California requesting an injunction against the San Diego Sheriff's Department to make immediate changes to address serious lapses in care in its jails.

164. In that lawsuit, the plaintiffs alleged that the County and Sheriff's Department's intercom system practices were ineffective. (Attorneys Seek Emergency Order to Force Changes at San Diego County Jails, The San Diego Union-Tribune, May 3, 2022, Available at: https://www.sandiegouniontribune.com/2022/05/02/attorneys-seek-emergency-order-to-force-changes-at-san-diego-county-jails/). This lawsuit included these facts:

- After days of struggling to breathe and begging for help from deputies and medical staff, Robert Moniger died. Robert and his cellmates, Michael Keavney and Dylan LaCroix, all pushed their cell's emergency button multiple times, but deputies did not respond or summon medical assistance.

- Jail staff did not respond to emergency intercom calls from Derryl Dunsmore until 20-30 minutes after he called for help while choking

on food. Darryl alleged he was later threatened with discipline if he used the button again.

- On March 12, 2022, a defective intercom prevented deputies from hearing a "man down" report during a fight that led to a man being placed on life support.

**D.    Because the Emergency Intercom System was Deliberately Muted or Ignored, Staff Failed to Protect Brandon**

165.    Each San Diego Central Jail cell is equipped with an intercom device by which inmates can call deputies in case of an emergency or immediate assistance.

166.    Defendants were aware that the use of intercom systems was the only communication mechanism inmates could use during emergencies, like assaults, rapes, and medical emergencies, in housing units and their cells.

167.    The Sheriff's Department's policy on emergency alarm systems states: Each facility shall maintain an intercom system for the purpose of providing a means of communication between sworn staff and incarcerated persons. Intercom systems should be primarily used as a means of relaying and or summoning emergency assistance. *Intercoms shall not be routinely muted or silenced.* (Emphasis added).

168.    Sheriff policies require that at the beginning of every shift, sworn staff assigned to positions equipped with intercom systems (e.g. Housing Control, Central Control, etc.) check their work area's touch screen panel, control panel, etc., and ensure intercoms have not been silenced or muted. Additionally, Intercom systems must also be checked any time sworn staff take over operations in such areas (e.g., relieving a deputy arriving late to work, during mealtime, leaving early, etc.)

169.    In the event an intercom is silenced or muted, sworn staff must make an entry in the Area Activity log, utilizing the "ALARMS" drop-down in the Jail

- 27 -

Information Management System (JIMS). At a minimum, the description field must include the cell number or the incarcerated person's name and booking number. The notes must indicate the reason the intercom was silenced or muted.

170.    The control deputy shall log into the Jail Information Management System (JIMS) all alarms indicating date, time, location, and disposition. The disposition shall include information as to the cause of the alarm such as, "medical", "fight", or "accidental", etc.

171.    In the event of an emergency or incident, an incarcerated person is to depress the intercom call button which activates an alarm on the receiving end (e.g. Housing Control, Central Control, etc.). The alarm will alert sworn staff of a possible emergency or incident that necessitates their attention. Sworn staff will answer all intercom calls in an expeditious manner and follow up on the nature of the call. (Emphasis added).

172.    At the time Brandon was brutally killed, Defendants had for years engaged in a pattern of violating their own policies and procedures by routinely ignoring or muting intercom calls, or failing to fix broken intercoms, which had already resulted in the severe injuries or deaths of Frankie Greer, Richard Boulanger, Vianna Granillo, Robert Moniger, and Derryl Dunsmore.

173.    Despite the knowledge that there was a *de facto* policy of deputies ignoring the written policies on intercom calls, the County and the supervisory defendants did nothing to remedy or correct this pattern of misconduct.

174.    According to Defendant Blackburn "Sometimes [an inmate will] press [the intercom], we'll respond by asking, "What is your medical emergency?" Sometimes there will be no response from the inmate and then they will keep pressing it. So we will have to, like, put up a bypass for 15 minutes and then make a note saying the inmate keeps pressing the button for nonmedical emergencies."

175.    This *de facto* policy of deputies muting or putting a "bypass" on panic emergency calls means that victims who are not able to respond to a question posed

by the deputies as a result of an assault or in this case, choking and smothering, will go unanswered.

## VII.  FIRST CAUSE OF ACTION:

### Deliberate Indifference (42 U.S.C. § 1983)
### [By Plaintiff Estate of Brandon Yates against Defendants Blackburn, Gonzalez and Does 1-26, 37-46]

176.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

177.   Officials of the San Diego Sheriff's Department, acting under color of law, have subjected decedent Brandon Yates, and other persons similarly situated to a pattern of conduct consisting of continuing, widespread, and persistent pattern of unconstitutional misconduct.

178.   Defendants failed to properly classify Ruis under state law and the San Diego County Sheriff's Department Detention Services Bureau Manual of Policies and Procedures.

179.   Defendants ignored his lengthy history of severe mental illness and his repeated assaultive behaviors.

180.   Defendants Blackburn, Gonzalez, Does 11-21, and 37-46, had an obligation to advise the JPMU that Ruis was violent and aggressive towards inmates and staff so that Ruis could be reclassified.

181.   Upon information and belief, Does 37-46 observed Ruis while he was in EOH. Defendants knew Ruis was an aggressive inmate who threatened to hurt others and commit suicide.

182.   Defendants knew or should have known that Ruis was a danger to himself and to others.

183.   Persons who are a danger to themselves or others were not to be housed on the Fourth floor.

184.   No one admitted him to the PSU where he could be monitored and

- 29 -

treated.

185.   Either the housing deputies and supervisors failed to notify Classification or the Classification officers failed to properly house Ruis.

186.   Upon information and belief, Ruis was never reclassified after repeatedly being sent to EOH for dangerous and psychotic behavior.

187.   Defendants Blackburn, Gonzalez and Does knew of Ruis's violent propensities and his grave mental illness. Blackburn, Gonzalez, and Does 11-21 witnessed Ruis's multiple violent outbursts and sent him to EOH on multiple occasions, including in the days before Ruis murdered Brandon.

188.   Upon information and belief, while in EOH, Ruis's violent rhetoric and symptoms escalated. Medical providers, Does 37-46, witnessed Ruis express suicidal and homicidal ideas and attempt to take his life.

189.   At some point, Jail staff placed Ruis on "bypass" because they knew he had a violent predisposition and would often provoke other inmates.

190.   Ruis was not allowed to have dayroom time with other inmates.

191.   Because Ruis had been placed on "bypass," Defendants knew Ruis was a violent inmate who could not be around any other inmate.

192.   Defendants did not take reasonable available measures to abate or reduce the risk that Ruis posed to other inmates, specifically Brandon, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved.

193.   Defendant Does 1-10, 11-21  failed to classify Ruis as a violent inmate who should not be housed in a cell with other inmates.

194.   Medical staff, Does 37-46, allowed Ruis to go back to his cell with the general population knowing Ruis was suffering from a serious mental health issue making it unsafe for him to be with another person.

195.   In housing Brandon in a cell with Ruis, Defendants placed Brandon at substantial risk of suffering serious harm.

196. Blackburn was explicitly told by Brandon's first cellmate that Brandon was vulnerable to attack. Brandon was taken out of that cell specifically because the cellmate threatened to harm him.

197. Blackburn knew that Brandon was mentally ill because he had seen Brandon was "nonsensical" and "babbling." Blackburn knew that Brandon was talking incessantly and rambling. Blackburn knew that Brandon was making no sense when speaking.

198. Blackburn, Gonzalez and other deputies knew that Ruis was mentally ill. They knew that Ruis babbled incessantly about God in a nonsensical manner.

199. Deputies were aware that Ruis was staying up all night, constantly yelling out the cell door erratic and nonsensical statements.

200. Deputies were aware that Ruis had been sent to EOH on the Sixth Floor multiple times.

201. Defendant Blackburn was deliberately indifferent and/or recklessly disregarded Brandon's safety needs when he placed him in cell 9 with Ruis, an inmate known to have violent tendencies and suicidal and homicidal ideations, in violation of Brandon's Fourteenth Amendment rights as a pretrial detainee.

202. Upon information and belief, either defendant deputies failed to communicate to others Ruis' bypass status or Blackburn knowingly ignored the information.

203. When Blackburn opened Ruis' cell door to place Brandon inside, Ruis told Blackburn that it was a "sign from God."

204. By failing to place safeguards to prevent placing incarcerated persons in Ruis's cell, Defendants knowingly and recklessly disregarded the severe risk Ruis posed to Brandon Yates.

205. Upon information and belief, Defendants Blackburn, Gonzalez, Does 11-21, and 22-26 ignored the screams for help and multiple attempts to get help by sworn staff .

- 31 -

206. Defendants, including Does 22-26, ignored the calls for help by muting the sound or bypassing the calls.

207. Deputies including Blackburn, Gonzalez, Does 11-21, who entered the module could hear Brandon screaming for help and ignored it.

208. Blackburn, Gonzalez and Doe defendants who had conducted cell checks in the module had failed to comply with Title 15 which requires that the checks be conducted at random.

209. Defendants conducted the cell checks every 60 minutes, which all inmates were aware of. Ruis timed his attack on Brandon, "taking his time" in torturing and killing Brandon.

210. During this time in which Ruis was left unmonitored, Ruis beat Brandon and did a "UFC chokehold" on Brandon.

211. Ruis tortured and killed Brandon.

212. Defendants acted with deliberate or reckless disregard of decedent's constitutionally protected rights.

213. The conduct alleged herein caused Brandon to be deprived of his civil rights that are protected under the United States Constitution which has also legally, proximately, foreseeably, and actually caused Brandon's suffering and death.

## VIII.  SECOND CAUSE OF ACTION:

**Failure to Properly Train, Supervise, and Discipline (42 U.S.C. § 1983) [Against Martinez, Williams, Supervisory Doe Defendants 27-36, and Medical Supervisory Does 47-51]**

214. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by reference.

215. Officials of the San Diego Sheriff's Department, acting under color of law, have subjected decedent Brandon and other persons similarly situated to continuing, widespread, and persistent patterns of constitutional misconduct.

216. These defendants were personally aware of the repeated Constitutional violations committed by their subordinates from the reports by NCCHC, CLERB, the California state auditor, community members, the Grand Jury, their own chain of command, and the lawsuits filed by the loved ones of people who died needlessly in the County Jails.

217. Individual defendants, including Doe deputies and medical care providers acted under the direction and supervision of Martinez, Williams and Supervisory Doe Defendants 27-36 and 47-51 who set forth the standards, policies and procedures on the treatment of people in San Diego County Jail custody.

218. Defendants Martinez, Williams, and Supervisory Does 27-36 were made aware of the failure to properly classify or house inmates through the deaths of Hartsaw, Woodward, McCoy, Baker, Van Tine, and Vogelman, and other beatings and assaults resulting from their improper classification or housing people in custody.

219. These Supervisory Defendants knew that Jail officials were failing to place patients and inmates in proper housing units where they could be monitored for their serious medical and mental health needs and that they were failing to conduct proper cell checks or responding to emergencies. Despite this knowledge, they continued to fail to train, supervise or discipline their staff.

220. As a result of Defendants' failures, Brandon was placed in a cell unmonitored with a "bypass inmate" for an hour. Brandon's assault and death were foreseeable consequences of Defendants' failures.

221. Defendant Martinez, Defendant Williams, and Medical Supervisory Does 47-51 also knew that their medical and mental health staff had been failing to properly classify and treat EOH inmates.

222. Defendants knew their medical and mental health staff had been improperly releasing EOH inmates into mainline, disregarding the dangerous risk they posed to themselves, other inmates, and deputies.

223.    They were made aware that their subordinates were failing to admit seriously mentally ill patients into the PSU from multiple prior deaths including that of Ruben Nunez.

224.    The supervisory defendants were aware that their subordinates had failed to admit Ruis into the PSU or to manage his serious and dangerous mental illness.

225.    These defendants took no action to remedy the misconduct.

226.    Defendants Martinez, Williams, and Supervisory Does 27-36 knew that the intercom system was the only communication mechanism during emergencies in housing units. They knew that no video cameras were looking into the cells. They knew that assaults, rapes, and medical emergencies occur in the housing cells and that the only way someone could call for help was through the intercom system.

227.    They knew it was common practice to either turn down or turn off the sound so inmate calls could not be heard in the control tower. It was common practice for deputies to ignore the calls when inmates did not respond to the question "What is your medical emergency?"

228.    Defendant Blackburn testified that they put up a bypass for 15 minutes if an inmate keeps pressing the button.

229.    This was the *de facto* policy of the San Diego jails. When a victim is unable to speak or timely respond to the inquiry because they are experiencing an emergency, they are silenced.

230.    Defendants Martinez, Williams, and Supervisory Does 27-36 failed to train their deputies on proper use of intercom systems, despite knowing this failure was causing serious injuries and deaths.

231.    There has been an *de facto* policy of acquiescence in the wrongful conduct of jail staff. Defendants failed to take corrective action or promulgate corrective policies and regulations in the face of repeated Constitutional violations.

232.    Defendants Martinez,  Williams, and Supervisory Does  27-36  knew that their deputies were consistently failing to conduct proper cell checks.  They were well aware that the checks were not conducted timely or randomly.

233.    They were aware of multiple instances in which deputies walked away from people in medical distress and left them to die.

234.    Ruis was able to time his assault and torture Brandon for nearly an hour because he knew that the cell checks were conducted at 60 minute intervals.

235.    The failure of all supervisory defendants to promulgate or maintain constitutionally adequate training was done with deliberate indifference to the rights of Brandon Yates and others in his position.

236.    As a direct result of the Defendants' failures, Brandon was tortured and killed.

## IX.  THIRD CAUSE OF ACTION

### *Monell* **(42 U.S.C. § 1983)**

### **[Against Defendant County of San Diego]**

237.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by reference.

238.    A municipality may be liable under § 1983 when the execution of a policy or custom inflicts plaintiff's injury. *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). The policy may be one of "inaction" that amounts to the "functional equivalent of a decision by the city itself to violate the Constitution." *City of Canton, Ohio v. Harris* ("Canton"), 489 U.S. 378, 394-95 (1989).

239.    The County is liable under § 1983 for its customs of inaction and its failure to promulgate adequate policies and training in the classification, reclassification and housing of inmates; failure to treat and monitor inmates; failure to treat patients with mental health conditions; and failure to timely respond to emergencies.

- 35 -

240.   The County is liable for its failure to train its classification officers, deputies, medical staff and contractors.   Classifying, housing and providing medical care to patients inside the jail are event that occur on a daily basis.   The failure to train and supervise County employees and contractors showed deliberate indifference to the consequences on the incarcerated people, including Brandon Yates.

241.   In February 2022, the Auditor of California highlighted deficiencies with how the Sheriff 's Department provides care for and protects incarcerated individuals. These deficiencies included its provision of medical and mental health care.

242.   The audit found that deficiencies in the Sheriff 's Department's policies and practices related to intake screenings, medical and mental health care, safety checks, and responses to emergencies likely contributed to jail deaths. The high rate of deaths in San Diego County jails compared to other counties' jails suggests that these systemic deficiencies have undermined the Sheriff's Department's ability to ensure the health and safety of the individuals in its custody. The auditor was concerned about whether the Sheriff 's Department would make meaningful changes to address these systemic problems.

### A.   Deficiencies in Identifying People's Medical and Mental Health Needs.

243.   The audit found that significant deficiencies in the Sheriff 's Department's provision of care to incarcerated individuals likely contributed to the deaths in its jails. For example, studies on health care at correctional facilities have demonstrated that identifying individuals' medical and mental health needs at intake—the initial screening process— is critical to ensuring their safety in custody.

244.   The auditor wrote: "Nonetheless, our review of 30 individuals' deaths from 2006 through 2020 found that some of these individuals had serious medical

- 36 -

or mental health needs that the Sheriff's Department's health staff did not identify during the intake process. Moreover, in one case we reviewed, an incident between two cellmates resulted in one's death. In this instance, the intake nurse did not identify that the perpetrator had a history of mental health issues. Had the perpetrator's mental health issues been identified properly at intake, the department's staff might have placed this individual in a different cell, leading to a different outcome."

245.   According to the auditor, the San Diego Sheriff's Department relied on registered nurses to perform the mental health portion of its intake screening, even though these nurses may not specialize in mental health care and may miss key signs of mental health needs. In contrast, the Riverside County Sheriff's Department's policy requires that a mental health clinician evaluate every individual at intake.

246.   According to San Diego policy, if the registered nurse identifies an individual as having mental health needs at intake, the nurse refers the individual for further evaluation by a qualified mental health professional. However, even if the nurse identifies a need for a further mental health assessment, the Sheriff's Department's policy may not require the individual to receive that assessment sooner than 30 days after intake, depending on the severity of an individual's symptoms.

247.   The February 2022 audit found that the Sheriff Department's staff did not always provide consistent follow-up care to individuals who requested or previously received medical or mental health services. The audit highlighted that poor policies and communication were reasons why the Sheriff's Department did not always follow up consistently. The audit stated the Sheriff's Department needed to address these deficiencies in its medical and mental health care system.

248.   The audit was critical of the Sheriff's Department failure to implement recommendations from the San Diego County Grand Jury related to the way it

communicates incarcerated individuals' mental health needs to its staff.

249.   Because the Sheriff's Department did not always properly identify the medical and mental health needs of individuals in the auditor's review at intake, some of them did not receive the care they required.

250.   One case example from the auditor's review of files from the Sheriff's Department included an intake nurse who did not identify an individual's mental health needs and did not have access to the individual's mental health history. Once incarcerated, that individual killed their cellmate. After the cellmate's death, the Sheriff's Department discovered the perpetrator's history of mental illness. The auditor concluded that had staff known about this history, they likely would have placed the perpetrator in a different cell, where they could better meet the individual's mental health needs and better ensure others' safety.

251.   When the National Commission reviewed the Sheriff's Department's jails in 2017, it found that they did not meet many of its standards, particularly those related to mental health.

**B.    *De Facto* Policy of Failing to Properly Classify and House Violent Inmates**

252.   The County has repeatedly failed to properly classify individuals which resulted violent beatings, rapes and murders.

253.   The County of San Diego failed to train staff on policies for proper classification of violent inmates.

254.   The County of San Diego failed to discipline staff when they misclassified inmates, thereby creating a *de facto* policy that allowed violent inmates to be housed with other inmates, despite a series of instances in which  misclassified inmates severely injured or killed other inmates.

255.   The County's failure to train and supervise its deputies and medical staff on improperly classifying and housing inmates who are a danger to themselves or others gives inference of a municipal custom that authorized or condoned deputy

misconduct.

256.   There was a custom and practice of failing to properly screen inmates who presented as a danger to themselves or others.

257.   Defendant County, by and through Martinez and Williams, had ample notice of the following: that San Diego County Jail had the highest mortality rate among California's largest jail systems; that there had been countless complaints made by inmates, family members, community members, and the SDJC's own staff regarding injuries caused by staff misconduct.

258.   The County was well aware of the danger of housing violent inmates with other people. The deaths of Hartsaw, Woodward, Vogelman, McCoy, Baker, and others should have been a wake-up call to the County.

259.   Bradon Yates's death was also a result of the County's continuing failure to train employees to properly classify their inmates and respond to emergency intercom calls.

260.   Defendant County of San Diego ratified and condoned the wrongful acts of Defendants Blackburn, Gonzalez, and Does 1-51 by failing to discipline them for unconstitutional conduct that caused Brandon's death. Defendant County failed to provide these Defendants additional training, remedial training, and closer supervision and monitoring. The County failed to take any steps to ensure that these Defendants would not continue to violate the rights of seriously ill or seriously disabled inmates.

261.   Defendant County is also liable based on Martinez's failure to enact new and different policies despite her knowledge of woefully inadequate policies and procedures in place while Brandon was incarcerated.

C.   *De Facto* **Policy of Ignoring Emergency Intercom Calls**

262.   Upon information and belief, the permanent, widespread well-settled practice or custom of Defendant was to ignore emergency intercom calls from inmates.

- 39 -

263.    For years, the County was aware inmates were suffering serious injuries, even death because of its employees' neglect and apathy. Defendant knew their correctional staff were silencing or letting emergency intercoms go unanswered.

264.    As of 2019, the County was well aware from Frankie Greer's case that deputies had ignored frantic calls by multiple inmates for "man down" while Mr. Greer was bleeding out. No one was disciplined for this misconduct despite the fact that Mr. Greer nearly died and suffered a permanent brain injury as a result of the delay in receiving medical attention.

265.    There is no question the County was aware of Mr. Greer's near-death incident because Sheriff Martinez referred to the case in her most recent interview with Voice of San Diego.

266.    There were multiple other instances in which deputies ignored the emergency intercom calls.

267.    When Defendants became aware that deputies had ignored emergency intercom calls, Defendants did not take corrective action.  Defendants did not retrain them. They did not discipline them.  They did not update Department policies.

268.    It was a matter of accepted policy that deputies muted the call for a "bypass" when the caller was not capable of communicating the reason for the call.  People who are experiencing medical emergencies or grave physical injuries who are unable to speak will be placed on bypass so that deputies can ignore them.

269.    Defendant County is liable based on their ratification and approval of the constitutional, statutory, and other law violations as alleged in this Complaint.

270.    Defendant County's policies, customs, or practices, actions and inactions by final policymakers, ratification of constitutional and law violations, and failure to train its employees caused Brandon's deprivation of rights by the individual defendants. That is, their policies, customs or practices, actions and

inactions by final policymakers, ratification of constitutional and law violations, and failure to train its employees were so closely related to Brandon's deprivation of rights that they were a moving force causing Brandon's assault and death.

### D. *De Facto* Policy of Improper Cell Checks

271.   Upon information and belief, the permanent, widespread well-settled practice or custom of Defendant was to permit deputies to violate Title 15 and the County's own written policies on conducting cell checks.

272.   For years, Defendants were aware inmates were suffering serious injuries, even death because of their employees' failures to conduct safety checks at random intervals for the safety of incarcerated people and deputies themselves. Defendants knew their correctional staff were consistently conducting cell checks on the hour or over one hour but failed to take any action.

273.   As a result, Brandon Yates' assailant knew that he could time the assault and murder during the one hour period between cell checks.

### E. Ratification

274.   Defendants have a widespread history of ratifying employee misconduct by failing to conduct appropriate investigations.

275.    There has been an official policy of acquiescence in the wrongful conduct. Defendants failed to promulgate corrective policies and regulations in the face of repeated Constitutional violations.

276.   Defendants refused to investigate misconduct and/or took no remedial steps or action against the staff involved in this case.

## X.  FOURTH CAUSE OF ACTION

**Right of Association (42 U.S.C. § 1983)**
**[By Dan Yates and Andrea Carrier Against Defendants Blackburn, Gonzalez, Does 1-26 and 37-46]**

277.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by reference.

278.   Defendants deprived Brandon Yates of his rights under the United States to be free from deliberate indifference to his Constitutional rights.

279.   The misconduct of the defendants caused the untimely and wrongful death of Brandon and deprived Dan Yates and Andrea Carrier ("Dan" and "Andrea") in their liberty interests in the family relationship in violation of her substantive due process rights as defined by the First and Fourteenth Amendments to the Constitution.

280.   A substantive due process claim of impermissible interference with familial association arises when a state official harms a parent or child in a manner that shocks the conscience. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). "[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation. Id. (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

281.   "There are two tests used to decide whether officers' conduct 'shocks the conscience.'" *Id*. at 1056. A state official's conduct may shock the conscience if (1) the official acted with a "purpose to harm" the victim for reasons unrelated to the legitimate law enforcement objectives; or (2) the official acted with "deliberate indifference" to the victim. *Id*. at 1137.

282.   Which test applies turns on the specific circumstances of the underlying events in each case. If the encounter at issue escalated so quickly that the officer had to make a snap judgment, the plaintiff must show the officer acted with a "purpose to harm." *Id*. However, if the situation evolved within a timeframe that allowed officers to reflect before acting, the plaintiff must show the officer acted with "deliberate indifference." *Id*.

283.   Defendants had time to deliberate in deciding to house Ruis in a general population housing unit without monitoring him for his dangerous and unpredictable behavior.  Defendants had time to deliberate in deciding not to place him in the PSU.  Defendants had time to deliberate in deciding to release Ruis from EOH when there were clear signs that he presented a danger to others.

284.   Defendants had ample time to deliberate when placing Brandon in a cell with a bypass inmate and failing to respond to the emergency calls. Allegations that they acted with deliberate indifference satisfy the "shock the conscience" standard under the Fourteenth Amendment because they are one and the same.

285.   There was no legitimate penological interest in placing Brandon in Ruis's cell knowing Ruis posed a danger to himself and other inmates.

286.   There was no legitimate penological interest in failing to respond to intercom requests for immediate help.

287.   The deprivation of the rights alleged above has destroyed the Constitutional rights of Dan and Andrea to the society and companionship of their son, which is protected by the substantive due process clause of the Fourteenth Amendment.

288.   The conduct alleged herein violated Brandon's rights alleged above, thereby resulting in the deprivation of Dan and Andrea's rights as his parents.

## XI.   FIFTH CAUSE OF ACTION

### Violation of Cal. Civil Code § 52.1 (Bane Act)
### [By Plaintiff the Estate of Brandon Yates Against All Defendants]

289.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by reference.

290.   Plaintiffs bring the claims in this cause of action as survival claims permissible under California law, including Cal. Code of Civil Procedure § 377.20, *et seq.*

291.   By their acts, omissions, customs, and policies, Defendants, as each Defendant acting in concert/conspiracy, as described above, while Brandon was in custody, and by threat, intimidation, and/or coercion, interfered with, attempted to interfere with, and violated Brandon's rights under California Code, § 52.1, under the United State Constitution and California Constitution, and California Civil Code § 43 as follows:

a.    The right to be free from objectively unreasonable deliberate indifference to Brandon's safety while in custody as a pre-trial detainee, as secured by the Fourteenth Amendment to the United States Constitution and by the California Constitution, Article 1 §§ 7 and 13;

b.    The right to enjoy and defend life and liberty; acquire possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1;

c.    The right to protection from bodily restraint, harm, or personal insult, as secured by California Civil Code, § 43; and

d.    The right to emergency medical care as required by California Government Code §845.6.

292.    Defendants violated Brandon's rights by instituting and maintaining the unconstitutional customs, policies, and practices described herein, when it was obvious that in doing so, individuals such as Brandon would be subjected to threat, intimidation, coercion, and ongoing violations of rights as Decedent was here.

293.    Defendants violated Brandon's rights by recklessly failing to train, supervise and discipline their subordinates who placed Brandon in a cell with a violent offender and failing to respond to his screams for help.  They recklessly failed to train, supervise and discipline their subordinates who failed to properly classify and house Ruis who had a long history of violent conduct then failed to monitor him.

294.    Defendants' violations of Brandon's due process rights with deliberate indifference, in and of themselves, constitute violations of the Bane Act.

295.    Each Defendant violated Brandon's rights with specific intent, meaning that they acted with recklessness.

296.    All of Defendants' violations of duties and rights, and coercive

conduct, described herein were volitional acts; none was accidental or merely negligent.

297.    The threat, intimidation, and coercion described herein were not necessary or inherent to Defendants' violation of Brandon's rights, or to any legitimate and lawful jail or law enforcement activity.

298.    Activities inside a jail are inherently coercive because the detainee may not leave the jail premises for protection or better treatment. In addition to the inherently coercive nature of incarceration, Brandon was placed in a locked cell with his murderer with nowhere to go.

299.    Defendants recklessly disregarded Brandon's Fourteenth Amendment rights to be free from deliberate indifference to his safety.

300.    Defendant County of San Diego is vicariously liable for the violation of rights by their employees and agents under the theory of *respondeat superior*.

301.    Defendant County of San Diego is liable pursuant to California Government Code, California Government Code, § 815.2.

## XII.  SIXTH CAUSE OF ACTION

### Negligence – Survival Claim (CCP § 377.30)
### [By Plaintiff The Estate of Brandon Yates Against All Defendants]

302.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by reference.

303.    Defendants had duties of care arising from the special relationship between a jailer and prisoner.

304.    Defendants had a duty to act pursuant to Title 15 and Title 24.

305.    Defendants had a duty to act reasonably.

306.    Defendants had a duty under the Minimum Standards for Local Detention Facilities under Title 24, Chapter 13, Article I, Section 13-102(c) which requires facilities to be "designed and/or equipped in such a manner that staff and inmates have the ability to summon ***immediate assistance in the event of an***

*incident or emergency*." (Emphasis added).

307.    Supervisory defendants failed to take action to ensure that the emergency button functioned in such a way that staff could not ignore the calls for immediate assistance.

308.    Supervisory defendants improperly, negligently, wrongfully and recklessly failed to set forth policies regarding proper screening, evaluation, treatment, and housing of inmates suffering from severe mental health issues.

309.    Supervisory defendants improperly, negligently, wrongfully and recklessly failed to take any action when they knew that their subordinates' failures to separate violent offenders from others would have catastrophic consequences.

310.    Defendants improperly, negligently, wrongfully and recklessly allowed Does 11-21 and Does 37-46 to release Ruis back into the general population knowing he was a danger to himself and others.

311.    Sworn staff had a duty to act with ordinary care in carrying out their duties as correctional officers, including reasonable care in jailing individuals, housing them, monitoring them, and protecting them from harm.

312.    By their acts, omissions, customs, and policies, Defendants breached the foregoing duties when they failed to prevent Ruis from assaulting Brandon.

313.    As alleged above, Defendants Blackburn, Gonzalez, and Does 11-26 breached their duties pursuant to California Government Code § 845.6 when they failed to render timely emergency care.

314.    In evaluating, assessing, and handling Ruis, knowing of his fragile and volatile mental condition, including homicidal and suicidal tendencies, knowing he was placed in EOH and in solitary confinement on numerous occasions, knowing he struggled to maintain any sort of relationship with inmates around him due to his violent demeanor, and knowing he was a high risk to any inmate assigned to be his cellmate, Does 1-10 and 37-46 failed to classify and house Ruis and Brandon Yates properly.  They failed to protect Brandon from harm that was predictable

when housing a vulnerable person with a cellmate with known history of violence.

315. Does 1-10 and 37-46 acted with extreme recklessness in failing to classify Ruis as a high level security risk inmate and placing him in the PSU where he could be separated and monitored for his volatility and violence.

316. Does acted negligently in failing to place Brandon in protective custody after his cellmate had told Blackburn that he would hurt Brandon. Defendants were well aware that Brandon was vulnerable to attack as a result of his mental illness.

317. Defendants improperly, negligently, and wrongfully, and recklessly assigned Brandon to Ruis's cell.

318. Defendants improperly, negligently and wrongfully, and recklessly failed to take any action to ensure Ruis would not harm Brandon.

319. Defendants improperly, negligently and wrongfully, and recklessly failed to respond to the emergency intercom message that Brandon transmitted, stating "They are going to kill me."

320. Defendants improperly, negligently and wrongfully, and recklessly failed to respond to the emergency intercom message that other Module 4C inmates sent at or around the time Ruis was murdering Brandon.

321. By engaging in the acts alleged herein, Defendants failed to act with ordinary care and breached their duty of care owed to Brandon.

322. As a direct and proximate result of the Defendant's negligent conduct as herein, Brandon died.

323. As set forth in the preceding paragraphs, Defendants committed wrongful acts, breaching their duties and causing harm to Plaintiff. Plaintiff thus seeks compensatory damages according to proof and punitive damages against individual defendants.

324. Moreover, because Defendants were acting in the course and scope of their employment as Sheriff's employees when the foregoing conduct occurred, the

County is vicariously liable for the injuries Plaintiff suffered as a result of the deputies' tortious conduct under California Government Code § 815.2.

## XIII.  SEVENTH CAUSE OF ACTION

### Wrongful Death (CCP § 377.60 et seq)
### [By Andrea Carrier and Dan Yates Against All Defendants]

325.  Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by reference.

326.  Plaintiffs allege all California state law claims as the basis for state law wrongful death cause of action and incorporate other later torts by reference.

327.  Defendants committed wrongful acts which proximately caused the death of Bradon Yates.

328.  As alleged above, Defendants Martinez, Williams, Blackburn, Gonzalez, and Does 1-51 owed Brandon a duty of care as applicable to any other inmate under the jailer-warden duty of care. Under this duty of care, a person who has custody of another owes a duty of reasonable care to protect the other from foreseeable harm. A custodian may thus be held liable for failure to make reasonable efforts to protect a ward from a third person's attack or molestation. *Giraldo v. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231, 247 (2008).

329.  The supervisory defendants, including Martinez, Williams, and Does 37-46 and 57-61 had a duty to supervise their subordinates on their duties, and their actions and inactions proximately caused Brandon's death.

330.  Defendant County of San Diego is responsible for the acts of the aforementioned individual and Doe defendants under the theory of *respondeat superior*.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiffs pray as follows:

For general and special damages according to proof at the time of trial;

For attorneys' fees and costs of suit and interest incurred herein;

For damages for pre-death pain and suffering pursuant to California Code of Civil Procedure Section 377.34 and 42 U.S.C. 1983;

For punitive damages against individual defendants; and

Any other relief this court deems just and proper.

### DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment of the Constitution, Plaintiffs hereby demand a jury trial of this action.

February 24, 2025                         Respectfully Submitted,

**IREDALE AND YOO, APC**
*s/ Julia Yoo*

EUGENE IREDALE
JULIA YOO
CHELSEA REHERMAN
Attorneys for Plaintiffs

- 49 -