1  EUGENE G. IREDALE: SBN 75292
2  JULIA YOO: SBN 231163
   CHELSEA REHERMAN: SBN 343446
3  IREDALE & YOO, APC
   105 West F Street, Fourth Floor
4  San Diego, CA 92101-6036
5  TEL: (619) 233-1525
   FAX: (619) 233-3221
6

7  **Attorneys for Plaintiffs**

8              **UNITED STATES DISTRICT COURT**
             **SOUTHERN DISTRICT OF CALIFORNIA**
9

10  THE ESTATE OF BRANDON            CASE NO.: 25-cv-0410-W-MMP
    YATES by and through its successor-
11  in-interest Dan Yates and Andrea     **PLAINTIFFS' OPPOSITION TO**
    Carrier; DAN YATES and ANDREA    **DEFENDANTS' MOTION TO**
12  CARRIER,                          **DISMISS**
13
                                      Hon. Thomas J. Whelan
14              Plaintiffs,
15                                    Hearing Date: June 9, 2023
    v.
16
                                      **NO ORAL ARGUMENT UNLESS**
17  COUNTY OF SAN DIEGO, KELLY        **REQUESTED BY THE COURT**
    MARTINEZ, in her individual
18  capacity, RICH WILLIAMS, in his
    individual capacity, MATTHEW
19  BLACKBURN, in his individual
    capacity, TONY GANZALEZ in his
20  individual capacity and DOES 1-51,
21
                Defendants.
22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ...........................................................................................1

II.   FACUTAL ALLEGATIONS ........................................................................2

    A.   The Murder of Brandon Yates ...........................................................2

    B.   The County's Classification System ...................................................5

III.  LEGAL STANDARD.....................................................................................6

IV.   ARGUMENT .................................................................................................7

    A.   Plaintiffs Have Properly Pled A Claim For Deliberate Indifference ..............7

    B.   Deputies Are Not Entitled to Qualified Immunity ........................................11

    C.   Plaintiffs Have Sufficiently Alleged A Claim for Failure to Properly Train, Supervise and/or Discipline.....................................................................13

    D.   Plaintiffs Have Properly Pled A Monell Claim Against the County............15

    E.   Plaintiffs' Have Sufficiently Alleged A Right of Association Claim ..........19

    F.   Plaintiffs' Allegations as to the Bane Act Are Sufficiently Alleged............20

    G.   Defendants Are Not Immune From Liability As to Plaintiffs' Negligence and Wrongful Death Claims.....................................................................22

V.    CONCLUSION............................................................................................22

i

# TABLE OF AUTHORITIES

**Cases**

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397(1997) ............18

*Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ..........................................................7, 14

*Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996).....................6

*Castro v. County of Los Angeles*, 833 F.3d 1060, 1067 (9th Cir. 2016) ...... 7, 12, 20

*Connick v. Thompson*, 563, U.S. 51 (2011)................................................................18

*Desoucy v. Cnty. of San Bernardino*, 2024 WL 3064089, at *13 (C.D. Cal. May 9, 2024) .........................................................................................................................21

*Estate of Ford v. Ramirez-Palmer,* 301 F.3d 1043, 1050 (9th Cir. 2002).... 8, 11, 12

*Estate of Mann v. County of Stanislaus*, 2023 WL 3168512, at *3 (E.D. Cal. Apr. 28, 2023) ...................................................................................................................21

*Farmer v. Brennan*, 511 U.S. 825, 833 (1994)........................................... 7, 12, 20

*Frost v. Cnty. of San Diego*, No. 21CV01903-L-AGS, 2022 WL 4809364, at *1 (S.D. Cal. Sept. 30, 2022) .........................................................................................8

*Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997)...........................7

*Giraldo v. Dep't of Corr. & Rehab.*, 168 Cal.App.4th 231, 247 (2008) .................22

*Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) ...............................................13

*Hope v. Pelzer,* 536 U.S. 730, 741-46 (2002)...........................................................13

*Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141-42 (9th Cir. 2020) .........................................................................................................................15

*Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) ...........................13

*Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) .................................7

*Lucas v. Cnty. of San Diego,* No. 20-CV-1735-CAB-JLB, 2021 WL 568787, at *1 (S.D. Cal. Feb. 16, 2021) ......................................................................................8, 9

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)...........................................7

*M.D. v. County of San Bernardino*, 2023 WL 8895699, at *8 (C.D. Cal. Nov. 15, 2023) .........................................................................................................................21

*Miles v. County of Alameda*, No. 22-CV-06707-WHO, 2023 WL 2766663, at *15 (N.D. Cal. Apr. 3, 2023). ........................................................................................19

*Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)................................................6

*Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 521 (9th Cir. 1994) ............7

*Sandoval v. County of San Diego*, 985 F.3d 657, 669 (9th Cir. 2021)....................13

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) ........................................................13

*Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020).........................................................13

*Wilk v. Neven*, 956 F.3d 1143, 1150 (9th Cir. 2020) ..............................................12

*Wright v. Contreras*, 2012 WL 834859, at *7 (S.D. Cal. Mar. 12, 2012)................8

**Statutes**

California Government Code § 820.2 ................................................................ 20, 21
California Government Code § 844.6 ................................................................ 22
California Government Code § 845.6 ................................................................ 22

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................... 6, 7
Fed. R. Civ. P. 8(d)(2) .................................................................................... 6

**Regulations**

15 C.C.R. § 1027.5(d) ..................................................................................... 17

# I.   INTRODUCTION

In January 2024, Brandon Yates was arrested and booked into the San Diego Central Jail. Within 24 hours of his booking, Brandon was found dead. He was naked with his hands and feet bound behind his back. His cellmate, Alvin Ruis, tortured Brandon before ultimately choking and smothering him to death.

Brandon was suffering from an acute psychiatric condition and his constant incoherent babbling about religion was provoking other inmates.  His first cellmate told Deputy Blackburn that Brandon needed to be removed from their cell, otherwise, "there would be trouble."  Blackburn removed Brandon out of that cell, then immediately placed him with Alvin Ruis.  Ruis had been designated a "bypass inmate" who was not allowed to be housed with other detainees. He was not even allowed to have yard time with others after he had threatened multiple cellmates and physically assaulted a deputy. It was widely known to the Jail staff that Ruis and Brandon both suffered from serious mental illness and extreme religiosity.

For nearly an hour, Deputies ignored multiple calls and screams for help by Brandon, other module detainees and even Alvin Ruis, who also pushed the panic button.  The deputies in the control tower either ignored the multiple calls for help or they muted the sound.

Plaintiffs' 49-page complaint lays out in 330 paragraphs the egregious, reckless failures by individual defendants and the systemic problems plaguing the County's jails. In their motion to dismiss the entire case, defendants refer to a total of ten (10) factual allegations. *See* ECF 11-1, 1:17-2:7. Then they contend that these ten facts are vague and conclusory and therefore deficient under Federal Rules of Civil Procedure Rule 8(a) to state a claim.  Before getting to Rule 8, it would serve Defendants well to pause at Rule 1, which requires that the parties "secure the just, speedy, and inexpensive determination of every action and proceeding."

Having failed to meet the most fundamental requirements of Rule 12, Defendants' frivolous motion should be denied.

1

## II.    FACTUAL ALLEGATIONS

### A. The Murder of Brandon Yates

On December 27, 2023, Alvin Ruis was arrested by the Chula Vista Police Department after he assaulted his children and wife. Complaint, ECF No. 1, ¶ 35. Ruis was charged with: Domestic Violence, Willful Cruelty to a Child, Stalking, Burglary, Violation of a Court Order, Committing a Felony while out on Bail and Violation of a Domestic Violence Temporary Restraining Order. *Id.* At his December 27 arraignment, Ruis' family requested help for him. *Id.* ¶ 36. His family feared he would commit suicide or murder as he had threatened to do on multiple occasions. *Id.* Ruis was then booked into the San Diego Central Jail. *Id.* ¶ 37.

On numerous occasions during his 19-day incarceration, Ruis had been declared a danger to himself and others. *Id.* ¶ 38. Because of this, he had been placed in the Sixth Floor Enhanced Observation Housing ("EOH") multiple times. *Id.* ¶ 39. EOH provides close observation and assessment of incarcerated person who may be at an elevated risk for suicide. *Id.* ¶ 40. Within the first few days of his incarceration, Ruis was sent to EOH for attempting to hang himself with a makeshift rope but was sent back to Module 4C shortly after. *Id.* ¶ 42. It is believed that Ruis displayed aggressive behavior while in EOH, verbally attacking EOH employees and threatening suicide and violence to others. *Id.* ¶ 41. Ruis began hearing the voices of his children yelling at him through the walls. *Id.* ¶ 44. Ruis grabbed a deputy through his cell's food flap and later threatened to hang himself. *Id.* ¶ 45-46. As a result, Ruis was placed in EOH once more. *Id.* ¶ 46. While in the Jail, Ruis engaged in non-stop compulsive talking about God and spoke indecipherable nonsense. *Id.* ¶ 48. He would frequently stay awake through the night, yelling out his cell door, upsetting and angering other inmates. *Id.* ¶ 49. It was clear that Ruis suffered from a significant mental illness that manifested in violent outbursts toward inmates and deputies. *Id.* ¶ 47. Despite this knowledge, no one ever admitted Ruis to the Psychiatric Stabilization Unit ("PSU") where mentally ill patients can be

monitored and involuntarily medicated, if necessary. *Id.* ¶ 43, 66. Nor did anyone place Ruis in administrative segregation, even after he assaulted a deputy. *Id.* ¶ 50, 66. Each time Ruis was placed in EOH, defendants would release him instead of treating or monitoring him for his serious mental health problems. *Id.* ¶ 51.

While at the Jail, Ruis was designated a "bypass" inmate. *Id.* ¶ 59. A bypass inmate is a designation for someone who must be kept separate from others because they could inflict harm on other inmates. *Id.* ¶ 59-60. When a deputy requests a "keep separate" be added to an inmate's record, an Inmate Status Report ("ISR") is required per County policy. *Id.* ¶ 61. This report is reviewed, approved, forwarded and disseminated among jail staff. *Id.* The ISR would have been available to all supervisory Doe Defendants. *Id.* ¶ 62. Ruis's "keep separate" status meant all sworn staff and their supervisors knew that it was not safe to place someone in a cell with him. *Id.* ¶ 63.

On January 15, Ruis was manifesting symptoms of serious mental illness threatening people and continuing to engage in self-harming behavior. *Id.* ¶ 67. Despite this, he was cleared to go back to mainline housing. *Id.* On the same day, 24-year-old Brandon Yates was arrested on suspicion of burglary and booked into the Jail after he had been found sleeping in someone's backyard shed. *Id.* ¶ 68, 69. Brandon had struggled with mental illness for many years. *Id.* ¶ 70. Brandon was placed in cell 2 of Module 4C, on the fourth floor. *Id.* ¶ 71. While in cell 2, Brandon began speaking nonsensically and babbling nonstop, causing his cellmates to get aggressive toward him. *Id.* ¶ 71-72. On January 16, his cellmates called Defendant Blackburn over and threatened that "there would be trouble" if the deputies did not remove Brandon from their cell. *Id.* ¶ 73. Defendant Blackburn took Brandon out of cell 2. *Id.* ¶ 74. Blackburn knew that Brandon was a vulnerable inmate as a result of his mental illness and that other inmates had threatened him. *Id.* ¶ 75. Defendant Blackburn also knew that Ruis was classified as a bypass inmate who needed to be kept separate from others and that Ruis had never been assigned any cellmates

because of his violent propensities. *Id.* ¶ 76. Despite this knowledge, Defendant Blackburn placed Brandon into Ruis's cell. *Id.* ¶ 77.

Within minutes of being moved into Ruis's cell, the two began having a conversation about God. *Id.* ¶ 78. The conversation quickly became contentious and Ruis decided Brandon was the devil. *Id.* Ruis referred to himself as a god and a pure being. *Id.* ¶ 81. Ruis sat next to Brandon and placed his hand on Brandon's thigh. *Id.* Brandon immediately jumped down from the bed to get away from Ruis. *Id.* ¶ 82. Ruis believed that this was a sign that Brandon had the devil inside him and stated he was going to kill Brandon. *Id.* ¶ 83-84. Brandon went to the door of the cell and began pressing the call button to try to summon help and pressed the emergency intercom multiple times saying, "They are going to kill me." *Id.* ¶ 85. Ruis even pressed the emergency button himself. *Id.* ¶ 86. Defendant Does 22-26 in the control ignored Brandon's multiple calls for help or placed Brandon's intercom on "bypass." *Id.* ¶ 87. Upon information and belief, Defendant Does muted Brandon's cell intercom for at least 15 minutes, silencing Brandon and ignoring his calls for help. *Id.* No deputy came to the cell to respond to the call for help for nearly an hour. *Id.* ¶ 88. Other inmates in Module 4C began to hear shouting and banging. *Id.* ¶ 89. The inmates notified the control tower by pressing the panic button, but they were ignored. *Id.* ¶ 90.

During this time, Ruis began punching Brandon so that he could kill Brandon and remove the devil. *Id.* ¶ 91. Ruis kicked Brandon and punched him in the face. *Id.* ¶ 92. Ruis got on Brandon's back and used his right arm to place Brandon in a chokehold. *Id.* ¶ 94. As Brandon struggled to breathe, Ruis took his left hand, put his fingers into Brandon's mouth, and pulled up on his mouth to expose Brandon's neck. *Id.* ¶ 95. Ruis squeezed his neck until it rendered Brandon unconscious. *Id.* ¶ 96. Ruis then saw Brandon was still alive. *Id.* ¶ 100. Ruis poured liquid soap into Brandon's nose and mouth before smothering Brandon with a jail blanket. *Id.* Eventually, Brandon stopped moving. *Id.* ¶ 102. Ruis then took off Brandon's

clothes. *Id.* ¶ 103. When Brandon was completely naked, Ruis put a bar of soap in Brandon's anus. *Id.* ¶ 104. Ruis tore up Brandon's shirt and tied his hands behind his back and crossed his legs. *Id.* ¶ 106. Ruis tied a strip of cloth around Brandon's neck and began tying Brandon's neck to the stool inside the cell. *Id.* ¶ 107-108. It was at this time, around 1:30 pm, when deputies finally arrived for their hourly cell check and found Brandon dead. *Id.* ¶108, 117. Brandon's cause of death was asphyxiation consistent with manual and ligature strangulation and smothering. *Id.* ¶ 109. Brandon's hyoid bone was broken. *Id.* ¶ 110.

**B. The County's Classification System**

The County maintains an Inmate Classification System to screen, assess and house inmates in a manner that will protect the safety of the community, staff and other inmates. *Id.* ¶ 120. The classification system also assists detention managers and staff in making sound decisions regarding inmate population management. *Id.* Proper inmate classification promotes impartial and consistent classification evaluations and keeps inmates safe. *Id.* An individual's housing assignment is critical to safety and care because it indicates to detention staff whether that individual has special needs or characteristics that warrant precaution. *Id.* ¶ 121. Inmate classification consists of several components including a custody assessment inmate interview by Jail Population Management ("JPMU") staff, and the periodic reclassification of inmates upon changes in their custody status. *Id.* ¶ 122.

Per San Diego County Policy R.3, inmates are classified at one of six levels of security, with level six being the highest level of security and level one being the lowest. Level 6 inmates ("High Maximum") must have a combination of current assaultive charges, a prior assaultive history or be an institutional problem. *Id.* ¶ 123. These inmates must be housed individually. *Id.* Level 5 inmates ("Maximum") are typically assaultive or an escape risk. *Id.* Level 4 inmates ("High") must have one of the following: current assaultive charges, a prior assaultive history, or are

deemed an institutional problem. *Id.* Level 3 inmates ("Medium") are considered somewhat criminally sophisticated but are not known to be assaultive. *Id.* Level 2 inmates ("Low") are not assaultive and have no known disciplinary problems. *Id.* Level 1 inmates ("Minimum") pose the lowest risk to staff and other inmates. *Id.* Level 1 inmate lacks criminal sophistication and is sentenced. *Id.* Inmates with custody levels 1, 2 or 3 can be housed together. *Id.* ¶ 124. Levels 4 and 5 can be housed together. *Id.* Level 6 inmates will be housed in Administrative Segregation. *Id.* Due to Ruis's assaultive charges, Ruis was, at minimum, a Level 4. *Id.* ¶ 125. Because Brandon had no assaultive charges and presented no threat to anyone at jail, Brandon was not permitted to be housed with Ruis according to the County's own policies and procedures. *Id.* County policy allows for individuals to be housed in administrative segregation if, among other reasons, the person's behavior is either criminal in nature or disruptive to the safe operation of the facility or they have shown a propensity for violence. *Id.* ¶ 127. During their stay, inmates may be reclassified based upon different occurrences such as displaying suicidal ideation, being assaultive or threatening to staff, and/or being deemed a vulnerable inmate. *Id.* ¶ 128.

### III.   LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. Fed. R. Civ. P. 12(b)(6); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The court must accept all factual allegations pleaded in the complaint as true and must construe them and draw all reasonable inferences therefrom in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations, rather, it must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). At the pleadings stage, litigants can plead alternative theories of liability. Fed. R. Civ. P. 8(d)(2).

Defendants may not assume the existence or the truth of facts that favor them outside of Plaintiffs' complaint on a Fed. R. Civ. P. 12(b)(6) motion. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). For this reason, "factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)." *Id.* The Court is "required to read the complaint charitably, to take all well-pleaded facts as true, and to assume that all general allegations embrace whatever specific facts might be necessary to support them." *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 521 (9th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)). "It is axiomatic that the motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997).

## IV.    ARGUMENT

### A. Plaintiffs Have Properly Pled A Claim For Deliberate Indifference

Pretrial detainees have a due process right under the Fourteenth Amendment to be free from violence at the hands of other inmates. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1067 (9th Cir. 2016); *see also Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt."). The Supreme Court held that "[p]rison officials have a duty to protect prisoners from violence at the hands of other prisoners" because corrections officers have "stripped [inmates] of virtually every means of self-protection and foreclosed their access to outside aid." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

Defendants make no mention of the facts pled in the complaint that they placed Brandon in a cell with someone who was known to them to be dangerous then ignored Brandon's screams for help for nearly an hour while he was being tortured to death.  While acknowledging that the proper legal standard is under the Fourteenth Amendment, the County inexplicably urges this Court to apply the more

stringent Eighth Amendment standard under *Estate of Ford v. Ramirez-Palmer,* 301 F.3d 1043, 1050 (9th Cir. 2002).

Defendants devote 19 lines of their brief to *Wright v. Contreras*, 2012 WL 834859, at *7 (S.D. Cal. Mar. 12, 2012), with no mention of the fact that the *Wright* Court made explicit that the case involved a prisoner and that under the facts of that case, the "standard is one of subjective recklessness." *Id*. at *5.[1]

Defendants rely on a prisoner case decided thirteen years ago, while failing to mention *Frost v. Cnty. of San Diego*, No. 21CV01903-L-AGS, 2022 WL 4809364, at *1 (S.D. Cal. Sept. 30, 2022) which involved a trans woman booked into the San Diego Central Jail where she was beaten by her cellmates. The *Frost* Court denied the County's motion to dismiss where deputies made an intentional decision to place Plaintiff in a holding cell with three men and Plaintiff was put at a substantial risk of suffering harm—which she did in fact suffer.   Under the Fourteenth Amendment, the plaintiff must show "more than negligence but less than subjective intent—something akin to reckless disregard." *Id*.  *Frost* held that "there is no requirement that Plaintiff show that she would be specifically targeted by the man that attacked her or that Defendants knew the man would be likely to attack." *Id*. at *5.

Defendants also ignore *Lucas v. Cnty. of San Diego,* No. 20-CV-1735-CAB-JLB, 2021 WL 568787, at *1 (S.D. Cal. Feb. 16, 2021), in which the plaintiff was attacked without provocation by his cellmate while detained at the San Diego County Central Jail.  Plaintiff's cellmate allegedly attacked Plaintiff for at least fifteen minutes, eventually putting him in a chokehold and biting off a portion of

---

[1] Defendants devote a total of 18 lines to the facts of the case, choosing to omit all allegations related to the deputies' knowledge of Ruis' assaultive behavior and the deputies' ignoring the repeated calls for help for nearly an hour by Brandon, the other detainees in the module and Ruis himself.

Plaintiff's face.  Plaintiff alleged that the cellmate was a "Level 5" inmate who was improperly housed in the general population module of the jail and that the deputies knew of the cellmate's violent tendencies. Plaintiff claimed that once the attack began, deputies watched the attack on security monitors but did not intervene for fifteen minutes, while other inmates called for the deputies and banged on the module windows.

The *Lucas* Court rejected the County's argument that the Plaintiff failed to allege sufficient facts. *Lucas* held that the plaintiff plausibly stated a claim for violation of his Fourteenth Amendment right to be protected from violence by other inmates by alleging that despite various indicators that the cellmate was unstable and becoming increasingly aggressive toward other inmates of which Defendants were aware, Defendants made the intentional decision to place him in general population housing. As a result, Plaintiff was put at substantial risk of suffering serious harm—and in fact did suffer such harm. *Lucas* held that a reasonable officer in the circumstances would have prevented or promptly intervened in the attack. *Lucas* also found that the failure to act by the deputies was objectively unreasonable given that their actions violated the Sheriff Department's Security and Control policies, which require deputies to prevent "foreseeable inmate-on-inmate violence."

Here, Defendants omit to mention nearly every single fact alleged, then argue that Plaintiffs have failed to allege sufficient facts. Rule 12 requires that the moving party take the facts in light most favorable to the nonmoving party. Defendants' motion should be denied based on this failure alone.  As alleged:

- Blackburn, Gonzalez and Does were housing deputies assigned to Floor 4 and had an obligation to advise the JPMU that Ruis was violent and aggressive towards inmates and staff so that Ruis could be reclassified. ECF No. 1, ¶20, ¶180
- Defendants Blackburn, Gonzalez and Does knew of Ruis's violent propensities and his grave mental illness. They witnessed Ruis's multiple

9

violent outbursts and sent him to EOH on multiple occasions, including in the days before Ruis murdered Brandon. ¶187

- Defendant deputies knew that Ruis was a "keep separate" inmate because the designation was disseminated among jail staff. ¶61.

- All sworn staff and their supervisors knew it was not safe to place someone in a cell with him. ¶63

- Brandon's cellmates called Defendant Blackburn over and threatened that "there would be trouble" if deputies did not remove Brandon from their cell. ¶73

- Blackburn had specific knowledge Brandon was a vulnerable inmate as a result of his mental illness and that others had threatened him. ¶75

- Blackburn knew Ruis needed to be kept separate from other inmates, and that Ruis had never been assigned any cellmates because of his violent propensities. ¶76

- After Ruis told Brandon that he was going to kill him, Brandon pressed the emergency intercom multiple times saying, "They are going to kill me". ¶85

- At one point, Ruis pressed the emergency button himself. ¶86

- The control tower deputies ignored the calls for help or placed Brandon's intercom on "bypass" at least 15 minutes, silencing Brandon and ignoring his call for help. ¶87

- Other inmates in the module notified the control tower to get help by pressing the panic button. They were ignored. ¶90

- No deputy came to the cell to respond to the call for help for nearly an hour. ¶88

- During this hour, Ruis kicked Brandon and punched him in the face with his left hand; got on Brandon's back and used his right arm around Brandon's neck in a chokehold; placed his left arm on top of Brandon's head; and as Brandon struggled to breath, Ruis took his left hand, put his fingers into Brandon's mouth, and pulled up on his mouth to expose Brandon's neck. He squeezed Brandon's neck until it rendered him unconscious. ¶¶92-95, 96

- Ruis then saw Brandon was still alive. Ruis poured liquid soap into Brandon's nose and mouth. Ruis took a green jail blanket and smothered

10

Brandon with it to make him stop breathing, Ruis continued to block Brandon's nose and mouth. Eventually, Bradon stopped moving.  ¶100

- Ruis took Brandon's clothes off.  When Brandon was completely naked, Ruis sodomized him with a bar of soap.  ¶¶103-104

- Ruis tore up Brandon's shirt and tied his hands behind his back and crossed his legs.  Ruis tied a strip of cloth around Brandon's neck. He was staging Brandon's body to replicate Jesus on the cross. ¶¶105-107

- During this hour in which deputies ignored all calls for help, Ruis was having a conversation with God in which God was telling him to take his time with Brandon.  ¶98.

- God told Ruis he could eat Brandon's face if that is what he wanted to do. ¶99.

- Upon information and belief, Defendants Blackburn, Gonzalez, and Does ignored the screams for help and multiple attempts to get help by sworn staff.  ¶205

- Ruis timed his torture because he knew that the deputies only did rounds once every hour at 60-minute intervals.  ¶113

- Blackburn, Gonzalez and Doe defendants who had conducted cell checks in the module had failed to comply with Title 15 which requires that the checks be conducted at random. ¶ 208.

Plaintiffs in this case alleged substantially more detailed facts than the plaintiffs in *Frost* or *Lucas*.

**B. Deputies Are Not Entitled to Qualified Immunity**

Defendants rely on an Eighth Amendment failure to protect case to contend that they are entitled to qualified immunity under the Fourteenth Amendment. *See* ECF No. 11-1, p. 14-15.  In *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1042 (9th Cir. 2002), the Court made particular note of the fact that deputies knew the murderer, Diesso, had been successfully double-celled with other inmates for **years**, and in fact, had been previously housed with the victim, Ford, without incident. *Id.* at 1051-1052 (emphasis added). Moreover, Diesso had been recently prescribed psychiatric medications and there were no recommendations for

"single-celling." *Id.* at 1046, 1051. Just prior to being housed with Ford, he was successfully housed with another inmate. *Id.* at 1051-1052.

Here, Ruis was considered a bypass inmate, who was not permitted to be housed with, or even be around, other inmates for safety reasons because he was threatening other inmates and the deputies. Ruis had not been successfully housed with other inmates nor was he prescribed psychiatric medications. Unlike *Estate of Ford,* Defendants ignored Brandon's screams for help while failing to conduct Title 15 safety checks at random intervals as required by state law.

While pointing the Court to *Estate of Ford*, Defendants steer this Court away from clearly established law. As the *Wilk* Court stated, even under the more stringent Eighth Amendment precedent, "None of the defendants can claim ignorance to a prisoner's right to be protected from violence at the hands of other inmates. That right has been clearly established since the Supreme Court's decision in *Farmer v. Brennan* in 1994." *Wilk v. Neven*, 956 F.3d 1143, 1150 (9th Cir. 2020) (internal citations omitted); *see also Farmer v. Brennan*, 511 U.S. 825 (1970); *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (finding that the "contours" of Castro's right were his right to be free from violence at the hands of other inmates as established by *Farmer*). "The Supreme Court need not catalogue every way in which one inmate can harm another for us to conclude that a reasonable official would understand that his actions violated [the inmate's] right." *Castro*, 833 F.3d at 1067. It has long been clearly established that Brandon had a right to be from violence at the hands of another incarcerated person. Any reasonable official would be on notice that placing Brandon into a cell with a violent "bypass" inmate against the Jail's own policies and rules, then ignoring his pleas for help and leaving him for an hour to be tortured, sexually assaulted and killed violates the Constitution. Defendants' tortured and cramped view of clearly established law cannot be squared with the Supreme Court's repeated admonitions that some violations are so obvious that no factually similar precedent is required

at all. *See, e.g., Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020); *Hope v. Pelzer,* 536 U.S. 730, 741-46 (2002).  Defendants are not entitled to qualified immunity.

**C. Plaintiffs Have Sufficiently Alleged A Claim for Failure to Properly Train, Supervise and/or Discipline**

"Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (internal citations omitted). A supervisor may be liable if he is either (1) personally involved in the constitutional deprivation; or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989).

In *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011), the Ninth Circuit held that Starr had properly pled a claim of deliberate indifference against Sheriff Baca by pleading specific factual allegations which "plausibly suggest that Sheriff Baca acquiesced in the unconstitutional conduct of his subordinates, and was thereby deliberately indifferent to the danger posed to Starr." *Id.* at 1216. Here, Plaintiffs have pled detailed factual allegations of deliberate indifference to security and safety/failure to protect by Martinez, Williams and supervisory Doe defendants.

As Defendants note, "a successful plaintiff must allege facts showing the supervisor knew of the pattern, so the inaction constituted an 'intentional decision.'" *See Sandoval v. County of San Diego*, 985 F.3d 657, 669 (9th Cir. 2021). This is precisely what Plaintiffs have alleged. Defendants' contention that Plaintiffs must plead "specific, detailed allegations about what information each supervisor had, what each supervisor did with that information, and based on that, what training or discipline should have been provided based on the information

13

known to each" is wholly inaccurate. ECF No. 11-1, p. 17. As a threshold matter, the complaint need not contain detailed factual allegations to survive a 12(b)(6) motion. *Bell*, 550 U.S. at 555. In this case, Defendants somehow missed the allegations against the supervisory defendants outlined in paragraphs 137 to 175. From page 19 to page 29, Plaintiffs alleged that Martinez, Williams and supervisory Does knew from the litany of claim and lawsuits, California's Attorney General Rob Bonta, the California state auditor's report, and the alarming number of deaths, that their subordinates were failing to protect detainees from violence. As an example, supervisory defendants were aware of the correctional staff ignoring emergency intercoms and knew that multiple people died or suffered injuries as a result. (*See* ¶¶156-175). Plaintiffs have alleged that their failure to correct these persistent wrongs caused the harm to Brandon Yates.

According to Defendants, the failure to allege that each supervisory defendant became aware that Brandon Yates was killed is fatal to the Plaintiffs' claim. ECF No. 11-1, p. 17. Given that supervisory liability hinges on their conduct leading up to the Constitutional violation, this argument is nonsense. Additionally, Defendants contend Plaintiffs were required to specifically plead "what training or discipline should have been provided." *Id.* Defendants cite no case law to support this contention.

Plaintiffs have alleged a series of specific incidents reflecting severe deficiencies in the safety provided to San Diego inmates and an extraordinarily high number of inmate deaths in San Diego County jails. *See* ECF No. 1, pp. 15-29. Plaintiffs have alleged that the supervisory Defendants had personal knowledge of the repeated Constitutional violations committed by their subordinates. *Id.* ¶¶ 216, 218-219, 221-224. Despite this knowledge, Defendants acquiesced in the constitutional violations by refusing to implement improved policies, procedures and training. *Id.* ¶231. Defendants took no action to remedy any misconduct. *Id.* ¶ 225. As a result of their failures and inaction, their subordinates continued to

violate the Constitution and Brandon was murdered as a result. *Id.* ¶¶220, 236. Martinez and Williams are not entitled to qualified immunity.

**D.    Plaintiffs Have Properly Pled A *Monell* Claim Against the County**

Defendants suggest that Plaintiffs have not adequately pled a claim of municipal liability under *Monell v. Dept. of Soc. Servs. Of City of New York*, 436 U.S. 658, 690 (1978), because their allegations related to policy and custom are "too vaguely worked and too all-encompassing and conclusory," and that Plaintiffs fail to point to any specific policies or procedures that led to Brandon Yates' murder. ECF No. 11-1, p. 13, 15.  Defendants' claim bears little relationship to the actual complaint, which devotes approximately 10 pages to discussing prior instances of harm suffered by individuals as a result of the County's Constitutional violations, audits and reports that have been issued detailing the County's consistent failures, and news articles highlighting the same. *See* ECF No. 1, ¶¶137-175.

A plaintiff may make out a claim for liability under *Monell* not only by alleging a facially deficient policy that any reasonable policymaker would recognize was inadequate to prevent the likely violation of the plaintiff's constitutional rights, but also through a pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice. *See Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141-42 (9th Cir. 2020).

Plaintiffs' complaint amply pleads a pattern of prior violations that put County policymakers on notice.  It alleges in specific and particular detail that Brandon Yates' brutal death at the hands of Ruis was not an isolated accident, but the predictable result of longstanding, systematic failures at the Sheriff's Department to identify inmates with mental health issues, to properly identify and classify violent inmates, to respond properly to emergency intercom calls, and to conduct proper cell checks — systematic failures about which Sheriff's

15

Department officials knew and did nothing, establishing a *de facto* policy or practice and failure to train.  To name a few, Plaintiffs alleged:

- Since 2010, several inmates have died by homicide or been seriously injured at the hands of another inmate, including Russell Hartsaw, Lyle Woodward, Richard Lee Salyers, Dominique McCoy, Derek Baker, Raymond Vogelman, Eric Van Tine, Miguel Lucas and Kristina Frost. ECF No. 1, ¶¶145-155. These injuries resulted from the County's *de facto* policy of housing violent inmates with other inmates. *Id.* ¶254.

- That a California State Auditor's report ("Auditor's Report") in February 2022 identified deficiencies in the Sheriff 's Department's policies and practices related to intake screenings, mental health care, safety checks, and responses to emergencies that it found likely contributed to jail deaths. *Id.* ¶¶ 241-42.

- That the Auditor's Report identified a specific incident in which an intake nurse's improper failure to identify an inmate's history of mental health issues, which caused the person being placed in a cell with another incarcerated person and who they killed. *Id.* ¶¶ 244, 250.

- The audit found that the Sheriff Department's staff did not always provide consistent follow-up care to individuals who requested or previously received medical or mental health services, blamed that on poor policies and communication, and highlighted the need to address these deficiencies. *Id.* ¶ 247,

- The County has repeated failed to properly classify individuals, which resulted in violent beatings, rapes and murders. *Id.* ¶ 252

- That at least five people had been killed in custody  recently others as the result of the County's failure to identify and appropriately classify violent people. *Id.* ¶ 258

- The County of San Diego "failed to train staff on policies for proper classification of violent inmates." *Id.* ¶ 253

- The County of San Diego failed to discipline staff when they misclassified inmates, thereby creating a *de facto* policy that allowed violent inmates to be housed with other inmates, despite a series of instances in which misclassified inmates severely injured or killed other inmates. *Id.* ¶ 255.

- That the County knew correctional staff were silencing or letting emergency intercoms go unanswered, ¶ 362; that Sheriff's Martinez knew of the problem from at least the high-profile incident involving Frankie Greer (which she mentioned in a media interview), ¶ 264, as well as others ¶ 266; at that the County took no corrective action or discipline when deputies failed to respond to intercom calls ¶ 267.

- That the County had a well-settled policy of permitting deputies to violate Title 15 and its own policies on cell checks, ¶ 271, despite knowing that inmates were suffering injuries and death from the failure to conduct safety checks at random intervals, ¶ 272, and that these failures allowed Brandon Yates' murderer to time his attack between checks to avoid detection, *Id.* ¶ 273.[2]

---

[2] What is most troubling aside from the inaccurate presentation of the applicable legal standard under the Fourteenth Amendment is the Defendants' material misrepresentation of the Plaintiffs' allegations. Defendants contend that Plaintiffs provide "completely inaccurate information related to Title 15 suggesting that the checks done in this case were not compliant" then cite to Section (b) to insist that the cell checks complied with the law. ECF No. 11-1, p. 25. Defendants omit any reference to Section (d) which requires all safety checks to "occur at random or varied intervals." 15 C.C.R. § 1027.5(d). As Plaintiffs allege, Defendants violated Title 15 by failing to do so. ECF No. 1, ¶¶208-209.

These allegations easily establish, or "a pattern of prior, similar violations" that gave "the relevant policymakers … actual or constructive notice," *Park*, 952 F.3d at 1141-42, of the County's *de facto* policy of deliberate indifference to their obligation to protect people in their custody from violence at the hands of other inmates through their failure to properly identify people with mental illness, to properly classify violent inmates, to avoid housing violent inmates with other inmates, to respond properly to emergency intercoms, and to conduct proper cell checks. Defendants' efforts to mischaracterize these claims as seeking *Monell* liability based on only a "general knowledge of prisoners being dangerous or violent," ECF No. 11-1, at 13:28-14:1, or pleading a "per se" violation from double-celling, bear no relationship to the actual allegations in the complaint and should be rejected.

Similarly, to prove *Monell* liability for failure to train, Plaintiff must show "a pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 563, U.S. 51, 62 (2011) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997)). "Policymakers' 'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability.'" *Id.* (citing *Brown*, 520 U.S. at 407). The detailed allegations noted above show the County has failed to train its correctional staff to properly identify violent inmates or inmates with mental health issues and avoid housing them with other vulnerable people in its custody, or to train its staff to respond properly to emergency intercoms.

Finally, Defendants argue that Plaintiff's *Monell* ratification claim fails because, they say, Plaintiffs "do not specific what decision, investigation, or misconduct was ratified," but that is wrong. Complaint states in painstaking detail all of the failures and violations that led to Brandon Yates' murder, and alleges

that the County of San Diego "ratified and condoned" their employees wrongful acts by "failing to discipline them for unconstitutional conduct that caused Brandon's death," "fail[ing] to provide … Defendants additional training, remedial training, and closer supervision and monitoring." ECF No. 1, ¶ 260.  In the context of Sheriff's Department policy requiring review of every death of an incarcerated person,[3] this adequate alleges that Department policymakers reviewed the various actions of defendants and "approv[ed] [their] subordinate[s] decision[s] and the bas[e]s for it."  *Miles v. County of Alameda*, No. 22-CV-06707-WHO, 2023 WL 2766663, at *15 (N.D. Cal. Apr. 3, 2023).

**E. Plaintiffs' Have Sufficiently Alleged A Right of Association Claim**

Defendants' argument that Plaintiffs have not alleged sufficient facts to show that the defendants knew of Ruis' mental history and therefore, were not deliberately indifferent to a known or obvious danger is disingenuous. Beyond the multitude of allegations regarding Ruis' violent behavior, his continued back and forth to EOH without receiving proper treatment and his constant threats to other inmates and deputies, Plaintiffs have specifically alleged that Ruis was a "bypass" inmate, meaning he had been designated as an inmate that could inflict harm on other inmates. ECF No. 1, ¶59-60. Once a "keep separate" designation is added to an inmate's record, an inmate status report gets disseminated among jail staff. *Id.* ¶61. Ruis' "keep separate" status meant that *all sworn staff and their supervisors knew that it was not safe to place someone in a cell with him. Id.* ¶63 (emphasis added). These facts alleged by Plaintiff are conveniently absent from Defendants' arguments regarding deliberate indifference. Under *Farmer* and *Castro*,

---

[3] *See* Policy #24/03 - M.7, *Incarcerated Person Deaths*, San Diego County Sheriff's Office Detention Services Bureau – Manual of Policies and Procedures (Sept. 11, 2024) (stating its purpose is to "to delineate a mechanism to ensure there is a review of every in custody incarcerated person death").

deliberately placing a bypass inmate who was not to be around other inmates because of his known violent tendencies with Brandon was objectively unreasonable and deliberately indifferent to Brandon's right to be free from violence at the hands of another inmate. *See Farmer*, 511 U.S. 825; *Castro*, 833 F.3d 1060. Moreover, Plaintiffs have alleged that Defendants were deliberately indifferent by continuously releasing Ruis from EOH when there were clear signs that he presented a danger to others and ultimately, should have been placed in the PSU. ECF No. 1, ¶238. Defendants were deliberately indifferent to Brandon's pleas for emergency help. *Id.* ¶284. As alleged, Defendants' actions were objectively unreasonable. *See id.* ¶¶283-286. As such, Plaintiffs have sufficiently alleged a claim for Right of Association against Defendants.

**F. Plaintiffs' Allegations as to the Bane Act Are Sufficiently Alleged**

Defendants' argue that Plaintiffs "do not point to any specific action by them that would qualify as any "threats, intimidation, or coercion" or of any attempted interference with a right. ECF 11-1, p. 29. Plaintiffs have alleged that activities inside a jail are inherently coercive because the detainee may not leave the jail premises. ECF No. 1, ¶298. Plaintiffs also allege several rights that Defendants interfered with, including the right to be free from objectively unreasonable deliberate indifference, the right to enjoy and defend life and liberty as secured by the California Constitution, the right to protection from bodily harm and the right to emergency medical care. *Id.* ¶291. Plaintiffs maintain that Defendants violated Brandon's rights by recklessly failing to train, supervise and discipline their subordinates. *Id.* ¶293. Additionally, Defendants acted with specific intent. *Id.* ¶294.

The County argues that California Government Code § 820.2—which states that "a public employee is not liable for an injury resulting from his act or omission ... result[ing] [from] the exercise of the discretion vested in him"—immunizes Martinez and Williams from Plaintiff's Bane Act. While California Government

Code section 820.2 can provide a source of immunity to public employees making discretionary policy decisions, courts construe section 820.2 "narrowly" and reserve its immunity only for "*basic policy decisions* which have been expressly committed to coordinate branches of government, and as to which judicial interference would thus be unseemly." *Desoucy v. Cnty. of San Bernardino*, 2024 WL 3064089, at *13 (C.D. Cal. May 9, 2024) (emphasis in original) (citing *Johnson v. State*, 69 Cal. 2d 782, 789–90 (1968) and *M.D. v. County of San Bernardino*, 2023 WL 8895699, at *8 (C.D. Cal. Nov. 15, 2023)). "[S]ection 820.2 immunity does not apply where a plaintiff 'challenges the implementation of existing policies, not the policies themselves.' " Most critically, when seeking section 820.2 immunity, the moving party must "identify a specific policy decision" that they made and show that they "consciously balance[ed] [the policy's] risks and advantages" in reaching their decision. *Id.* at 13–14 (citing *M.D.*, 2023 WL 8895699, at *9 and *Estate of Mann v. County of Stanislaus*, 2023 WL 3168512, at *3 (E.D. Cal. Apr. 28, 2023)).

First, fatal to the Defendants' argument is the failure to list each policy alleged in the complaint and identify how Defendants balanced the risks and advantages. Second, Martinez and Williams had no discretion in setting policies related to Title 15 cell checks and emergency call buttons because the state law requires the minimum standards.  Third, Plaintiffs have alleged the extensive *de facto* policies in place that violate the County's written policies.  Thus, California Government Code § 820.2 does not afford immunity to any of the Defendants with respect to Plaintiffs' Bane Act claim.

//

//

//

//

//

## G. Defendants County, Martinez and Williams Are Not Immune From Liability as to Plaintiffs' Negligence and Wrongful Death Claims

Defendants claim they are immune from liability for an injury proximately caused by any prisoner or an injury to any prisoner. ECF No. 11-1, p. 30.[4] However, as alleged by Plaintiffs, under California Government Code § 845.6, Defendants are liable for failing to render timely emergency care to Brandon while he was being beaten to death and his screams for help were being ignored. ECF No. 1, ¶313, 325. Moreover, a custodian may be held liable for failure to make reasonable efforts to protect a ward from a third person's attack under the jailer-warden duty of care. *See Giraldo v. Dep't of Corr. & Rehab.*, 168 Cal.App.4th 231, 247 (2008). "Prisoners are vulnerable. And dependent…the jailer has control over the prisoner, who is deprived of the normal opportunity to protect himself from harm inflicted by others." *Id.* at 250. Further, Plaintiffs incorporate the argument regarding discretionary immunity under § 820.2 above as the reasoning why Martinez and Williams are not immune from liability.

## V.    CONCLUSION

Based on the foregoing, Plaintiffs respectfully request the Court deny Defendants' Motion to Dismiss.

Date: May 23, 2025

s/ *Chelsea Reherman*
JULIA YOO
CHELSEA REHERMAN
Attorneys for Plaintiffs

---

[4] Nothing in California Government Code § 844.6 exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission.