UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF BRANDON YATES by and through its successor-in-interest Dan Yates and Andrea Carrier; DAN YATES; and ANDREA CARRIER,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO et al.,<br><br>Defendants. | Case No.:  25-CV-410 W (MMP)<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT [DOC. 11]** |

Pending before the Court is Defendants' motion to dismiss Plaintiffs' Complaint. ("*Mtn.*" [Doc. 11].)  The Court decides the matter on the papers submitted and without oral argument.  *See* CivLR 7.1(d)(1).  For the reasons provided below, the Court **DENIES** the motion to dismiss.

I.    <u>BACKGROUND</u>

This suit arises from the in-custody death of Brandon Yates at the San Diego Central Jail (the "Jail").  (*Compl.* [Doc. 1] at 1.)  The Complaint alleges the 24-year-old—left unmonitored in his cell for approximately 60-minutes—was tortured, sexually

assaulted, and murdered by his cellmate as he screamed for help and repeatedly pushed the panic button in his cell to no avail.  (*Id.* at 1:13–18.)

### A.    Alvin McDonald Ruis III

Leading up to his death, Mr. Yates was placed in a cell with Alvin McDonald Ruis III.  Mr. Ruis was an alleged "bypass inmate," who had been arrested for assaulting his wife and children on two occasions, expressed intentions of killing people, threatened other inmates, and assaulted a deputy.  (*Id.* at 1:7–13.)  The Complaint alleges that Mr. Ruis was declared a danger to himself and others on numerous occasions, and Deputies had placed him "in the Sixth Floor Enhanced Observation Housing ("EOH") multiple times.  (*Id.* at ¶¶ 38–39.)  While in EOH, Mr. Ruis exhibited "heightened aggressive behavior, verbally attacked EOH employees, and threaten[ed] suicide and violence to others," including fashioning a rope out of jail clothing to hang himself.  (*Id.* at ¶¶ 41–42.)

The Complaint further alleges that Mr. Ruis had previously been removed from shared housing with other inmates due to threats he had made against those cellmates and was labeled a "bypass inmate."  (*Id.* at ¶¶ 53–58.)  A bypass inmate is a label given to someone who must be kept separate from other inmates because they are believed to be a danger to themselves and other inmates.  (*Id.* at ¶¶ 59–60.)  Plaintiffs allege the jail staff was aware of Mr. Ruis's status as a bypass inmate, but despite the danger, was cleared from EOH and returned to his cell in Module 4C.  (*Id.* at ¶¶ 62–65.)

### B.    Mr. Yates's Arrest and Booking

On January 15, 2024, Mr. Yates was found sleeping in someone's backyard shed and was arrested on suspicion of burglary.  (*Id.* at ¶ 68.)  At the time of his arrest, Mr. Yates was struggling with mental health and addiction.  (*Id.* at ¶¶ 6, 71.)  When booked at the San Diego Central Jail, the Complaint asserts he was placed in Cell 2 of Module 4C, and while there, his mental health struggles were amplified, he spoke

nonsensically, babbled nonstop, and angered his cellmates.  (*Id.* at ¶¶ 71–72.)  The next day, one of his cellmates alerted Deputy Blackburn that "there would be trouble" if Mr. Yates was not removed from their cell.  (*Id.* at ¶ 73.)  The Complaint alleges that shortly after, Mr. Yates was placed in a shared cell with Mr. Ruis even though Deputy Blackburn knew Mr. Ruis was a bypass inmate who was not assigned another cellmate because of his violent tendencies.  (*Id.* at ¶ 76.)

### C.    Events Taking Place in Mr. Ruis's and Mr. Yates's Shared Cell

The Complaint asserts that within minutes of being placed in Mr. Ruis's cell, the two began having a conversation about God.  (*Id.* at ¶ 78.)  The two both had strong views on religion, as Mr. Yates believed he was Jesus, and Mr. Ruis believed he was chosen and directed by God, referring to himself as God's soldier on Earth, a God on Earth, and a pure being.  (*Id.* at ¶¶ 78–81.)  Staring into Mr. Yates's pupils, Mr. Ruis became convinced that Mr. Yates was the devil, and the conversation quickly turned hostile.  (*Id.*)  Mr. Ruis sat next to Mr. Yates and placed his hand on his thigh, prompting Mr. Yates to spring away from him.  (*Id.* at ¶¶ 81–82.)  Seeing this as a sign that Mr. Yates was the devil, he told him he was going to kill him.  (*Id.* at ¶ 84.)

Mr. Yates began pressing the call button at the door of the cell to summon help, saying multiple times, "[t]hey are going to kill me."  (*Id.* at ¶ 85.)  At some point, Mr. Ruis pressed the emergency call button himself.  (*Id.* at ¶ 86.)  However, the Complaint alleges that the jail had a practice of ignoring or "bypassing" calls from the inmates, and Mr. Yates's calls for help were muted for at least 15 minutes.  (*Id.* at ¶ 87.)  Deputies failed to respond to the calls for nearly an hour.  (*Id.* at ¶ 88.)

During that time, Mr. Ruis attacked Mr. Yates, punching him and dodging Mr. Yates attempts to fight back.  (*Id.* at ¶¶ 92–93.)  Mr. Ruis jumped on Mr. Yates's back, swinging his right arm around him into a chokehold and using his left hand to pull his mouth to expose his neck.  (*Id.* at ¶¶ 95–96.)  The chokehold continued until Mr. Yates could no longer breathe and fell unconscious.  (*Id.*)

After, Mr. Ruis began talking to God, hearing God tell him he could eat Mr. Yates's face and hearing, "[y]ou can take your time.  You can do whatever you want."  (*Id.* at ¶ 98.)  Mr. Ruis then poured liquid soap in Mr. Yates's unconscious nose and mouth, smothered him with a nearby blanket, and watched Mr. Yates's chest rise and fall until falling flat for the last time.  (*Id.* at ¶¶ 100–02.)  Mr. Ruis then stripped off Mr. Yates's clothes, located a nearby bar of soap, and forced the bar of soap in Mr. Yates's anus.  (*Id.* at ¶ 104.)  He then staged Mr. Yates's body to replicate Jesus on the cross, tearing apart Mr. Yates's shirt to tie his hands behind his back and cross his legs together.  (*Id.* at ¶¶ 106–07.)  After, he tied a piece of shirt to Mr. Yates's neck and a nearby metal stool but was interrupted by deputies who arrived on their hourly cell check.  (*Id.* at ¶ 108.)

When discovered, Mr. Ruis told investigators that the murder was "one hundred percent" premeditated, that he staged the death to show that it was not a suicide, and that he timed the torture because he knew deputies would only discover what happened during their hourly checkups.  (*Id.* at ¶¶ 112–13.)  An autopsy showed that the hyoid bone in Mr. Yates's neck was broken with hemorrhaging into the muscles of the anterior and posterior neck.  (*Id.* at ¶ 110.)

On February 24, 2025, Plaintiffs filed this lawsuit against Defendants asserting various causes of action, including: (1) Deliberate Indifference (42 U.S.C. § 1983); (2) Failure to Properly Train, Supervise, and Discipline (42 U.S.C. § 1983); (3) *Monell* (42 U.S.C. § 1983); (4) Right of Association (42 U.S.C. § 1983); (5) Violation of Cal. Civ. Code § 52.1; (6) Negligence; and (7) Wrongful Death.  (*Compl.* [Doc. 1].)  Defendants have moved to dismiss the Complaint.  (*Mtn.* [Doc. 11].)  Plaintiffs oppose.  (*Opp'n* [Doc. 12].)

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "A pleading that

states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *See Balistreri v. Pac. Police Depot*, 901 F.2d 696, 699 (9th Cir. 1990).

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When considering a motion to dismiss, a court must accept as true all "well-pleaded factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). However, a court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotations omitted).

## III.  DISCUSSION

### A.  Plaintiffs Have Adequately Pled Deliberate Indifference and Defendant Deputies Are Not Entitled to Qualified Immunity

Pretrial detainees who have not been convicted of any crime have a due process right under the Fourteenth Amendment to be free from violence from other inmates. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1067 (9th Cir. 2016). "Prison officials have a duty to protect prisoners from violence at the hands of other prisoners because corrections officers have stripped the inmate of virtually every means of self-protection and foreclosed their access to outside aid." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)) (internal quotations omitted). A pretrial detainee bringing a Fourteenth

Amendment claim against an individual officer for failing to protect them from violence while in custody must establish:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) by not taking such measures, the defendant caused the plaintiff's injuries. With respect to the third element, the defendant's conduct must be objectively unreasonable.

*Lucas v. Cnty. of San Diego*, No. 20-CV-1735-CAB-JLB, 2021 WL 568787, at *3 (S.D. Cal. Feb. 16, 2021) (citing *Castro*, 833 F.3d at 1071).

### 1.    <u>Plaintiffs Have Sufficiently Pled Deliberate Indifference</u>

Defendants first move to dismiss Plaintiffs' first cause of action for failing to state a claim for deliberate indifference.  (*Mtn.* at 3–6.)  Defendants argue that Plaintiffs have failed to state specific facts as to each defendant (Defendant Deputy Blackburn, Deputy Gonzalez, and the various Doe defendants), and instead "make vague and conclusory assertions to suggest that there is sufficient information" as to each element of the claim, such as what the Deputies and Doe defendants knew about Mr. Ruis's violent propensities.  (*Id.* at 5:7–20.)  Defendants argue that Plaintiffs only assert conclusory statements without any "further factual information related to an intentional decision by any deputy, let alone anything about how each specific deputy knew that the conditions presented a substantial risk of serious harm to Decedent's safety."  (*Id.* at 5:21–24) (internal citations and quotations omitted).

In response, Plaintiffs argue the Complaint contains several allegations specifically targeting Deputy Blackburn, Deputy Gonzalez, and the Doe defendants, including that:

- The defendant deputies were assigned to Floor 4 and had an obligation to advise the JPMU that Ruis was violent and aggressive toward inmates. (*Compl.* at ¶¶ 20, 180.)
- The deputies witnessed Mr. Ruis's violent outbursts on multiple occasions and sent him to EOH multiple times, including in the days leading up to Mr. Yates's death. (*Id.* at ¶ 187.)
- The deputies knew Mr. Ruis was a "keep separate" inmate because the designation was disseminated among jail staff. (*Id.* at ¶ 67.)
- Deputy Blackburn knew Mr. Ruis needed to be kept separate and had never been assigned any cellmates because of his violent tendencies (*Id.* at ¶ 76.)
- Deputy Blackburn knew Mr. Yates was a vulnerable inmate due to his mental illness, had been threatened by other inmates, and previous cellmates had warned there would be trouble if he continued to share a cell with them. (*Id.* at ¶¶ 73, 75.)
- Defendants Blackburn, Gonzalez, and Does ignored Mr. Yates's screams for help. (*Id.* at ¶¶ 88, 90.)
- Defendants Blackburn, Gonzalez, and Does failed to conduct cell checks in accordance with Title 15, requiring them to be performed at random. (*Id.* at ¶¶ 208.)

Reading these facts in the light most favorable to the Complaint, Plaintiffs have stated a claim against Defendants for deliberate indifference. *See San Carlos Apache Tribe v. Becerra*, 53 F.4th 1236, 1239 n. 2 (9th Cir. 2022) ("When reviewing the dismissal of a complaint for failure to state a claim . . . [the court] take[s] all factual allegations set forth in the complaint as true, construed in the light most favorable to the plaintiff . . . ."). The Complaint alleges that Defendants were aware that Mr. Ruis had mental illnesses, had violent propensities, and had been segregated from other inmates because of his violent conduct and expressions. It also alleges Mr. Yates was a vulnerable inmate, suffered from mental illness, and was targeted and threatened by other inmates. Additionally, when calls for help came from the shared cell, Defendants failed to answer those calls and only later discovered Mr. Yates's body during their routine hourly cell inspection. These facts plausibly state a claim that Defendants were aware Mr. Yates was in danger when they placed him in the same cell as Mr. Ruis.

7

Defendants argue their case is analogous to other cases that have been dismissed, so dismissal is appropriate here.  Defendants rely on *Wright v. Contreras* for the proposition that courts are instructed to give deference to prison officials in their decision-making.  *Wright v. Contreras*, No. 09-CV-2566 JLS MDD, 2012 WL 834859, at *7 (S.D. Cal. Mar. 12, 2012).  There, the court stated that "[p]risons, by definition, are places of involuntary confinement of persons who have demonstrated proclivity for antisocial, criminal, and often violent conduct . . . .  [and] [c]hoosing the optimal [] measures to prevent violence and maintain safety is difficult and not readily susceptible to judicial evaluation."  *Id.*  Further, Defendants point out that—in that case—the court granted the motion to dismiss where a prisoner complained that "the prison and officers housed him with a mentally ill inmate who drugged and raped him and who had a history of doing the same to others."  (*Mtn.* at 6:11–14.)

However, Plaintiffs distinguish *Wright* on the basis that plaintiffs in that case failed to allege the named defendants were aware of the cellmate's dangerous tendencies. *Wright*, 2012 WL 834859, at *7 ("Plaintiff does not allege that Smith was aware of Hopkins' previous single-cell status or of any prior attacks by Hopkins on other cellmates."); ("[The Complaint] does not establish that Marrero was aware of and dismissed a substantial risk to Plaintiff's safety caused by sharing a cell with a different inmate.").  Defendants contend that Plaintiffs' assertions are conclusory and do not point out any specific facts that the deputies knew Mr. Ruis was aggressive.  (*Reply* at 2:9–14.) However, Plaintiffs point out that the deputies in this case had specific knowledge of Mr. Ruis's dangerous tendencies because of his alleged classification as a "bypass inmate," his violent outbursts, trips to EOH, and his criminal history with violence and domestic abuse.  (*Opp'n* at 8:3–6 n. 1.)  Unlike the plaintiffs in *Wright*, Plaintiffs in this case have pled facts that, if true, demonstrate Defendants were aware of Mr. Ruis's violent tendencies and ignored that risk in having Mr. Yates share a cell with him.

Plaintiffs cite two cases to support their position.  The first case, *Frost v. Cnty. of San Diego*, involved a transgender woman who was booked in the San Diego Central Jail

8

and later beaten by her cellmates.  *Frost v. Cnty. of San Diego*, No. 21CV01903-L-AGS, 2022 WL 4809364, at *1 (S.D. Cal. Sept. 30, 2022).  There, the plaintiff argued that placing a "transgender woman, in a minimally monitored cell with three men . . . [was an obvious safety risk] because transgender women are particularly vulnerable to violence and sexual assault in male correctional settings."  *Id.* at *4.  The court denied the motion to dismiss, finding that the plaintiff alleged facts sufficient to show that a reasonable officer would have "appreciated the risk of placing a transgender woman in a holding cell with men absent additional information . . . . [and based on the facts alleged] that failure to mitigate the risk to Plaintiff was objectively unreasonable."  *Id.* at *5.  Plaintiffs argue the dangers in this case were similarly obvious because Defendants were aware that both Mr. Ruis and Mr. Yates suffered from mental illness, Mr. Yates was known to be a vulnerable inmate, and Mr. Ruis was known to exhibit violent behavior and tendencies.  (*Opp'n* at 8:8–18.)

The second case, *Lucas v. Cnty. of San Diego*, involved an inmate plaintiff who was allegedly placed in a chokehold and had a portion of his face bitten off by his cellmate without provocation.  No. 20-CV-1735-CAB-JLB, 2021 WL 568787, at *1–2 (S.D. Cal. Feb. 16, 2021).  The complaint alleged that the cellmate was a "Level 5" inmate who was improperly housed in the general population because the jail was understaffed and did not have enough deputies to properly monitor high-risk inmates.  *Id.* Denying the motion to dismiss, the court found that the plaintiff stated a claim his constitutional rights were violated because defendants were aware of the cellmate's dangerous propensities, and by placing him in the general population, disregarded a substantial risk of harm.  *Id.* at 3–4.

Plaintiffs compare their facts to those in *Lucas*, asserting that like the defendants in that case, the deputies were aware of Mr. Ruis's violent tendencies.  *Id.*  Plaintiffs point out that the defendants in *Lucas* allegedly left the plaintiff unmonitored in the shared cell for fifteen minutes, whereas the deputies left Mr. Yates unmonitored for nearly an hour.  (*Opp'n* at 9:1–14.)  Plaintiffs argue that, like the defendants in *Lucas*, the deputies

similarly acted unreasonably to prevent or monitor Mr. Yates and Mr. Ruis given the foreseeable risk of inmate-on-inmate violence. (*Opp'n* at 9:14–19.)

In their Reply brief, Defendants attempt to distinguish *Lucas* and *Frost* but do so unpersuasively. As to *Lucas*, Defendants point out that Plaintiffs in this case assert that Mr. Ruis "*should have* been a minimum Level 4 [classification] . . . ." unlike *Lucas* where the plaintiff alleged the inmate attacker was a Level 5 inmate. (*Reply* at 2:15–26.) However, this argument is unavailing as Plaintiffs have alleged facts that demonstrate Mr. Ruis was known to have violent propensities, such as being sent to EOH on multiple occasions, his violent outbursts, and the need to keep him isolated from other inmates. Put another way, Plaintiffs are asserting that Defendants failed to properly classify Mr. Ruis as according to his potential to harm other inmates.

Defendants argue that *Frost* involved a specific, isolated danger of placing a transgender woman in a shared cell with men, whereas this case involves the general dangers of placing inmates together who routinely suffer from mental illness. (*Reply* at 3:3–11.) Defendants argue that this interpretation of *Frost* is too expansive and would suggest that because nearly "all . . . inmates present such a substantial danger to every other inmate, that it would be deliberately indifferent to house any together." (*Id.*)

Moreover, Plaintiffs do not argue that any time an inmate is injured in a shared cell by their cellmate Defendants are at fault. Rather, Plaintiffs argue that Mr. Ruis was known to be a danger to other inmates, and by failing to keep him separated, Defendants abdicated their duty to ensure Mr. Yates's safety while in custody. (*Opp'n* at 8:7–18.) Read that way, *Frost* is not so broad as to create deliberate indifference claims in every instance of inmate-on-inmate violence, but only where the officers or deputies (1) are aware that an inmate has a special proclivity for violence, (2) ignore those warning signs, and (3) place a vulnerable inmate in the same cell who is ultimately attacked by the violent inmate. *See Lucas*, 2021 WL 568787, at *1–2 (citing *Castro*, 833 F.3d at 1067 (internal quotations and citations omitted) ("[T]he Supreme Court made clear that prison officials have a duty to protect prisoners from violence at the hands of other prisoners

because corrections officers have stripped the inmates of virtually every means of self-protection and foreclosed their access to outside aid.").

For these reasons, the Court finds that Plaintiffs have plausibly stated a claim that Defendants were deliberately indifferent to Mr. Yates's constitutional rights when he was required to share a cell with Mr. Ruis and left unmonitored for nearly an hour.


### i.    Defendants' Qualified Immunity Defense is Denied

Defendants also argue that under the facts alleged in the Complaint, they are entitled to qualified immunity. Qualified immunity precludes liability if the officer's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of this doctrine is to balance two important interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *O'Doan v. Sanford*, 991 F.3d 1027, 1036 (9th Cir. 2021) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

To determine whether an officer is entitled to qualified immunity, the court considers two independent questions: (1) whether the officer's conduct violated a statutory or constitutional right, and (2) whether that right was "clearly established" at the time of the incident. *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018). Stated another way, qualified immunity bars Section 1983 suits against a government officer when "either no deprivation of rights was alleged or the law dictating that specific constitutional [or statutory] right was not yet clearly established." *Cates v. Stroud*, 976 F.3d 972, 978 (9th Cir. 2020) (citing *Pearson*, 555 U.S. at 236). Although qualified immunity is a two-step analysis, the court may analyze just the second step "when no clearly established law shows that the officers' conduct was unconstitutional." *O'Doan*, 991 F.3d at 1036. As to statutory rights, courts also look to whether "existing precedent

must have placed the statutory[] question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017).

As explained above, Plaintiffs have stated a claim that the deputies were deliberately indifferent to Mr. Yates's constitutional rights. Therefore, the first qualified immunity prong has been satisfied. As to the next prong, Plaintiffs cite *Farmer v. Brennan*, alongside several circuit opinions, to establish that the right to be free from inmate-on-inmate violence is clearly established. (*Opp'n* at 12:9–21) (citing *Farmer v. Brennan*, 511 U.S. 825 (1970)); *see also Castro*, 833 F.3d at 1067. Defendants take the opposite position, citing *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043 (9th Cir. 2002) for support.

In *Estate of Ford*, the Ninth Circuit reversed the denial of qualified immunity where one cellmate (Diesso) killed another cellmate (Ford) when placed in a shared cell. *Id.* at 1045. Before he murdered Ford, Diesso had been classified as "extremely violent and dangerous" and designated as a "predator." (*Id.* at 1046.) Diesso was also classified at the highest security level and previously threatened to attack a cellmate when he was not medicated. *Id.* at 1051. The officers placed Ford and Diesso in a shared cell, believing it to be safe because Diesso (1) had been double-celled successfully with another inmate for three days; (2) was taking medication; (3) Ford and Diesso had previously been celled together without incident; (4) they were not enemies nor in a gang-related conflict; and (5) the two had requested to be celled together. *Id.* at 1051–52. The Ninth Circuit held that under the above facts, the officers were entitled to qualified immunity, because a reasonable officer would not have expected that celling Ford and Diesso together would present an "excessive or intolerable risk of serious injury." *Id.*

Plaintiffs persuasively distinguish this case from *Estate of Ford* in several respects. Unlike Diesso, Mr. Ruis had not been double-celled successfully in the past, was not on medication, was not allowed to be around other inmates, and the two did not request to be celled together. (*Opp'n* at 11:20–27; 12:1–8.) These facts are compelling, as the court in *Estate of Ford* specifically stated, "the evidence does not show that Ford faced an

1    intolerable risk as the two *had been celled before and requested to do so again*." 301

2    F.3d at 1052 (emphasis added).  Even more, the Ninth Circuit explained that the officers'

3    knowledge of Diesso's violent history would not be enough to overcome qualified

4    immunity, because he had only acted aggressively *on one occasion while off medication*

5    *and had since been medicated. Id.*  Those material facts—absent in this case—were

6    critical to the Ninth Circuit's decision to reverse the denial of qualified immunity.

7         For these reasons, the Court agrees with Plaintiff that the right to be free from

8    inmate-on-inmate violence is clearly established.  Although Defendants argue *Estate of*

9    *Ford* controls and qualified immunity should be granted, the Court finds the facts of this

10   case materially distinguishable and that case does not control the clearly established

11   analysis here.  Therefore, Defendants' qualified immunity defense is denied.

12

13        **B.    Plaintiffs Have Properly Pled a Claim for Failure to Properly Train,**

14        **Supervise, or Discipline**

15        Plaintiffs' second cause of action is for failure to properly train, supervise, or

16   discipline under 42 U.S.C. § 1983.  Defendants argue that Plaintiffs have failed to state a

17   claim for failure to properly train, supervise, or discipline because they have not alleged

18   specific allegations about "what information each supervisor had, what each supervisor

19   did with the information, and . . . what discipline should have been provided . . . ." (*Mtn.*

20   at 10:13–16.)  Defendants assert the Complaint is conclusory, fails to point out which

21   trainings were absent, which trainings caused the violation, and "does not even allege that

22   any supervisory Defendant was aware that Yates was killed." (*Id.* at 10:18–26.)

23

24        **1.    Inmate Housing Classifications**

25        Plaintiffs cite paragraphs 137 to 175 of the Complaint, detailing their allegations

26   about failure to train, supervise, and discipline as to housing violent inmates with other

27   vulnerable inmates. (*Opp'n* at 14:1–9.)  A few of those allegations are:

28

- A 2022 California State Auditor report that criticized the San Diego Sheriff's Department for failing to update equipment for monitoring the safety of the inmates. (*Compl.* at ¶¶ 143–44.)
- Eight inmates in California killed by other inmates, including: Russel Hartsaw (classified as a "Keep Separate All" inmate due to his vulnerabilities); Lyle Woodward (an African-American man strangled by his cellmate, an Aryan Brotherhood white supremacist); Richard Lee Salyers (found dead during a late cell check); Dominque McCoy (killed by his cellmate; a report after the incident found that SDSD failed to implement reasonable measures to prevent the cellmate from harming others); Derek Baker (beaten and killed by his cellmate; a report after the incident found SDSD failed to act reasonably in placing the two inmates in a shared cell); Raymond Vogelman (inmate with special vulnerabilities, who had to e separated from other inmates, was found beaten and soaked in blood; and emergency services were not summoned for at least 12 minutes); Eric Van Tine (inmate who suffered from schizophrenia placed in a shared cell with two other inmates; beaten into a coma and later died due to injuries).
- The case *Lucas v. County of San Diego et al.*, 20-cv-1735-CAB-JLB, 2021 WL 568787 (S.D. Cal. 2020) involving similar facts (explained in further detail above).

The facts alleged state a claim that Defendants were aware of a systemic problem with housing violent inmates in shared cells with vulnerable inmates, yet failed to take action to ensure their safety. Plaintiffs assert Defendants failed to follow their own policies to properly classify inmates by their propensity for violence, and that if they had followed their classification procedures, Mr. Yates would not have been placed in a cell with Mr. Ruis. (*Compl.* at ¶¶ 124–29.) The Complaint asserts that Defendant Does 11 through 21 knew Mr. Ruis was a danger to himself and others; Does 37 through 46 and Medical Supervisory Does 47 through 51 observed Mr. Ruis's violent and aggressive behavior while in EOH; Does 11 through 21, 37 through 46, and Medical Supervisory Does 47 through 51 had a responsibility to advise the deputies about Mr. Ruis's violent propensities so he could be reclassified; and if Mr. Ruis had been properly classified, Mr. Yates would not have been placed in a cell with him. (*Id.* at ¶¶ 130–36.)

The facts alleged in the Complaint plausibly state a claim that Defendants failed to properly train, supervise, and discipline by failing to update security equipment for inmates, failing to correctly classify inmates by their violence level in the past, and failing to take remedial action after numerous inmate deaths due to inmate-on-inmate violence.

### 2.   <u>**Muting Safety Intercoms**</u>

Plaintiffs also assert that Defendants were aware of an ongoing practice of silencing inmate emergency intercom calls and allowing emergency buttons to remain nonfunctional.  (*Compl.* at ¶ 156.)  The Complaint cites:

- An investigation into Richard Boulanger's death, an inmate who committed suicide in 2016 in the San Diego Central Jail.  (*Id.* at ¶¶ 158–59.)  That investigation found that the deputies on duty failed to hear his emergency calls although the system was functional.  (*Id.*)
- Another incident in 2016 where the intercom was reportedly at a low volume and ineffective.  (*Id.*)
- CLERB policy recommendations made to dispatch assistance when an inmate emergency alarm is activated and to check the intercom monitor for visual alerts and to ensure the audio alert on the monitor have not been disabled.  (*Id.*)  Additionally, detention staff is prohibited from muting or otherwise disabling the audio component or lowering its volume.  (*Id.*)
- An incident in 2018, where inmate Frankie Greer experienced a seizure.  (*Id.* at ¶ 160.)  Although his cellmates repeatedly pressed the emergency intercom button, the calls were either ignored or muted for over thirty-minutes.  (*Id.*)  By the time Mr. Greer got emergency assistance, he had had to have a hole drilled in his brain to drain the blood that pooled in his skull.  (*Id.*)  An investigation found that 19 days after the incident, the intercoms were not working properly.  (*Id.* at ¶ 161.)
- Three days after Mr. Greer's investigation, homicide detectives investigating Paul Silva's death found that no sound or alert could be heard when pressing the intercom button at his holding cell in the San Diego Central Jail.  (*Id.* at ¶ 162.)
- A lawsuit brought by civil rights attorneys in 2022, alleging that (1) deputies failed to respond to inmates struggling to breathe, begging for help, and pushing the cell's emergency button multiple times; (2) deputies did not respond to an emergency intercom call from a choking inmate for 20 to 30

minutes and the inmate was threatened with discipline if he used the button again; and (3) that a defective intercom prevented deputies from promptly responding to a "man down" incident during a fight that led to a man being placed on life support. (*Id.* at ¶ 164.)

The Complaint then relates these incidents to the facts of their case, asserting that Defendants were aware of Department policy prohibiting staff from routinely muting or silencing the intercoms. (*Id.* at ¶¶ 165–68.) The Complaint alleges a pattern of ignoring, muting, or failing to fix intercoms despite the Department's written policies. (*Id.* at ¶¶ 172–73.) For example, the Complaint asserts that the deputies have a practice of bypassing calls from inmates who press the button for nonmedical emergencies or do not answer callbacks. (*Id.* at ¶ 174.) The Complaint argues this alleged practice means that those who press the emergency button in their cell but cannot answer the call will have their emergencies "bypassed" and ignored. (*Id.* at ¶ 175.) Plaintiffs tie these allegations to the facts of their case by asserting that Mr. Ruis was improperly classified (*Compl.* at ¶¶ 219–21) and the prison staff either muted or ignored Mr. Yates's repeated emergency calls over the intercom (*id.* at ¶¶ 226–27).

Defendants argue the allegations against them are conclusory and that Plaintiffs failed to state a claim against each individual defendant. (*Mtn.* at 9:14–24.) However, as explained above, Plaintiffs alleged facts showing a pattern of placing inmates with other inmates with a propensity for violence and muting emergency intercoms. Plaintiffs also allege Defendants had personal knowledge of repeated constitutional violations committed by subordinates, but failed to implement improved policies, procedures, and training to prevent future misconduct. (*Compl.* at ¶¶ 216–24.) Therefore, the Court will deny Defendants' motion to dismiss the failure to train, supervise, and discipline under 42 U.S.C. § 1983.

Defendants also assert they are entitled to qualified immunity, so the claim should be dismissed. However, as explained above, Plaintiffs have stated a claim their constitutional rights were violated and that the law was clearly established at the time.

*See supra* Sec. A(1)(ii). Therefore, the Court will also deny Defendants' qualified immunity defense.

### C.     **Plaintiffs Have Sufficiently Stated a *Monell* Claim Against the County**

Defendants also move to dismiss the *Monell* claims against the County. Under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, municipalities cannot be held vicariously liable under Section 1983 for the actions of their employees. 436 U.S. 658, 692 (1978). Instead, "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original).

Thus, to be liable under Section 1983 for a *Monell* claim, a plaintiff must establish: (1) his or her constitutional right was violated; (2) the municipality had a policy; (3) the policy "amounts to deliberate indifference" to plaintiff's constitutional right; and (4) the policy, custom, or practice is the "moving force behind the constitutional violation." *Lockett v. Cty. of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020) (citing *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)).

#### 1.     **Policy or Custom**

Defendants first assert that Plaintiffs have failed to state a *Monell* claim against the County for an unconstitutional policy, custom, or practice. (*Mtn.* at 12–16.) To state a *Monell* claim based on an unconstitutional pattern and practice, Plaintiff must allege facts showing a custom that is so "persistent and widespread" that it establishes a "permanent and well settled city policy." *Monell*, 436 U.S. at 690–91. A municipal policy exists when "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). Defendants argue that "each of Plaintiffs' allegations related to a policy or

1 custom are too vaguely worded and too all-encompassing and conclusory . . . . [and] have

2 not even cited any actual Sheriff's policy for any of the claims. . . ." (*Mtn.* at 13:21–24.)

3          However, as explained above, Plaintiffs have cited various other incidents of

4 similar violations and related those to the facts of their case as required under *Monell*.

5 The Complaint details a *de facto* policy of failing to classify inmates based on their

6 propensity for inmate-on-inmate violence and ignoring and muting the emergency

7 intercoms.  The Complaint then cites various incidents of inmate-on-inmate violence and

8 incidents prompted by failing to respond to the emergency intercom systems.  Plaintiffs

9 then tie those incidents to the facts of their case as they assert (1) Mr. Ruis would not

10 have been permitted to have a cellmate had he been properly classified and (2) the

11 deputies could have prevented Mr. Yates's murder had they responded to his emergency

12 calls.  (*See Opp'n* at 15:22–28; 16–17.)

13          Based on the allegations pled in the Complaint, the Court finds that Plaintiffs have

14 sufficiently stated a *Monell* claim against the County for an unconstitutional policy or

15 custom.  Because Plaintiffs have adequately stated a *Monell* claim, the Court need not

16 consider Plaintiffs' other *Monell* theories.

17

18          **D.     <u>Plaintiffs Have Plausibly Stated a Right to Association Claim</u>**

19          Defendants also move to dismiss Mr. Yates's Right of Association claim.  (*Mtn.* at

20 19–21.)  "Parents and children may assert Fourteenth Amendment substantive due

21 process claims if they are deprived of their liberty interest in the companionship and

22 society of their child or parent through official conduct."  *Lemire v. California Dept. Of*

23 *Corrections and Rehabilitation*, 726 F.3d 1062, 1075 (9th Cir. 2013).  "Only official

24 conduct that shocks the conscience is cognizable as a due process violation."  *Id.*

25 (citations and internal quotation marks omitted).  "A prison official's deliberately

26 indifferent conduct will generally shock the conscience so as long as the prison official

27 had time to deliberate before acting or failing to act in a deliberately indifferent manner."

28 *Id.*

Defendants argue that Plaintiffs have failed to provide facts showing that the deputies were "deliberately indifferent to a known or obvious danger for Yates."  Instead, the Complaint focuses on Mr. Ruis despite that the deputies were unaware of any facts suggesting that Mr. Ruis would kill a cellmate.  (*Mtn.* at 21:1–9.)

However, as explained earlier, Plaintiffs have plausibly stated a claim that the deputies were deliberately indifferent to Mr. Yates's safety when they placed him in a shared cell with Mr. Ruis, as the Complaint alleges that Mr. Ruis was a "bypass inmate" who was not permitted to be around other inmates, was sent back and forth to EOH, was not placed on medication, had a history of threatening other inmates, and the deputies failed to respond to Mr. Yates's calls over the emergency intercoms.  (*Supra* Sec. A(1)(i).)  Despite these facts, Plaintiffs allege that Defendants placed Mr. Yates in a shared cell and failed to respond to emergency calls while he was murdered by Mr. Ruis.

Accordingly, the Court finds that Mr. Yates has stated a plausible Right of Association claim.  Therefore, the motion to dismiss the claim will be denied.

### E.   Plaintiffs Have Sufficiently Pled a Claim under the California Bane Act

Defendants next move to dismiss Plaintiffs' Bane Act claim.  The Bane Act creates civil liability for anyone who "interferes by threat, intimidation, or coercion . . . with the exercise or enjoyment by any individual or individuals or rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of [California]."  Cal. Civ. Code § 52.1.  To successfully plead a claim under the Act, a plaintiff must show (1) interference with or attempted interference with a state or federal constitutional or legal right, and (2) that the interference or attempted interference was by threats, intimidation, or coercion.  *Sanchez v. Cnty. of Los Angeles*, No. CV201146DSFPVCX, 2020 WL 9074714, at *9 (C.D. Cal. Apr. 28, 2020).

Defendants first argue the Bane Act claim should be dismissed because Plaintiffs have failed to allege "any threat, intimidation, or coercion or of any attempted interference with a right by them under this claim."  (*Mtn.* at 22:1–3.)  However,

19

California courts have taken the position that "[n]othing in the text of the statute requires that the offending 'threat, intimidation, or coercion' be 'independent' from the constitutional violation alleged." *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 800 (2017); *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1044–45 (9th Cir. 2018) (citing *Cornell*, 17 Cal. App. 5th at 801–02). Therefore, Plaintiffs have sufficiently alleged Mr. Yates's rights were violated by coercion. (*Opp'n* at 20:15–17.)

### 1.    <u>Defendants Are Not Entitled to Immunity</u>

Defendants also move to dismiss the Bane Act claim based on immunity for government official's discretionary acts within the scope of their authority. (*Mtn.* at 22:4–13.) Specifically, Defendants point to Cal. Gov. Code § 820.2, providing that "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." *Caldwell v. Montoya*, 10 Cal. 4th 972, 980 (1995) (citations omitted).

However, Plaintiffs argue that the immunity afforded under that statute is construed narrowly and reserved for "basic policy decisions which have been expressly committed to coordinate branches of government, and as to which judicial interference would thus be unseemly." (*Opp'n* at 21:1–15); *Desoucy v. Cnty. of San Bernardino*, No. EDCV 23-1287JGB (MAAX), 2024 WL 3064089, at *13 (C.D. Cal. May 9, 2024) (citing *Johnson v. State*, 69 Cal. 2d 782, 787–90 (1968)) ("although a basic policy decision . . . may be discretionary and hence warrant governmental immunity, subsequent ministerial actions in the implementation of that basic decision must still face case-by-case adjudication on the question of negligence."); *M.D. v. Cnty. of San Bernardino*, No. 5:22-CV-1357-SP, 2023 WL 8895699, at *8 (C.D. Cal. Nov. 15, 2023) (quoting *Caldwell*, 10 Cal. 4th at 981). Additionally, the moving party must "identify a specific policy decision [and show they] 'consciously balance[d] risks and advantages.'" *Desoucy*, 2024 WL 3064089, at *14 (citing *M.D.*, 2023 WL 8895699, at *8).

1    Plaintiffs assert that immunity based on discretionary acts is not warranted in this
2    case because they are challenging the implementation of a policy, not the policy itself.
3    (*Opp'n* at 21:1–15.)  Further, Plaintiffs point out that Defendants have failed to cite any
4    policy and show their decisions were based on a process of balancing risks and
5    advantages.  (*Id.* at 21:16–23); *see Desoucy*, 2024 WL 3064089, at *14.  The Court
6    agrees that Defendants are not entitled to immunity under Cal. Gov. Code § 820.2.

7    Defendants also assert that immunity is warranted under Cal. Gov. Code § 845.2,
8    which provides that public entities and employees are not liable for the failure to provide
9    sufficient equipment, personnel, or facilities.  (*Mtn.* at 22:19–21.)  Despite this, the cases
10   Defendants cite in support share a similar problem.  Defendants first cite *Taylor v. Buff*,
11   172 Cal. App. 3d 384, 388 (1984).  Defendants point out that in *Taylor*, a sheriff was
12   entitled to immunity where (1) he did not have the funds to remedy defective locks and
13   (2) the injuries were attributable to a discretionary act.  (*Mtn.* at 22:21–25.)  However, the
14   Court explained that "[t]he decision whether or not to allocate funds for an improved
15   security system in the jail was a purely discretionary one and cannot serve as a basis for
16   tort liability."  *Taylor*, 172 Cal. App. at 390–91.  Defendants also cite *Estate of Abdollahi
17   v. Cnty. of Sacramento*, 405 F. Supp. 2d 1194 (E.D. Cal. 2005) for the proposition that
18   officials are immune from negligence suits based on providing insufficient guards to
19   observe suicide prone detainees and inmates.  (*Mtn.* at 22:25–28; 23:1.)

20   Even so, Defendants have not explained how Plaintiffs' claims are a "category of
21   political decisionmaking includ[ing] questions of budgetary and fiscal policy, personnel
22   administration standards, allocation of available resources according to valuable priorities
23   of need, and choices between competing plans for accomplished approved objectives."
24   *Taylor*, 172 Cal. App. at 390–91.  Defendants have not demonstrated that immunity
25   under Section 845.2 is warranted.  *See Bakos v. Roach*, 108 Cal. App. 5th 390, 400
26   (2025) (citing *Johnson v. State of California*, 69 Cal. 2d 782, 794 fn. 8 (1968))
27   ("Defendants bear the burden of establishing that immunity applies.").  Accordingly, the
28   motion to dismiss the Bane Act claim is denied.

25-CV-410 W (MMP)

1

2      **F.**      <u>**Defendants Are Not Entitled to Immunity for Plaintiffs' Negligence and**</u>

3              <u>**Wrongful Death Claims**</u>

4           Defendants next move to dismiss Plaintiffs' Negligence and Wrongful Death

5      claims. (*Mtn.* at 23:4–10.) Defendants argue that Cal. Gov't Code § 844.6 expressly

6      provides that the County is immune from claims based on an injury proximately caused

7      by any prisoner and an injury to any prisoner and failure to summon medical care. (*Id.* at

8      23:17–23.) In response, Plaintiffs argue that their claims are not based on an injury

9      proximately caused by any prisoner or an injury to any prisoner. (*Opp'n* at 22:3–4.)

10     Rather, Mr. Yates was injured by Defendants' failure to render care. (*Id.*)

11          Defendants point out that California courts have interpreted Section 844.6 as

12     "precluding actions against public entities for the wrongful death of prisoners regardless

13     of the underlying theory of liability." *May v. Cnty. of Monterey*, 139 Cal. App. 3d 717,

14     721 (1983). However, an exception to this immunity is Section 845.6. Defendants are

15     not entitled to immunity if (1) the public employee knows or has reason to know of the

16     need for (2) immediate medical care, and (3) fails to take reasonable action to summon

17     medical care. *Scalia v. Cnty. of Kern*, 308 F. Supp. 3d 1064, 1085 (E.D. Cal., Apr. 10,

18     2018).

19          Plaintiffs argue Defendants unreasonably failed to render emergency care as Mr.

20     Yates repeatedly pressed the emergency button in the cell for help as he was beaten to

21     death. (*Id.* at 22:5–8.) In response, Defendants argue liability under § 845.6 is "limited

22     to serious and obvious medical conditions requiring immediate care." *Watson v. State of*

23     *California*, 21 Cal. App. 4th 836, 841 (1993). However, the Complaint provides:

24

25             •    "Brandon went to the door of the cell and began pressing the call button

26                    to try to summon help, pressed the emergency intercom, multiple times saying, "They are going to kill me." (*Compl.* at ¶ 85.)

27             •    "At one point, Ruis pressed the emergency button himself." (*Id.* at

28                    ¶ 86.)

- "Defendants . . . ignored the multiple calls for help . . . . Defendants muted cell 9's intercom or at least 15 minutes, silencing Brandon and ignoring his call for help." (*Id.* at ¶ 87.)
- "Brandon and Ruis's exchange became loud enough for other inmates in Module 4C to hear shouting and banging." (*Id.* at ¶ 89.)
- "Other inmates in the module notified the control tower by pressing the panic button. It was ignored." (*Id.* at ¶ 90.)

The Court agrees that Plaintiffs have stated a claim that Defendants reasonably should have known medical care was necessary. As explained above, the Complaint alleges that Defendants knew Mr. Yates was a vulnerable inmate who had been threatened by other inmates, that Mr. Ruis was known to have violent tendencies, and Mr. Yates had repeatedly requested emergency help as he was attacked by Mr. Ruis, saying "[t]hey are going to kill me." Based on these facts, the Court finds—at this stage—the allegations sufficiently allege that Defendants had reason to know that Mr. Yates required immediate medical care. Therefore, Defendants are not entitled to immunity under Section 844.6.

Defendants also briefly raise immunity arguments under Cal. Gov't Code §§ 820.2 and 845.2. However, as explained above, Defendants have not demonstrated that immunity under the statutes is warranted. *Supra* Sec. E(1). Therefore, the motion to dismiss the negligence and wrongful death claims is denied.

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' motion to dismiss the Complaint [Doc. 11].

**IT IS SO ORDERED.**

Dated:  August 21, 2025

Hon. Thomas J. Whelan
United States District Judge