1  DAVID J. SMITH, Acting County Counsel (SBN185643)
   By:    JENNIFER M. MARTIN, Senior Deputy (SBN 322048)
2         LAURA WILSON, Senior Deputy (SBN 273045)
   Office of County Counsel, County of San Diego
3  1600 Pacific Highway, Room 355
   San Diego, California 92101-2469
4  Telephone: (619) 531-4901; (619) 595-4531 Fax: (619) 531-6005
   E-mail: jennifer.martin2@sdcounty.ca.gov; laura.wilson@sdcounty.ca.gov
5  *Attorneys for Defendants and Third Party Cross Complainant County of San Diego, and
   Defendants Kelly Martinez, Rich Williams, Matthew Blackburn, and Tony Gonzalez*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF BRANDON YATES by and through its successors-in-interest Dan Yates and Andrea Carrier; DAN YATES and ANDREA CARRIER, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SAN DIEGO, KELLY MARTINEZ, in her individual capacity, RICH WILLIAMS, in his individual capacity, MATTHEW BLACKBURN, in his individual capacity, TONY GONZALEZ in his individual capacity and DOES 1-51, <br><br> Defendants. <br> _____ <br><br> COUNTY OF SAN DIEGO, <br><br> Third Party/Cross-complainant, <br><br> v. <br><br> DR. HUDAD TOLLOUI; DR. REBECCA ROBINSON; DR. PETE J. FARRELL IV; MIRANDA EVANS; LIBERTY HEALTHCARE CORPORATION; LIBERTY HEALTHCARE OF CALIFORNIA, INC.; NAPHCARE OF SAN DIEGO, LLC; NAPHCARE, INC.; AND ROES 1-30. <br><br> Third Party/Cross-claim Defendants. | No. 25-cv-0410-W-MMP <br><br> **DEFENDANT COUNTY OF SAN DIEGO'S THIRD-PARTY/CROSS-CLAIMS FOR:** <br> **(1) CONTRACTUAL INDEMNITY** <br> **(2) EQUITABLE INDEMNITY** <br> **(3) DECLARATORY RELIEF** <br><br> **<u>Jury Trial Demanded</u>** |

**INTRODUCTION**

Defendant and Third-Party/Cross-complainant County of San Diego (the "County") brings these third party cross-claims against: DR. HUDAD TOLLOUI; DR. REBECCA ROBINSON; DR. PETE J. FARRELL IV; MIRANDA EVANS; LIBERTY HEALTHCARE CORPORATION; LIBERTY HEALTHCARE OF CALIFORNIA, INC.; NAPHCARE, INC.; NAPHCARE OF SAN DIEGO, LLC (collectively, "Cross Claim Defendants").

These third party cross-claims arise out of the same transactions and occurrences as the claims Plaintiff has brought against the County in this action. Additionally, a determination of all claims in one proceeding is necessary and appropriate to avoid the multiplicity of actions that would result if the County were required to bring separate actions against the Cross-claim Defendants for indemnification and/or contribution for any sums the County may be compelled to pay to Plaintiff as a result of any judgment or other award in this matter.

**PARTIES**

1. Cross-complainant County of San Diego is, and at all times relevant to these cross claims was, a public entity duly organized and existing under the laws of the State of California.

2. Cross-claim Defendant NAPHCARE, INC. is, and at all times relevant to these cross-claims was, a corporation organized under the laws of the State of California. NAPHCARE, INC. agreed to provide on-site mental health related care to inmates at County jails and under its agreement with the County, provided physicians and mental health providers that provided care to Alvin Ruis and/or decedent Brandon Yates.

3. Cross-claim Defendant NAPHCARE OF SAN DIEGO, LLC is, and at all times relevant to these cross-claims was, a corporation organized under the laws of the State of California. NAPHCARE, INC agreed to provide on-site mental health related care to inmates at County jails and under its agreement with the County provided physicians and mental health providers that provided care to Alvin Ruis and/or decedent

1  Brandon Yates.  Upon information and belief, NAPHCARE OF SAN DIEGO, LLC is the
2  alter ego of NAPHCARE, INC., is not separately capitalized, and does not observe
3  corporate formalities.

4      4.    Cross-claim Defendant LIBERTY HEALTHCARE CORPORATION
5  ("Liberty Healthcare") is, and at all times relevant to these cross-claims was, a
6  corporation organized under the laws of the State of California. Liberty Healthcare
7  Corporation agreed to provide on-site mental health related care at County jails and is
8  believed to have done so pursuant to a contract with Naphcare Defendants and its
9  physicians and mental health providers provided care to Alvin Ruis and/or decedent
10  Brandon Yates.

11      5.    Cross-claim Defendant LIBERTY HEALTHCARE OF CALIFORNIA, INC
12  ("Liberty Healthcare") is, and at all times relevant to these cross-claims was, a
13  corporation organized under the laws of the State of California. LIBERTY
14  HEALTHCARE OF CALIFORNIA, INC agreed to provide on-site mental health related
15  care at County jails and is believed to have done so pursuant to a contract with Naphcare
16  Defendants and its physicians and mental health providers provided care to Alvin Ruis
17  and/or decedent Brandon Yates.  Upon information and belief, LIBERTY
18  HEALTHCARE OF CALIFORNIA, INC is the alter ego of LIBERTY HEALTHCARE
19  CORPORATION, is not separately capitalized, and does not observe corporate
20  formalities.

21      6.    Cross-claim Defendant HUDAD TOLLOUI, is, and at all times relevant to
22  these cross-claims was, an individual residing in the County of San Diego and a Licensed
23  Clinical Psychologist licensed to practice in the State of California.  At all times relevant
24  to these cross-claims, this defendant practiced as a LIBERTY HEALTHCARE OF
25  CALIFORNIA, INC, LIBERTY HEALTHCARE CORPORATION, NAPHCARE OF
26  SAN DIEGO, LLC, and/or NAPHCARE, INC. physician and/or mental healthcare
27  provider, in that capacity, provided mental health care to Alvin Ruis and/or decedent
28  Brandon Yates.

7.     Cross-claim Defendant REBECCA ROBINSON, is, and at all times relevant to these cross-claims was, an individual residing in the County of San Diego and a is a registered psychological associate and/or licensed clinical psychologist licensed to practice in the State of California.  At all times relevant to these cross-claims, this defendant practiced as a LIBERTY HEALTHCARE OF CALIFORNIA, INC, LIBERTY HEALTHCARE CORPORATION, NAPHCARE OF SAN DIEGO, LLC, and/or NAPHCARE, INC. physician and/or mental healthcare provider, in that capacity, provided mental health care to Alvin Ruis and/or decedent Brandon Yates.

8.     Cross-claim Defendant PETE J. FARRELL IV, is, and at all times relevant to these cross-claims was, an individual residing in the County of San Diego and a is a psychiatrist licensed to practice in the State of California.  At all times relevant to these cross-claims, this defendant practiced as a LIBERTY HEALTHCARE OF CALIFORNIA, INC, LIBERTY HEALTHCARE CORPORATION, NAPHCARE OF SAN DIEGO, LLC, and/or NAPHCARE, INC. physician and/or mental healthcare provider, in that capacity, provided mental health care to Alvin Ruis and/or decedent Brandon Yates.

9.     Cross-claim Defendant MIRANDA EVANS, is, and at all times relevant to these cross-claims was, an individual residing in the County of San Diego and a is a clinical social worker licensed to practice in the State of California.  At all times relevant to these cross-claims, this defendant practiced as a LIBERTY HEALTHCARE OF CALIFORNIA, INC, LIBERTY HEALTHCARE CORPORATION, NAPHCARE OF SAN DIEGO, LLC, and/or NAPHCARE, INC. provider and/or mental healthcare provider, in that capacity, provided mental health care to Alvin Ruis and/or decedent Brandon Yates.

10.     The County is ignorant of the true names and capacities of the Cross-claim Defendants sued herein as Roes 1-30 and therefore sues these cross-claim defendants by such fictitious names.  The County will amend its cross-claims to allege the true names and capacities when ascertained.  The County is informed and believes, and on that basis

alleges, that each of the fictitiously named cross-claim defendants are responsible in some manner for the occurrences as herein alleged and that the County's losses as herein alleged were proximately caused by such conduct.

**JURISDICTION AND VENUE**

11.    Jurisdiction and venue are proper in this judicial district.  The County has brought cross-claims for breach of contract and equitable indemnity that arise from the same transactions and occurrences as the claims that Plaintiff has brought against the County in this action.

12.    Jurisdiction is proper pursuant to 28 U.S.C. §1367.  Venue is proper in the Southern District of California pursuant to 28 U.S.C. §1391.

**GENERAL ALLEGATIONS**

13.    On, February 24, 2025, THE ESTATE OF BRANDON YATES, by and through its successors-in-interest Dan Yates and Andrea Carrier; and DAN YATES and ANDREA CARRIER ("Plaintiffs'), filed a Complaint against the County of San Diego and Doe defendants in this action titled, *THE ESTATE OF BRANDON YATES by and through its successors-in-interest Dan Yates and Andrea Carrier; DAN YATES and ANDREA CARRIER, Plaintiffs, v. COUNTY OF SAN DIEGO, KELLY MARTINEZ, in her individual capacity, RICH WILLIAMS, in his individual capacity, MATTHEW BLACKBURN, in his individual capacity, TONY GANZALEZ in his individual capacity and DOES 1-51, Defendants.,* in the United States District Court for the Southern District of California, Case No. 25CV0410WMMP, ("Yates Lawsuit") alleging, among other things, that decedent, Brandon Yates, was killed by Alvin Ruis and that Plaintiffs have suffered damages due to a failure to adhere to the applicable standard of care or otherwise obtain or furnish mental health and medical care for Alvin Ruis and/or Brandon Yates.

14.    Exhibit A, attached to this Complaint is a copy of the Yates Lawsuit Complaint, which is incorporated by reference.

15.    On or about April 26, 2022, NAPHCARE OF SAN DIEGO, LLC and NAPHCARE, INC entered into an agreement with the County that NAPHCARE OF

SAN DIEGO, LLC and NAPHCARE, INC were to provide licensed mental healthcare staffing at County jails (the "Naphcare Agreement"), including during the dates alleged in the Yates Lawsuit Complaint.  A true and correct copy of NAPHCARE OF SAN DIEGO, LLC and NAPHCARE, INC's agreement with the County, as subsequently amended, is attached hereto as Exhibit "B" and incorporated herein by reference.

16.    On information and belief, Defendant Does identified in Exhibit A (¶¶26-28) include the Third Party / Cross Defendants in this Complaint.

17.    LIBERTY HEALTHCARE CORPORATION and LIBERTY HEALTHCARE OF CALIFORNIA, INC, agreed to provide on-site mental health care and related medical services at County jails, including during the dates alleged in the Yates Lawsuit Complaint.

18.    DR. HUDAD TOLLOUI; DR. REBECCA ROBINSON; DR. PETE J. FARRELL IV; MIRANDA EVANS were the mental healthcare professionals that LIBERTY HEALTHCARE CORPORATION, LIBERTY HEALTHCARE OF CALIFORNIA, INC, NAPHCARE OF SAN DIEGO, LLC, NAPHCARE, INC's provided to County jails.

19.    Plaintiff has asserted a claim in the Yates Lawsuit Complaint in this action for "negligence" and "wrongful death" against DOES in that action who are Third Party Cross Defendants in this complaint and alleges that those Defendants.

20.    The Yates Complaint alleges: Medical personnel (Does 37-46) failed to properly assess, treat, and monitor Ruis despite knowledge of his serious mental illness and violent tendencies (Paragraphs 25, 38, 41, 43, 47, 51, 55-57); Medical staff failed to admit Ruis to the Psychiatric Stabilization Unit (PSU) where he could have been monitored and medicated (Paragraphs 43, 66); Medical staff failed to properly inform deputies about Ruis's dangerous condition (Paragraphs 25, 132, 134);  Medical Supervisory personnel (Does 47-51) failed to properly supervise the medical staff in their duties (Paragraphs 26, 57, 132); These failures directly contributed to the foreseeable harm that resulted in Brandon Yates' death (Paragraphs 134, 136).

21.   The Yates Complaint also specifically identifies these individuals as contractors and subcontractors of the County. The Yates Complaint is incorporated in its entirety.  Below, are quotes from the Complaint:

¶25

Defendant Medical Does 37-46 were medical and mental health personnel responsible for assessing inmates and providing psychiatric care. Does 37-46 knew of the lengthy history of mental illness and reports of serious psychiatric problems Ruis was experiencing but failed to treat or monitor him. They failed to place him in a housing unit where he could be monitored and/or medicated. They failed to notify the classification staff and housing deputies of the dangers Ruis posed to others.

¶26

At all times relevant to this complaint, Medical Supervisory Does 47- 51 were supervisory medical and mental health personnel Does 47-51 were responsible for training, supervising, disciplining, and overseeing medical and mental health personnel.

¶27

Does 1-51 were agents of Defendant County of San Diego, including contractors or subcontractors authorized to work at the Jail.

¶38

On numerous occasions during his 19-day incarceration at the Central Jail, Ruis had been declared a danger to himself and others.

¶¶41-43

Upon information and belief, while in EOH, Ruis displayed

1    heightened aggressive behavior, verbally attacking EOH

2    employees and threatening suicide and violence to others.

3    Within the first few days of his incarceration at SDCJ, Ruis was

4    sent to EOH for fashioning a rope out of jail-supplied clothing

5    and attempting to hang himself with it. Ruis was sent back to

6    the Module 4C shortly after.

7    No one admitted Ruis to the Psychiatric Stabilization Unit

8    (PSU) where mentally ill patients can be monitored and

9    involuntarily medicated if necessary.

10    ¶47

11    Throughout his time at San Diego Central Jail, it was clear that

12    Ruis suffered from a significant mental illness that manifested

13    in violent outbursts toward inmates and deputies.

14    ¶51

15    Each time Ruis was placed in EOH, defendants would release

16    him instead of treating or monitoring him for his serious mental

17    health problems.

18    ¶52

19    Ruis's dangerous propensities were known to Defendants,

20    including . . . Does 1-51.

21    ¶57

22    Despite showing heightened violent tendencies, Does 37-46,

23    under the supervision of Medical Supervisory Does 47-51,

24    released Ruis from EOH to mainline after every EOH

25    placement without further evaluation, medication, or

26    monitoring.

27    ¶132

28    [DOES] had a responsibility to advise JPMU deputies about

Ruis's continual danger. Defendants had the responsibility to
advise JPMU deputies to reclassify Ruis according to his
violent propensities.

¶314

They failed to protect Brandon from harm that was predictable
when housing a vulnerable person with a cellmate with known
history of violence

¶318

improperly, negligently and wrongfully, and recklessly, failed
to take any action to ensure Ruis would not harm Brandon.

¶322

As a direct and proximate result of the Defendant's negligent
conduct as herein, Brandon died.

22.    Plaintiff alleges in the Yates Complaint, *inter alia*, that Third Party /
Cross-defendants were negligent and careless in, among other things, allegedly not
properly addressing the symptoms they observed in Ruis and or Yates.

23.    LIBERTY HEALTHCARE CORPORATION, LIBERTY HEALTHCARE
OF CALIFORNIA, INC, NAPHCARE OF SAN DIEGO, LLC, NAPHCARE, INC's
mental health providers saw and examined Ruis during the December 27, 2023, to
January 16, 2024, period at issue in the Complaint including in the contexts alleged in the
Yates Complaint regarding DOE medical and mental health providers. These include,
*inter alia*:

24.    On January 2, 2024, January 4, 2024, and January 11, 2024, and other dates,
Hudad Tolloui observed, examined, and/or evaluated Ruis.

25.    On January 2, 2024, and January 12, 2024, and other dates, Rebecca
Robinson observed, examined, and/or evaluated Ruis.

26.    On January 3, 2024, and other dates, Peter Farrell observed, examined,
and/or evaluated Ruis.

27. On January 5, 2024, and other dates, Miranda Evans observed, examined, and/or evaluated Ruis.

28. Plaintiff seeks damages from the County including, without limitation, for damages and costs related to the death of Brandon Yates at the hands of Alvin Ruis. Cross-claim Defendants have denied the County's requests for indemnification and contribution.

## **FIRST CLAIM**

(Breach of Contract as to Cross-Claim Defendants NAPHCARE OF SAN DIEGO, LLC, and NAPHCARE, INC)

29. The County re-alleges and incorporates by reference each allegation and document referenced or contained in the preceding paragraphs as if fully set-forth herein.

30. The Naphcare Agreement obligates NAPHCARE OF SAN DIEGO, LLC, and NAPHCARE, INC to provide the County with a defense and indemnity for claims related to the Naphcare Agreement

31. Specifically, the Naphcare Agreement states, in pertinent part:

> County shall not be liable for, and Contractor shall
> defend and indemnify County and the employees and
> agents of County (collectively, "County Parties"), against
> any and all claims, demands, liability, judgments,
> awards, fines, mechanics' liens or other liens, labor
> disputes, losses, damages, expenses, charges or costs of
> any kind or character, including attorneys' fees and court
> costs (hereinafter collectively referred to as "Claims"),
> related to this Agreement or the work covered by this
> Agreement and arising either directly or indirectly from
> any act, error, omission or negligence of Contractor or its
> Contractors, licensees, agents, servants or employees;
> including, without limitation, Claims caused by the sole

1     passive negligent act or the concurrent negligent act,

2     error or omission, whether active or passive of County

3     Parties.

4   Exhibit B, Naphcare Agreement, Article 10 at ¶ 10.1.

5   32.    Plaintiff's claims against the County in this action relate to and arise out of

6   work performed pursuant to the Naphcare Agreement.

7   33.    The Yates Lawsuit triggers Defendants NAPHCARE OF SAN DIEGO,

8   LLC, and NAPHCARE, INC's obligation under the Naphcare Agreement to defend and

9   indemnify the County.  However, NAPHCARE OF SAN DIEGO, LLC, and

10  NAPHCARE, INC have breached the Naphcare Agreement by refusing the County's

11  demand for a defense and indemnity.

12  34.    As a direct result of NAPHCARE OF SAN DIEGO, LLC, and

13  NAPHCARE, INC''s conduct, the County has sustained damage in that, among other

14  things, NAPHCARE OF SAN DIEGO, LLC, and NAPHCARE, INC's breaches of

15  contract have exposed the County to a potential judgment in Plaintiff's favor, and caused

16  the County to bear the expense and inconvenience of these proceedings, including the

17  damages incurred as attorneys' fees and costs to defend the Yates Lawsuit.

18  35.    Further, as a direct and proximate result of NAPHCARE OF SAN DIEGO,

19  LLC, and NAPHCARE, INC's breaches of the Naphcare Agreement, the County has

20  been additionally damaged in amounts according to proof at trial.

21  **SECOND CLAIM**

22  (Equitable Indemnity as to All Cross-claim Defendants)

23  36.    The County re-alleges and incorporates by reference each allegation and

24  document referenced or contained in the preceding paragraphs as if fully set forth herein.

25  37.    While the County does not concede the truth of Plaintiff's allegations, the

26  Cross-claim Defendants are obligated to indemnify the County for all damages, defense

27  costs, settlement payments, and attorneys' fees and costs the County incurs as a

28  proximate result of the Yates Lawsuit.

38.     If the County bears any liability to Plaintiff, which the County denies, the County's liability is secondary and Cross-claim Defendants are primarily liable. Cross-claim Defendants' liability is based upon their alleged negligent and wrongful conduct both in providing medical and mental healthcare services in the context of their interactions with Alvin Ruis and Brandon Yates, including in observing, examining, and/or evaluating Alvin Ruis and Brandon Yates, and in allegedly failing to meet the appropriate standard of care in addressing symptoms observed.

39.     The County has been and will continue to be damaged as a proximate result of the alleged negligent, improper, and/or tortious conduct of Cross-claim Defendants.

40.     The County is entitled to equitable indemnity from Cross-claim Defendants, and each of them, in a sum according to proof at trial.

## THIRD CLAIM

(Declaratory Relief as to all Cross-claim Defendants)

41.     The County re-alleges and incorporates by reference each allegation contained in the preceding paragraphs as if fully set-forth herein.

42.     An actual controversy has arisen and now exists between the County and Cross-claim Defendants in that the County contends that (1) responsibility for the damages Plaintiff claims rests entirely or partially with the Cross-claim Defendants; and (2) as a result, Cross-claim Defendants are obligated to completely or partially indemnify the County for any sum or sums which the County may be compelled to pay as a result of any alleged damage, judgment, or other award recovered by Plaintiff.

43.     The County desires a declaration of the respective liabilities of the parties for the damages Plaintiff has alleged in this action, and a declaration of Cross-claim Defendants' responsibility for indemnification or contribution to the County for the sum or sums which the County may be compelled to pay and for which Cross-claim Defendants have been determined to be responsible.

44.     Such a declaration is necessary and appropriate at this time so that the County may ascertain its rights and duties, if any, with respect to Plaintiff's claims.

Additionally, to the extent that Plaintiff's claims are upheld, the claims of all parties arise out of the same transactions and occurrences, and a determination of all claims in one proceeding is necessary and appropriate to avoid the multiplicity of actions that would otherwise result if the County was required to solely defend the Yates Lawsuit and then bring separate actions against the Cross-claim Defendants for indemnification and contribution.

## **PRAYER FOR RELIEF**

WHEREFORE, the County respectfully prays for judgment as follows:

A. As to the First Claim, for contractual indemnity in an amount subject to proof, but not less than the amount of damages the County incurs as a result of a settlement or judgment in the Yates Lawsuit, as well as any attorneys' fees and costs the County incurred for its defense in the Yates Lawsuit and to prosecute these cross-claims;

B. As to the Second Claim, for equitable indemnity in an amount subject to proof, but not less than the amount of damages the County incurs as a result of a settlement or judgment in the Yates Lawsuit, as well as any attorneys' fees and costs the County incurred for its defense in the Yates Lawsuit and to prosecute these cross-claims;

C. As to the Third Claim, for a declaration of the amount for which Cross-claim Defendants are obligated to indemnify the County for damages the County incurs as a result of a settlement or judgment in the Yates Lawsuit, together with attorneys' fees and costs the County incurred for its defense in the Yates Lawsuit and to prosecute these cross-claims; and

D. As to all claims, for (1) costs of suit incurred herein, (2) reasonable attorneys' fees, and (3) for such other and further relief as the Court deems just and proper.

DATED: September 18, 2025

DAVID J. SMITH, Acting County Counsel

By: s/JENNIFER M. MARTIN, Senior Deputy
Attorneys for Defendants County of San Diego,
Kelly Martinez, Rich Williams, Matthew
Blackburn, and Tony Gonzalez

EXHIBIT "A"

1  EUGENE G. IREDALE: SBN 75292
2  JULIA YOO: SBN 231163
   CHELSEA REHERMAN: SBN 343446
3  IREDALE & YOO, APC
4  105 West F Street, Fourth Floor
   San Diego, CA 92101-6036
5  TEL: (619) 233-1525
6  Attorneys for Plaintiffs

7
                **UNITED STATES DISTRICT COURT**
8              **SOUTHERN DISTRICT OF CALIFORNIA**
9

10 | THE ESTATE OF BRANDON | CASE NO. '25CV0410 W   MMP |
   | YATES by and through its | |
11 | successors-in-interest Dan Yates and | **COMPLAINT** |
   | Andrea Carrier; DAN YATES and | |
12 | ANDREA CARRIER, | **(1)  Deliberate Indifference (42 U.S.C.** |

THE ESTATE OF BRANDON YATES by and through its successors-in-interest Dan Yates and Andrea Carrier; DAN YATES and ANDREA CARRIER,

          Plaintiffs,

v.

COUNTY OF SAN DIEGO, KELLY MARTINEZ, in her individual capacity, RICH WILLIAMS, in his individual capacity, MATTHEW BLACKBURN, in his individual capacity, TONY GANZALEZ in his individual capacity and DOES 1-51,

          Defendants.

CASE NO. '25CV0410 W    MMP

**COMPLAINT**

**(1)  Deliberate Indifference (42 U.S.C. §1983)**
**(2)  Failure to Properly Train, Supervise and Discipline (42 U.S.C.§1983)**
**(3)  *Monell* (42 U.S.C. §1983)**
**(4)  Right of Association (42 U.S.C. §1983)**
**(5)  Violation of Cal. Civ. Code §52.1 (Bane Act)**
**(6)  Negligence**
**(7)  Wrongful Death (CCP §377.60)**

**JURY TRIAL DEMANDED**

EXHIBIT A

## I. INTRODUCTION

On January 15, 2024, Brandon Yates was arrested and booked into San Diego Central Jail ("Jail"). Within 24 hours, Brandon was found face down on the floor of his cell, naked with his hands and feet bound behind his back. His cellmate Alvin Ruis had tortured and sexually assaulted Brandon. Ruiz had choked and smothered Brandon to death.

Alvin Ruis was a "bypass inmate" who was not allowed to be with other detainees. He was not even allowed to have yard time with others as a result of his behavior. Ruis had been arrested for assaulting his wife and children on two separate occasions. He had told his family that he had intentions of killing other people. Ruis had threatened multiple cellmates and had assaulted a deputy. He was not to be housed with others in his cell.

In the approximately 60-minute time period after Brandon had been placed unmonitored in Ruis' cell, Brandon was heard screaming for help. Brandon pushed the panic button in his cell multiple times for the deputies in the control tower to save his life, telling them he was going to be killed. The control tower deputies either ignored the desperate calls or put the intercom on "bypass" meaning they turned the sound off from Brandon's cell. Other inmates heard Ruis threatening Brandon and Brandon screaming for help. The deputies who entered the module ignored those screams. No one came as Brandon was being tortured, stripped naked, bound, sexually assaulted, and murdered. Brandon Yates was 24 years old.

## II. GENERAL ALLEGATIONS

1.    Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §1331 and 28 U.S.C. § 1343(3) and (4), *et. seq*.

- 1 -

EXHIBIT A

2.      Venue is proper in the Southern District of California because the acts or omissions which form the basis of the Plaintiffs' claims occurred in San Diego, California, within the Southern District.

3.      At all times relevant to this complaint, decedent Brandon Yates was an individual residing in San Diego County, California.

4.      Brandon and his fraternal twin were born prematurely.  Brandon faced tough physical challenges from birth but grew to excel in sports.  Brandon was involved with the youth ministry at church and  junior guard.  Brandon loved to surf.  Brandon excelled academically.

5.      After graduating from high school, Brandon began suffering from extreme anxiety and other mental health issues.  Brandon began using heroin and methamphetamine.

6.      When his addiction took control over him, Brandon would become homeless, struggling with his mental illness and increasing religious ideations and grandiosity.

7.      When Brandon was in rehab, he thrived. He was a loving and kind son and brother.  He was known for his generosity.  He loved his family and his life.



- 2 -

EXHIBIT A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





- 3 -

EXHIBIT A

8. At the time of his death, Brandon Yates was not married. He had no children. He did not leave behind any will or other testamentary documents. Brandon Yates died intestate. For this reason, there is no probate proceeding pending related to Brandon Yates.

9. Because Brandon died intestate, was not married, and had no children, his surviving parents, Dan Yates and Andrea Carrier, are Brandon's heirs and sole beneficiaries. Thus, they are Brandon's successors-in-interest. (See Declarations of Dan Yates and Andrea Carrier, attached hereto as Exhibit A).

10. There is no other person with a superior right to commence the action.

11. Dan Yates and Andrea Carrier bring this action in their own right, as well, for the loss of their son, Brandon Yates.

12. Plaintiffs properly complied with the Government Claim Act. The claims were submitted to the County of San Diego on June 26, 2024.

13. The County of San Diego rejected the claims on January 27, 2025.

### III. PARTIES

14. Defendant County of San Diego is a public entity, duly organized and existing under the laws of the State of California. Under its authority, Defendant County of San Diego operates and manages the San Diego Central Jail, and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures and practices/customs of the Central Jail, and its respective employees, contractors and/or agents.

15. Defendant Kelly Martinez ( "Martinez") was, at all times mentioned herein, the Sheriff of the County of San Diego, the highest position with the San Diego County Sheriff's Department. As Sheriff, Defendant Martinez was responsible for hiring, screening, training, retention, supervision, discipline, counseling, and control of all San Diego County Sheriff's Department custodial employees and/or agents, medical staff, contractors, and DOE Defendants.

- 4 -

EXHIBIT A

16.     At all times relevant to this complaint, Defendant Kelly Martinez was a policymaker for the San Diego County Sheriff's Department and was responsible for the promulgation of policies and procedures to comply with the California state mandates and the state and federal Constitutions. Defendant Martinez was the Title 15 officer and was also responsible for the noncompliance with California state law. Having had the opportunity to comply with state law, she failed to do so. She was responsible for the supervision and control of officers who are or were employed by the Sheriff's Department, who are under her command and/or who report to her, including the Defendants to be named.

17.     Before taking office as Sheriff in January 2023, Defendant Martinez was the Undersheriff for the San Diego County Sheriff's Department, under then-elected Sheriff William Gore. In her capacity as Undersheriff, Martinez was a policymaker for the Sheriff's Department and the County on matters relating to the Sheriff's Department, the Jail, and its deputies, employees, and agents. She was also responsible for the County's compliance with state and federal laws and constitutions and for the training and supervision of County employees and agents.

18.     Defendant Rich Williams ("Williams") was, at all times mentioned herein, the Undersheriff of the County of San Diego, the highest position with the San Diego County Sheriff's Department. As Undersheriff, Defendant Williams was responsible for overseeing all department operations and ensuring the Sheriff's Office "provides the highest quality public safety service to everyone in San Diego County." Defendant Williams was also responsible for the more than 4,700 employees of the San Diego County Sheriff's Office.

19.     At all times relevant to this complaint, Defendant Deputy Mathew Blackburn was a housing deputy at the San Diego Central Jail, assigned to floor 4. As a housing deputy, Defendant Deputy Blackburn was responsible for conducting cell checks in compliance with Title 15 and San Diego County Sheriff policies and procedures, and ensuring inmate safety.

- 5 -

EXHIBIT A

20. At all times relevant to this complaint, Defendant Deputy Tony Gonzalez was a housing deputy at the San Diego Central Jail, assigned to floor 4. As a housing deputy, Defendant Deputy Gonzalez was responsible for conducting cell checks in compliance with Title 15 and San Diego County Sheriff policies and procedures, and ensuring inmate safety.

21. At all times relevant to this complaint, Defendant Does 1-10 were the Jail Population Management Unit deputies and/or Classification deputies, Sergeants or Lieutenants at the San Diego Central Jail who were responsible for classifying and housing Brandon Yates and Alvin Ruis.

22. At all times relevant to this complaint, Defendant Does 11-21 were housing deputies at the San Diego Central Jail during the days in which Brandon was in custody at the Jail. Does 11-21 were tasked with conducting security checks in compliance with Title 15 and San Diego County Sheriff policies and procedures and ensuring inmate safety.

23. At all times relevant to this complaint, Defendant Does 22-26 were Control Deputies and/or Control Tower Deputies on January 16, 2024. Does 22-26 were responsible for ensuring that the intercoms in each cell were functioning properly, responding to intercom calls, and maintaining a safety watch from the watchtower.

24. At all times relevant to this complaint, Supervisory Doe Defendants 27-36 were supervisors at the San Diego County Sheriff's Department who were responsible for supervising, disciplining, and training the staff at the Central Jail.

25. At all times relevant to this complaint, Defendant Medical Does 37-46 were medical and mental health personnel responsible for assessing inmates and providing psychiatric care. Does 37-46 knew of the lengthy history of mental illness and reports of serious psychiatric problems Ruis was experiencing but failed to treat or monitor him. They failed to place him in a housing unit where he could

- 6 -

EXHIBIT A

be monitored and/or medicated. They failed to notify the classification staff and housing deputies of the dangers Ruis posed to others.

26.     At all times relevant to this complaint, Medical Supervisory Does 47-51 were supervisory medical and mental health personnel Does 47-51 were responsible for training, supervising, disciplining, and overseeing medical and mental health personnel.

27.     At all times relevant to this complaint, all individual defendants and Does 1-51 were San Diego Sheriff's civilian employees, deputies, supervisory officials, or medical and mental health care providers. Does 1-51 were agents of Defendant County of San Diego, including contractors or subcontractors authorized to work at the Jail.

28.     Plaintiffs are truly ignorant of the true names and capacities of Does 1-51 and/or are truly ignorant of the facts giving rise to their liability. Plaintiffs will amend this complaint once their identities have been ascertained as well the facts giving rise to their liability.

29.     These defendants were agents, servants, and employees of each other of the other named defendants and were acting at all times within the full course and scope of their agency and employment, with the full knowledge and consent, either express or implied, of their principal and/or employer and each of the other named defendants, thereby making the currently named defendants herein liable for the acts and/or omissions of their agents, servants, and/or employees

**IV.  FACTS REGARDING THE MURDER OF BRANDON YATES**

30.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

31.     Alvin McDonald Ruis III ("Ruis") was a gravely mentally ill individual who had an extensive treatment history. Ruis had been involuntarily

EXHIBIT A

committed on multiple occasions prior to his imprisonment in San Diego Central Jail.

32. One month before his December 2023 arrest, Ruis was hospitalized in Montana after suffering a psychotic episode which led him to act erratically. Ruis was involuntarily committed to the Montana Mental Hospital from November 21, 2023, until November 28, 2023. After his release from the Montana Mental Hospital, he returned to San Diego.

33. On or about December 2, 2023, Ruis physically assaulted his wife and one of his minor children. Shortly thereafter, Ruis believed God was telling him to travel to Rome.

34. While on a plane en route to Rome, Ruis had a manic episode and assaulted a flight attendant. He was detained in London and involuntarily hospitalized at a mental hospital from around December 7, 2023, to around December 20, 2023, when he was permitted to leave Great Britain.

35. On December 27, 2023, the Chula Vista Police Department arrested Ruis on the following charges: Domestic Violence, Willful Cruelty to a Child, Stalking, Burglary, Violation of a Court Order, Committing a Felony while out on Bail, and Violation of a Domestic Violence Temporary Restraining Order ("DV-TRO"). CVPD arrested Ruis after he again assaulted his children and wife.

36. At his December 27, 2023, arraignment, Ruis's family, including his father and mother, requested help for Ruis. Ruis's family feared Ruis would commit suicide or murder someone as he had threatened on multiple occasions.

37. As a result of these charges, Ruis was booked into the San Diego Central Jail.

38. On numerous occasions during his 19-day incarceration at the Central Jail, Ruis had been declared a danger to himself and others.

39. Deputies had placed Ruis in the Sixth Floor Enhanced Observation Housing ("EOH") multiple times.

- 8 -

EXHIBIT A

40. EOH provides close observation and assessment of incarcerated persons who may be at an elevated risk for suicide.

41. Upon information and belief, while in EOH, Ruis displayed heightened aggressive behavior, verbally attacking EOH employees and threatening suicide and violence to others.

42. Within the first few days of his incarceration at SDCJ, Ruis was sent to EOH for fashioning a rope out of jail-supplied clothing and attempting to hang himself with it. Ruis was sent back to the Module 4C shortly after.

43. No one admitted Ruis to the Psychiatric Stabilization Unit (PSU) where mentally ill patients can be monitored and involuntarily medicated if necessary.

44. Ruis began having auditory hallucinations, including the voices of his children yelling at him through the walls.

45. Ruis grabbed a deputy through his cell's food flap resulting in the deputy using force on Ruis.

46. Later that same day, Ruis threatened to hang himself. Deputies placed Ruis in EOH once more.

47. Throughout his time at San Diego Central Jail, it was clear that Ruis suffered from a significant mental illness that manifested in violent outbursts toward inmates and deputies.

48. Ruis engaged in non-stop, compulsive talking about God and spoke in indecipherable nonsense.

49. Ruis would frequently make erratic statements and stay awake through the night, yelling out his cell door, upsetting and angering other inmates.

50. For some reason, no one placed Ruis in administrative segregation even after he assaulted a deputy.

51. Each time Ruis was placed in EOH, defendants would release him instead of treating or monitoring him for his serious mental health problems.

EXHIBIT A

52.     Ruis's dangerous propensities were known to Defendants, including Defendant Blackburn, Defendant Gonzalez, and Does 1-51.

53.     Ruis's inability to share a cell was known to deputies in the Module.

54.     On at least one occasion before murdering Brandon, Ruis had to be removed from shared housing with other inmates due to threats he made against those cellmates.

55.     In the days leading up to Brandon's murder, Ruis' psychosis was becoming increasingly more acute.

56.     He was placed in EOH and safety cells as a result of his dangerous and psychotic behavior putting himself and others in danger.

57.     Despite showing heightened violent tendencies, Does 37-46, under the supervision of Medical Supervisory Does 47-51, released Ruis from EOH to mainline after every EOH placement without further evaluation, medication, or monitoring.

58.     Ruis was threatening not only other inmates but the deputies on the floor.

59.     While at SDCJ, Ruis was a "bypass" inmate, a designation for someone who must be kept separate because they cannot get along with others. As a bypass, Ruis had to be let out to the dayroom separate and apart from every other inmate. This was for everyone's safety.

60.     A "bypass inmate" refers to people who could suffer or inflict harm on other inmates.

61.     If a line deputy requests a "keep separate" be added to an inmate's record, an Inmate Status Report ("ISR") is required per Detentions P&P Section F.5. An inmate status report details an incarcerated person's movements and notable incidents. For example, an ISR would be used when there is a housing movement due to an individual request, when a person's status is changed to "keep

- 10 -

EXHIBIT A

separate," or when there is a change of classification due to disciplinary action. This report is reviewed, approved, forwarded, and disseminated among jail staff.

62.  The ISR would have been available to supervisory Does 27-36.

63.  Ruis's "keep separate" status meant that all sworn staff and their supervisors knew that it was not safe to place someone in a cell with him.

64.  Here, either Doe defendants 11-21 and their supervisors Does 27-36 failed to properly record and communicate the "Keep Separate" requirement in the ISR to the housing deputies or Defendant Blackburn ignored the requirement in placing Brandon in Ruis' cell.

65.  Upon information and belief, despite Ruis continuing to display aggressive and violent behavior, Does 37-46 continued to clear him from EOH back to Module 4C.

66.  Despite the escalating level of threat and actual assault on a deputy, no one placed Ruis in segregation housing or in the PSU where he could be monitored constantly.

67.  On January 15, Ruis was manifesting symptoms of serious mental illness threatening people, and continuing to engage in self-harming behavior. Despite this behavior, he was cleared to go back to mainline housing.

68.  Brandon Yates was arrested on suspicion of burglary and booked into the San Diego Central Jail ("SDCJ") on January 15, 2024, after he had been found sleeping in someone's backyard shed.

69.  At the time, Brandon was 24 years old.

70.  Brandon had struggled with mental illness for many years.

71.  Brandon was placed in cell 2 of Module 4C, on the fourth floor. While in cell 2, Brandon's mental health issues were causing his cellmates to get aggressive toward him.

72.  Brandon was speaking nonsensically and babbling nonstop.

- 11 -

EXHIBIT A

73.    On January 16, 2024, his cellmates called Defendant Deputy Blackburn over and threatened that "there would be trouble" if deputies did not remove Brandon from their cell.

74.    Blackburn took Brandon out of cell 2.

75.    Blackburn knew that Brandon was a vulnerable inmate as a result of his mental illness and that others had threatened him.

76.    Defendant Blackburn also knew Ruis had just been released from EOH, was classified as a bypass inmate who needed to be kept separate from other inmates during communal periods, and that Ruis had never been assigned any cellmates because of his violent propensities.

77.    Despite this knowledge, Defendant Blackburn moved Brandon into Ruis's cell.

78.    Within minutes of being moved into Ruis's cell, Brandon and Ruis began having a conversation about God. That conversation quickly became contentious, and Ruis decided Brandon was the devil.

79.    Both Brandon and Ruis suffered from hyper-religiosity. They both spoke obsessively about God. Brandon believed he was Jesus. Ruis believed he was chosen by God and that all of his actions were direct orders from God.

80.    Ruis believed Brandon was the devil because Brandon's pupils were dark in color and Ruis had seen the same in his wife's eyes. This meant that the devil was inside Brandon and the devil was inside Ruis' wife.

81.    Ruis referred to himself as God's soldier on earth, a God on earth and a pure being. Ruis sat next to Brandon and placed his hand on Brandon's thigh.

82.    Brandon immediately jumped down from the bed to get away from Ruis.

83.    Ruis believed that this was a sign that Brandon had the devil inside of him.

84.    Ruis told Brandon that he was going to kill him.

- 12 -

EXHIBIT A

85.     Brandon went to the door of the cell and began pressing the call button to try to summon help, pressed the emergency intercom, multiple times saying, "They are going to kill me".

86.     At one point, Ruis pressed the emergency button himself.

87.     Defendants, Does 22-26,  who were in the control tower ignored the multiple calls for help or placed Brandon's intercom on "bypass." Upon information and belief, Defendants muted cell 9's intercom for at least 15 minutes, silencing Brandon and ignoring his call for help.

88.     No deputy came to the cell to respond to the call for help for nearly an hour.

89.     Brandon and Ruis's exchange became loud enough for other inmates in Module 4C to hear shouting and banging.

90.     Other inmates in the module notified the control tower by pressing the panic button.  It was ignored.

91.     During this time, Ruis began punching Brandon so that he could kill Brandon and remove the devil.

92.     Ruis kicked Brandon, and punched him in the face with his left hand.

93.     Ruis told Brandon to hit him back.  Brandon attempted to swing at Ruis but Ruis ducked.

94.     Ruis got on Brandon's back and used his right arm around Brandon's neck in a chokehold.  He then placed his left arm on top of Brandon's head.

95.     As Brandon struggled to breath, Ruis took his left hand, put his fingers into Brandon's mouth, and pulled up on his mouth to expose Brandon's neck.

96.     Ruis squeezed Brandon's neck until it rendered him unconscious.

97.     Ruis had been a competitive wrestler who had competed in state championships and achieved a significant winning record.

- 13 -

EXHIBIT A

98.    At one point when Brandon was unconscious, Ruis had a conversation with God in which God was telling him, "You can take your time. You can do whatever you want."

99.    At one point, God told Ruis he could eat Brandon's face if that is what he wanted to do.

100.    Ruis then saw Brandon was still alive.  Ruis poured liquid soap into Brandon's nose and mouth.  Ruis took a green jail blanket and smothered Brandon with it to make him stop breathing.

101.    During this time, Ruis could see Brandon's chest rise and fall and knew that he was still breathing.

102.    Ruis continued to block Brandon's nose and mouth.  Eventually, Bradon stopped moving.

103.    After Brandon stopped moving, Ruis took Brandon's clothes off.

104.    When Brandon was completely naked, Ruis put a bar of soap in Brandon's anus.

105.    Ruis had a conversation with God and he tried to replicate Jesus on the cross and the pain that Jesus had gone through by staging Brandon's body.

106.    Ruis tore up Brandon's shirt and tied his hands behind his back and crossed his legs.

107.    Ruis tied a strip of cloth around Brandon's neck.

108.    He was in the process of tying Brandon's neck to the metal stool inside the cell when the deputies finally arrived for their hourly cell check.

109.    Brandon's cause of death was asphyxiation consistent with manual and ligature strangulation and smothering.

110.    The hyoid bone in Brandon's neck was broken.  There was hemorrhaging into the muscles of the anterior and posterior neck.

111.    Additional autopsy findings included abrasions and contusions of the head, neck, torso, and extremities.

- 14 -

EXHIBIT A

112.   Ruis told the investigators that this was "one hundred percent" premediated and he staged Brandon's body to prove that his death was not a suicide.

113.   Ruis timed his torture because he knew that the deputies only did rounds once every hour at 60 minute intervals.

114.   There were multiple torn ligatures around the cell.  They found the liquid soap used to smother Brandon on the second bunk of the cell and on the blanket.

115.   Ruis told the investigators that he had seen the devil and the antichrist a thousand times.  Ruis stated that he spoke with Travis Barker telepathically.

116.   Ruis told the investigators that Kim Kardashian illuminati were taking his blood and that the CIA was coming through the vents.

117.   When deputies finally found Brandon, at around 1:30 p.m., he was already dead.

## V.  INDIVIDUAL DEFENDANTS' VIOLATION OF POLICY, TRAINING AND THE CONSTITUTION

118.   Defendants were aware that Alvin Ruis was a dangerous inmate with violent propensities.

119.   Ruis was arrested and booked on a litany of violent crimes, including PC § 243(e)(1), Battery of a Current or Former Significant Other, and three counts of PC § 273a(b) Cruelty to a Child by Endangering Heath.

120.   The purpose of the Inmate Classification System is to screen, assess, and house inmates in a manner that will protect the safety of the community, staff, and other inmates. It also assists detention managers and staff in making sound decisions regarding inmate population management. Proper inmate classification promotes impartial and consistent classification evaluations and keeps inmates safe.

- 15 -

EXHIBIT A

121. An individual's housing assignment is critical to safety and care because it indicates to detention staff whether that individual has special needs or characteristics that warrant precaution.

122. Inmate classification consists of several components including a custody assessment inmate interview by Jail Population Management Staff ("JPMU") staff, and the periodic reclassification of inmates upon changes in their custody status.

123. Per the San Diego County Sheriff's Department Detention Services Bureau–Manual of Policies and Procedures Number R.3 ("Sheriff's Manual"), inmates are classified at one of six levels of security, determined by the parameters of the Classification Navigator within JIMS:

- **6–HIGH MAXIMUM**: This incarcerated person must have a combination of current assaultive charges, a prior assaultive history or to be an institutional behavior problem. In addition, they may have a high-profile case or extreme act of violence which jeopardizes public safety or provides an incarcerated person with status that would allow them to have power or authority over other incarcerated persons. Level 6 incarcerated persons will be housed individually; any exception must be approved by the JMPU in command.
- **5–MAXIMUM**: This incarcerated person must have a combination of two of the following: current assaultive charges, prior assaultive history, are deemed an institutional behavior or problem, or an escape risk. Incarcerated persons classified as assaultive or escape risks (Greenbander) will be classified as a minimum level 5.
- **4–HIGH**: This incarcerated person must have one of the following: current assaultive charges, a prior assaultive history, or are deemed an institutional behavioral problem.
- **3–MEDIUM**: This incarcerated person has no current or significant assaultive history. The incarcerated person also has no escape history or known disciplinary problems, but is somewhat more criminally sophisticated than a Level 2 incarcerated person. This incarcerated person can be on active parole, active Post-Release Community Supervision, sentenced to local prison, or out to court for further proceedings from federal or state prison.

- 16 -

EXHIBIT A

- **2–LOW**: The incarcerated person has no current or significant prior assaultive history. This incarcerated person also has no escape history or known disciplinary problems. Incarcerated persons sentenced to local prison time "IJC" or "ICS" will be classified as a minimum of a level 2.
- **1–MINIMUM**: An incarcerated person classified at this level poses the lowest risk to staff and other incarcerated persons. This incarcerated person is non-assaultive with no known disciplinary problems, lacks criminal sophistication, and is sentenced.

124.    Inmates with custody levels 1,2 or 3 can be housed together. Levels 4 and 5 can be housed together. Level 6 inmates will be housed in Administrative Segregation.

125.    Ruis had multiple assaultive charges: one (PC § 243(e)(1), Battery of a Current or Former Significant Other, and three counts of PC § 273a(b),  Cruelty to a Child by Endangering Heath).  He had assaulted a deputy who was walking by Ruis's cell.  Ruis was at a minimum a Level 4.  Because Brandon had no assaultive charges and had presented no threat to anyone at the jail, Brandon was not permitted to be housed with Ruis according to the County's own policies and procedures.

126.    Exceptions to the housing assignments are inmates housed in Administrative Segregation, Protective Custody, Psychiatric Stabilization Unit (PSU), and designated medical or psychiatric housing.

127.    Additionally, the Sheriff's Manual Number J.3 provides:

The following are types of incarcerated persons who may be placed into administrative separation housing:

…

2. Those who displayed a continual failure to adjust and conform to the minimum standards expected of those in mainline housing or designated special housing. The incarcerated person's behavior is either criminal in nature or disruptive to the safe operation of the facility.

- 17 -

EXHIBIT A

3. Those persons have shown a propensity for violence towards other incarcerated persons and/or staff, or participatory action in conspiracy, or known premeditated thoughts or indications by a single incarcerated person, to assault or harm other incarcerated persons and/or staff.

128. Inmates may be reclassified upon different occurrences while in custody, including, but not limited to, displaying suicidal or homicidal ideation, behaving assaultive or threatening to assault staff, becoming disruptive to day-to-day operations, and/or being deemed vulnerable. An employee who receives information that could change an inmate's classification code and/or housing assignment has the responsibility of advising a JPMU deputy. The JPMU deputy will evaluate the information to determine whether it requires the inmate to be reclassified.

129. Upon information and belief, on multiple occasions, housing deputies, including Defendant Does 11-21 recommended Alvin Ruis be placed in EOH and/or solitary confinement due to his erratic, disruptive, and violent behavior. Defendants witnessed Ruis harassing and attacking other inmates and jail staff.

130. Upon information and belief, Defendant Does 11-21 knew Ruis was violent and a danger to himself and others.

131. Upon information and belief, while EOH housed Ruis, Defendant Does 37-46 and Medical Supervisory Does 47-51 observed Ruis continuing to be violent and aggressive.

132. Upon information and belief, Does 11-21, 37-46 and Medical Supervisory Does 47-51 had a responsibility to advise JPMU deputies about Ruis's continual danger. Defendants had the responsibility to advise JPMU deputies to reclassify Ruis according to his violent propensities.

- 18 -

EXHIBIT A

133.   Either deputies failed to advise JPMU deputies regarding these alarming incidents or the JPMU staff failed to take proper action to classify or reclassify Ruis.

134.   Had Does 11-21, 37-46 and Medical Supervisory Does 47-51 followed their policies and procedures, Ruis would have been properly classified and Brandon would have never been placed in cell 9.

135.   All defendants had a legal duty to protect Brandon Yates from foreseeable harm.   They had an affirmative duty to protect Brandon from the conduct of would-be third-party attackers including Ruis.  There exists a "special relationship" between a jailer and prisoner which imposes a duty on prison officials to protect prisoners from foreseeable harm by other prisoners.

136.   The failure of the defendants to properly classify and house Ruis and Brandon Yates led to the foreseeable harm of Ruis attacking Brandon and killing him.

## VI.   *MONELL* ENTITY AND SUPERVISORY LIABILITY

### A.   The County of San Diego and Sheriff's Department Officials Knew San Diego County Suffers the Highest Rate of Inmate Deaths in California.

137.   For years, Defendants Martinez, Williams, and Supervisory Does 27-36 have been aware of the pervasive pattern of inmates dying in their institutions. Before taking on her role as Sheriff, Defendant Martinez served as Undersheriff, overseeing the day-to-day operations under Sheriff William Gore's leadership.

138.   Doe Defendants 27-36 were exposed to the litany of claims and lawsuits against Sheriff Gore and the County due to the systemic and inhumane mistreatment of inmates.

139.   Having worked for the San Diego Sheriff's Department since 1985, Defendant Martinez was aware of the multitude of problems making San Diego one of the deadliest jails in California.

- 19 -

EXHIBIT A

140.   Defendant Martinez acknowledged this pattern of the disturbingly high number of in-custody deaths. Indeed, after being sworn in as Sheriff in 2022, Defendant Martinez met with the Attorney General of California, Rob Bonta, and assured him she was working to solve the problem. The Attorney General stated he hoped the Sheriff's Department would be able to solve the problem by having a "collaborative partnership." If not, the Attorney General warned, "A lawsuit is always possible."

141.   Defendant Martinez acknowledged the Attorney General's ability to file a lawsuit or investigate civil rights violations. (AG Says Sheriff Must Find Solution to Jail Deaths–Or Fact Consequences, Voice of San Diego, Oct. 10, 2023, Available at: https://voiceofsandiego.org/2023/10/10/ag-says-sheriff-must-find-solution-to-jail-deaths-or-face-consequences/).

142.   On February 3, 2022, the California State Auditor published a report ("State Auditor Report") detailing the San Diego County Sheriff's failure to prevent and respond to inmate deaths. In its introduction, the Acting California State Auditor, Michael Tilden, found,

> From 2006 through 2020, 185 people died in San Diego County's jails–one of the highest totals among counties in the State. The high rates of deaths in San Diego County's jails compared to the other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices. In fact, our review identified deficiencies in how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in-custody deaths.

(San Diego County Sheriff's Department: It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody, Auditor of the State of California, Feb. 3, 2022, available at: https://information.auditor.ca.gov/reports/2021-109/index.html#section2.)

- 20 -
EXHIBIT A

143.    The State Auditor Report highlights, "In the Past 15 years, More Individuals Died while in the San Diego Sheriff's Department's Custody Than in the Custody of Nearly any comparable County in the State." (sic).

144.    The State Auditor Report also criticized the San Diego Sheriff's Department for "not updating equipment for monitoring the safety of incarcerated individuals." The report recommended the Sheriff's Department "prioritize implementing or resolving all recommendations intended to keep individuals in custody safe."

## B.    Defendants Were of Aware of the Danger in Housing Violent Inmates with Other Inmates

145.    From 2010 to 2020, eight inmates died by homicide at the hands of another inmate. (Explore Data on In-Custody Deaths, Auditor of the State of California, Last Accessed: Oct. 18, 2024, Available At: https://information.auditor.ca.gov/reports/2021-109/supplemental.html).

146.    Russell Hartsaw, a mentally ill 70-year-old arrested on a probation violation was beaten to death in 2010 by other inmates. Hartsaw was classified as a "Keep Separate All" inmate due to his vulnerability amongst other inmates. Knowing his vulnerability and his classification status, George Bailey Detention Facility deputies nonetheless placed him in a room with Mario Lopez, a 6-foot-4 gang member nicknamed "Evil" who rallied four other inmates to join in an attack and brutally beat Hartsaw to death. Autopsy and court records showed Hartsaw was moved into the jail's general population despite his high-risk designation.

147.    On December 3, 2016, Lyle Woodward, an African-American man, was strangled to death by his cellmate, Clinton Thinn, a violent member of the white supremacist prison gang known as the Aryan Brotherhood. According to the complaint filed by The Estate of Lyle Woodward, jail personnel received radio intercom communications from the cell block indicating that an inmate was seriously injured and needed immediate medical attention. However, personnel did

- 21 -

EXHIBIT A

not immediately call medical personnel. Lyle died from his injuries on December 10, 2016.

148.   On August 22, 2021, Richard Lee Salyers was strangled to death by his cellmate.  Mr. Salyers had only been at the jail for four days before he was found dead in his cell by San Diego County Deputies during a late cell check. His cellmate, Steven Young, had murdered him.

149.   On December 29, 2021, on the same day a court ordered him to be released, Dominique McCoy was brutally beaten and murdered by John Roman Medina, another inmate, after deputies placed McCoy in a cell with Medina knowing he was violent and prone to assaulting others. The CLERB report generated after his death found, "Based on Medina's documented propensity towards violence, the department failed to implement reasonable measures to prevent him from doing harm to others, a shortcoming that attributed to IP McCoy's death. The lack of protection to IP McCoy cannot be attributed (to) one individual, but as a department, the SDSD failed to provide a safe environment for McCoy." The report continued, stating, "The Department was responsible for arranging a safe environment for those in its custody and to identify and facilitate proactive ways in safeguarding individuals in housing units with mixed classification/security levels. The evidence showed a systematic family of a combination of issues, which ultimately accounted for IP McCoy being placed in an unsafe environment. Inadequate housing availability led to the SDSD's inability and failure to provide McCoy with a safe environment."

150.   On March 12, 2022, Derek Baker, an inmate at the San Diego Central Jail, was beaten by his cellmate, Patrick James Ferncase. Derek later died from his injuries. The CLERB report detailing this incident found that "Baker was subsequently housed with another cellmate, but one who was a violent offender. While there was no violation of the classification policy, the SDSD failed to implement reasonable measures in housing two PC inmates, one an elderly low-

level (3) sex offender with another, a high-level (5) violent offender. The evidence supported the allegation and the act was not justified."

151.   In 2022, deputies placed Raymond Vogelman back in the housing module where he had been attacked in his sleep by multiple people just one month before.  There was a report by a deputy that Mr. Vogelman should not return to that module for his safety.  Mr. Vogelman was known to have suicidal ideations and a serious mental illness, which made him vulnerable to assault by others, yet no one reclassified him to go into protective custody even after multiple beatings. Because deputies were not monitoring the module, they never discovered who attacked Mr. Vogelman. All too predictably, back in this module, Mr. Vogelman was found laying on his bed with a blood soaked towel over his head.  For twelve minutes, deputies and a sergeant watched Mr. Vogelman, who had multiple visible injuries to his face, collapse to the floor and cough up blood.  For these twelve minutes, no one called 911.  They only called for an ambulance when Mr. Vogelman's face  started to turn grey.  Mr. Vogelman stopped breathing in the ambulance.  He died from his injuries and internal bleeding.

152.  On December 2, 2023, Eric Van Tine, who suffered from schizophrenia, was placed in a cell with two other mentally ill inmates in a triple bunk.  Triple bunking was impermissible at the Jail because it violates California state law.  The cellmate beat Eric into a coma where he remained for months.  Eric suffered a permanent brain injury and died as a result of these injuries.

153.   Defendants knew of these persistent problems from *Lucas v. County of San Diego et al.*, 20-cv-1735-CAB-JLB (S.D. Cal. 2020), which alleged that the plaintiff, a "lower-level offender[]," was placed in a cell with a mentally ill inmate—who then assaulted the plaintiff—due to a classification error by the County.

154.  Defendants' failure to properly classify and house inmates had resulted in sexual assaults of inmates by aggressive predators.  In the case of one

- 23 -

EXHIBIT A

victim, two cellmates pled guilty to one count of sexual penetration by force and one count of sexual battery by restraint.

155.   Defendants' failure to properly classify and house inmates also resulted in the brutal beating of Kristina Frost in 2020.  CLERB found "The assault and injury were the result of a systemic failure on the part of (the Sheriff's Department) exemplified by insufficient policies and procedures, a lack of sensible and appropriate communication among numerous staff members and no apparent forethought by several employees as to the ramifications of placing a transgender female in a cell with three cisgender men."

## C.   Defendants Were Aware of Previous Deaths and Injuries Resulting from the Neglect and Misconduct Associated with Intercom Systems.

156.   For years,  Defendants Martinez, Williams, and Supervisory Does 27-36 were aware that their correctional staff were silencing inmates, neglecting emergency intercom calls, and, in some cases, allowing emergency buttons to remain entirely nonfunctional.

157.   The Citizen's Law Enforcement Review Board ("CLERB") has reported for years that jail intercom systems are too often inoperable.

158.   On February 14, 2016, Richard Boulanger committed suicide in his cell while housed in the San Diego Central Jail. Richard's cellmate reported that upon discovering Richard's body hanging from the bunk bed he pressed the intercom button between four and ten times to call for help, but no one answered. The cellmate further stated that it took approximately 10 to 20 minutes before deputies arrived.

159.   An investigation into Richard Boulanger's death revealed concerns about the deputy's failure to make sure the intercom system was operational and not muted to provide the proper emergency medical response. At the time of Mr. Boulanger's death, the deputies on duty claimed to not receive intercom calls

- 24 -

EXHIBIT A

although the system was functional. Prior to Mr. Boulanger's incident, another incident occurred in 2016 when the intercom was reportedly at a low volume and ineffective. After a second review of Richard Boulanger's case, CLERB made the following policy recommendations:

- It is recommended that the San Diego Sheriff's Department ensure compliance with Sheriff's Policy I.1, Emergency Alarms Systems that explicitly direct the Control Deputy to dispatch assistance when an inmate emergency alarm is activated. To address an unspecified element of this policy, it is recommended that an addendum to the existing policy be drafted that directs the Control Deputy to immediately check the inmate intercom monitor for visual alerts at the beginning of each shift and to ensure that the audio alerts on the monitor have not been disabled.
- It is further recommended that a policy be drafted that strictly prohibits detention staff from muting or otherwise disabling the audio component of the inmate intercom monitor or lowering its volume to an audible level.

160. On January 31, 2018, Frankie Greer was arrested and booked into Central Jail. During the booking and intake process, Mr. Greer explained to the intake personnel that he had a seizure disorder and that he needed to be placed on a bottom bunk. Medical staff noted the need for a lower bunk assignment in his medical file but failed to place the order in the Jail Information Management System ("JIMS"), which notified other jail staff. After intake, Mr. Greer was assigned a top bunk. While on his bunk, Mr. Greer fell from a height of approximately 6 feet, lost consciousness, and experienced a seizure. Mr. Greer's cellmates frantically called "mandown" and continuously pressed the emergency intercom, but the control tower deputies either ignored the call or had muted the sound. Frankie Greer continued to bleed out for over half an hour while suffering several seizures because the deputies ignored the call. By the time he was taken to the hospital, the doctors had to drill a hole in his brain to drain the blood that had

- 25 -

EXHIBIT A

pooled in his skull. As of today, Mr. Greer still suffers from a permanent brain injury.

161. An investigation of intercoms 19 days after Frankie Greer's severe injury found that intercoms were still not functioning properly.

162. Three days after the investigation of Mr. Greer's injury, Homicide detectives investigating the death of Paul Silva conducted another death investigation at SDJC. Detectives assessed the holding cell's intercom where Mr. Silva was held at the San Diego Central Jail. When detectives pressed the button, no sound or alert was heard in the control center.

163. On May 2, 2022, a group of civil rights attorneys, including the San Diego and Imperial County ACLU affiliate, filed an emergency request in the Southern District of California requesting an injunction against the San Diego Sheriff's Department to make immediate changes to address serious lapses in care in its jails.

164. In that lawsuit, the plaintiffs alleged that the County and Sheriff's Department's intercom system practices were ineffective. (Attorneys Seek Emergency Order to Force Changes at San Diego County Jails, The San Diego Union-Tribune, May 3, 2022, Available at: https://www.sandiegouniontribune.com/2022/05/02/attorneys-seek-emergency-order-to-force-changes-at-san-diego-county-jails/). This lawsuit included these facts:

- After days of struggling to breathe and begging for help from deputies and medical staff, Robert Moniger died. Robert and his cellmates, Michael Keavney and Dylan LaCroix, all pushed their cell's emergency button multiple times, but deputies did not respond or summon medical assistance.

- Jail staff did not respond to emergency intercom calls from Derryl Dunsmore until 20-30 minutes after he called for help while choking

- 26 -

EXHIBIT A

on food. Darryl alleged he was later threatened with discipline if he used the button again.

- On March 12, 2022, a defective intercom prevented deputies from hearing a "man down" report during a fight that led to a man being placed on life support.

### D. Because the Emergency Intercom System was Deliberately Muted or Ignored, Staff Failed to Protect Brandon

165.    Each San Diego Central Jail cell is equipped with an intercom device by which inmates can call deputies in case of an emergency or immediate assistance.

166.    Defendants were aware that the use of intercom systems was the only communication mechanism inmates could use during emergencies, like assaults, rapes, and medical emergencies, in housing units and their cells.

167.    The Sheriff's Department's policy on emergency alarm systems states: Each facility shall maintain an intercom system for the purpose of providing a means of communication between sworn staff and incarcerated persons. Intercom systems should be primarily used as a means of relaying and or summoning emergency assistance. *Intercoms shall not be routinely muted or silenced.* (Emphasis added).

168.    Sheriff policies require that at the beginning of every shift, sworn staff assigned to positions equipped with intercom systems (e.g. Housing Control, Central Control, etc.) check their work area's touch screen panel, control panel, etc., and ensure intercoms have not been silenced or muted. Additionally, Intercom systems must also be checked any time sworn staff take over operations in such areas (e.g., relieving a deputy arriving late to work, during mealtime, leaving early, etc.)

169.    In the event an intercom is silenced or muted, sworn staff must make an entry in the Area Activity log, utilizing the "ALARMS" drop-down in the Jail

- 27 -

Information Management System (JIMS). At a minimum, the description field must include the cell number or the incarcerated person's name and booking number. The notes must indicate the reason the intercom was silenced or muted.

170.   The control deputy shall log into the Jail Information Management System (JIMS) all alarms indicating date, time, location, and disposition. The disposition shall include information as to the cause of the alarm such as, "medical", "fight", or "accidental", etc.

171.   In the event of an emergency or incident, an incarcerated person is to depress the intercom call button which activates an alarm on the receiving end (e.g. Housing Control, Central Control, etc.). The alarm will alert sworn staff of a possible emergency or incident that necessitates their attention. Sworn staff will answer all intercom calls in an expeditious manner and follow up on the nature of the call. (Emphasis added).

172.   At the time Brandon was brutally killed, Defendants had for years engaged in a pattern of violating their own policies and procedures by routinely ignoring or muting intercom calls, or failing to fix broken intercoms, which had already resulted in the severe injuries or deaths of Frankie Greer, Richard Boulanger, Vianna Granillo, Robert Moniger, and Derryl Dunsmore.

173.   Despite the knowledge that there was a *de facto* policy of deputies ignoring the written policies on intercom calls, the County and the supervisory defendants did nothing to remedy or correct this pattern of misconduct.

174.   According to Defendant Blackburn "Sometimes [an inmate will] press [the intercom], we'll respond by asking, "What is your medical emergency?" Sometimes there will be no response from the inmate and then they will keep pressing it. So we will have to, like, put up a bypass for 15 minutes and then make a note saying the inmate keeps pressing the button for nonmedical emergencies."

175.   This *de facto* policy of deputies muting or putting a "bypass" on panic emergency calls means that victims who are not able to respond to a question posed

EXHIBIT A

by the deputies as a result of an assault or in this case, choking and smothering, will go unanswered.

## VII.  FIRST CAUSE OF ACTION:

### Deliberate Indifference (42 U.S.C. § 1983)
### [By Plaintiff Estate of Brandon Yates against Defendants Blackburn, Gonzalez and Does 1-26, 37-46]

176.  Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

177.  Officials of the San Diego Sheriff's Department, acting under color of law, have subjected decedent Brandon Yates, and other persons similarly situated to a pattern of conduct consisting of continuing, widespread, and persistent pattern of unconstitutional misconduct.

178.  Defendants failed to properly classify Ruis under state law and the San Diego County Sheriff's Department Detention Services Bureau Manual of Policies and Procedures.

179.  Defendants ignored his lengthy history of severe mental illness and his repeated assaultive behaviors.

180.  Defendants Blackburn, Gonzalez, Does 11-21, and 37-46, had an obligation to advise the JPMU that Ruis was violent and aggressive towards inmates and staff so that Ruis could be reclassified.

181.  Upon information and belief, Does 37-46 observed Ruis while he was in EOH. Defendants knew Ruis was an aggressive inmate who threatened to hurt others and commit suicide.

182.  Defendants knew or should have known that Ruis was a danger to himself and to others.

183.  Persons who are a danger to themselves or others were not to be housed on the Fourth floor.

184.  No one admitted him to the PSU where he could be monitored and

- 29 -

treated.

185.  Either the housing deputies and supervisors failed to notify Classification or the Classification officers failed to properly house Ruis.

186.  Upon information and belief, Ruis was never reclassified after repeatedly being sent to EOH for dangerous and psychotic behavior.

187.  Defendants Blackburn, Gonzalez and Does knew of Ruis's violent propensities and his grave mental illness. Blackburn, Gonzalez, and Does 11-21 witnessed Ruis's multiple violent outbursts and sent him to EOH on multiple occasions, including in the days before Ruis murdered Brandon.

188.  Upon information and belief, while in EOH, Ruis's violent rhetoric and symptoms escalated. Medical providers, Does 37-46, witnessed Ruis express suicidal and homicidal ideas and attempt to take his life.

189.  At some point, Jail staff placed Ruis on "bypass" because they knew he had a violent predisposition and would often provoke other inmates.

190.  Ruis was not allowed to have dayroom time with other inmates.

191.  Because Ruis had been placed on "bypass," Defendants knew Ruis was a violent inmate who could not be around any other inmate.

192.  Defendants did not take reasonable available measures to abate or reduce the risk that Ruis posed to other inmates, specifically Brandon, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved.

193.  Defendant Does 1-10, 11-21  failed to classify Ruis as a violent inmate who should not be housed in a cell with other inmates.

194.  Medical staff, Does 37-46, allowed Ruis to go back to his cell with the general population knowing Ruis was suffering from a serious mental health issue making it unsafe for him to be with another person.

195.  In housing Brandon in a cell with Ruis, Defendants placed Brandon at substantial risk of suffering serious harm.

- 30 -

EXHIBIT A

196.   Blackburn was explicitly told by Brandon's first cellmate that Brandon was vulnerable to attack.  Brandon was taken out of that cell specifically because the cellmate threatened to harm him.

197.   Blackburn knew that Brandon was mentally ill because he had seen Brandon was "nonsensical" and "babbling."  Blackburn knew that Brandon was talking incessantly and rambling.  Blackburn knew that Brandon was making no sense when speaking.

198.   Blackburn, Gonzalez and other deputies knew that Ruis was mentally ill.  They knew that Ruis babbled incessantly about God in a nonsensical manner.

199.   Deputies were aware that Ruis was staying up all night, constantly yelling out the cell door erratic and nonsensical statements.

200.   Deputies were aware that Ruis had been sent to EOH on the Sixth Floor multiple times.

201.   Defendant Blackburn was deliberately indifferent and/or recklessly disregarded Brandon's safety needs when he placed him in cell 9 with Ruis, an inmate known to have violent tendencies and suicidal and homicidal ideations, in violation of Brandon's Fourteenth Amendment rights as a pretrial detainee.

202.   Upon information and belief, either defendant deputies failed to communicate to others Ruis' bypass status or Blackburn knowingly ignored the information.

203.   When Blackburn opened Ruis' cell door to place Brandon inside, Ruis told Blackburn that it was a "sign from God."

204.   By failing to place safeguards to prevent placing incarcerated persons in Ruis's cell, Defendants knowingly and recklessly disregarded the severe risk Ruis posed to Brandon Yates.

205.   Upon information and belief, Defendants Blackburn, Gonzalez, Does 11-21, and 22-26 ignored the screams for help and multiple attempts to get help by sworn staff .

- 31 -

EXHIBIT A

206.  Defendants, including Does 22-26, ignored the calls for help by muting the sound or bypassing the calls.

207.  Deputies including Blackburn, Gonzalez, Does 11-21, who entered the module could hear Brandon screaming for help and ignored it.

208.  Blackburn, Gonzalez and Doe defendants who had conducted cell checks in the module had failed to comply with Title 15 which requires that the checks be conducted at random.

209.  Defendants conducted the cell checks every 60 minutes, which all inmates were aware of.  Ruis timed his attack on Brandon, "taking his time" in torturing and killing Brandon.

210.  During this time in which Ruis was left unmonitored, Ruis beat Brandon and did a "UFC chokehold" on Brandon.

211.  Ruis tortured and killed Brandon.

212.  Defendants acted with deliberate or reckless disregard of decedent's constitutionally protected rights.

213.  The conduct alleged herein caused Brandon to be deprived of his civil rights that are protected under the United States Constitution which has also legally, proximately, foreseeably, and actually caused Brandon's suffering and death.

## VIII.  SECOND CAUSE OF ACTION:

**Failure to Properly Train, Supervise, and Discipline (42 U.S.C. § 1983) [Against Martinez, Williams, Supervisory Doe Defendants 27-36, and Medical Supervisory Does 47-51]**

214.  Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by reference.

215.  Officials of the San Diego Sheriff's Department, acting under color of law, have subjected decedent Brandon and other persons similarly situated to continuing, widespread, and persistent patterns of constitutional misconduct.

- 32 -

EXHIBIT A

216.    These defendants were personally aware of the repeated Constitutional violations committed by their subordinates from the reports by NCCHC, CLERB, the California state auditor, community members, the Grand Jury, their own chain of command, and the lawsuits filed by the loved ones of people who died needlessly in the County Jails.

217.    Individual defendants, including Doe deputies and medical care providers acted under the direction and supervision of Martinez, Williams and Supervisory Doe Defendants 27-36 and 47-51 who set forth the standards, policies and procedures on the treatment of people in San Diego County Jail custody.

218.    Defendants Martinez, Williams, and Supervisory Does 27-36 were made aware of the failure to properly classify or house inmates through the deaths of Hartsaw, Woodward, McCoy, Baker, Van Tine, and Vogelman, and other beatings and assaults resulting from their improper classification or housing people in custody.

219.    These Supervisory Defendants knew that Jail officials were failing to place patients and inmates in proper housing units where they could be monitored for their serious medical and mental health needs and that they were failing to conduct proper cell checks or responding to emergencies. Despite this knowledge, they continued to fail to train, supervise or discipline their staff.

220.    As a result of Defendants' failures, Brandon was placed in a cell unmonitored with a "bypass inmate" for an hour. Brandon's assault and death were foreseeable consequences of Defendants' failures.

221.    Defendant Martinez, Defendant Williams, and Medical Supervisory Does 47-51 also knew that their medical and mental health staff had been failing to properly classify and treat EOH inmates.

222.    Defendants knew their medical and mental health staff had been improperly releasing EOH inmates into mainline, disregarding the dangerous risk they posed to themselves, other inmates, and deputies.

- 33 -

EXHIBIT A

223.   They were made aware that their subordinates were failing to admit seriously mentally ill patients into the PSU from multiple prior deaths including that of Ruben Nunez.

224.   The supervisory defendants were aware that their subordinates had failed to admit Ruis into the PSU or to manage his serious and dangerous mental illness.

225.   These defendants took no action to remedy the misconduct.

226.   Defendants Martinez, Williams, and Supervisory Does 27-36 knew that the intercom system was the only communication mechanism during emergencies in housing units. They knew that no video cameras were looking into the cells. They knew that assaults, rapes, and medical emergencies occur in the housing cells and that the only way someone could call for help was through the intercom system.

227.   They knew it was common practice to either turn down or turn off the sound so inmate calls could not be heard in the control tower. It was common practice for deputies to ignore the calls when inmates did not respond to the question "What is your medical emergency?"

228.   Defendant Blackburn testified that they put up a bypass for 15 minutes if an inmate keeps pressing the button.

229.   This was the *de facto* policy of the San Diego jails. When a victim is unable to speak or timely respond to the inquiry because they are experiencing an emergency, they are silenced.

230.   Defendants Martinez, Williams, and Supervisory Does 27-36 failed to train their deputies on proper use of intercom systems, despite knowing this failure was causing serious injuries and deaths.

231.   There has been an *de facto* policy of acquiescence in the wrongful conduct of jail staff. Defendants failed to take corrective action or promulgate corrective policies and regulations in the face of repeated Constitutional violations.

- 34 -

EXHIBIT A

232.   Defendants Martinez, Williams, and Supervisory Does 27-36 knew that their deputies were consistently failing to conduct proper cell checks. They were well aware that the checks were not conducted timely or randomly.

233.   They were aware of multiple instances in which deputies walked away from people in medical distress and left them to die.

234.   Ruis was able to time his assault and torture Brandon for nearly an hour because he knew that the cell checks were conducted at 60 minute intervals.

235.   The failure of all supervisory defendants to promulgate or maintain constitutionally adequate training was done with deliberate indifference to the rights of Brandon Yates and others in his position.

236.   As a direct result of the Defendants' failures, Brandon was tortured and killed.

## IX.  THIRD CAUSE OF ACTION
### *Monell* (42 U.S.C. § 1983)
### [Against Defendant County of San Diego]

237.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by reference.

238.   A municipality may be liable under § 1983 when the execution of a policy or custom inflicts plaintiff's injury. *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). The policy may be one of "inaction" that amounts to the "functional equivalent of a decision by the city itself to violate the Constitution." *City of Canton, Ohio v. Harris* ("Canton"), 489 U.S. 378, 394-95 (1989).

239.   The County is liable under § 1983 for its customs of inaction and its failure to promulgate adequate policies and training in the classification, reclassification and housing of inmates; failure to treat and monitor inmates; failure to treat patients with mental health conditions; and failure to timely respond to emergencies.

- 35 -

EXHIBIT A

240.   The County is liable for its failure to train its classification officers, deputies, medical staff and contractors.   Classifying, housing and providing medical care to patients inside the jail are event that occur on a daily basis.   The failure to train and supervise County employees and contractors showed deliberate indifference to the consequences on the incarcerated people, including Brandon Yates.

241.   In February 2022, the Auditor of California highlighted deficiencies with how the Sheriff 's Department provides care for and protects incarcerated individuals. These deficiencies included its provision of medical and mental health care.

242.   The audit found that deficiencies in the Sheriff 's Department's policies and practices related to intake screenings, medical and mental health care, safety checks, and responses to emergencies likely contributed to jail deaths. The high rate of deaths in San Diego County jails compared to other counties' jails suggests that these systemic deficiencies have undermined the Sheriff's Department's ability to ensure the health and safety of the individuals in its custody. The auditor was concerned about whether the Sheriff 's Department would make meaningful changes to address these systemic problems.

### A.   Deficiencies in Identifying People's Medical and Mental Health Needs.

243.   The audit found that significant deficiencies in the Sheriff 's Department's provision of care to incarcerated individuals likely contributed to the deaths in its jails. For example, studies on health care at correctional facilities have demonstrated that identifying individuals' medical and mental health needs at intake—the initial screening process— is critical to ensuring their safety in custody.

244.   The auditor wrote: "Nonetheless, our review of 30 individuals' deaths from 2006 through 2020 found that some of these individuals had serious medical

EXHIBIT A

or mental health needs that the Sheriff's Department's health staff did not identify during the intake process. Moreover, in one case we reviewed, an incident between two cellmates resulted in one's death. In this instance, the intake nurse did not identify that the perpetrator had a history of mental health issues. Had the perpetrator's mental health issues been identified properly at intake, the department's staff might have placed this individual in a different cell, leading to a different outcome."

245.   According to the auditor, the San Diego Sheriff's Department relied on registered nurses to perform the mental health portion of its intake screening, even though these nurses may not specialize in mental health care and may miss key signs of mental health needs. In contrast, the Riverside County Sheriff's Department's policy requires that a mental health clinician evaluate every individual at intake.

246.   According to San Diego policy, if the registered nurse identifies an individual as having mental health needs at intake, the nurse refers the individual for further evaluation by a qualified mental health professional. However, even if the nurse identifies a need for a further mental health assessment, the Sheriff's Department's policy may not require the individual to receive that assessment sooner than 30 days after intake, depending on the severity of an individual's symptoms.

247.   The February 2022 audit found that the Sheriff Department's staff did not always provide consistent follow-up care to individuals who requested or previously received medical or mental health services. The audit highlighted that poor policies and communication were reasons why the Sheriff's Department did not always follow up consistently. The audit stated the Sheriff's Department needed to address these deficiencies in its medical and mental health care system.

248.   The audit was critical of the Sheriff's Department failure to implement recommendations from the San Diego County Grand Jury related to the way it

EXHIBIT A

communicates incarcerated individuals' mental health needs to its staff.

249.   Because the Sheriff's Department did not always properly identify the medical and mental health needs of individuals in the auditor's review at intake, some of them did not receive the care they required.

250.   One case example from the auditor's review of files from the Sheriff's Department included an intake nurse who did not identify an individual's mental health needs and did not have access to the individual's mental health history. Once incarcerated, that individual killed their cellmate. After the cellmate's death, the Sheriff's Department discovered the perpetrator's history of mental illness. The auditor concluded that had staff known about this history, they likely would have placed the perpetrator in a different cell, where they could better meet the individual's mental health needs and better ensure others' safety.

251.   When the National Commission reviewed the Sheriff's Department's jails in 2017, it found that they did not meet many of its standards, particularly those related to mental health.

### B.   *De Facto* Policy of Failing to Properly Classify and House Violent Inmates

252.   The County has repeatedly failed to properly classify individuals which resulted violent beatings, rapes and murders.

253.   The County of San Diego failed to train staff on policies for proper classification of violent inmates.

254.   The County of San Diego failed to discipline staff when they misclassified inmates, thereby creating a *de facto* policy that allowed violent inmates to be housed with other inmates, despite a series of instances in which  misclassified inmates severely injured or killed other inmates.

255.   The County's failure to train and supervise its deputies and medical staff on improperly classifying and housing inmates who are a danger to themselves or others gives inference of a municipal custom that authorized or condoned deputy

EXHIBIT A

misconduct.

256.   There was a custom and practice of failing to properly screen inmates who presented as a danger to themselves or others.

257.   Defendant County, by and through Martinez and Williams, had ample notice of the following: that San Diego County Jail had the highest mortality rate among California's largest jail systems; that there had been countless complaints made by inmates, family members, community members, and the SDJC's own staff regarding injuries caused by staff misconduct.

258.   The County was well aware of the danger of housing violent inmates with other people. The deaths of Hartsaw, Woodward, Vogelman, McCoy, Baker, and others should have been a wake-up call to the County.

259.   Bradon Yates's death was also a result of the County's continuing failure to train employees to properly classify their inmates and respond to emergency intercom calls.

260.   Defendant County of San Diego ratified and condoned the wrongful acts of Defendants Blackburn, Gonzalez, and Does 1-51 by failing to discipline them for unconstitutional conduct that caused Brandon's death. Defendant County failed to provide these Defendants additional training, remedial training, and closer supervision and monitoring. The County failed to take any steps to ensure that these Defendants would not continue to violate the rights of seriously ill or seriously disabled inmates.

261.   Defendant County is also liable based on Martinez's failure to enact new and different policies despite her knowledge of woefully inadequate policies and procedures in place while Brandon was incarcerated.

## C.   *De Facto* Policy of Ignoring Emergency Intercom Calls

262.   Upon information and belief, the permanent, widespread well-settled practice or custom of Defendant was to ignore emergency intercom calls from inmates.

- 39 -

EXHIBIT A

263.  For years, the County was aware inmates were suffering serious injuries, even death because of its employees' neglect and apathy. Defendant knew their correctional staff were silencing or letting emergency intercoms go unanswered.

264.  As of 2019, the County was well aware from Frankie Greer's case that deputies had ignored frantic calls by multiple inmates for "man down" while Mr. Greer was bleeding out. No one was disciplined for this misconduct despite the fact that Mr. Greer nearly died and suffered a permanent brain injury as a result of the delay in receiving medical attention.

265.  There is no question the County was aware of Mr. Greer's near-death incident because Sheriff Martinez referred to the case in her most recent interview with Voice of San Diego.

266.  There were multiple other instances in which deputies ignored the emergency intercom calls.

267.  When Defendants became aware that deputies had ignored emergency intercom calls, Defendants did not take corrective action.  Defendants did not retrain them. They did not discipline them.  They did not update Department policies.

268.  It was a matter of accepted policy that deputies muted the call for a "bypass" when the caller was not capable of communicating the reason for the call.  People who are experiencing medical emergencies or grave physical injuries who are unable to speak will be placed on bypass so that deputies can ignore them.

269.  Defendant County is liable based on their ratification and approval of the constitutional, statutory, and other law violations as alleged in this Complaint.

270.  Defendant County's policies, customs, or practices, actions and inactions by final policymakers, ratification of constitutional and law violations, and failure to train its employees caused Brandon's deprivation of rights by the individual defendants. That is, their policies, customs or practices, actions and

EXHIBIT A

inactions by final policymakers, ratification of constitutional and law violations, and failure to train its employees were so closely related to Brandon's deprivation of rights that they were a moving force causing Brandon's assault and death.

### D. *De Facto* Policy of Improper Cell Checks

271. Upon information and belief, the permanent, widespread well-settled practice or custom of Defendant was to permit deputies to violate Title 15 and the County's own written policies on conducting cell checks.

272. For years, Defendants were aware inmates were suffering serious injuries, even death because of their employees' failures to conduct safety checks at random intervals for the safety of incarcerated people and deputies themselves. Defendants knew their correctional staff were consistently conducting cell checks on the hour or over one hour but failed to take any action.

273. As a result, Brandon Yates' assailant knew that he could time the assault and murder during the one hour period between cell checks.

### E. Ratification

274. Defendants have a widespread history of ratifying employee misconduct by failing to conduct appropriate investigations.

275. There has been an official policy of acquiescence in the wrongful conduct. Defendants failed to promulgate corrective policies and regulations in the face of repeated Constitutional violations.

276. Defendants refused to investigate misconduct and/or took no remedial steps or action against the staff involved in this case.

## X.  FOURTH CAUSE OF ACTION

### Right of Association (42 U.S.C. § 1983)
### [By Dan Yates and Andrea Carrier Against Defendants Blackburn, Gonzalez, Does 1-26 and 37-46]

277. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by reference.

- 41 -

278.    Defendants deprived Brandon Yates of his rights under the United States to be free from deliberate indifference to his Constitutional rights.

279.    The misconduct of the defendants caused the untimely and wrongful death of Brandon and deprived Dan Yates and Andrea Carrier ("Dan" and "Andrea") in their liberty interests in the family relationship in violation of her substantive due process rights as defined by the First and Fourteenth Amendments to the Constitution.

280.    A substantive due process claim of impermissible interference with familial association arises when a state official harms a parent or child in a manner that shocks the conscience. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). "[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation. Id. (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

281.    "There are two tests used to decide whether officers' conduct 'shocks the conscience.'" *Id*. at 1056. A state official's conduct may shock the conscience if (1) the official acted with a "purpose to harm" the victim for reasons unrelated to the legitimate law enforcement objectives; or (2) the official acted with "deliberate indifference" to the victim. *Id*. at 1137.

282.    Which test applies turns on the specific circumstances of the underlying events in each case. If the encounter at issue escalated so quickly that the officer had to make a snap judgment, the plaintiff must show the officer acted with a "purpose to harm." *Id*. However, if the situation evolved within a timeframe that allowed officers to reflect before acting, the plaintiff must show the officer acted with "deliberate indifference." *Id*.

283.    Defendants had time to deliberate in deciding to house Ruis in a general population housing unit without monitoring him for his dangerous and unpredictable behavior. Defendants had time to deliberate in deciding not to place him in the PSU. Defendants had time to deliberate in deciding to release Ruis from EOH when there were clear signs that he presented a danger to others.

284.   Defendants had ample time to deliberate when placing Brandon in a cell with a bypass inmate and failing to respond to the emergency calls. Allegations that they acted with deliberate indifference satisfy the "shock the conscience" standard under the Fourteenth Amendment because they are one and the same.

285.   There was no legitimate penological interest in placing Brandon in Ruis's cell knowing Ruis posed a danger to himself and other inmates.

286.   There was no legitimate penological interest in failing to respond to intercom requests for immediate help.

287.   The deprivation of the rights alleged above has destroyed the Constitutional rights of Dan and Andrea to the society and companionship of their son, which is protected by the substantive due process clause of the Fourteenth Amendment.

288.   The conduct alleged herein violated Brandon's rights alleged above, thereby resulting in the deprivation of Dan and Andrea's rights as his parents.

## XI.  FIFTH CAUSE OF ACTION

### Violation of Cal. Civil Code § 52.1 (Bane Act)
### [By Plaintiff the Estate of Brandon Yates Against All Defendants]

289.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by reference.

290.   Plaintiffs bring the claims in this cause of action as survival claims permissible under California law, including Cal. Code of Civil Procedure § 377.20, *et seq*.

291.   By their acts, omissions, customs, and policies, Defendants, as each Defendant acting in concert/conspiracy, as described above, while Brandon was in custody, and by threat, intimidation, and/or coercion, interfered with, attempted to interfere with, and violated Brandon's rights under California Code, § 52.1, under the United State Constitution and California Constitution, and California Civil Code § 43 as follows:

- 43 -

EXHIBIT A

a.　　The right to be free from objectively unreasonable deliberate indifference to Brandon's safety while in custody as a pre-trial detainee, as secured by the Fourteenth Amendment to the United States Constitution and by the California Constitution, Article 1 §§ 7 and 13;

b.　　The right to enjoy and defend life and liberty; acquire possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1;

c.　　The right to protection from bodily restraint, harm, or personal insult, as secured by California Civil Code, § 43; and

d.　　The right to emergency medical care as required by California Government Code §845.6.

292.　Defendants violated Brandon's rights by instituting and maintaining the unconstitutional customs, policies, and practices described herein, when it was obvious that in doing so, individuals such as Brandon would be subjected to threat, intimidation, coercion, and ongoing violations of rights as Decedent was here.

293.　Defendants violated Brandon's rights by recklessly failing to train, supervise and discipline their subordinates who placed Brandon in a cell with a violent offender and failing to respond to his screams for help.  They recklessly failed to train, supervise and discipline their subordinates who failed to properly classify and house Ruis who had a long history of violent conduct then failed to monitor him.

294.　Defendants' violations of Brandon's due process rights with deliberate indifference, in and of themselves, constitute violations of the Bane Act.

295.　Each Defendant violated Brandon's rights with specific intent, meaning that they acted with recklessness.

296.　All of Defendants' violations of duties and rights, and coercive

- 44 -

EXHIBIT A

conduct, described herein were volitional acts; none was accidental or merely negligent.

297.   The threat, intimidation, and coercion described herein were not necessary or inherent to Defendants' violation of Brandon's rights, or to any legitimate and lawful jail or law enforcement activity.

298.   Activities inside a jail are inherently coercive because the detainee may not leave the jail premises for protection or better treatment. In addition to the inherently coercive nature of incarceration, Brandon was placed in a locked cell with his murderer with nowhere to go.

299.   Defendants recklessly disregarded Brandon's Fourteenth Amendment rights to be free from deliberate indifference to his safety.

300.   Defendant County of San Diego is vicariously liable for the violation of rights by their employees and agents under the theory of *respondeat superior*.

301.   Defendant County of San Diego is liable pursuant to California Government Code, California Government Code, § 815.2.

## XII.  SIXTH CAUSE OF ACTION

### Negligence – Survival Claim (CCP § 377.30)
**[By Plaintiff The Estate of Brandon Yates Against All Defendants]**

302.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by reference.

303.   Defendants had duties of care arising from the special relationship between a jailer and prisoner.

304.   Defendants had a duty to act pursuant to Title 15 and Title 24.

305.   Defendants had a duty to act reasonably.

306.   Defendants had a duty under the Minimum Standards for Local Detention Facilities under Title 24, Chapter 13, Article I, Section 13-102(c) which requires facilities to be "designed and/or equipped in such a manner that staff and inmates have the ability to summon ***immediate assistance in the event of an***

- 45 -

EXHIBIT A

*incident or emergency*." (Emphasis added).

307.   Supervisory defendants failed to take action to ensure that the emergency button functioned in such a way that staff could not ignore the calls for immediate assistance.

308.   Supervisory defendants improperly, negligently, wrongfully and recklessly failed to set forth policies regarding proper screening, evaluation, treatment, and housing of inmates suffering from severe mental health issues.

309.   Supervisory defendants improperly, negligently, wrongfully and recklessly failed to take any action when they knew that their subordinates' failures to separate violent offenders from others would have catastrophic consequences.

310.   Defendants improperly, negligently, wrongfully and recklessly allowed Does 11-21 and Does 37-46 to release Ruis back into the general population knowing he was a danger to himself and others.

311.   Sworn staff had a duty to act with ordinary care in carrying out their duties as correctional officers, including reasonable care in jailing individuals, housing them, monitoring them, and protecting them from harm.

312.   By their acts, omissions, customs, and policies, Defendants breached the foregoing duties when they failed to prevent Ruis from assaulting Brandon.

313.   As alleged above, Defendants Blackburn, Gonzalez, and Does 11-26 breached their duties pursuant to California Government Code § 845.6 when they failed to render timely emergency care.

314.   In evaluating, assessing, and handling Ruis, knowing of his fragile and volatile mental condition, including homicidal and suicidal tendencies, knowing he was placed in EOH and in solitary confinement on numerous occasions, knowing he struggled to maintain any sort of relationship with inmates around him due to his violent demeanor, and knowing he was a high risk to any inmate assigned to be his cellmate, Does 1-10 and 37-46 failed to classify and house Ruis and Brandon Yates properly.  They failed to protect Brandon from harm that was predictable

- 46 -

EXHIBIT A

when housing a vulnerable person with a cellmate with known history of violence.

315. Does 1-10 and 37-46 acted with extreme recklessness in failing to classify Ruis as a high level security risk inmate and placing him in the PSU where he could be separated and monitored for his volatility and violence.

316. Does acted negligently in failing to place Brandon in protective custody after his cellmate had told Blackburn that he would hurt Brandon. Defendants were well aware that Brandon was vulnerable to attack as a result of his mental illness.

317. Defendants improperly, negligently, and wrongfully, and recklessly assigned Brandon to Ruis's cell.

318. Defendants improperly, negligently and wrongfully, and recklessly, failed to take any action to ensure Ruis would not harm Brandon.

319. Defendants improperly, negligently and wrongfully, and recklessly failed to respond to the emergency intercom message that Brandon transmitted, stating "They are going to kill me."

320. Defendants improperly, negligently and wrongfully, and recklessly failed to respond to the emergency intercom message that other Module 4C inmates sent at or around the time Ruis was murdering Brandon.

321. By engaging in the acts alleged herein, Defendants failed to act with ordinary care and breached their duty of care owed to Brandon.

322. As a direct and proximate result of the Defendant's negligent conduct as herein, Brandon died.

323. As set forth in the preceding paragraphs, Defendants committed wrongful acts, breaching their duties and causing harm to Plaintiff. Plaintiff thus seeks compensatory damages according to proof and punitive damages against individual defendants.

324. Moreover, because Defendants were acting in the course and scope of their employment as Sheriff's employees when the foregoing conduct occurred, the

EXHIBIT A

County is vicariously liable for the injuries Plaintiff suffered as a result of the deputies' tortious conduct under California Government Code § 815.2.

## XIII.  SEVENTH CAUSE OF ACTION

### Wrongful Death (CCP § 377.60 et seq)
### [By Andrea Carrier and Dan Yates Against All Defendants]

325.  Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by reference.

326.  Plaintiffs allege all California state law claims as the basis for state law wrongful death cause of action and incorporate other later torts by reference.

327.  Defendants committed wrongful acts which proximately caused the death of Bradon Yates.

328.  As alleged above, Defendants Martinez, Williams, Blackburn, Gonzalez, and Does 1-51 owed Brandon a duty of care as applicable to any other inmate under the jailer-warden duty of care. Under this duty of care, a person who has custody of another owes a duty of reasonable care to protect the other from foreseeable harm. A custodian may thus be held liable for failure to make reasonable efforts to protect a ward from a third person's attack or molestation. *Giraldo v. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231, 247 (2008).

329.  The supervisory defendants, including Martinez, Williams, and Does 37-46 and 57-61 had a duty to supervise their subordinates on their duties, and their actions and inactions proximately caused Brandon's death.

330.  Defendant County of San Diego is responsible for the acts of the aforementioned individual and Doe defendants under the theory of *respondeat superior*.

### RELIEF REQUESTED

**WHEREFORE,** Plaintiffs pray as follows:

For general and special damages according to proof at the time of trial;

For attorneys' fees and costs of suit and interest incurred herein;

- 48 -

EXHIBIT A

For damages for pre-death pain and suffering pursuant to California Code of
Civil Procedure Section 377.34 and 42 U.S.C. 1983;

For punitive damages against individual defendants; and

Any other relief this court deems just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh
Amendment of the Constitution, Plaintiffs hereby demand a jury trial of this action.

February 24, 2025                          Respectfully Submitted,

                                           **IREDALE AND YOO, APC**
                                           *s/ Julia Yoo*

                                           EUGENE IREDALE
                                           JULIA YOO
                                           CHELSEA REHERMAN
                                           Attorneys for Plaintiffs

- 49 -

EXHIBIT A

**CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

THE ESTATE OF BRANDON YATES, DAN YATES and ANDREA CARRIER

**(b)** County of Residence of First Listed Plaintiff    San Diego
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Julia Yoo; Iredale & Yoo, APC.; 105 West F Street, Fourth Floor, San Diego, CA 92101; (619) 233-1525

## DEFENDANTS

COUNTY OF SAN DIEGO, et al.

County of Residence of First Listed Defendant    San Diego
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

'25CV0410 W    MMP

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | |
| ☐ 2 | U.S. Government Defendant | |
| ☒ 3 | Federal Question *(U.S. Government Not a Party)* | |
| ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | **PERSONAL INJURY** | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 365 Personal Injury - Product Liability | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | **LABOR** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 751 Family and Medical Leave Act | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | ☐ 790 Other Labor Litigation | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | ☐ 791 Employee Retirement Income Security Act | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | **SOCIAL SECURITY** | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 862 Black Lung (923) | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 863 DIWC/DIWW (405(g)) | |
| | | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI | |
| | | ☐ 555 Prison Condition | ☐ 865 RSI (405(g)) | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | **FEDERAL TAX SUITS** | |
| | | **IMMIGRATION** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| | | ☐ 462 Naturalization Application | ☐ 871 IRS—Third Party 26 USC 7609 | |
| | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer |  ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. 1983

Brief description of cause:
This is a civil rights action for the death of Brandon Yates while he was detained at a San Diego County jail.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 2/24/2025 | s/ JULIA YOO |

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

EXHIBIT A

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a)  **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b)  **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c)  **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.  **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III.  **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.  **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V.  **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI.  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII.  **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.  **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

EXHIBIT A

## DECLARATION OF DAN YATES

I, Dan Yates, declare as follows:

1. I am over the age of 18 and reside in San Diego County, California. I make the following declaration based on my personal knowledge. If called upon to testify as a witness, I could and would competently testify thereto.

2. My son, Brandon Yates, was born on May 17, 1999. I am his biological father.

3. Brandon died in the city and county of San Diego on January 16, 2024. He was 24 years old.

4. At the time of his death, Brandon was not married and he had no children. He did not leave behind any will. He did not leave any testamentary instrument or other written document designating any heir or beneficiary or making any donative transfer of property. Brandon died intestate.

5. No proceeding is pending in California for administration of his estate. No probate proceeding is pending in any other state or country for administration of Brandon's estate.

6. Because at the time of his death, Brandon was not married and had no children, I, along with Brandon's biological mother Andrea Carrier, am one of decedent Brandon Yates' successors in interest (as defined in Section 377.11 of the California Code of Civil Procedure) and succeed to the decedent's interest in the action or proceeding.

7. No other person has a superior right to commence the action or proceeding or to be substituted for the decedent's interest in the action or proceeding.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on _FEB 14, 2025_ in _CARLSBAD_, California.

_Dan Yates_ (signature)
_____
DAN YATES

EXHIBIT A

'25 CV 0410 W    MMP

# DECLARATION OF ANDREA CARRIER

I, Andrea Carrier, declare as follows:

1. I am over the age of 18 and reside in San Diego County, California. I make the following declaration based on my personal knowledge. If called upon to testify as a witness, I could and would competently testify thereto.

2. My son, Brandon Yates, was born on May 17, 1999. I am his biological mother.

3. Brandon died in the city and county of San Diego on January 16, 2024. He was 24 years old.

4. At the time of his death, Brandon was not married and he had no children. He did not leave behind any will. He did not leave any testamentary instrument or other written document designating any heir or beneficiary or making any donative transfer of property. Brandon died intestate.

5. No proceeding is pending in California for administration of his estate. No probate proceeding is pending in any other state or country for administration of Brandon's estate.

6. Because at the time of his death, Brandon was not married and had no children, I, along with Brandon's biological father Dan Yates, am decedent Brandon Yates' successors in interest (as defined in Section 377.11 of the California Code of Civil Procedure) and succeed to the decedent's interest in the action or proceeding.

7. No other person has a superior right to commence the action or proceeding or to be substituted for the decedent's interest in the action or proceeding.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on *February 17, 2025* in *Carlsbad*, California.

*Andrea Carrier*
ANDREA CARRIER

CERTIFICATION OF VITAL RECORD

# COUNTY OF SAN DIEGO

CERTIFICATE OF DEATH   3202437001885

| | |
|---|---|
| NAME OF DECEDENT—FIRST | BRANDON |
| MIDDLE | |
| LAST | YATES |

DATE OF BIRTH: 05/17/1998   AGE: 24   SEX: M

STATE OF BIRTH: CA   SOCIAL SECURITY NUMBER: 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   NEVER MARRIED   01/16/2024   1414

EDUCATION: HS GRADUATE   WHITE

USUAL OCCUPATION: FISHERMAN   KIND OF BUSINESS: COMMERCIAL FISHING   1

DECEDENT'S RESIDENCE: UNK

ST: UNK   CITY: UNK   COUNTY/PROVINCE: UNK   ZIP CODE: UNK   YEARS IN COUNTY: UNK   UNK

INFORMANT'S NAME: ANDREA CARRIER, MOTHER   UNK

NAME OF SURVIVING SPOUSE—FIRST: —   MIDDLE: —   LAST: —

NAME OF FATHER/PARENT—FIRST: DANNY   MIDDLE: —   LAST: YATES   BIRTH STATE: CA

NAME OF MOTHER/PARENT—FIRST: ANDREA   MIDDLE: —   LAST: CARRIER   BIRTH STATE: MI

DISPOSITION DATE: 02/02/2024   PLACE OF FINAL DISPOSITION: AT SEA OFF THE COAST OF SAN DIEGO COUNTY

TYPE OF DISPOSITION(S): CREMATE/SCATTER AT SEA   SIGNATURE OF EMBALMER: NOT EMBALMED   LICENSE NUMBER:

NAME OF FUNERAL ESTABLISHMENT: CREMATION SERVICES INC.   LICENSE NUMBER: FD1618   SIGNATURE OF LOCAL REGISTRAR: WILMA WOOTEN MD   DATE: 02/02/2024

PLACE OF DEATH: SAN DIEGO CENTRAL JAIL

DEATH COUNTY: SAN DIEGO   FACILITY ADDRESS OR LOCATION: 1173 FRONT STREET   CITY: SAN DIEGO

CAUSE OF DEATH:
IMMEDIATE CAUSE (A): ASPHYXIATION   ONSET: MINS   24-00174
(B): 
(C): 
(D): 

OTHER SIGNIFICANT CONDITIONS: NONE

WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 111: NO

PHYSICIAN CERTIFICATION section

CORONER'S USE ONLY:
OTHER: JAIL   INJURY DATE: 01/16/2024   UNK

PLACE OF INJURY: PLACED IN A CHOKEHOLD, SMOTHERED, AND STRANGLED BY ANOTHER PERSON

LOCATION OF INJURY: 1173 FRONT STREET, SAN DIEGO, CA 92101

SIGNATURE OF CORONER: DEBRA BERRY MD   DATE: 01/20/2024   DEBRA BERRY MD, DME

STATE REGISTRAR | A | B | C | D | E

County of San Diego – Health & Human Services Agency – 5560 Overland Avenue. This is to certify that, if bearing the OFFICIAL SEAL OF THE STATE OF CALIFORNIA, the OFFICIAL SEAL OF SAN DIEGO COUNTY AND THEIR DEPARTMENT OF HEALTH SERVICES EMBOSSED SEAL, this is a true copy of the ORIGINAL DOCUMENT FILED. This copy not valid unless prepared on engraved border displaying seal and signature of Registrar.

DATE ISSUED: 2/9/2024

WILMA J. WOOTEN, M.D., M.P.H.
REGISTRAR OF VITAL RECORDS
County of San Diego



A 004383760

EXHIBIT A



ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

# EXHIBIT "B"

# COUNTY CONTRACT NUMBER 566117
# AGREEMENT WITH NAPHCARE, INC. FOR
# SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

This agreement ("Agreement") is made and entered into effective as of the date of the last signature on the signature page by and between the County of San Diego, a political subdivision of the State of California ("County") and **NaphCare, Inc. and NaphCare of San Diego, LLC located at 2090 Columbiana Road, Suite 4000, Birmingham, AL 35216** *(*"Contractor"), with reference to the following facts:

## RECITALS

A.    The County, by action of the Board of Supervisors August 4, 2020 Minute Order No**.** 1 authorized the Director of Purchasing and Contracting to award a contract for Sheriff's Department Comprehensive Health Care Delivery.

B.    Contractor is specially trained and possesses certain skills, experience, education and competency to perform these services.

C.    The Chief Administrative Officer made a determination that Contractor can perform the services more economically and efficiently than the County, pursuant to Section 703.10 of the County Charter**.**

D.    The Agreement shall consist of this document, Exhibit A Statement of Work, Exhibit A-1 Jail Based Competency Treatment Program**,** Exhibit B Insurance Requirements, Exhibit C, Payment Schedule, Exhibit D, CORI/CLETS Requirements, and Exhibit E, Transition Plan**.** In the event that any provision of the Agreement or its Exhibits, A, A-1, B or C, conflicts with any other term or condition, precedence shall be: First (1st) the Agreement; Second (2nd) Exhibit B; Third (3rd) Exhibit A; Fourth (4th) Exhibit D; fifth (5th) Exhibit C, and sixth (6th) Exhibit A-1.

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

## ARTICLE 1
## PERFORMANCE OF WORK

1.1    Standard of Performance.  Contractor shall, in good and workmanlike manner and in accordance with the highest professional standards, at its own cost and expense, furnish all of the labor, technical, administrative, professional and all other personnel, all supplies and materials, equipment, printing, transportation, training, facilities, and all other means whatsoever, except as herein otherwise expressly specified to be furnished by County, necessary or proper to perform and complete the work and provide the services required of Contractor by this Agreement.

1.2    Contractor's Representative. The person identified on the signature page ("Contractor's Representative") shall ensure that Contractor's duties under this Agreement shall be performed on behalf of the Contractor by qualified personnel; Contractor represents and warrants that (1) Contractor has fulfilled all applicable requirements of the laws of the State of California to perform the services under this Agreement and (2) Contractor's Representative has full authority to act for Contractor hereunder.  Contractor and County recognize that the services to be provided by Contractor's Representative pursuant to this Agreement are unique: accordingly, Contractor's Representative shall not be changed during the Term of the Agreement without County's written consent.  County reserves the right to terminate this Agreement pursuant to Clause 7.1 "Termination for Default", if Contractor's Representative should leave Contractor's employ, or if, in County's judgment, the work hereunder is not being performed by Contractor's Representative.

1.3    Contractor as Independent Contractor.  Contractor is, for all purposes of this Agreement, an independent contractor, and neither Contractor nor Contractor's employees or subcontractors shall be deemed to be employees of the County. Contractor shall perform its obligations under this Agreement according to the Contractor's own means and methods of work, which shall be in the exclusive charge and under the control of the Contractor, and which shall not be subject to control or supervision by County except as to the results of the work.  County hereby delegates to Contractor any and all responsibility for the safety of Contractor's employees, which shall include inspection of property to identify potential hazards. Neither Contractor nor Contractor's employees or subcontractors shall be entitled to any benefits to which County employees are entitled, including without limitation, overtime, retirement benefits, workers' compensation benefits and injury leave.

1.4    Contractor's Agents and Employees or Subcontractors. Contractor shall obtain, at Contractor's expense, all agents, employees, subcontractors, and consultants required for Contractor to perform its duties under this Agreement, and all such services shall be performed by Contractor's Representative, or under Contractor's Representatives' supervision, by persons authorized by law to perform such services. Retention by Contractor of any agent, employee, subcontractor, or consultant shall be at Contractor's sole cost and expense, and County shall have no obligation to pay Contractor's agents, employees subcontractors, or consultants; to support any such person's or entity's claim against the Contractor; or to defend Contractor against any such claim.

EXHIBIT B

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

In the event any subcontractor or consultant is utilized by Contractor for any portion of the project, Contractor retains the prime responsibility for carrying out all the terms of this Agreement, including the responsibility for performance and ensuring the availability and retention of records of subcontractors and consultants in accordance with this Agreement.

1.4.1  "Related Subcontract" means an agreement to furnish, or the furnishing of, supplies, materials, equipment, or services of any kind to Contractor or any higher tier subcontractor in the performance of some or all of the work in this Agreement. Related Subcontracts includes consultant agreements, which are defined as agreements for services rendered, or the rendering of services, by persons who are members of a particular profession or possess as special skill and who are not officers or employees of the Contractor. Examples include those services acquired by Contractor or a subcontractor in order to enhance their legal, economic, financial, or technical positions. Professional and consultant services are generally acquired to obtain information, advice, opinions, alternatives, conclusions, recommendations, training or direct assistance, such as studies, analyses, evaluations, liaison with government officials, or other forms or representation. Related Subcontracts shall not include agreements for ancillary goods or services, or consulting services intended to support Contractor in a general manner not specific to the work performed under this Agreement.

1.4.2  Mandated Clause: Contractor shall notify all Related Subcontractors of Contractor's relationship to County. Contractor shall include in its Related Subcontracts and ensure compliance with the Standard Terms and Conditions required of Contractor in Articles 3, 7, 8, 9, 10, 11, 12, 13, 14 and 16 herein.

1.4.3  Contractor shall provide Contracting Officer Representative with copies of all Related Subcontracts entered into by Contractor within thirty (30) days after the effective date of the Related Subcontract, or within thirty (30) days of the effective date of this Agreement if such Related Subcontract is already in existence at that time.

1.4.4  County Approval: Any Related Subcontract that is in excess of fifty thousand dollars ($50,000) or twenty five percent (25%) of the value of this Agreement, whichever is less; or a combination of Related Subcontracts to the same individual or firm for the Agreement period, the aggregate of which exceeds fifty thousand dollars ($50,000) or twenty five percent (25%) of the value of this Agreement, whichever is less; or any Related Subcontract for health care services including mental health services, regardless of value, must have prior written concurrence of the Contracting Officer's Representative ("COR"). Such subcontractors of Contractor shall be notified of Contractor's relationship to County.

1.5  Offshore Prohibition. Except where Contractor obtains the County's prior written approval, Contractor shall perform the work of this Agreement only from or at locations within the United States. Any County approval for the performance of work outside of the United States shall be limited to the specific instance and scope of such written approval, including the types of work and locations involved. Notwithstanding the foregoing, this Section shall not restrict the country or countries of origin of any assets purchased to provide the work hereunder; provided that when such assets are used to provide the work, such assets shall be used only from or at locations within the geographic boundaries of the United States.

**ARTICLE 2**
**SCOPE OF WORK**

2.1  Statement of Work. Contractor shall perform the work described in the "Statement of Work" attached as Exhibit "A" to this Agreement, and by this reference incorporated herein, except for any work therein designated to be performed by County.

2.2  Right to Acquire Equipment and Services. Nothing in this Agreement shall prohibit the County from acquiring the same type or equivalent equipment and/or service from other sources, when deemed by the County to be in its best interest.

2.3  Responsibility for Equipment. For cost reimbursement agreements, County shall not be responsible nor be held liable for any damage to persons or property consequent upon the use, misuse, or failure of any equipment used by Contractor or any of Contractor's employees, even though such equipment may be furnished, rented, or loaned to Contractor by County. The acceptance or use of any such equipment by Contractor or Contractor's employees shall be construed to mean that Contractor accepts full responsibility for and agrees to exonerate, indemnify and hold harmless County from and against any and all claims for any damage whatsoever resulting from the use, misuse, or failure of such equipment, whether such damage be to the employee or property of Contractor, other Contractors, County, or other persons. Equipment includes, but is not limited to material, computer hardware and software, tools, or other things.

2.3.1  Contractor shall repair or replace, at Contractor's expense, all County equipment or fixed assets that are damaged or lost as a result of Contractor negligence.

EXHIBIT B

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

2.4    Non-Expendable Property Acquisition.  County retains title to all non-expendable property provided to Contractor by County, or which Contractor may acquire with funds from this Agreement if payment is on a cost reimbursement basis, including property acquired by lease purchase Agreement.  Contractor may not expend funds under this Agreement for the acquisition of non-expendable property having a unit cost of $5,000 or more and a normal life expectancy of more than one year without the prior written approval of Contracting Officer Representative.  Contractor shall maintain an inventory of non-expendable equipment, including dates of purchase and disposition of the property.  Inventory records on non-expendable equipment shall be retained, and shall be made available to the County upon request, for at least three years following date of disposition. Non-expendable property that has value at the end of the Agreement (e.g. has not been depreciated so that its value is zero), and to which the County may retain title under this paragraph, shall be disposed of at the end of the Agreement as follows: At County's option, it may: 1) have Contractor deliver to another County contractor or have another County contractor pick up the non-expendable property; 2) allow the contractor to retain the non-expendable property provided that the contractor submits to the County a written statement in the format directed by the County of how the non-expendable property will be used for the public good; or 3) direct the Contractor to return to the County the non-expendable property.

2.5    Transition Services. The Services shall include the transparent, seamless, orderly, and uninterrupted transition from the manner in which the County receives or performs the Services prior to the Effective Date to the provision of all such Services to the County by Contractor (the "Transition"). Such Transition shall include the complete and timely performance by Contractor of all requirements set forth in the Transition Plan, attached as Exhibit E, in accordance with the due dates specified therein and shall be accomplished by Contractor in such a manner as to have no adverse effect upon the County, any agency, subdivision or department thereof, nor upon the quality or continuity of the services being provided at County detention facilities. From and after the completion of Transition, Contractor shall ensure that there is no material adverse effect on the quality of the services being provided at County detention facilities that would not have otherwise occurred had the Transition contemplated by this Agreement not taken place.

    2.5.1    Milestones for Transition. The County and Contractor recognize and agree that time is of the essence for a successful Transition and they have designated certain actions and projects in the Transition Plan as Transition Milestones. If Contractor fails to meet any such Transition Milestone by the date corresponding thereto in the Transition Plan, Contractor shall be subject to Fee Reductions pursuant to Article 4 hereof. In the event that Contractor anticipates that action or inaction by the County could impact a Transition Milestone, Contractor may request an extension on such Transition Milestone, approval of which shall not be unreasonably withheld by the County. Notwithstanding the foregoing or anything to the contrary set forth in this Agreement, if Contractor fails to complete the Transition of all Services within one year from the Effective Date, the County may terminate this Agreement for cause without requirement of notice or opportunity for cure.

    2.5.2    Progress Reports. Contractor shall provide to the COR a written update as to progress of the Transition Plan at least weekly until such plan and each of Contractor's responsibilities thereunder have been met.

    2.5.3    Effects of Transition Services. In the event that the County determines, in its sole discretion, at any time during the Transition, that the County, any agency, department or subdivision of the County, or the quality or continuity of the Services has been materially and adversely affected in any way, or that any such material and adverse effect seems reasonably likely to occur, then the County may direct Contractor to stop and proceed no further with Transition or portion thereof until such time as Contractor shall have: (i) analyzed the cause of such effect; (ii) developed a reasonable plan for resuming Transition in such a manner as to eliminate or avoid such effect (and any other negative or adverse consequences of Transition); and (iii) received the County's approval to proceed with Transition, which approval shall not be unreasonably withheld. Following any resumption of the Transition of the Services to Contractor, if the County again determines that a material and adverse effect has occurred, then the process described above in this Section 2.5.3 shall be repeated. Nothing in this Section 2.5.3, nor the County's exercise of its rights, as described above, pursuant to this Section 2.5.3, shall in any way reduce, limit, or obviate any obligation of Contractor to meet a Transition Milestone or any other schedule, target, completion schedule, or other commitment specified in the Transition Plan or this Agreement. In addition, the County's exercise of its rights as set forth in this Section 2.5.3 shall not trigger any additional charges or fees from the Contractor.

**ARTICLE 3**
**DISENTANGLEMENT**

3.1    General Obligations.

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

At County's discretion, Contractor shall accomplish a complete transition of the services as set forth in Exhibit A to this Agreement (for purposes of this Article 3.1, these shall be referred to as the "Disentangled Services") being terminated from Contractor and the Subcontractors to County, or to any replacement provider designated by County, without any interruption of or adverse impact on the Disentangled Services or any other services provided by third parties. This process shall be referred to as the Disentanglement. Contractor shall fully cooperate with County and any new service provider and otherwise promptly take all steps, including, but not limited to providing to County or any new service provider all requested information or documentation, required to assist County in effecting a complete Disentanglement. Contractor shall provide all information or documentation regarding the Disentangled Services or as otherwise needed for Disentanglement, including, but not limited to, data conversion, client files, interface specifications, training staff assuming responsibility, and related professional services. Contractor shall provide for the prompt and orderly conclusion of all work required under the Agreement, as County may direct, including completion or partial completion of projects, documentation of work in process, and other measures to assure an orderly transition to County or the County's designee of the Disentangled Services. All Contractor work done as part of the Disentanglement shall be performed by Contractor and will be reimbursed by the County at no more than Contractor's costs, up to the total amount of this Agreement. Contractor shall not receive any additional or different compensation for the work otherwise required by the Agreement. Contractor's obligation to provide the Services shall not cease until the earlier of the following: 1) The Disentanglement is satisfactory to County, including the performance by Contractor of all asset-transfers and other obligations of Contractor provided in this Paragraph, has been completed to the County's reasonable satisfaction or 2) twelve (12) months after the Expiration Date of the Agreement.

3.2   Disentanglement Process.

The Disentanglement process shall begin on any of the following dates: (i) the date County notifies Contractor that no funds or insufficient funds have been appropriated so that the Term shall be terminated pursuant to the Agreement, Article 7; (ii) the date designated by County not earlier than sixty (60) days prior to the end of any initial or extended term that County has not elected to extend pursuant to the Agreement's, Signature Page, Agreement Term; or (iii) the date any Termination Notice is delivered, if County elects to terminate any or all of the Services pursuant to the Agreement, Article 7. Subject to Exhibit A Contractor's obligation to perform Disentangled Services, and County's obligation to pay for Disentangled Services, shall expire: (A) when funds appropriated for payment under this Agreement are exhausted, as provided in this Agreement, Article 7; (B) at the end of the initial or extended term set forth in this Agreement's, Signature Page, Agreement Term; or (C) on the Termination Date, pursuant to this Agreement, Article 7 (with the applicable date on which Contractor's obligation to perform the Services expires being referred to herein as the "Expiration Date"). Contractor and County shall discuss in good faith a plan for determining the nature and extent of Contractor's Disentanglement obligations and for the transfer of the Disentangled Services in process provided, however, that Contractor's obligation under this Agreement to provide all Disentangled Services shall not be lessened in any respect.

3.3   Specific Obligations.

The Disentanglement shall include the performance of the following specific obligations:

3.3.1   No Interruption or Adverse Impact.

Contractor shall cooperate with County and all of the County's other service providers to ensure a smooth transition at the time of Disentanglement, with no interruption of Disentangled Services or other work required under the Agreement, no adverse impact on the provision of Disentangled Services or other work required under the Agreement or County's activities, no interruption of any services provided by third parties, and no adverse impact on the provision of services provided by third parties.

3.3.2   Third-Party Authorizations.

Without limiting the obligations of Contractor pursuant to any other clause in Exhibit A herein, Contractor shall, subject to the terms of any third-party agreements, procure at no charge to County any third-party authorizations necessary to grant County the use and benefit of any third-party agreements between Contractor and third-party contractors used to provide the Disentangled Services, pending their assignment to County. Similarly, at County's direction, Contractor shall obtain all legally necessary client consents or authorizations legally necessary to transfer client data to County or any new service provider.

3.3.3   Licenses to Proprietary Software.

For any software programs developed for use under this Agreement, Contractor shall provide a nonexclusive, nontransferable, fully-paid, perpetual, irrevocable, royalty-free worldwide license to the County (or other service provider, as the case may be), at no charge to County, to use, copy, and modify, all Contractor Underlying Works

EXHIBIT B

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

and Contractor Derivatives that would be needed in order to allow County to continue to perform for itself, or obtain from other providers, the Services as the same might exist at the time of Disentanglement. Contractor shall also provide County with a copy of each such program, in such media as requested by County, together with object code, source code, and appropriate documentation. Contractor shall also offer to County the right to receive maintenance (including all enhancements and upgrades) and support with respect to such Contractor Underlying Works and Contractor Derivatives for so long as County requires, at the best rates Contractor is offering to other major customers for services of a similar nature and scope.

3.3.4   Return, Transfer and Removal of Assets.

    3.3.4.1   Contractor shall return to County all County assets in Contractor's possession, pursuant to Paragraph 2.4 of the Agreement.

    3.3.4.2   County shall be entitled to purchase at net book value those Contractor assets used for the provision of Disentangled Services to or for County, other than those assets expressly identified by the Parties as not being subject to this provision. Contractor shall promptly remove from County's premises, or the site of the work being performed by Contractor for County, any Contractor assets that County, or its designee, chooses not to purchase under this provision.

3.3.5   Transfer of Leases, Licenses, and Agreements.

Contractor, at its expense, shall convey or assign to County or its designee such fully-paid leases, licenses, and other agreements used by Contractor, County, or any other Person in connection with the Disentangled Services, as County may select, when such leases, licenses, and other agreements have no other use by Contractor. Contractor's obligation described herein, shall include Contractor's performance of all obligations under such leases, licenses, and other agreements to be performed by it with respect to periods prior to the date of conveyance or assignment and Contractor shall reimburse County for any losses resulting from any claim that Contractor did not perform any such obligations.

3.3.6   Delivery of Documentation.

Contractor shall deliver to County or its designee, at County's request, all documentation and data related to County, including, but not limited to, the County Data and client files, held by Contractor, and Contractor shall destroy all copies thereof not turned over to County, all at no charge to County. Notwithstanding the foregoing, Contractor may retain one (1) copy of the documentation and data, excluding County Data, for archival purposes or warranty support, and Contractor may maintain records that it is legally required to maintain.

3.4   Findings Confidential. Any reports, information, data, etc., given to or prepared or assembled by Contractor under this Agreement that the County requests to be kept as confidential shall not be made available to any individual or organization by the Contractor without the prior written approval of the County.

3.5   Publication, Reproduction or Use of Materials. No material produced, in whole or in part, under this Agreement shall be subject to copyright in the United States or in any other country. The County shall have unrestricted authority to publish, disclose, distribute and otherwise use, in whole or in part, any reports, data or other materials prepared under this Agreement. All reports, data and other materials prepared under this Agreement shall be the property of the County upon completion of this Agreement.

**ARTICLE 4**
**COMPENSATION**

The Payment Schedule, and/or budget are in Exhibit C and the compensation is on the Signature page. County will pay Contractor the agreed upon price(s), pursuant to Exhibit C for the work specified in Exhibit A, Statement of Work. The County is precluded from making payments prior to receipt of services (advance payments). Contractor shall provide and maintain an accounting and financial support system to monitor and control costs to assure the Agreements completion. Invoices are subject to the requirements below.

4.1   Fiscal for Fixed Pricing (Rev. 2/10/21)

    4.1.1   General Principles. Contractor shall, comply with generally accepted accounting principles and good business practices, including all applicable cost principles published by the Federal Office of Management and Budget (OMB), including 2 CFR 200 - UNIFORM ADMINISTRATIVE REQUIREMENTS, COST PRINCIPLES, AND AUDIT REQUIREMENTS FOR FEDERAL AWARDS "The Uniform Guidance", which can be viewed at https://www.ecfr.gov/cgi-bin/text-idx?tpl=/ecfrbrowse/Title02/2cfr200_main_02.tpl . Contractor shall comply with all federal, State, and other funding source requirements. Contractor shall, at its own expense, furnish all cost items

EXHIBIT B

# COUNTY CONTRACT NUMBER 566117
# AGREEMENT WITH NAPHCARE, INC. FOR
# SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

associated with this Agreement except as herein otherwise specified in the budget or elsewhere to be furnished by County. Contractor shall submit annually to the County a cost allocation plan in accordance with The Uniform Guidance.

4.1.2   <u>Invoices</u>. Payment for the services performed under this Agreement shall be in accordance with Exhibit C, unless other payment methodologies are negotiated and agreed to by both Contractor and County. Contractor shall submit approved invoices monthly to the Contracting Officer's Representative ("COR") for work performed in the monthly period, accordingly. Contractor's monthly invoices shall be completed and submitted in accordance with written COR instructions and in compliance with all Agreement terms.

4.1.3   <u>Payments</u>. County agrees to pay Contractor in arrears only after receipt and approval by COR of properly submitted, detailed and itemized original invoice referencing the Agreement number and a detailed listing of each pay point target, accomplishment, unit price and/or percentages, and showing the appropriate calculation for each, a progress report documenting the status and accomplishments of Contractor during the billing period pursuant to Exhibit C. Payment shall be NET 30 days from receipt and approval of invoice unless otherwise stated.

4.1.4   <u>Full Compensation</u>. Pending any adjustments by the COR, each invoice approved and paid shall constitute full and complete compensation to the Contractor for all work completed during the billing period pursuant to Exhibit A and Exhibit C. Contractor shall be entitled only to compensation, benefits, reimbursements or ancillary services specified in this Agreement. Payment shall be NET 30 days from receipt and approval of invoice unless otherwise stated.

4.1.5   <u>Prompt Payment for Vendors and Subcontractors</u>

4.1.5.1   Prompt payment for vendors and subcontractors.

4.1.5.1.1.   Unless otherwise set forth in this paragraph, Contractor shall promptly pay its vendors and subcontractor(s) for satisfactory performance under its subcontract(s) to this Agreement. Such prompt payment shall be no later than thirty (30) days after Contractor receives payment for such services from County and shall be paid out of such amounts as are paid to Contractor under this Agreement.

4.1.5.1.2   Contractor shall include a payment clause conforming to the standards set forth in Paragraph 4.1.5.2.3 of this Agreement in each of its subcontracts, and shall require each of its subcontractors to include such a clause in their subcontracts with each lower-tier subcontractor or supplier.

4.1.5.2   If Contractor, after submitting a claim for payment to County but before making a payment to a vendor or subcontractor for the goods or performance covered by the claim, discovers that all or a portion of the payment otherwise due such vendor or subcontractor is subject to withholding from the vendor or subcontractor in accordance with the vendor or subcontract agreement, then the Contractor shall:

4.1.5.2.1   Furnish to the vendor or subcontractor and the COR within three (3) business days of withholding funds from its vendor or subcontractor a notice stating the amount to be withheld, the specific causes for the withholding under the terms of the subcontract or vendor agreement; and the remedial actions to be taken by the vendor or subcontractor in order to receive payment of the amounts withheld.

4.1.5.2.2   Contractor shall reduce the subcontractor's progress payment by an amount not to exceed the amount specified in the notice of withholding furnished under paragraph 4.1.5.2.1 of this Agreement and Contractor may not claim from the County this amount until its subcontractor has cured the cause of Contractor withholding funds;

4.1.5.2.3   Upon the vendor's or subcontractor's cure of the cause of withholding funds, Contractor shall pay the vendor or subcontractor as soon as practicable, and in no circumstances later than ten (10) days after the Contractor claims and receives such funds from County.

4.1.5.3   Contractor shall not claim from County all of or that portion of a payment otherwise due to a vendor or subcontractor that Contractor is withholding from the vendor or subcontractor in accordance with the subcontract agreement where Contractor withholds the money before submitting a claim to County. Contractor shall provide its vendor or subcontractor and the COR with the notice set forth in Paragraph 4.1.5.2.1 of this Agreement and shall follow Paragraph 4.1.5.2.3 of this Agreement when vendor or subcontractor cures the cause of Contractor withholding its vendors or subcontractor's funds.

4.1.5.4   Overpayments. If Contractor becomes aware of a duplicate contract financing or invoice payment or that County has otherwise overpaid on a contract financing or invoice payment, Contractor shall immediately notify the COR and request instructions for disposition of the overpayment.

EXHIBIT B

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

4.1.6    Conditions Prerequisite to Payments. County may elect not to make a particular payment if any of the following exists:

    4.1.6.1    Misrepresentation. Contractor, with or without knowledge, made any misrepresentation of substantial and material nature with respect to any information furnished to County.

    4.1.6.2    Unauthorized Actions by Contractor.  Contractor took any action pertaining to this Agreement, which required County approval, without having first received said County approval.

    4.1.6.3    Default.  Contractor was in default under any terms and conditions of this Agreement.

4.1.7    Withholding of Payment. County may withhold payment until reports, data, audits, or other information required for Agreement administration or to meet County or State reporting or auditing requirements are received and approved by COR or designee. The County may also withhold payment if, in the County's determination, Contractor is in non-compliance with this Agreement.

4.1.8    Availability of Funding. The County's obligation for payment of any Agreement beyond the current fiscal year is contingent upon the availability of funding from which payment can be made. No legal liability on the part of the County shall arise for payment beyond June 30 of the calendar year unless funds are designated by the County and are made available for such performance.

County shall, in its sole discretion, have the right to terminate or suspend Agreement or reduce compensation and service levels proportionately upon thirty (30) days' written notice to Contractor in the event that Federal, State or County funding for this Agreement ceases or is reduced prior to the ordinary expiration of the term of this Agreement. In the event of reduction of funding for the Agreement, County and Contractor shall meet within ten (10) days of written notice to renegotiate this Agreement based upon the modified level of funding.  In this case if no agreement is reached between County and Contractor within 10 days of the first meeting, either party shall have the right to terminate this Agreement within ten (10) days written notice of termination.

In the event of termination of this Agreement in accordance with the terms of this Section, Contractor shall be entitled to retain all sums paid as of the effective date of such termination, subject to any payment offset to which County may be entitled, for damages or otherwise, under the terms of this Agreement. In the event of termination of this Agreement pursuant to this Section, in no event shall Contractor be entitled to any loss of profits on the portion of this Agreement so terminated, or to other compensation, benefits, reimbursements or ancillary services other than as herein expressly provided.

4.1.9    Disallowance. In the event the Contractor receives payment for services under this Agreement which is later disallowed by the County, Contractor shall promptly refund the disallowed amount to County on request, or at its option, County may offset the amount disallowed from any payment due or to become due to Contractor under any Agreement with the County.

4.1.10    Maximum Price. During the performance period of this Agreement, the maximum price for the same or similar items and/or services shall not exceed the lowest price at which Contractor then offers the items and/or services to its most favored customer.

**ARTICLE 5**
**AGREEMENT ADMINISTRATION**

5.1    County's Agreement Administrator. The Director of Purchasing and Contracting is designated as the Contracting officer ("Contracting Officer") and is the only County official authorized to make any Changes to this Agreement. The County has designated the individual identified on the signature page as the Contracting Officer's Representative ("COR")

    5.1.1    County's COR will chair Contractor progress meetings and will coordinate County's Agreement administrative functions.  The COR is designated to receive and approve Contractor invoices for payment, audit and inspect records, inspect Contractor services, and provide other technical guidance as required.  The COR is not authorized to change any terms and conditions of this Agreement.  Only the Contracting Officer, by issuing a properly executed amendment to this Agreement, may make changes to the scope of work or total price.

    5.1.2    Notwithstanding any provision of this Agreement to the contrary, County's COR may make Administrative Adjustments ("AA") to the Agreement, such as line item budget changes or adjustments to the service requirements that do not change the purpose or intent of the Statement of Work, the Terms and Conditions, the Agreement Term or the total Agreement price. Each AA shall be in writing and signed by COR and Contractor. All inquiries about such AA will be referred directly to the COR.

EXHIBIT B

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

5.2   Agreement Progress Meeting. The COR and other County personnel, as appropriate, will meet periodically with the Contractor to review the Agreement performance. At these meetings the COR will apprise the Contractor of how the County views the Contractor's performance and the Contractor will apprise the County of problems, if any, being experienced. The Contractor shall also notify the Contracting Officer (in writing) of any work being performed, if any, that the Contractor considers being over and above the requirements of the Agreement. Appropriate action shall be taken to resolve outstanding issues. The minutes of these meetings will be reduced to writing and signed by the COR and the Contractor. Should the Contractor not concur with the minutes, the Contractor shall set out in writing any area of disagreement. Appropriate action will be taken to resolve any areas of disagreement.

**ARTICLE 6**
**CHANGES**

6.1   Contracting Officer. The Contracting Officer may at any time, by a written order, make changes ("Changes"), within the general scope of this Agreement, in the definition of services to be performed, and the time (i.e.) hours of the day, days of the week, etc. and place of performance thereof. If any such Change causes an increase or decrease in the cost of, or the time required for, the performance of any part of the work under this Agreement, whether changed or not changed by such an order, an equitable adjustment shall be made in the Agreement price or delivery schedule, or both, and the Agreement shall be modified in writing accordingly. Such changes may require Board of Supervisors approval.

   6.1.1   In the event that Contractor experiences unanticipated or unaccounted for changes in the health care systems or methods of required delivery, Contractor will provide the Contracting Officer with impact information and documentation. The Contracting Officer will consider any appropriate changes to the contract. Any such changes will be at the county's discretion.

6.2   Claims. Contractor must assert any claim for adjustment under this clause within thirty (30) days from the date of receipt by the Contractor of the notification of Change; provided, however, that the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this Agreement. Where the cost of property made obsolete or excess as a result of a change is included in the Contractor's claim for adjustment, the Contracting Officer shall have the right to prescribe the manner of disposition of such property. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this Agreement entitled "Disputes" (Article 15). However, nothing in this clause shall excuse the Contractor from proceeding with this Agreement as changed.

**ARTICLE 7**
**SUSPENSION, DELAY AND TERMINATION**

7.1   Termination for Default. Upon Contractor's breach of this Agreement, County shall have the right to terminate this Agreement, in whole or part. Prior to termination for default, County will send Contractor written notice specifying the cause. The notice will give Contractor ten (10) days from the date the notice is issued to cure the default or make progress satisfactory to County in curing the default, unless a different time is given in the notice. If County determines that the default contributes to the curtailment of an essential service or poses an immediate threat to life, health or property, County may terminate this Agreement immediately upon issuing oral or written notice to the Contractor without any prior notice or opportunity to cure. In the event of termination under this Article, all finished or unfinished documents, and other materials, prepared by Contractor under this Agreement shall become the sole and exclusive property of County.

In the event of such termination, the County may purchase or obtain the supplies or services elsewhere, and Contractor shall be liable for the difference between the prices set forth in the terminated order and the actual cost thereof to the County. The prevailing market price shall be considered the fair repurchase price. Notwithstanding the above, Contractor shall not be relieved of liability to County for damages sustained by County by virtue of any breach of this Agreement by Contractor, and County may withhold any reimbursement to Contractor for the purpose of off-setting until such time as the exact amount of damages due County from Contractor is determined.

If, after notice of termination of this Agreement under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, the rights and obligations of the parties shall, if this Agreement contains a clause providing for termination for convenience of the County, be the same as if the notice of termination had been issued pursuant to such clause.

7.2   Damages for Delay. If Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as shall ensure its completion within the time specified in this Agreement, or any extension thereof, or fails to complete said work within such time, County will be entitled to the resulting damages caused by the delay. Damages will be the cost to

EXHIBIT B

# COUNTY CONTRACT NUMBER 566117
## AGREEMENT WITH NAPHCARE, INC. FOR
## SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

County incurred as a result of continuing the current level and type of service over that cost that would be incurred had the Agreement segments been completed by the time frame stipulated and any other damages suffered by County.

7.3   <u>County Exemption from Liability</u>. In the event there is a reduction of funds made available by County to Contractor under this or subsequent agreements, the County of San Diego and its Departments, officers and employees shall incur no liability to Contractor and shall be held harmless from any and all claims, demands, losses, damages, injuries, or liabilities arising directly or from such action.

7.4   <u>Full Cost Recovery of Investigation and Audit Costs</u>. Contractor shall reimburse County of San Diego for all direct and indirect expenditures incurred in conducting an audit/investigation when Contractor is found in violation (material breach) of the terms of the Agreement.

At the sole discretion of the County, and subject to funding source restrictions and federal and State law, County may (1) withhold reimbursement for such costs from any amounts due to Contractor pursuant to the payment terms of the Agreement, (2) withhold reimbursement for such costs from any other amounts due to Contractor from County, and/or (3) require Contractor to remit a check for the total amount due (or a lesser amount specified by the County) to County within thirty (30) days of request by County. Alternatively, at the County's sole discretion, County and Contractor may enter into a written repayment plan for the reimbursement of the audit/investigation costs.

7.5   <u>Termination for Convenience</u>. The County may, by written notice stating the extent and effective date terminate this Agreement for convenience in whole or in part, at any time. The County shall pay the Contractor as full compensation for work performed in accordance with the terms of this Agreement until such termination:

7.5.1   The unit or pro rata price for any delivered and accepted portion of the work.

7.5.2   A reasonable amount, as costs of termination, not otherwise recoverable from other sources by the Contractor as approved by the County, with respect to the undelivered or unaccepted portion of the order, provided compensation hereunder shall in no event exceed the total price.

7.5.3   In no event shall the County be liable for any loss of profits on the resulting order or portion thereof so terminated.

7.5.4   County's termination of this Agreement for convenience shall not preclude County from taking any action in law or equity against Contractor for:

7.5.4.1   Fraud, waste or abuse of Agreement funds, or

7.5.4.2   Improperly submitted claims, or

7.5.4.3   Any failure to perform the work in accordance with the Statement of Work, or

7.5.4.4   Any breach of any term or condition of the Agreement, or

7.5.4.5   Any actions under any warranty, express or implied, or

7.5.4.6   Any claim of professional negligence, or

7.5.4.7   Any other matter arising from or related to this Agreement, whether known, knowable or unknown before, during or after the date of termination.

7.6   <u>Suspension of Work</u>. The Contracting Officer may order the Contractor, in writing, to suspend, delay, or interrupt all or any part of the work of this Agreement for the period of time that the Contracting Officer determines appropriate for the convenience of the Government. County reserves the right to prohibit, without prior notice, contractor or contractor's employees, directors, officers, agents, subcontractors, vendors, consultants or volunteers from 1) accessing County data systems and County owned software applications, including websites, domain names, platforms, physical files, 2) treating County's patients, clients, or facility residents, or 3) providing any other services under this Agreement.

7.7   <u>Remedies Not Exclusive</u>. The rights and remedies of County provided in this article shall not be exclusive and are in addition to any other rights and remedies provided by law, equity, or under resulting order.

## ARTICLE 8
## COMPLIANCE WITH LAWS AND REGULATIONS

8.1   <u>Compliance with Laws and Regulations</u>. Contractor shall at all times perform its obligations hereunder in compliance with all applicable federal, State, County, and local laws, rules, and regulations, current and hereinafter enacted, including facility and professional licensing and/or certification laws and keep in effect any and all licenses, permits, notices and certificates

EXHIBIT B

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

as are required.  Contractor shall further comply with all laws applicable to wages and hours of employment, occupational safety, and to fire safety, health and sanitation.

8.2     <u>Contractor Permits and License</u>. Contractor certifies that it possesses and shall continue to maintain or shall cause to be obtained and maintained, at no cost to the County, all approvals, permissions, permits, licenses, and other forms of documentation required for it and its employees to comply with all existing foreign or domestic statutes, ordinances, and regulations, or other laws, that may be applicable to performance of services hereunder. The County reserves the right to reasonably request and review all such applications, permits, and licenses prior to the commencement of any services hereunder.

8.3     <u>Equal Opportunity</u>. Contractor shall comply with all federal, State and local equal opportunity laws and regulations, including but not limited to the provisions of Title VII of the Civil Rights Act of 1964, in that it will not discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment nor shall Contractor discriminate in any way that would deprive or intend to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an employee because of such individual's race, color, religion, sex, national origin, age, handicap, medical condition, sexual orientation or marital status.

8.4     <u>Affirmative Action</u>. Each Contractor of services and supplies employing fifteen (15) or more full-time permanent employees, shall comply with the Affirmative Action Program for Vendors as set forth in Article IIIk (commencing at Section 84) of the San Diego County Administrative Code, which program is incorporated herein by reference. A copy of this Affirmative Action Program will be furnished upon request by COR or from the County of San Diego Internet web-site (www.co.san-diego.ca.us).

8.5     <u>Non-Discrimination</u>. Contractor shall ensure that services and facilities are provided without regard to ethnic group identification, race, color, nation origin, creed, religion, age, sex, physical or mental disability, political affiliation or marital status in accordance with applicable laws, including, but not limited to, Title VI of the Civil Rights Act of 1964 (42 U.S.C 2000d), Section 162 (a) of the Federal-Aid Highway Act of 1973 (23 U.S.C 324), Section 504 of the Rehabilitation Act of 1973, The Civil Rights Restoration Act of 1987 (P.L. 100-209), Executive Order 12898 (February 11, 1994), Executive Order 13166 (August 16, 2000), Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e), the Age Discrimination Act of 1975 (42 U.S.C. 6101), Article 9.5, Chapter 1, Part 1, Division 2, Title 2 (Section 11135, et seq.) of the California Government Code, Title 9, Division 4, Chapter 6 (Section 10800, et seq.) of the CCR and California Dept of Social Services Manual of Policies and Procedures (CDSS MPP) Division 19.

8.6     <u>AIDS Discrimination</u>. Contractor shall not deny any person the full and equal enjoyment of, or impose less advantageous terms, or restrict the availability of, the use of any County facility or participation in any County funded or supported service or program on the grounds that such person has Human Immunodeficiency Virus (HIV) or Acquired Immune Deficiency Syndrome (AIDS) as those terms are defined in Title 3, Division 2, Chapter 8, Section 32.803, of the San Diego County Code of Regulatory Ordinances.

8.7     <u>American with Disabilities Act (ADA) 1990</u>.  Contractor shall not discriminate against qualified people with disabilities in employment, public services, transportation, public accommodations and telecommunications services in compliance with the Americans with Disabilities Act (ADA) and California Administrative Code Title 24.

8.8     <u>Political Activities Prohibited</u>.  None of the funds, provided directly or indirectly, under this Agreement shall be used for any political activities or to further the election or defeat of any candidate for public office.  Contractor shall not utilize or allow its name to be utilized in any endorsement of any candidate for elected office.  Neither this Agreement nor any funds provided hereunder shall be utilized in support of any partisan political activities, or activities for or against the election of a candidate for an elected office.

8.9     <u>Lobbying</u>. Contractor agrees to comply with the lobbying ordinances of the County and to assure that its officers and employees comply before any appearance before the County Board of Supervisors. Except as required by this Agreement, none of the funds provided under this Agreement shall be used for publicity or propaganda purposes designed to support or defeat any legislation pending before State and federal Legislatures, the Board of Supervisors of the County, or before any other local governmental entity. This provision shall not preclude Contractor from seeking necessary permits, licenses and the like necessary for it to comply with the terms of this Agreement.

8.10    <u>Religious Activity Prohibited</u>.  There shall be no religious worship, instructions or proselytization as part of or in connection with the performance of this Agreement.

8.11    <u>RESERVED</u>

EXHIBIT B

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

8.12    Board of Supervisors' Policies.  Contractor represents that it is familiar, and shall use its best efforts to comply, with the following policies of the Board of Supervisors, available on the County of San Diego website:

8.12.1   Board Policy B-67, which encourages the County's Contractors to offer products made with recycled materials, reusable products, and products designed to be recycled to the County in response to the County's requirements; and

8.12.2   Board Policies B-53 and B-39a, which encourage the participation of small and veteran owned businesses in County procurements; and

8.12.3   Zero Tolerance for Fraudulent Conduct in County Services.  Contractor shall comply with County of San Diego Board of Supervisors Policy A-120 "Zero Tolerance for Fraudulent Conduct in County Services." There shall be "Zero Tolerance" for fraud committed by contractors in the administration of County programs and the provision of County services. Upon proven instances of fraud committed by contractors in connection with their performance under the Agreement, said contractor shall be subject to corrective action up to and including termination of the Agreement; and

8.12.4   Interlocking Directorate.  In recognition of Board Policy A-79, available on the County of San Diego Website, not-for-profit Contractors shall not subcontract with related for-profit subcontractors for which an interlocking relationship exist unless specifically authorized in writing by the Board of Supervisors; and

8.12.5   Drug and Alcohol-Free Workplace.  The County of San Diego, in recognition of individual rights to work in a safe, healthful and productive work place, has adopted a requirement for a drug and alcohol free work place, County of San Diego Drug and Alcohol Use Policy C-25, available on the County of San Diego website.  This policy provides that all County-employed Contractors and Contractor employees shall assist in meeting this requirement.

8.12.5.1   As a material condition of this Agreement, the Contractor agrees that the Contractor and the Contractor employees, while performing service for the County, on County property, or while using County equipment:

8.12.5.1.1   Shall not be in any way impaired because of being under the influence of alcohol or a drug.

8.12.5.1.2   Shall not possess an open container of alcohol or consume alcohol or possess or be under the influence of an illegal drug.

8.12.5.1.3   Shall not sell, offer, or provide alcohol or an illegal drug to another person; provided, however, that the foregoing restriction shall not be applicable to a Contractor or Contractor employee who as part of the performance of normal job duties and responsibilities prescribes or administers medically prescribed drugs.

8.12.5.2   Contractor shall inform all employees who are performing service for the County on County property or using County equipment of the County objective of a safe, healthful and productive work place and the prohibition of drug or alcohol use or impairment from same while performing such service for the County.

8.12.5.3   The County may terminate for default or breach this Agreement, and any other agreement the Contractor has with the County, if the Contractor, or Contractor employees are determined by the Contracting Officer not to be in compliance with the conditions listed herein

8.11.4   When requested by County, Contractor's employees working on County property shall be subjected to drug testing at Contractor's expense.

8.13    Contractor represents that it is familiar, and shall use its best efforts to comply, with the following policies of the Board of Supervisors, available on the County of San Diego website:

8.13.1   Upon proven instances of fraud committed by independent Zero Tolerance in Coaching Medi-Cal or Welfare Clients (Including Undocumented Immigrants).  The County of San Diego in recognition of its unique geographical location and the utilization of the Welfare and Medi-Cal systems by foreign nationals who are not legal residents of this county or country, has adopted a Zero Tolerance policy and shall aggressively prosecute employees and Contractors who coach Medi-Cal or Welfare clients (including undocumented immigrants), to obtain services for which they are not otherwise entitled.

As a material condition of this Agreement, Contractor agrees that the Contractor and Contractor's employees, while performing service for the County, on County property or while using County equipment shall not:

EXHIBIT B

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

    (a)    in any way coach, instruct, advise, or guide any Medi-Cal or Welfare clients or prospective clients who are undocumented immigrants on ways to obtain or qualify for Medi-Cal assistance, for which they are not otherwise entitled.

    (b)    support or provide funds to any organization engaged directly or indirectly in advising undocumented immigrants on ways to obtain or qualify for Medi-Cal assistance, for which they are not otherwise entitled.

Contractor shall inform all employees that are performing service for the County on County property or using County equipment of County's Zero Tolerance Policy as referenced herein.

County may terminate for default or breach this Agreement and any other agreement Contractor has with County, if Contractor or Contractor employees are determined not to be in compliance with the conditions stated herein.

8.14  <u>Cartwright Act</u>. Following receipt of final payment under the Agreement, Contractor assigns to the County all rights, title and interest in and to all causes of action it may have under Section 4 of the Clayton Act (15 U.S.C. Sec. 15) or under the Cartwright act (Chapter 2) (commencing with Section 16700) of Part 2 of Division 7 of the Business and Professions Code), arising from purchases of goods, materials, or services by the Contractor for sale to the County under this Agreement.

8.15  <u>Hazardous Materials</u>. Contractor shall comply with all Environmental Laws and all other laws, rules, regulations, and requirements regarding Hazardous Materials, health and safety, notices, and training. Contractor agrees that it will not store any Hazardous Materials at any County facility for periods in excess of ninety (90) days or in violation of the applicable site storage limitations imposed by Environmental Law. Contractor agrees to take, at its expense, all actions necessary to protect third parties, including, without limitation, employees and agents of the County, from any exposure to Hazardous Materials generated or utilized in its performance under this Agreement. Contractor agrees to report to the appropriate governmental agencies all discharges, releases, and spills of Hazardous Materials that are required to be reported by any Environmental Law and to immediately notify the County of it. Contractor shall not be liable to the County for the County's failure to comply with, or violation of, any Environmental Law. As used in this section, the term "Environmental Laws" means any and all federal, state or local laws or ordinances, rules, decrees, orders, regulations or court decisions (including the so-called "common law"), including, but not limited to, the Resource Conservation and Recovery Act, relating to hazardous substances, hazardous materials, hazardous waste, toxic substances, environmental conditions or other similar substances or conditions. As used in this section the term "Hazardous Materials" means any chemical, compound, material, substance or other matter that: (a) is a flammable, explosive, asbestos, radioactive nuclear medicine, vaccine, bacteria, virus, hazardous waste, toxic, overtly injurious or potentially injurious material, whether injurious or potentially injurious by itself or in combination with other materials; (b) is controlled, referred to, designated in or governed by any Environmental Laws; (c) gives rise to any reporting, notice or publication requirements under any Environmental Laws, or (d) is any other material or substance giving rise to any liability, responsibility or duty upon the County or Lessee with respect to any third person under any Environmental Laws.

8.16  <u>Clean Air Act and Federal Water Pollution Control Act</u>.

    8.16.1  Contractor agrees to comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act, as amended, 42 U.S.C. §§ 7401 et seq. Contractor agrees to report each violation to the USDA and the appropriate EPA Regional Office.

    8.16.2  Contractor agrees to comply with all applicable standards, orders or regulations issued pursuant to the Federal Water Pollution Control Act as amended (33 U.S.C. §§ 1251 et seq.). Contractor agrees to report each violation to the USDA and the appropriate EPA Regional Office.

8.17  <u>Debarment, Exclusion, Suspension, and Ineligibility</u>.

    8.17.1  Contractor certifies that, to the best of its knowledge, and except as disclosed to County and acknowledged in writing by County prior to the execution of this Agreement, Contractor, its employees, directors, officers, agents, subcontractors, vendors, consultants, and volunteers:

        8.17.1.1  Are not presently debarred, excluded, suspended, declared ineligible, voluntarily excluded, or proposed for debarment, exclusion, suspension or ineligibility by any federal, state, or local department or agency; and

        8.17.1.2  Have not within a 3-year period preceding this Agreement been convicted of, or had a civil or administrative judgment rendered against them for, the commission of fraud or a criminal offense or civil action in connection with obtaining, attempting to obtain, or performing a public (federal, State, or local) transaction; violation of federal or State anti-trust statutes or commission of embezzlement, theft, forgery,

EXHIBIT B

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

bribery, falsification or destruction of records, making false statements, receiving stolen property; physical, financial or sexual abuse or misconduct with a patient or client, or medical negligence or malpractice;

8.17.1.3  Are not presently indicted or otherwise criminally, civilly or administratively charged by a government entity (federal, State, or local) with commission of any of the offenses enumerated in the paragraph above; and

8.17.1.4  Have not within a 3-year period preceding this Agreement had one or more public transaction (federal, State, or local) terminated for cause or default.

8.17.2  Contractor shall have an ongoing duty during the term of this Agreement to disclose to the County any occurrence that would prevent Contractor from making the certifications contained in this Section 8.16 on an ongoing basis. Such disclosure shall be made in writing to the COR and the County Office of Ethics and Compliance within five (5) business days of when Contractor discovers or reasonably believes there is a likelihood of such occurrence.

8.17.3  Contractor invoices shall include the following language:

I certify, under penalty of perjury under the laws of the State of California, that the deliverables and/or services invoiced were delivered and/or performed specifically for this Agreement in accordance with and compliance to all terms and conditions set forth herein.

8.18  Display of Fraud Hotline Poster(s).  As a material term and condition of this Agreement, Contractor shall:

8.18.1  Prominently display in common work areas within all business segments performing work under this Agreement County of San Diego Office of Ethics and Compliance Ethics Hotline posters;

8.18.2  Posters may be downloaded from the County Office of Ethics and Compliance website at: http://www.sandiegocounty.gov/content/sdc/cao/oec.html. Additionally, if Contractor maintains a company website as a method of providing information to employees, the Contractor shall display an electronic version of the poster(s) at the website;

8.18.3  If Contractor has implemented a business ethics and conduct awareness program, including a reporting mechanism, the Contractor need not display the County poster;

8.18.4  In the event Contractor subcontracts any of the work performed under this Agreement, Contractor shall include this clause in the subcontract(s) and shall take appropriate steps to ensure compliance by the subcontractor(s).

8.19  False Claims Act Training. Contractor shall, not less than annually, provide training on the Federal False Claims Act (31 USC 3729, et seq. or successor statutes) and State False Claims Act (California Government Code 12650, et seq. or successor statutes) to all employees, directors, officers, agents, subcontractors, consultants or volunteers providing services under this Agreement. Contractor shall maintain verification of this training. Contractor shall retain verifications in accordance with the Agreement requirement for retention of records. For the purposes of this section, "Subcontractor" shall include any entity, other than County, that furnishes to Contractor services or supplies relevant to this Agreement other than standard commercial supplies, office space, and printing services.

8.20  Code of Ethics. As a material term and condition of this Agreement, Contractor shall develop and implement a Code of Ethics or similar document and maintain it during the term of this Agreement. Additionally, Contractor shall train all employees and volunteers on the Code of Ethics, and all employees, volunteers, directors, officers, and agents shall certify that they have received training and have been provided an opportunity to ask questions of their employer regarding the Code of Ethics. Contractor shall retain these certifications in accordance with the Agreement's provision regarding retention of records. Contractor shall pass this requirement down to its subcontractors in its entirety. For purposes of this section, "Subcontractor" shall mean any entity, other than County, that furnishes to Contractor services or supplies relevant to this Agreement other than standard commercial supplies, office space, and printing services.

8.21  Compliance Program. Contractors with an agreement that exceeds more than $250,000 in value annually shall establish, and maintain for the duration of this Agreement, a compliance program that meets the standards of Federal Sentencing Guidelines section 8B2.1 and 42 CFR 438.608, regardless of funding source or services.

8.22  Investigations. Unless prohibited by an investigating government authority, Contractor shall cooperate and participate fully in any investigation initiated by County relative to this Agreement. Upon County's request, Contractor shall promptly provide to County any and all documents, including any and all communications or information stored digitally, and make available for interviews any employee(s) of Contractor identified by County. Contractor further agrees to immediately notify County if any employee, director, officer, agent, subcontractor, vendor, consultant or volunteer of Contractor comes under

EXHIBIT B

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

investigation by any federal, State or local government entity with law enforcement or oversight authority over the Agreement or its funding for conduct arising out of, or related to, performance under this Agreement.

Contractor shall promptly make available to County all internal investigative results, findings, conclusions, recommendations and corrective action plans pertaining to the investigation in its possession as requested by the County, unless otherwise protected by applicable law or privilege.

8.23   CORI/CLETS Compliance. Without limiting anything in this Article 8, Contractor shall comply with Exhibit D, CORI/CLETS Requirements, attached hereto and made a part hereof by this reference.

**ARTICLE 9**
**CONFLICTS OF INTEREST; CONTRACTOR'S CONDUCT**

9.1   Conflicts of Interest. Contractor presently has no interest, including but not limited to other projects or independent agreements, and shall not acquire any such interest, direct or indirect, which would conflict in any manner or degree with the performance of services required to be performed under this Agreement. The Contractor shall not employ any person having any such interest in the performance of this Agreement. Contractor shall not hire County's employees to perform any portion of the work or services provided for herein including secretarial, clerical and similar incidental services except upon the written approval of County. Without such written approval, performance of services under this Agreement by associates or employees of County shall not relieve Contractor from any responsibility under this Agreement.

9.1.1   California Political Reform Act and Government Code Section 1090 Et Seq. Contractor acknowledges that the California Political Reform Act ("Act"), Government Code section 81000 et seq., provides that Contractors hired by a public agency, such as County, may be deemed to be a "public official" subject to the Act if the Contractor advises the agency on decisions or actions to be taken by the agency. The Act requires such public officials to disqualify themselves from participating in any way in such decisions if they have any one of several specified "conflicts of interest" relating to the decision. To the extent the Act applies to Contractor, Contractor shall abide by the Act. In addition, Contractor acknowledges and shall abide by the conflict of interest restrictions imposed on public officials by Government Code section 1090 et seq.

9.2   Conduct of Contractor.

9.2.1   Contractor shall inform the County of all Contractor's interests, if any, that are, or that Contractor believes to be, incompatible with any interests of the County.

9.2.2   Contractor shall not, under circumstances that might reasonably be interpreted as an attempt to influence the recipient in the conduct of his duties, accept any gratuity or special favor from individuals or organizations with whom the Contractor is doing business or proposing to do business, in accomplishing the work under this Agreement.

9.2.3   Contractor shall not use for personal gain or make other improper use of confidential information acquired in connection with this Agreement. In this connection, the term "confidential information" includes, but is not limited to, unpublished information relating to technological and scientific development; medical, personnel, or security records of individuals; anticipated materials requirements or pricing actions; and knowledge of selections of Contractors or subcontractors in advance of official announcement.

9.2.4   Contractor, its employees, directors, officers, agents, subcontractors, vendors, consultants, and volunteers shall not offer, directly or indirectly, any unlawful gift, gratuity, favor, entertainment, or other item(s) of monetary value to an employee or official of the County.

9.2.5   Referrals. Contractor further covenants that no referrals of clients through Contractor's intake or referral process shall be made to the private practice of any person(s) employed by the Contractor.

9.3   Prohibited Agreements. As required by Section 67 of the San Diego County Administrative Code, Contractor certifies that it is not in violation of the provisions of Section 67, and that Contractor is not, and will not subcontract with, any of the following:

9.3.1.   Persons employed by County or of public agencies for which the Board of Supervisors is the governing body;

9.3.2.   Profit-making firms or businesses in which employees described in sub-section 9.3.1, above, serve as officers, principals, partners, or major shareholders;

EXHIBIT B

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

9.3.3.   Persons who, within the immediately preceding twelve (12) months came within the provisions of the above sub-sections and who (1) were employed in positions of substantial responsibility in the area of service to be performed by the Agreement, or (2) participated in any way in developing the Agreement or its service specifications; and

9.3.4.   Profit-making firms or businesses, in which the former employees described in sub-section 9.3.3 above, serve as officers, principals, partners, or major shareholders.

9.4   Limitation of Future Agreements or Grants. It is agreed by the parties to the Agreement that Contractor shall be restricted in its future contracting with the County to the manner described below. Except as specifically provided in this clause, Contractor shall be free to compete for business on an equal basis with other companies.

9.4.1   If Contractor, under the terms of the Agreement, or through the performance of tasks pursuant to this Agreement, is required to develop specifications or statements of work and such specifications or statements of work are to be incorporated into a solicitation, Contractor shall be ineligible to perform the work described within that solicitation as a prime or subcontractor under an ensuing County agreement. It is further agreed, however, that County will not, as additional work, unilaterally require Contractor to prepare such specifications or statements of work under this Agreement.

9.4.2   Contractor may not apply for nor accept additional payments for the same services contained in the Statement of Work.

**ARTICLE 10**
**INDEMNITY AND INSURANCE**

10.1   Indemnity. County shall not be liable for, and Contractor shall defend and indemnify County and the employees and agents of County (collectively "County Parties"), against any and all claims, demands, liability, judgments, awards, fines, mechanics' liens or other liens, labor disputes, losses, damages, expenses, charges or costs of any kind or character, including attorneys' fees and court costs (hereinafter collectively referred to as "Claims"), related to this Agreement or the work covered by this Agreement and arising either directly or indirectly from any act, error, omission or negligence of Contractor or its Contractors, licensees, agents, servants or employees, including, without limitation, Claims caused by the sole passive negligent act or the concurrent negligent act, error or omission, whether active or passive, of County Parties. Contractor shall have no obligation, however, to defend or indemnify County Parties from a Claim if it is determined by a court of competent jurisdiction that such Claim was caused by the sole negligence or willful misconduct of County Parties. Additionally, with respect to any Claim, Contractor shall have no obligation to defend or indemnify County Parties from liability in excess of Contractor's insurance limits (as described in Exhibit B) except to the extent such liability arises from any act, error, omission or negligence of Contractor or its Contractors, licensees, agents, servants or employees. The defense and indemnification obligation of this section shall only apply to Claims related to the services described in this Agreement, and for the avoidance of doubt shall not apply to liability to the extent such liability is determined by a court of competent jurisdiction to be caused by the actions of County custodial officers. Consideration related to Contractor's limited indemnification and insurance of County employees is included in the Contractor's base price, and will be reviewed annually by the Parties and revised as appropriate by mutual agreement of the Parties.

10.2   Insurance. Prior to execution of this Agreement, Contractor must obtain at its own cost and expense, and keep in force and effect during the term of this Agreement, including all extensions, the insurance specified in Exhibit "B", "Insurance Requirements," attached hereto.

**ARTICLE 11**
**AUDIT AND INSPECTION OF RECORDS**

The County shall have the audit and inspection rights described in this section.

11.1   Audit and Inspection. Contractor agrees to maintain and/or make available within San Diego County accurate books and accounting records relative to all its activities under this Agreement. Authorized federal, State or County representatives shall have the right to monitor, assess, or evaluate Contractor's performance pursuant to this Agreement, said monitoring, assessments, or evaluations to include but not limited to audits, inspection of premises, reports, and interviews of project staff and participants. Contractor assertions of confidentiality shall not be a bar to full access to the records.

At any time during normal business hours and as often as County may deem necessary, Contractor shall make available to County, State or federal officials for examination all of its records with respect to all matters covered by this Agreement and will permit County, State or federal officials to audit, examine and make excerpts or transcripts from such records, and to make audits of all invoices, materials, payrolls, records of personnel, information regarding clients receiving services, and

EXHIBIT B

# COUNTY CONTRACT NUMBER 566117
# AGREEMENT WITH NAPHCARE, INC. FOR
# SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

other data relating to all matters covered by this Agreement. If an audit is conducted, it will be done in accordance with generally accepted government auditing standards as described in "Government Auditing Standards," published for the United States Government Accountability Office or the institute of Internal Auditors International Standards for the Professional Practice of Internal Auditing.

If any services performed hereunder are not in conformity with the specifications and requirements of this Agreement, County shall have the right to require the Contractor to perform the services in conformity with said specifications and requirements at no additional increase in total Agreement amount. When the services to be performed are of such nature that the difference cannot be corrected, County shall have the right to (1) require Contractor immediately to take all necessary steps to ensure future performance of the services in conformity with requirements of the Agreement, and (2) reduce the Agreement price to reflect the reduced value of the services performed. In the event Contractor fails to perform the services promptly or to take necessary steps to ensure future performance of the service in conformity with the specifications and requirements of the Agreement, County shall have the right to either (1) by agreement or to otherwise have the services performed in conformity with the Agreement specifications and charge to Contractor any cost occasioned to County that is directly related to the performance of such services, or (2) terminate this Agreement for default as provided in the Termination clause.

11.2 <u>External Audits</u>. Contractors will provide the following to the COR:

11.2.1 Contractor shall provide COR a copy of all notifications of audits or pending audits by federal or State representatives regarding contracted services identified in this Agreement no later than three (3) business days of Contractor receiving notice of the audit.

11.2.2 Contractor shall provide COR with a copy of the draft and final State or federal audit reports within twenty four (24) hours of receiving them (Health and Human Services Agency (HHSA) Contractors shall also provide electronic copies to Agency Contract Support (ACS) at ACS.HHSA@sdcounty.ca.gov).

11.2.3 Contractor shall provide COR a copy of the contractor's response to the draft and final State or federal audit reports at the same time as response provided to the State or federal representatives.

11.2.4 Unless prohibited by the government agency conducting the audit, Contractor shall provide COR a copy of all responses made by the federal or State audit representative to the contractors' audit response no later than three (3) business days of receiving it. This will continue until the federal or State auditors have accepted and closed the audit.

11.3 <u>Cost or Pricing Data</u>. If the Contractor submitted cost or pricing data in connection with the pricing of this Agreement or any change or modification thereto, unless such pricing was based on adequate price competition, established catalog or market prices of commercial items sold in substantial quantities of the general public, or prices set by law or regulation, the Contracting Officer or his representatives who are employees of the County or its agent shall have the right to examine all books, records, documents and other data of the Contractor related to the negotiation pricing or performance of such Agreement, change or modification, for the purpose of evaluating the accuracy, completeness and currency of the cost or pricing data submitted.

11.4 <u>Availability</u>. The materials described above shall be made available at the office of the Contractor, at all reasonable times, for inspection, audit or reproduction, until the expiration of three (3) years from the date of final payment under this Agreement, or by section 11.4.1 and 11.4.2, below:

11.4.1 If this Agreement is completely or partially terminated, the records relating to the work terminated shall be made available for a period of three (3) years from the date of any resulting final settlement.

11.4.2 Record that relate to appeals under the "Disputes" clause of this Agreement, or litigation or the settlement of claims arising out of the performance of this Agreement, shall be made available until such appeals, litigation, or claims have been disposed of, or three years after Agreement completion, whichever is longer. County shall keep the materials described above confidential unless otherwise required by law.

11.5 <u>Subcontract</u>. The Contractor shall insert a clause containing all the provisions of this Article 11 in all subcontracts hereunder except altered as necessary for proper identification of the contracting parties and the contracting officer.

## ARTICLE 12
## INSPECTION OF SERVICE

12.1 <u>Subject to Inspection</u>. All performance (including services, materials, supplies and equipment furnished or utilized in the performance of this Agreement, and workmanship in the performance of services) shall be subject to inspection and test by

EXHIBIT B

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

the County at all times during the term of this Agreement. Contractor shall cooperate with any inspector assigned by the County to permit the inspector to determine whether Contractor's performance conforms to the requirements of this Agreement. County shall perform such inspection in a manner as not to unduly interfere with Contractor's performance.

12.2 <u>Specification and Requirements</u>. If any services performed by Contractor do not conform to the specifications and requirements of this Agreement, County may require Contractor to re-perform the services until they conform to said specifications and requirements, at no additional cost, and County may withhold payment for such services until Contractor correctly performs them. When the services to be performed are of such a nature that Contractor's cannot correct its performance, the County shall have the right to (1) require the Contractor to immediately take all necessary steps to ensure future performance of services conforms to the requirements of this Agreement, and (2) reduce the Agreement price to reflect the reduced value of the services received by County.  In the event Contractor fails to promptly re-perform the services or to take necessary steps to ensure that future performance of the service conforms to the specifications and requirements of this Agreement, the County shall have the right to either (1) without terminating this Agreement, have the services performed, by agreement or otherwise, in conformance with the specifications of this Agreement, and charge Contractor, and/or withhold from payments due to Contractor, any costs incurred by County that are directly related to the performance of such services, or (2) terminate this Agreement  for default.

**ARTICLE 13**
**USE OF DOCUMENTS AND REPORTS**

13.1 <u>Findings Confidential</u>. Any reports, information, data, etc., given to or prepared or assembled by Contractor under this Agreement that the County requests to be kept as confidential shall not be made available to any individual or organization by the Contractor without the prior written approval of the County.

13.2 <u>Ownership, Publication, Reproduction and Use of Material</u>.  All reports, studies, information, data, statistics, forms, designs, plans, procedures, systems, and any other material or properties produced under this Agreement shall be the sole and exclusive property of County. No such materials or properties produced in whole or in part under this Agreement shall be subject to private use, copyright or patent right by Contractor in the United States or in any other country without the express written consent of County. County shall have unrestricted authority to publish, disclose, distribute and otherwise use, copyright or patent, in whole or in part, any such reports, studies, data, statistics, forms or other materials or properties produced under this Agreement.

13.3 <u>Confidentiality</u>. Contractor agrees to maintain the confidentiality of and take industry appropriate and legally required measures to prevent the unlawful disclosure of any information that is legally required to be kept confidential. Except as otherwise allowed by local, State or federal law or regulation and pursuant to this Section 13.3, Contractor agrees to only disclose confidential records where the holder of the privilege, whether the County, or a third party, provides written permission authorizing the disclosure.

13.4 <u>Public Records Act</u>. The California Public Records Act ("CPRA") requires County to disclose "public records" in its actual or constructive possession unless a statutory exemption applies. This generally includes contracts and related documents. If County receives a CPRA request for records relating to the Agreement, County may, at its sole discretion, either determine its response to the request without notifying Contractor or notify Contractor of the request. If County determines its response to the request without notifying Contractor, Contractor shall hold County harmless for such determination. If County notifies Contractor of the request, Contractor may request that County withhold or redact records responsive to the request by submitting to County a written request within five (5) business days after receipt of the County's notice. Contractor's request must identify specific records to be withheld or redacted and applicable exemptions. Upon timely receipt of Contractor's request, County will review the request and at its sole discretion withhold and/or redact the records identified by Contractor. Contractor shall hold County harmless for County's decision whether to withhold and/or redact pursuant to Contractor's written request. Contractor further agrees that its defense and indemnification obligations set forth in Section 10.1 of this Agreement extend to any Claim (as defined in Section 10.1) against the County Parties (as defined in Section 10.1) arising out of County's withholding and/or redacting of records pursuant to Contractor's request. Nothing in this section shall preclude Contractor from bringing a "reverse CPRA action" to prevent disclosure of records. Nothing in this section shall prevent the County or its agents or any other governmental entity from accessing any records for the purpose of audits or program reviews if that access is legally permissible under the applicable local, State or federal laws or regulations. Similarly, County or its agent or designee may take possession of the record(s) where legally authorized to do so.

13.5 <u>Maintenance of Records</u>.  Contractor shall maintain all records relating to its performance under this Agreement, including all records of costs charged to this Agreement, and shall make them available within San Diego County for a minimum of five (5) years from the ending date of this Agreement, or longer where required by funding source or while under dispute

EXHIBIT B

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

under the terms of this Agreement, unless County agrees in writing to an earlier disposition. Contractor shall provide any requested records to County within two (2) business days of request.

13.6    Custody of Records. County, at its option, may take custody of Contractor's client records upon Agreement, termination, expiration, or at such other time as County may deem necessary. County agrees that such custody will conform to applicable confidentiality provisions of State and federal law. Said records shall be kept by County in an accessible location within San Diego County and shall be available to Contractor for examination and inspection. Notwithstanding the foregoing, Contractor may maintain custody of records where legally required.

13.7    Audit Requirement.

(a) Contractor shall annually engage a Licensed Certified Public Accountant licensed to perform audits and attests in the State of California to conduct an annual financial audit of the organization. Contractors that expend $750,000 or more of federal grant funds per year shall also have an audit conducted in compliance with Government Auditing Standards, which includes Single Audit Act Amendments and the Compliance Supplement (2 CFR part 200 App. XI). Contractors that are commercial organizations (for-profit) are required to have a non-federal audit if, during its fiscal year, it expended a total of $750,000 or more under one or more HHS awards. 45 CFR part 74.26(d) incorporates the threshold and deadlines of the Compliance Supplement but provides for-profit organizations two options regarding the type of audit that will satisfy the audit requirements. Contractor shall include a clause in any agreement entered into with an audit firm, or notify the audit firm in writing prior to the audit firm commencing its work for Contractor, that the audit firm shall, pursuant to 31 U.S.C. 7503, and to the extent otherwise required by law, provide access by the federal government or other legally required entity to the independent auditor's working papers that were part of the independent auditor's audit of Contractor. Contractor shall submit two (2) copies of the annual audit report, the audit performed in accordance with the Compliance Supplement, and the management letter to the County fifteen (15) days after receipt from the independent Certified Public Accountant but no later than nine (9) months after the Contractor's fiscal year end.

(b) Contractor shall immediately notify County upon learning that Contractor's independent Certified Public Accountant may or will issue a disclaimer of opinion due to substantial doubt of Contractor's ability to continue as a going concern.

13.8    Reports. Contractor shall submit reports required in Exhibit A and additional reports as may be requested by the COR and agreed to by the Contractor. Format for the content of such reports may be developed by County. The timely submission of these reports is a necessary and material term and condition of this Agreement and Contractor agrees that failure to meet specified deadlines will be sufficient cause to withhold payment. Contractor shall submit to County within thirty (30) days of the termination of this Agreement a report detailing all work done pursuant to this Agreement by Contractor.

13.9    Evaluation Studies. Contractor shall participate as requested by the County in research and/or evaluative studies designed to show the effectiveness and/or efficiency of Contractor services or to provide information about Contractor's project.

**ARTICLE 14**
**INFORMATION PRIVACY AND SECURITY PROVISIONS**

14.1    Recitals. This Article is intended to protect the privacy and security of County information that Contractor may create, receive, access, store, transmit, and/or destroy under this Agreement. In addition to the below Responsibilities, contractor shall be in compliance with the following rules, regulations, and agreements, *as applicable*:

14.1.1    Health Insurance Portability and Accountability Act, specifically, Public Law 104-191, the Health Information Technology for Economic and Clinical Health Act, Public Law 111-005, 42USC section 17921 et seq., and 45CFR Parts 160 and 164, collectively referred to as "HIPAA;"

14.1.2    County agreements with the State of California, collectively referred to as "State Agreements" and posted on the County's website at: www.cosdcompliance.org, including:

14.1.2.1    The Medi-Cal Privacy and Security Agreement Between the California Department of Health Care Services (DHCS) and the County;

14.1.2.2    The Medi-Cal Behavioral Health Services Performance Agreement between DHCS and the County;

14.1.2.3    The San Diego County Alcohol and Drug Program Administrator Agreement between DHCS and the County

14.1.2.4    The Refugee Health Agreement between the California Department of Public Health (CDPH) and the County;

14.1.2.5    The HIV/AIDS Case Reporting System Data Use Agreement between CDPH and the County;

14.1.2.6    The Childhood Lead Poisoning Prevention Program between CDPH and the County;

EXHIBIT B

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

14.1.2.7     The Standard Agreement between the County and the California Department of Aging; and

14.1.2.8     The Agreement for Whole Person Care Pilot Program for San Diego County with DHCS.

14.1.3   Title 42 Code of Federal Regulations, Chapter 1, Subchapter A, Part 2.

14.1.4   California Civil Code 1798;

14.1.5   California Senate Bill 1386.

14.2   <u>Definitions</u>.  Terms used, but not otherwise defined, in this Article shall have the same meaning as defined by HIPAA.

14.2.1   "Breach" of Protected Health Information (PHI) shall have the same meaning given to the term "breach" under HIPAA and "breach" of Personal Information (PI)/Personally Identifiable Information (PII) shall have the same meaning as given to it under the State Agreements.

14.2.2   "Business Associate," when applicable, shall mean the Contractor.

14.2.3   "County PHI" shall have the same meaning as PHI under HIPAA, specific to PHI under this Agreement.

14.2.4   "County PI/PII" shall have the same meaning as PI/PII under the State Agreements, specific to PI/PII under this Agreement.

14.2.5   "Covered Entity," when applicable, shall mean the County.

14.2.6   "Security incident" shall have the same meaning as defined by the State Agreements.

14.3   <u>Responsibilities of Contractor</u>.

14.3.1   <u>Use and Disclosure of County PHI/PI/PII</u>. Contractor shall use the minimum County PHI/PI/PII required to accomplish the requirements of this Agreement or as required by Law. Contractor may not use or disclose County PHI/PI/PII in a manner that would violate HIPAA or the State Agreements if done by the County.

14.3.2   <u>Safeguards</u>. Contractor shall develop and maintain a HIPAA-compliant information privacy and security program to prevent use or disclosure of County PHI/PI/PII, other than as required by this Agreement.

14.3.3   <u>Mitigation</u>. Contractor shall mitigate, to the extent practicable, any harmful effects caused by violation of the requirements of this Article, as directed by the County.

14.3.4   <u>Subcontractors</u>. Contractor shall ensure that any agent, including a subcontractor, to whom it provides County PHI/PI/PII, imposes the same conditions on such agents that apply to Contractor under this Article.

14.3.5   <u>Cooperation with County</u>.

14.3.5.1     Contractor shall provide access to County PHI/PI/PII, as well as internal practices and records related to County PHI/PI/PII, at the written request of County within ten (10) calendar days.

14.3.5.2     Contractor will assist County regarding individual's access, copy, amendment, accounting of disclosure, and other such requests for County PHI/PI/PII in the time and manner designated by County.

14.3.6   <u>Breach Reporting</u>. Contractor shall report breaches and suspected security incidents to County, to include:

14.3.6.1     <u>Initial Report</u>.

14.3.6.1.1     Contractor shall email County Contracting Officer's Representative (COR) and County Chief Compliance and Privacy Officer (CCPO) immediately upon the discovery of a suspected security incident that involves data provided to County by the Social Security Administration, as per the State Agreements.

14.3.6.1.2     Contractor shall email COR and CCPO immediately of breaches and suspected privacy incidents involving 500 or more individuals.

14.3.6.2     <u>Investigation Report</u>. Contractor shall immediately investigate such suspected security incident or breach and provide the County a complete report of the investigation within seven (7) working days.

14.3.6.3     <u>Notification</u>. Contractor will comply with County's request to notify individuals and/or media and shall pay any costs of such notifications, as well as any costs associated with the breach. County shall approve the time, manner and content of any such notifications before notifications are made.

14.3.7   <u>Designation of Individuals</u>. Contractor shall designate a Privacy Official and a Security Official to oversee its privacy and security requirements herein.

14.3.8   <u>Data Security</u>. Contractor shall comply with, as applicable, data privacy and security requirements specified by HIPAA and the State Agreements, which may include, but are not limited to:

EXHIBIT B

# COUNTY CONTRACT NUMBER 566117
## AGREEMENT WITH NAPHCARE, INC. FOR
### SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

14.3.8.1   Workforce members, including employees, interns, volunteers, subcontractors, etc., with access to applicable County PHI/PI/PII shall:

14.3.8.1.1   Complete privacy and security training to include a signed certification within thirty (30) days of hire, and at least annually thereafter; and

14.3.8.1.2   Sign a confidentiality statement, prior to access to such PHI/PI/PII; and

14.3.8.2   Computer warning banners for all systems containing applicable County PHI/PI/PII

14.3.8.3   Comprehensive, annual security risk assessments

14.3.8.4   Policies and internal controls to ensure secure transport and storage of County PHI/PI/PII in cars, airplanes, trains, and buses.

14.3.8.5   Sufficient administrative, physical, and technical controls in place to protect County PHI/PI/PII

14.3.9   <u>Termination</u>. Upon termination of the Agreement for any reason, Contractor shall return or destroy all County PHI/PII/PI, except County PHI/PII/PI necessary for Contractor to continue its proper management and administration or to carry out its legal responsibilities, as mutually agreed upon by the Parties.  If the Parties mutually agree that return or destruction of County PHI/PII/PI is infeasible, Contractor shall extend the protections of this Article to such County PHI/PII/PI for so long as Contractor maintains such County PHI/PII/PI.

## ARTICLE 15
### DISPUTES

Notwithstanding any provision of this Agreement to the contrary, the Contracting Officer shall decide any dispute concerning a question of fact arising out of this Agreement that is not otherwise disposed of by the parties within a reasonable period of time. The decision of the Contracting Officer shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, capricious, arbitrary or so grossly erroneous as necessarily to imply bad faith.  Contractor shall proceed diligently with its performance hereunder pending resolution by the Contracting Officer of any such dispute.  Nothing herein shall be construed as granting the Contracting Officer or any other administrative official, representative or board authority to decide questions of law, or issues regarding the medical necessity of treatment or to pre-empt any medical practitioners' judgment regarding the medical necessity of treatment of patients in their care. The foregoing does not change the County's ability to refuse to pay for services rendered if County disputes the medical necessity of care.

## ARTICLE 16
### GENERAL PROVISIONS

16.1   <u>Assignment and Subcontracting</u>.  Contractor shall not assign any interest in this Agreement, and shall not transfer any interest in the same (whether by assignment or novation), without the prior written consent of the County; County's consent shall not be unreasonably withheld.  The Contractor shall make no agreement with any party for furnishing any of the work or services herein contained without the prior written consent of the COR, pursuant to Paragraph 1.4.

16.2   <u>Contingency</u>.  This Agreement shall bind the County only following its approval by the Board of Supervisors or when signed by the Purchasing and Contracting Director.

16.3   <u>Entire Agreement</u>.  This Agreement, together with all Exhibits attached hereto and other agreements expressly referred to herein, constitute the entire agreement between the parties with respect to the subject matter contained herein. All prior or contemporaneous agreements, understandings, representations, warranties and statements, oral or written, including any proposals from Contractor and requests for proposals from County, are superseded.

16.4   <u>Sections and Exhibits</u>.  All sections and exhibits referred to herein are attached hereto and incorporated by reference.

16.5   <u>Further Assurances</u>. Parties agree to perform such further acts and to execute and deliver such additional documents and instruments as may be reasonably required in order to carry out the provisions of this Agreement and the intentions of the parties.

16.6   <u>Governing Law</u>.  This Agreement shall be governed, interpreted, construed and enforced in accordance with the laws of the State of California.

16.7   <u>Headings</u>. The Article captions, Clause and Section headings used in this Agreement are inserted for convenience of reference only and are not intended to define, limit or affect the construction or interpretation of any term or provision hereof.

EXHIBIT B

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

16.8    Modification Waiver.  Except as otherwise provided in Article 6, "Changes," above, no modification, waiver, amendment or discharge of this Agreement shall be valid unless the same is in writing and signed by both parties.

16.9    Neither Party Considered Drafter.  Despite the possibility that one party may have prepared the initial draft of this Agreement or played the greater role in the physical preparation of subsequent drafts, neither party shall be deemed the drafter of this Agreement and that, in construing this Agreement in case of any claim that any provision hereof may be ambiguous, no such provision shall be construed in favor of one party on the ground that such provision was drafted by the other.

16.10   No Other Inducement.  The making, execution and delivery of this Agreement by the parties hereto has been induced by no representations, statements, warranties or agreements other than those expressed herein.

16.11   Notices. Notice to either party shall be in writing and personally delivered; sent by certified mail, postage prepaid, return receipt requested; or emailed to the County's or Contractor's designated representative (or such party's authorized representative). Any such notice shall be deemed received by the party (or such party's authorized representative) on the earliest of the date of personal delivery, three (3) business days after deposit in the U.S. Mail, or upon sending of an email from which an acknowledgement of receipt has been received other than an out of office, unavailable, or undeliverable reply.

16.12   Severability. If any term, provision, covenant or condition of this Agreement is held to be invalid, void or otherwise unenforceable, to any extent, by any court of competent jurisdiction, the remainder of this Agreement shall not be affected thereby, and each term, provision, covenant or condition of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

16.13   Successors.  Subject to the limitations on assignment set forth in Clause 16.1 above, all terms of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties hereto and their respective heirs, legal representatives, successors, and assigns.

16.14   Time.  Time is of the essence for each provision of this Agreement.

16.15   Time Period Computation.  All periods of time referred to in this Agreement shall be calendar days, unless the period of time specifies business days. Calendar days shall include all days of the week, including holidays. Business days shall be Monday through Friday, excluding County observed holidays.

16.16   Waiver.  The waiver by one party of the performance of any term, provision, covenant or condition shall not invalidate this Agreement, nor shall it be considered as a waiver by such party of any other term, provision, covenant or condition. Delay by any party in pursuing any remedy or in insisting upon full performance for any breach or failure of any term, provision, covenant or condition shall not prevent such party from later pursuing remedies or insisting upon full performance for the same or any similar breach or failure.

16.17   Third Party Beneficiaries Excluded.  This Agreement is intended solely for the benefit of the County and its Contractor.  Any benefit to any third party is incidental and does not confer on any third party to this Agreement any rights whatsoever regarding the performance of this Agreement.  Any attempt to enforce provisions of this Agreement by third parties is specifically prohibited.

16.18   Publicity Announcements and Materials.  All public announcements, including those issued on Contractor letterhead, and materials distributed to the community shall identify the County of San Diego as the funding source for contracted programs identified in this Agreement.  Copies of publicity materials related to contracted programs identified in this Agreement shall be filed with the COR. County shall be advised at least twenty four (24) hours in advance of all locally generated press releases and media events regarding contracted services identified in this Agreement. Alcohol and Drug Prevention Services Contractors shall notify COR or designee at least five (5) business days in advance of all Contractor generated media releases and media events regarding contracted services identified in this Agreement.

16.19   Critical Incidents.  Contractor shall have written plans or protocols and provide employee training for handling critical incidents involving: external or internal instances of violence or threat of violence directed toward staff or clients; loss, theft or unlawful accessing of confidential client, patient or facility resident Personal Information (PI), Personally Identifiable Information (PII) and/or Personal Health Information (PHI); fraud, waste and/or abuse of Agreement funds; unethical conduct; or violation of any portion of San Diego County Board of Supervisors Policy C-25 "Drug & Alcohol Use" while performing under this Agreement. Contractor shall report all such incidents to the COR within one business day of their occurrence.  However, if this Agreement includes Article 14, Contractor must adhere to the timelines and processes contained in Article 14.

16.20   Responsiveness to Community Concerns.  Unless prohibited by applicable State or federal law, Contractor shall notify County within one business day of receipt of any material complaints including but not limited to complaints referring to

EXHIBIT B

**COUNTY CONTRACT NUMBER 566117**
**AGREEMENT WITH NAPHCARE, INC. FOR**
**SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY**

issues of abuse or quality of care, submitted to Contractor orally or in writing, regarding the operation of Contractor's program or facility under this Agreement. Contractor shall take appropriate steps to acknowledge receipt of said complaint(s) from individuals or organizations. Contractor shall take appropriate steps to utilize appropriate forums to address or resolve any such complaints received. Nothing in this provision shall be interpreted to preclude Contractor from engaging in any legally authorized use of its facility, property or business as approved, permitted or licensed by the applicable authority.

16.21 <u>Criminal Background Check Requirements</u>. Contractor shall ensure that criminal background checks are required and completed prior to employment or placement of any employee, director, officer, agent, subcontractor, consultant or volunteer who will be providing any services, accessing County or client data, or receiving compensation under this Agreement. Background checks shall be in compliance with any licensing, certification, funding, or Agreement requirements, including the Statement of Work, which may be higher than the minimum standards described herein. Furthermore, for any individuals identified above who will be assigned to sensitive positions funded by this Agreement, background checks shall be in compliance with Board of Supervisors Policy C-28, available on the County of San Diego website. Sensitive positions are those that: (1) physically supervise minors or vulnerable adults; (2) have unsupervised physical contact with minors or vulnerable adults; and/or (3) have a fiduciary responsibility to any County client, or direct access to, or control over, bank accounts or accounts with financial institutions of any client. If this Agreement includes Article 14, Contractor must also adhere to requirements contained in Article 14.

Contractor shall have a documented process for reviewing the information and determine if criminal history demonstrates behavior that could create an increased risk of harm to clients or risk to services to be performed under Agreement. Contractor shall document review of criminal background findings and consideration of criminal history in the selection of such persons listed above in this section.

16.21.1 Contractor shall utilize a subsequent arrest notification service during the term of this Agreement for any employee, director, officer, agent, subcontractor, consultant or volunteer who will be providing any services under this Agreement. Contractor shall keep the documentation of their review and consideration of the individual's criminal history on file in accordance with paragraph 13.4 "Maintenance of Records."

16.21.2 <u>Definitions</u>

    A.   <u>Minor</u>: Individuals under the age of eighteen (18) years old.

    B.   <u>Vulnerable Adult</u>: (1) Individuals age eighteen (18) years or older, who require assistance with activities of daily living and who may be put at risk of abuse during service provision; (2) Individuals age eighteen (18) years or older who have a permanent or temporary limited physical and/or mental capacity that may put them at risk of abuse during service provision because it renders them: unable to make decisions for themselves, unable to physically defend themselves, or unaware of physical abuse or other harm that could be perpetrated against them. Activities of daily living are defined as the basic tasks of everyday life, such as eating, bathing, dressing, toileting, and transferring.

    C.   <u>Volunteer</u>: A person who performs a service willingly and without pay.

16.22 <u>Health Insurance</u>. Contractors providing direct services to the public shall ask if the client and any minor(s) for whom they are responsible have health insurance coverage. If the response is "no" for client or minor(s) the Contractor shall refer the client to Covered California at https://www.coveredca.com/ or to 1-800-300-1506.

16.23 <u>Survival</u>. The following sections or articles of this Agreement shall survive the expiration or earlier termination of this Agreement: Sections 8.1, 8.13, 8.14, 8.15, 8.21, 10.1, 11.1, 11.2, and 11.4, and Articles 7 and 13.

/
/
/

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY

## SIGNATURE PAGE

**AGREEMENT TERM.** The initial term of this Agreement shall begin on June 1, 2022, and end on May 31, 2027, for an Agreement period of approximately five (5) years ("Initial Term").

**OPTION TO EXTEND.** The County shall have the option to extend the term of this Agreement for five (5) increments of one-year each for a total of five (5) years beyond the expiration of the Initial Term, not to exceed May 31, 2032, pursuant to Exhibit C Payment Schedule or other applicable pricing provisions of this Agreement. Unless County notifies Contractor in writing not less than thirty (30) days prior to the expiration date that the County does not intend to extend the Agreement, the Agreement will be automatically extended for the next option period.

Options to Extend for One to Six Additional Months at End of Agreement. County shall also have the option to extend the term of this Agreement, in one or more increments, for a total of no less than one (1) and no more than six (6) calendar months ("Incremental Options"). The County may exercise each Incremental Option by providing written notice to Contractor no fewer than fifteen (15) calendar days prior to expiration of this Agreement. The rates in effect at the time an Incremental Option is exercised shall apply during the term of the Incremental Option.

**COMPENSATION:** Pursuant to Exhibit C, Article 4, and other applicable provisions of this Agreement, County agrees to pay Contractor a sum not to exceed Six Hundred Twenty Million, Seven Hundred Seventy-Eight Thousand, Two Hundred Sixty-One Dollars and Sixty-Five Cents ($620,778,261.65) ("Maximum Agreement Amount"). Furthermore, compensation for the Initial Term and any Option Periods shall not exceed the amounts shown for the Initial Term or that Option Period shown below.

| Initial Term (Year 1) | 06/01/2022 - 05/31/2023 | $54,527,938.00 | First Option Period | 06/01/2027 - 05/31/2028 | $62,742,422.89 |
|---|---|---|---|---|---|
| Initial Term (Year 2) | 06/01/2023 - 05/31/2024 | $56,075,173.78 | Second Option Period | 06/01/2028 - 05/31/2029 | $64,536,093.20 |
| Initial Term (Year 3) | 06/01/2024 - 05/31/2025 | $57,668,826.63 | Third Option Period | 06/01/2029 - 05/31/2030 | $66,383,573.66 |
| Initial Term (Year 4) | 06/01/2025 - 05/31/2026 | $59,310,289.09 | Fourth Option Period | 06/01/2030 - 05/31/2031 | $68,286,478.50 |
| Initial Term (Year 5) | 06/01/2026 - 05/31/2027 | $61,000,995.40 | Fifth Option Period | 06/01/2031 - 05/31/2032 | $70,246,470.50 |

**COR.** The County has designated the following individual as the Contracting Officer's Representative ("COR")

Keith Spears, Manager
Sheriff Contracts & Grants Divisions
9625 Ridgehaven Court, San Diego, CA 92123
Phone (858) 974-2236 Email keith.spears@SDSheriff.org

**CONTRACTOR'S REPRESENTATIVE.** The Contractor has designated the following individual as the Contractor's Representative.
Brad McLane, Chief Executive Officer
NaphCare, Inc.
2090 Columbiana Road, Suite 4000, Birmingham, AL 35216
Phone (205) 536-8532 Email brad.mclane@naphcare.com

IN WITNESS WHEREOF, County and Contractor have executed this Agreement effective as of the date of the last signature below.

**NAPHCARE, INC**

By: _____

BRAD McLANE, Chief Executive Officer

Date: _4/19/2022_

**COUNTY OF SAN DIEGO**

By: _____

JOHN M. PELLEGRINO, Director
Department of Purchasing and Contracting

Date: _4-26-22_

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

1. BACKGROUND/PURPOSE

1.1. The San Diego Sheriff's Department (SDSD) Detention Services Bureau (DSB) Medical Services Division (MSD) currently provides comprehensive primary and specialty health care services, oral care services, mental health services, and related ancillary services to incarcerated individuals at various detention facilities throughout the County. Hospital services and additional ancillary services are also utilized for the incarcerated individuals when services or treatment cannot be provided within the detention facility. Incarcerated individuals are defined as individuals who are booked and in the custody of the SDSD or have been arrested by the SDSD and awaiting booking.

1.2. Currently, SDSD utilizes a hybrid model of care consisting of SDSD employees and multiple contracted services. SDSD intends to enhance this model by contracting with a single contractor for services. The overarching goal is to provide for a robust, comprehensive, and integrated health care delivery system in the best interest of patient care. It is the intent of SDSD to preserve all current and future SDSD staff positions thereby maintaining a hybrid model.

2. SCOPE OF WORK/GENERAL REQUIREMENT

2.1. CONTRACTOR REQUIREMENT

2.1.1. Contractor must provide NCCHC-compliant policies and procedures to provide intake receiving screenings and health assessments, sick call triage and nursing clinics, and medication administration. SDSD will continue to provide nursing services at all SDSD facilities. Contractor's Program Manager/Health Services Administrator will serve as a point of contact and coordination between Contractor, the SDSD Director of Nursing, and the respective nursing staff.

2.1.2. Contractor will coordinate with SDSD nursing staff to create a seamless and centralized system of care between all levels of onsite clinicians including nurses, medical and mental health providers, while having simultaneous access to a patient's record. This coordination and use of TechCare between all vendors, across all disciplines, will be valuable in communication and delivery of quality patient care.

2.1.3. NCCHC-compliant policies and procedures for care are programmed into TechCare and provide automated processes that guide nurses through a course of care. Contractor has developed nursing protocols that enable healthcare staff to readily deal with common ailments and has built these protocols into TechCare for ease of access, ease of use, and ease of documentation. SDSD nurses can access the protocols through TechCare while treating patients. The protocols ensure that patients are treated in an effective, efficient manner by the nursing staff, and they allow nursing staff to distinguish minor ailments more easily from emergent medical needs. These protocols are integrated into the TechCare system at all SDSD facilities, which enables nursing staff to implement the same processes for uniformity of care across all sites. Traditionally, as the current provider of TechCare for the County, SDSD nurses are already familiar with these protocols in the system, enabling continuity of care and ease in transition.

2.1.4. Contractor shall work with SDSD management to continue to utilize and work in close coordination with the SDSD Director of Nursing, SDSD Supervising Registered Nurses, Registered Nurses, Licensed Vocational Nurses, Mental Health Director, Clinical Director, Behavioral Health Program Coordinator, Chief Mental Health Clinicians, Mental Health Clinicians, Pharmacy Technicians, Health Information Management Staff, and other county-employed staff at all SDSD facilities.

EXHIBIT B

Case 3:25-cv-00410-W-MMP  Document 20  Filed 09/18/25  PageID.334  Page 95 of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

## 2.2. ON-SITE SERVICES

2.2.1. Contractor and SDSD shall provide comprehensive health care services for incarcerated individuals at the following facilities.

    2.2.1.1.    San Diego Central Jail (SDCJ) (Booking Facility)
1173 Front Street,
San Diego, CA 92101
Phone: (619) 615-2454 Fax: (619) 615-2450

    2.2.1.2.    Las Colinas Detention & Reentry Facility (LCDRF) (Booking Facility)
451 Riverview Parkway,
Santee, CA 92071
Phone: (619) 258-3200 Fax: (619) 258-3100

    2.2.1.3.    Vista Detention Facility (VDF) (Booking Facility)
352 S. Melrose Drive
Vista, CA 92081
Phone: (760) 940-4473 Fax: (760) 940-4842

    2.2.1.4.    George Bailey Detention Facility (GBDF)
446 Alta Road, Ste. 5300
San Diego, CA 92158
Phone: (619) 661-2620 Fax: (619) 661-2611

    2.2.1.5.    East Mesa Reentry Facility (EMRF)
446 Alta Rd., Ste. 5200
San Diego, CA 92158
Phone: (619) 661-2608 Fax: (619) 661-2722

    2.2.1.6.    Facility (FAC8)
446 Alta Rd., Ste. 5200
San Diego, CA 92158
Phone: (619) 661-2731 Fax: (619) 661-2680

    2.2.1.7.    Rock Mountain Detention Facility (RMDF) (This facility is not open at the time of the contract start date)
446 Alta Road, Suite 5400
San Diego, CA 92158
Phone: (619) 672-2299

    2.2.1.7.1.    The parties agree to meet and negotiate appropriate staffing and compensation to meet the needs of the County at this facility. Current pricing and staffing do not encompass any staffing or services provided at RMDF at this time.

Case 3:25-cv-00410-W-MMP   Document 20   Filed 09/18/25   PageID.335   Page 96 of
207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.2.1.8.  South Bay Detention Facility (SBDF)
500 Third Avenue
Chula Vista, CA 91910
Phone: (619) 591-4810 Fax: (619) 691- 4445

2.2.1.9.  Medical Services Division, Admin Office
5530 Overland Avenue Suite 370
San Diego, CA 92123
Phone: (858) 974-5971 Fax (858) 974-5870

2.2.1.10.  Additions and changes to the designated facilities may occur in the future as necessary
and as agreed by both the Sheriff's Department and the Contractor.

## 2.3. COMPREHENSIVE HEALTH CARE SERVICES

2.3.1. Receiving Screening and Assessment Process

2.3.1.1.  SDSD nursing staff shall be responsible for performing a receiving screening and assessment as
defined by NCCHC Standards. Contractor shall provide telehealth support from a midlevel
provider 24/7 to the booking nurses through the STATCare service and provide appropriate
support and training to SDSD nursing staff regarding the receiving screening and assessment
process as defined in the NCCHC standards. All completed Receiving Screenings shall be
maintained in TechCare for providers' review. Patients with chronic illnesses will be identified
during the Receiving Screening and enrolled in a chronic care clinic. All chronic care clinic visits
will be scheduled and tracked within TechCare.

2.3.2. Initial and Ongoing Health Assessments

2.3.2.1.  Contractor and SDSD shall implement policies and procedures to ensure SDSD health staff
complete a comprehensive Health Assessment, including a physical examination, as required by,
and defined in NCCHC Standards. This Health Assessment will typically be completed during the
intake process for each patient and will always be completed within 14 days. All Health
Assessments are reviewed and electronically signed by a provider.

2.3.2.2.  Contractor and SDSD health staff shall ensure the receiving screening processes includes rapid
intervention to stabilize patients and identify and treat existing medical, mental health and
substance abuse conditions as early as possible. This includes starting medications, managing
chronic conditions, and initiating withdrawal protocols.

2.3.2.3.  Contractor and SDSD shall screen all patients for active tuberculosis via a chest x-ray for
clearance into the general population. TB screening, evaluation, and treatment will be in
accordance with NCCHC and CDC recommendations and treatment guidelines.

2.3.2.4.  Patients referred for follow-up shall be seen by the appropriate healthcare professional, and
referrals shall be documented in TechCare. Patients are evaluated based on the medical

Case 3:25-cv-00410-W-MMP   Document 20   Filed 09/18/25   PageID.336   Page 97 of
207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

information obtained during the Receiving Screening as to the medical necessity of conducting a
health assessment by a provider.

2.3.2.5.  Contractor and SDSD staff shall provide annual health assessments and track these assessments
in TechCare to ensure their completion. All patients' most recent screenings shall be recorded in
TechCare with a date set for the next required annual screening. Patients requiring screenings
shall be listed according to the date on the TechCare calendar and provide their annual screening
at the appropriate time.

### 2.3.3. Transfer Screening Process

2.3.3.1.  SDSD nursing staff shall implement a transfer screening process for incarcerated individuals who
are either moved internally or transferred outside of the SDSD facilities. This process should
ensure the safe, effective implementation of infection control measures and provide continuity of
health services.

2.3.3.2.  Contractor shall utilize TechCare to manage all patient healthcare records from the point of intake
to release. Patients who are transferred from one facility to the next shall have their patient history
and record of care readily available within TechCare.

### 2.3.4. Discharge Planning

2.3.4.1.  Contractor and SDSD shall implement a system of discharge planning per the NCCHC standard.

2.3.4.2.  Contractor and SDSD shall have shared responsibility for discharge planning. The discharge
planning process shall begin at intake. Patients identified with mental health concerns are flagged
and referred by healthcare staff screener to mental health staff for further evaluation and
stabilization. This information is entered into the patient's medical record and their discharge
information starts being compiled based on the evolution of their identified conditions and needs
throughout treatment. Mental health staff shall assist in the referral of mental health patients to
community agencies prior to or upon their release from the facility.

2.3.4.3.  Contractor and SDSD shall have a policy and procedure for discharge planning that covers the
following:

2.3.4.3.1.  Information gathered during the receiving screening necessary for the development of a
discharge plan that accounts for the patient's needs.

2.3.4.3.2.  The development of a plan to address key issues such as continued medical and mental
healthcare, housing, medical insurance, transportation, Social Security Disability, and
employment.

2.3.4.3.3.  As part of the Receiving Screening, SDSD staff shall gather information that shall be
needed by discharge planners, and disposition choices include referrals for case
management and comprehensive team planning for patients with complex healthcare
issues.

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.4.3.4.    Once aware of potential release, case managers and Contractor and SDSD mental health professionals arrange an appointment prior to release.

2.3.4.3.5.    A caseworker coordinates the patient's anticipated medical and mental healthcare needs to include resource numbers and resource access to care according to their demographics in collaboration with mental health and healthcare staff to facilitate ongoing reintegration care.

2.3.4.3.6.    The patient is provided educational information, regarding their specific illness and the importance of follow-up appointments and medication continuity, from a healthcare provider. The patient also receives a comprehensive packet that contains essential community resources to include the following:

2.3.4.3.6.1.    Social Security Administration (SST) office
2.3.4.3.6.2.    Veteran's Administration resources
2.3.4.3.6.3.    Local free clinics
2.3.4.3.6.4.    Local Health Department
2.3.4.3.6.5.    Homeless shelters
2.3.4.3.6.6.    Hospitals
2.3.4.3.6.7.    Outpatient day treatment programs
2.3.4.3.6.8.    Resources listed by city or town
2.3.4.3.6.9.    Dual diagnosis programs
2.3.4.3.6.10.   SUD programs

2.3.4.4.    Contractor and SDSD shall utilize TechCare to assure all relevant information are instantly available and easily provided (after signed release of information/patient consent) to community providers. If an entire medical record is requested, Contractor will deposit a Summary of Records (Release Summary) with the most recent activity as a cover page along with the entire medical record within the NaphCare Cloud, Contractor's data storage cloud, within 24 hours/next business day.

2.3.4.5.    Contractor shall pursue partnerships with community resource providers, local resources available, and with community providers in San Diego County and the surrounding areas.

2.3.4.6.    Contractor shall ensure the continuity of medication after release. As part of discharge planning, case managers, medical, and mental healthcare professionals shall help arrange follow-up appointments for the patient.

2.3.4.7.    Contractor shall prescribe medication in a manner consistent with nursing and pharmacy practice acts in California.

2.3.4.8.    Contractor and SDSD shall ensure all discharge planning activities are documented using TechCare. The Release/Discharge Summary screen shall be used to provide medical information to the patient, medical facility, or another state prison system. The specific items that pertain to the patient's care shall automatically populate to this summary to advance the patient's release and help with the reintegration planning. All active medications, with time and dose of last administration, are listed for print and shall be given with their medications at release. Any follow-up care or specialist appointments that should be addressed either by the patient or the receiving facility are listed on the summary for continuity of care.

2.3.5. Incarcerated Individual Worker Screening

2.3.5.1.    SDSD nursing staff shall conduct a health care screening for incarcerated individual worker candidates which shall include a medical history and screening assessment, health questionnaire, vaccination review, screening for infectious disease, mental health review and medication review in accordance with NCCHC standards.

2.3.5.2.    SDSD nursing staff shall provide a customized medical clearance process for all incarcerated individual workers. The medical clearance process shall be initiated within 24 hours of receiving the list of incarcerated individuals to be cleared. The need for laboratory testing may increase the time required to provide medical clearance.

2.3.6. Mental Health Screening

2.3.6.1.    Contractor and SDSD staff shall provide mental health screening, care, and related services as defined in the NCCHC standards and SDSD policy. Mental health screening is performed to ensure urgent mental health needs are met. Mental health screening shall be performed as soon as possible from the time of intake but no later than 14 days after admission. Mental Health screening may be conducted by qualified mental health professionals or qualified health care professionals with appropriate training.

2.3.6.2.    All incoming patients shall receive a mental health screening assessment at intake and evaluation by a qualified mental health professional within 14 days after admission as indicated. Any patient screening positive in the initial mental health screening shall receive the mental health assessment and evaluation immediately or as soon as possible to protect the patient and address any urgent mental health needs. Screening and comprehensive mental health assessments (MHEs) will be completed by SDSD Staff with support from Contractor staff pursuant to mutually agreed upon policies and procedures.

2.3.6.3.    Mental health assessments shall comply with NCCHC standards and compliance indicators.

2.3.6.4.    Contractor and SDSD staff shall ensure a process and provide for a rapid response to any need for an evaluation or mental health intervention whether identified at intake or later through staff identification of need or Sick Call request.

2.3.6.5.    Psychiatric providers and mental health professionals shall coordinate with the facility leadership on recommendations regarding housing placement, monitoring, and other operational issues. Mental health referrals shall be received, documented, and processed through the scheduling system in TechCare.

2.3.6.6.    Contractor and SDSD shall ensure all patients who are determined to need additional mental health services are flagged in the TechCare and scheduled for further evaluation by mental health professionals as clinically indicated.

2.3.6.7.    Contractor and SDSD shall ensure all screenings and evaluations identify patients with suicidal and homicidal tendencies, as well as acute and chronic behavioral health issues. All mental health encounters shall be documented in TechCare.

2.3.6.8.    Contractor and SDSD shall adopt the Columbia Suicide Severity Rating Scale (C-SSRS) to facilitate the ability of mental health professionals or non-mental health professionals to screen

incarcerated individuals who may be at risk for suicide behavior and ensure appropriate precautions are initiated and timely mental health referrals are made.

2.3.6.9.    Contractor's corporate STATCare Team includes mid-level providers that are available to always consult with onsite staff to ensure any potential flags are identified during the Mental Health Screening and Evaluation and treatment is begun immediately to stabilize the patient.

2.3.7. Mental Health Delivery System

2.3.7.1.    Contractor shall operate and manage a comprehensive mental health delivery system in collaboration with SDSD staff. This should include, but is not limited to, utilizing County Mental Health Clinicians and Contractor psychologists and other qualified mental health professionals to perform on-site, face-to-face mental health clinics as well as psychiatry clinics. Contractor may provide these services directly or subcontract for mental health services.

2.3.7.2.    Contractor and SDSD staff shall ensure a process and provide education and instruction to patients on how to access mental health services through self-referral, the mental health sick call process, or by contacting staff for any urgent issues.

2.3.7.3.    Mental health referrals shall be received, documented, and processed through the scheduling system in TechCare, to provide instant, up-to-date information accessible to all providers.

2.3.7.4.    Mental health staff shall also respond to family and other outside sources of referral for patient mental health services through coordination with the facility leadership.

2.3.7.5.    Mental health patients shall have access to individual therapy such as Cognitive Behavioral Therapy as well as Solution Focused Brief Therapy. They also shall have access to psychological education groups and treatment that fit individual needs and mental health issues such as:

2.3.7.5.1.    Male Veterans Group
2.3.7.5.2.    Impulse Control
2.3.7.5.3.    LGBTQ Support
2.3.7.5.4.    Anger Management
2.3.7.5.5.    Women's Anger Management
2.3.7.5.6.    Life Skills groups

2.3.7.6.    Patients with chronic mental health conditions shall be seen by a psychiatric provider and/or SDSD mental health professional every 90 days or sooner as indicated by the stability of the patient's symptoms. Individualized treatment plans and discharge plans shall be developed and updated. SDSD mental health professionals shall monitor the chronic mental health population through individual contacts, counseling, groups, and routine mental health rounds. Patients enrolled in chronic mental health clinics shall have the opportunity to participate in groups that focus on life skills and discharge planning. Examples of life skills and discharge planning groups include: Mental Health Awareness, Sleep Hygiene, Anger Management, Medication Education, and Re-Entry Preparation.

2.3.7.7.    Contractor shall consistently evaluate the mental health program for efficacy and introduce new and innovative approaches to improve services and the mental health outcome of patients.

2.3.7.8.    Contractor shall meet monthly with the onsite Mental Health Director and the SDSD Mental Health Director to discuss clinical issues, mental health processes and systems, exchange valuable information, and discuss the latest mental health trends.

2.3.7.9.     Contractor and SDSD Staff shall develop a Suicide Prevention Plan consistent with NCCHC standards. The key components of the plan are as follows:

2.3.7.9.1.     Staff Training – intensive training of all medical, and mental health staff
2.3.7.9.2.     Screening and Identification of High-Risk Patients
2.3.7.9.3.     Proactive and thorough assessment through the Receiving and Mental Health Screenings.
2.3.7.9.4.     Alerts in TechCare assist the evaluator in decision making and notifying sworn and mental health personnel of a patient in need of urgent services.
2.3.7.9.5.     Referral, Evaluation, Housing
2.3.7.9.6.     Patients at risk of suicide are quickly referred to appropriate housing and mental health services.
2.3.7.9.7.     Patients at risk of attempting suicide or self-harm shall be placed on Suicide Watch in appropriate housing located within the facility and shall be monitored as clinically indicated based on their level of acuity.
2.3.7.9.8.     Once discharged from watch they remain in the mental health caseload and have regular follow up until released from custody.

2.3.8. Lanterman-Petris-Short Act (LPS) Units

2.3.8.1.     From admission to discharge, members of the interdisciplinary treatment team shall ensure all patients transferring through the LPS units receive high-quality care that is in accordance with the Lanterman-Petris-Short Act. Recognized as Acute Psychiatric Units by the California Department of Health Care Services, the two Lanterman-Petris-Short Act (LPS) units offer onsite psychiatric stabilization and treatment that is commensurate with inpatient psychiatric care. To achieve this hospital level of care, an interdisciplinary treatment team - which consists of psychiatrists, psychiatric nurse practitioners, psychologists, qualified mental health providers (QMHPs), and psychiatric nurses – will coordinate care for patients residing on the 32-bed unit at PSU and the 30-bed unit at WPSU.

2.3.8.2.     Upon admission to the LPS unit, all patients regardless of their admission status (Voluntary, 5150 hold, PC 1370.01 etc.) will receive information about patient rights and responsibilities.

2.3.8.2.1.     44.1     Each patient shall meet with members of the interdisciplinary treatment team for intake assessments.
2.3.8.2.2.     44.2     Within 24 hours of admission, the patient shall meet with a psychiatric provider for a comprehensive evaluation to determine clinical impressions and medication needs.
2.3.8.2.3.     44.3     Within 5 days of admission, the patient shall meet with a QMHP to conduct a comprehensive psychosocial assessment.

2.3.8.3.     Treatment team members and sworn staff shall meet on a weekly basis to review, discuss, create, and modify each patient's treatment plan.

2.3.8.4.     Team members shall be responsible for documenting and implementing clinical interventions.

2.3.8.5.     Treatment team members and sworn staff shall meet daily to review and discuss patient progress towards their goals and discuss plan of action for the day.

2.3.8.6.     At least one SDSD or Contractor team member shall have one-to-one contact with each patient at least once per shift.

Case 3:25-cv-00410-W-MMP    Document 20    Filed 09/18/25    PageID.341    Page 102
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.8.6.1.    48.1    QMHP shall be responsible for documenting daily interactions under progress notes and QMHP Progress Note once per week.

2.3.8.7.    To ensure patient rights are upheld and clinically appropriate treatment is offered in the least restrictive manner possible, team members shall remain involved throughout the medicolegal process and provide transparent, clear communication with the court, the patient, and other stakeholders.

2.3.8.8.    Contractor and SDSD team members shall be responsible for the following activities within his or her scope of practice:

2.3.8.8.1.    50.1    Providing crisis stabilization services
2.3.8.8.2.    50.2    Prescribing and managing psychotropic medications
2.3.8.8.3.    50.3    Intervening in urgent behavioral/medical situations
2.3.8.8.4.    50.4    Offering psychosocial interventions via individual and group formats

2.3.9. Jail Based Competency Treatment

2.3.9.1.    San Diego County Sheriff's Department has in its custody individuals with felony charges and who have been declared by the California Superior Courts to be Incompetent to Stand Trial (IST). Contractor shall manage the Jail Based Competency Treatment Program.

2.3.9.2.    To address this shortage of beds at the state hospitals, DSH has contracted with several counties and established the JBCT which would provide restoration of competency treatment services like those provided in state hospitals.

2.3.9.3.    The SDSD requires Contractor to administer a JBCT program to restore individuals to competency using clinical treatment in accordance with the current treatment guidelines and program elements established by DSH. Contractor may elect to provide this service directly or utilize a subcontractor.

2.3.9.4.    The objectives of this program are to reduce the number of County IST incarcerated individuals waiting for treatment at a state facility, allow incarcerated individuals to begin restoration of competency treatment faster, and significantly decrease the time these individuals remain incarcerated due to a faster adjudication of their criminal charges.

2.3.9.5.    The County shall provide Contractor and staff access to the San Diego Central Jail (SDCJ), to allow contractor to provide the clinical programming which may restore competency to IST incarcerated individuals. The Contractor shall provide Jail Based Competency Treatment to IST incarcerated individuals incarcerated at SDCJ in accordance with the respective duties and responsibilities as outlined below. The county does not currently have a JBCT program for incarcerated individuals housed at the Las Colinas Detention and Re-entry Facility (LCDRF) but reserves the right to develop and implement a program if requested to do so by DSH and/or SDSD management. The parties agree to meet and negotiate an amendment in the event the JBCT program is expanded to the LCDRF.

2.3.9.6.    Duties of the San Diego County Sheriff's Department:

Case 3:25-cv-00410-W-MMP   Document 20   Filed 08/18/25   PageID.342   Page 103
of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.9.6.1.    To provide a minimum of twenty-five (25) beds and up to thirty (30) if needed, for incarcerated individuals who are ordered into the treatment program. Those beds shall be located on the 6th floor of San Diego Central Jail (SDCJ) at 1173 Front Street, San Diego, CA 92101. The SDSD reserves the right to change the location if needed.

2.3.9.6.2.    To provide adequate security to protect Contractor's staff while they are providing services in the facility. The deputies assigned to the JBCT program housing area shall generally be Crisis Intervention Team (CIT) trained deputies.

2.3.9.6.3.    To provide full access to and full utilization by Contractor staff of the Jail's Medical Records System during the term of this agreement and for seven (7) years thereafter, as well as access as required by the State of California or any other governmental or judicial entity, to all medical information of all individuals who have participated in the program, to the extent authorized by law.

2.3.9.6.4.    To provide a representative at meetings conducted at the jail of all stakeholders as agreed upon to include at the minimum the Contractor Program Manager, Sheriff's Medical Services Administrator, Sheriff's Chief Medical Officer (CMO), Facility Commander or his designee, and others such as Department of State Hospitals, Public Defenders, DA, and courts as needed.

2.3.9.6.5.    To notify Contractor in advance of any inspections or review by any appropriate inspecting or reviewing entities.

2.3.9.6.6.    To comply with all federal and state laws pertaining to the administration of the jails and keeping of incarcerated individuals. County shall provide the incarcerated individuals participating in the restoration program with all items, services and supplies which are supplied to all incarcerated individuals in San Diego Central Jail.

2.3.9.6.7.    Contractor shall not be charged with, billed for, or otherwise expected to provide incarcerated individuals with the items the Sheriff is required to provide.

2.3.9.6.8.    To provide and dispense psychotropic medications as prescribed by authorized Contractor staff.

2.3.9.7.    Duties of the JBCT program Contractor:

2.3.9.7.1.    To provide, utilizing its own staff or subcontracted staff, restoration of competency treatment services to IST incarcerated individuals participating in the JBCT Program at San Diego Central Jail, and adhere to the same existing treatment guidelines and program elements established and administered at DSH hospitals as outlined in Exhibit A-1 PROGRAM ELEMENTS AND TREATMENT PROTOCOL of this agreement.

2.3.9.7.2.    To coordinate incarcerated individual's transfer and admission with DSH facility for those incarcerated individuals unable to be restored to competency under the program. This coordination may include working with the courts and attorneys for a new commitment order or stipulation to Patton State Hospital. Contractor is not financially responsible for any costs associated with competency restoration performed at Patton State Hospital or other offsite facility. Additionally, Contractor is not financially responsible for any mental health offsite costs. Any mental health offsite costs incurred


EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

by Contractor will be billed back to the County for one hundred percent (100%) reimbursement of same.

2.3.9.7.3.    To provide licensed clinical staff, who shall work approximately forty (40) hours per week during mutually agreed upon hours, and who shall provide restoration to competency services for the incarcerated individuals placed in the restoration program consistent with CA DSH as it relates to said services.

2.3.9.7.4.    Staff shall comply with all standards per CA Title 15 and correctional community standards for mental healthcare as per the National Commission on Correctional Health Care (NCCHC).

2.3.9.7.5.    To adhere to all the rules, policies, and regulations of the jail.

2.3.9.7.6.    To appoint an individual, or designee, who shall be available twenty-four (24) hours per day, seven (7) days per week, as a liaison to communicate with County on matters relating to this Agreement.

2.3.9.7.7.    To provide treatment services consisting of mental illness management, to prescribe psychotropic medications from the County formulary, competency restoration, physical stimulation, mental/social stimulation, and other components of the treatment program in compliance with applicable state law and regulations.

2.3.9.7.8.    To provide quality control indicators from program data which shall be reported to the Stakeholder's Board.

2.3.9.7.9.    To submit significant suggested changes in policies and procedures to the stakeholder's board for review by appropriate jail staff.

2.3.9.7.10.    To comply with applicable state law and the terms of the contract for this program between the Sheriff and Contractor.

2.3.9.7.11.    Contractor staff shall remain in compliance with all applicable state and/or federal licensing requirements applicable to mental health providers and show proof of such licensing compliance to County upon request.

2.3.9.7.12.    Notwithstanding anything set forth above, San Diego County may terminate or reduce the size of the JBCT program at any time upon written notice to Contractor in the event its contract with CA-DSH is terminated or reduced.

2.3.9.7.13.    If funding for any fiscal year for the JBCT program is reduced or deleted by State's Budget Act for purposes of this program, and the State exercises its option to either cancel its agreement with the County, the County shall have the option to either cancel the JBCT program with no liability occurring to the County or offer an agreement amendment to Contractor to reflect the reduced amount. In the event JBCT services are deleted or reduced, Contractor will not be responsible for providing JBCT staffing services as identified in Contractor's staffing matrix. Any reduced funding amounts by the state will result in negotiations between parties for appropriate JBCT staffing and pricing adjustments.

2.3.9.8.    Treatment Team

Case 3:25-cv-00410-W-MMP   Document 20   Filed 08/18/25   PageID.344   Page 105
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.9.8.1.    Contractor shall use an interdisciplinary approach to offer a range of specialized skills and expertise in the delivery of comprehensive restoration treatment services to JCBT participants.

2.3.9.8.2.    To promote efficient and effective delivery of competency restoration treatment, the Treatment Team comprised of the Contractor staff listed below shall convene weekly to review each JBCT defendant:

2.3.9.8.2.1.    Program Director – Licensed psychologist shall provide oversight of the JBCT program, including ensuring compliance with County, DSH, and Contractor standards and expectations. The Program Director reviews DSH Patient Management Unit (PMU) referrals to determine program suitability, provides clinical oversight to the JBCT as needed, and liaises with the DSH, the Superior Court, and legal personnel as needed. Ensures data deliverables required by DSH are accurate and timely submitted.

2.3.9.8.2.2.    Psychiatric Provider – Completes a comprehensive assessment of each JBCT participant within 72 hours of admission to the program. Based on the thorough work-up, the psychiatric provider prescribes psychotropic medication (as appropriate) to treat symptoms that interfere with trial competency. Thereafter, the psychiatric provider monitors the defendant's response to pharmacological interventions by meeting weekly with individuals to discuss potential side effects of prescribed medications, make medication adjustments as needed, and consider alternative medications if necessary. Psychiatric Services are overseen by the JBCT Chief Psychiatrist.

2.3.9.8.2.3.    Psychologist – Performs forensic evaluations of trial competency to inform treatment planning and provide statutorily required status reports/forensic evaluation reports to San Diego County Superior Court and its designated officials. Congruent with NCCHC guidelines, the psychologist who conducts forensic evaluations does not deliver clinical services (e.g., treatment, intervention). Rather, the psychologist's role on the team is to gather data about the JBCT participant's progression in the restoration process and acquires information about other team members' interactions with program participants as part of the ongoing competency evaluation process. After initial assessment of competency upon admission to the JBCT, psychologists re-assess competency at least every 30 days. Psychologist also submit formal written reports to the court when an individual is opined restored, when a person is believed to not be restorable within a reasonable period or maximum allowable period, or when statutorily require updates are due.

2.3.9.8.2.4.    Social Worker/Mental Health Clinician – Performs admission assessment to determine clinical, psychosocial, and discharge needs. Delivers group and individual mental health interventions. In addition, the licensed social worker/mental health clinician serves as the treatment team coordinator to ensure team documentation (e.g., progress notes, treatment plans) is accurate and current. In addition, social worker/mental health clinicians coordinate re-entry and discharge plans to ensure continuity of care.

2.3.9.8.2.5.    Mental Health Rehabilitation Specialist – Provides rehabilitation and recreational group activities and offers support to the social worker/mental health clinician and forensic restoration specialist as needed.

Case 3:25-cv-00410-W-MMP    Document 20    Filed 08/18/25    PageID.345    Page 106
of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.9.8.2.6.    Forensic Restoration Specialist – Conducts competency education/training sessions in individual and group formats and documents progress in ForensicCARE. Consult with treatment team members to discuss participants' progress, areas in need of attention, and insights about behavioral observations.

2.3.9.8.3.    During weekly meetings, the Treatment Team shall review the effectiveness of treatment interventions, determine if additional treatment elements should be incorporated into the treatment plans and discuss if a JBCT participant is under consideration for discharge or transfer to state hospital

2.3.9.8.4.    Treatment Team discussions shall be documented in ForensicCARE to memorialize treatment plan modifications, team decisions, etc.

2.3.9.8.5.    Keeping with best practices, professionals involved in the competency restoration treatment and evaluation process shall be specially trained to work with a forensic population. Such training shall involve cross- discipline education about the practices other disciplines use and the issues other disciplines must manage during the competency restoration treatment and evaluation process.

2.3.9.9.    Group Curriculum

2.3.9.9.1.    Day programming shall be incorporated with the intent of providing education about the criminal justice system and processes, as well as promote skills that lend to competency restoration (e.g., attention, problem- solving, stress management, behavioral control). Each participant shall receive a program handbook containing handouts, journal logs, out-of-group activity sheets, and other resources that is theirs to keep as a reference upon completion of the JBCT program.

2.3.9.9.2.    Competency Education

2.3.9.9.3.    Educational treatment shall involve use of multiple learning formats to facilitate the treatment modules. Competency educational training shall be provided through informative lectures, visual/instructional aids (e.g., handouts, white boards), group discussion, vignettes, review and discussion of relevant videos, role- playing, and other novel teaching strategies.

2.3.9.9.4.    When planning competency restoration activities, the group facilitator shall consider an individual's readiness for education training, learning style, cultural influences, and level of educational achievement.

2.3.9.9.5.    Twice daily, defendants shall attend competency education groups. The morning group shall focus on gaining factual knowledge about the legal system primarily through lecture-based learning supported by visual aids, while the afternoon session shall be an applied group that promotes learning through discussion about vignettes, mock trials, and other hypothetical scenarios.

2.3.9.10.   Incentivized Treatment Participation

2.3.9.10.1.   Individuals mandated by the court to undergo competency restoration treatment may be reluctant to comply with mental health interventions. To promote cooperation and compliance with treatment, Contractor shall use an incentive program whereby defendants can earn privileges and access to certain items in exchange for positive/prosocial behavior and treatment compliance. JBCT staff shall be specifically trained in operating a token economy to promote consistent delivery of incentives. Collaboration with San Diego Central Jail leadership shall be made to determine the specific parameters of this program to maintain facility safety and security.

2.3.9.11.   Discharge and Re-Entry Planning

2.3.9.11.1.   It is imperative that restoration gains be maintained once individuals begin to transition out of the JBCT unit. The JBCT team shall coordinate care with receiving mental health providers. Contractor shall ensure seamless coordination at this point and enhance continuity of care.

2.3.9.11.2.   If the individual requires transfer to a DSH facility for further restoration services, the JBCT team shall compiles relevant data and forwards that information to the DSH PMU for processing.

2.3.9.11.3.   In the event an individual is discharged to the community, the JBCT team shall ensure the discharge plan and coordination includes, if clinically, indicated appropriate mental health counseling appointments, medication management, services for chemical dependency, and overall health/wellness activities.

2.3.9.11.4.   The assessment shall be completed electronically in TechCare module ForensicCARE, and all results are documented and stored in the patient's electronic health record. JBCT records will be maintained in TechCare module, ForensicCARE, as a separate clinical from forensic files.

2.3.9.11.5.   SDSD nursing staff shall ensure a review of all incarcerated individuals health records is conducted prior to transfer to coordinate medication distribution and continuity of care.

2.3.10.   Oral Care Services

2.3.10.1.   SDSD staff shall provide oral hygiene instruction and preventive oral education at intake.

2.3.10.2.   Contractor shall be the prime provider for oral care services and shall provide dental staffing. Contractor oral care services shall comply with NCCHC standards by which patients receive dental treatment, not limited to extractions. Contractor may provide dental services directly or utilize a subcontractor.

2.3.10.3.   Treatments shall include any other services deemed necessary by the contracted dentist. Contractor shall ensure that patients' serious dental needs are met in compliance with NCCHC, and other applicable standards.

2.3.10.4.    Contractor shall establish dental services in accordance with guidelines for dental evaluation and treatment. A priority system shall be used to guide treatment decisions, and proper infection control procedures are utilized for all oral treatment procedures.

2.3.10.5.    Documentation shall be standardized in TechCare to better document dental health conditions and treatment and, thereby, enhance communication among healthcare staff.

2.3.10.6.    Contractor's oral care program shall provide the following services for patients:

2.3.10.6.1.    Training and Support of SDSD Nurses in providing Health Assessment, which includes a Dental Screening and Hygiene Examination Dental Assessments for patients who request dental services for urgent/emergent needs:

2.3.10.6.1.1.    Emergency and routine dental care
2.3.10.6.1.2.    Temporary fillings
2.3.10.6.1.3.    Incision and drainage
2.3.10.6.1.4.    Control of bleeding
2.3.10.6.1.5.    Necessary emergency surgery
2.3.10.6.1.6.    Clinically indicated extractions
2.3.10.6.1.7.    Referral to dental specialist if needed
2.3.10.6.1.8.    Medically necessary dental-related prescriptions

2.3.10.7.    The oral care program shall begin at the Receiving Screening, administered by a SDSD healthcare professional who is specifically trained by the contracted dentist. The results of this screening are relayed to the dentist for review and referral, if clinically indicated.

2.3.10.8.    A patient can be referred to the dentist any time during incarceration. Treatment services provided by the onsite dentist reflect contracted services identified by the SDSD.

2.3.10.9.    Contractor shall provide an appropriate and timely response to requests for dental services and institute periodic performance measurements to ensure patients have timely access to dental care.

2.3.10.10.    Dental emergencies shall be addressed immediately. Emergency dental services shall be available 24 hours a day either onsite or offsite.

2.3.10.11.    Patients with urgent dental needs shall be seen at the initial sick call.

2.3.10.12.    Non-urgent or routine dental services shall be provided during regular clinic hours.

2.3.10.13.    Contractor shall coordinate appropriate offsite referrals for patients requiring dental care outside the capabilities of the facility.

2.3.10.14.    All dental services shall be delivered according to proper universal precautions, defined from Centers for Disease Control (CDC) Infection Control Guidelines, measures and shall be documented in the patient's medical record.

2.3.10.15.    Contractor shall not be required to perform cosmetic dental services.

2.3.10.16.    The following equipment and supplies shall be available in each onsite dental treatment area:

Case 3:25-cv-00410-W-MMP Document 20 Filed 09/18/25 PageID.348 Page 109 of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.10.16.1.    Handwashing facilities.
2.3.10.16.2.    Dental examination chair.
2.3.10.16.3.    Examination light.
2.3.10.16.4.    Sterilizer.
2.3.10.16.5.    Instruments.
2.3.10.16.6.    Biohazard and non-hazard trash containers.
2.3.10.16.7.    Personal protective equipment; and,
2.3.10.16.8.    Stool or alternative seating for dentist.
2.3.10.16.9.    A dental operatory shall require, at a minimum:

2.3.10.16.9.1.    An x-ray unit with developing capability.
2.3.10.16.9.2.    Blood pressure monitoring equipment; and,
2.3.10.16.9.3.    Oxygen.

## 2.3.11.  Chronic Care Program

2.3.11.1.    Contractor shall implement a chronic care program. Incarcerated individuals with chronic diseases shall be identified and treated accordingly.

2.3.11.2.    Contractor's chronic care program shall incorporate principles of case and disease management for complex cases and promote maximum progress and healing.

2.3.11.3.    Patients shall receive timely follow-up, evaluation, treatment, and education about the preventive activities available for those requiring chronic or convalescent care. This policy ensures all patients are screened, identified, and monitored in a manner consistent with national clinical guidelines established for the care and treatment of chronic illnesses.

2.3.11.4.    Chronic Care Management and preventive care shall begin at Receiving Screening when patients are classified into the appropriate chronic care clinic and scheduled for follow-up treatment.

2.3.11.5.    All chronic care clinic visits shall be scheduled and tracked in TechCare. At a minimum, the database shall include the following:

2.3.11.5.1.    Each patient enrolled in a chronic care clinic.
2.3.11.5.2.    Each occasion when an enrolled patient is seen at a chronic care clinic.
2.3.11.5.3.    Patient refusals for a chronic care visit.

2.3.11.6.    Contractor's process shall ensure compliance with standards established for the care and treatment of chronic illnesses. If clinically indicated during the receiving screening, the following procedures shall be followed:

2.3.11.7.    If the patient's responses during intake indicate that he or she requires additional medical care, the patient's medical record is electronically flagged for follow-up; their chronic issues are addressed by the provider during the initial health assessment.

2.3.11.8.    Contractor and SDSD staff shall maintain continuity for patients on pharmacologic therapy including by SDSD nursing staff reviewing SureScripts and obtaining orders from STATCare or onsite provider as clinically indicated.

Case 3:25-cv-00410-W-MMP   Document 20   Filed 08/18/25   PageID.349   Page 110
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.11.9.  Patients whose chronic conditions are unstable at booking shall be refused and sent directly to a hospital pursuant to SDSD policies and procedures. In any case where SDSD nursing staff require guidance as to whether a patient may be safely admitted the matter will be immediately referred by nursing to STATCare or onsite provider for consideration of refusal versus onsite management.

2.3.11.10.  In the case where a patient's chronic disease is stable, he/she shall be scheduled for a first chronic disease visit in approximately one month.

2.3.11.11.  Contractor shall collaborate with jail and sworn staff to reduce interruption of chronic care medications or appointments when patients with chronic disease are transferred between institutions or moved for housing, court, or release.

2.3.11.12.  Contractor shall ensure patients enrolled in chronic care clinics are seen by a qualified healthcare professional at appropriate intervals, or more frequently if clinically indicated. Newly diagnosed patients shall be seen for the first clinic within 45 days of diagnosis and then scheduled for follow-up as clinically appropriate.

2.3.11.13.  Individual Treatment Plans: Individual treatment plans are developed by the evaluating provider according to guidelines set by the responsible physician. The plan includes directions to healthcare personnel regarding their roles in the care and supervision of the patient.

2.3.11.14.  Contractor shall provide education about chronic diseases to chronically ill patients. Disease-specific information is selected from a list in TechCare and printed to give the patient the knowledge to help care for themselves.

2.3.11.15.  Within TechCare, the pharmacy team analyzes profiles of patients with chronic care medications, identifies chronic care patients who may not have been identified yet, and updates the patient medical record. If a patient has been incarcerated for more than 30 days and has been receiving a chronic care medication but has not been flagged as a chronic care patient, the pharmacy shall send out a second request for the patient to be re-assessed. Patients in need of chronic care shall be enrolled in the proper clinic and ensured they receive the appropriate labs and scheduled follow-ups. Contractor shall regularly provide this quality assurance activity as part of the Proactive Care Model.

2.3.12.  Comprehensive Substance Use Disorder Management Program

2.3.12.1.  Contractor shall implement a medically supervised withdrawal and MAT program. Such program should have at a minimum the following:

   2.3.12.1.1.  A medically supervised withdrawal and treatment program.
   2.3.12.1.2.  Medication assisted treatment processes.
   2.3.12.1.3.  Substance counseling/therapy.
   2.3.12.1.4.  Community collaboration and integration.

2.3.12.2.  Contractor shall ensure incarcerated individuals who are intoxicated or undergoing withdrawal are managed and treated as clinically indicated. This includes but is not limited to alcohol, opioid, and benzodiazepines. This includes protocols and treatments managed by a physician or other

Case 3:25-cv-00410-W-MMP    Document 20    Filed 08/18/25    PageID.350    Page 111
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

medical professional trained in withdrawal treatment. Incarcerated individuals should receive evidence-based care during confinement and linked to care upon release as described in NCCHC Standards for discharge planning. To complete this function, Contractor requires an observation unit prior to start-up, due to the increased risk of detox patients housed throughout the County facilities, higher risk patients, and limited modalities of identifying patients at greater risk. Said observation unit will lessen movement requirements to conduct CIWA-COWS checks, as well as reduce County and Contractor staff movement throughout the facility to assess detoxing patients.

2.3.13.  Withdrawal and Treatment Program

2.3.13.1.    For patients at risk of withdrawal, Contractor shall take the following actions:

2.3.13.1.1.    Enrollment in the Detox Monitoring dashboard within TechCare

2.3.13.1.2.    Treatment orders for comfort medications for nausea, diarrhea, and generalized pain

2.3.13.1.3.    Treatment orders for vitamin supplements and electrolyte replacement hydration (e.g., Gatorade)

2.3.13.1.4.    Treatment with buprenorphine and benzodiazepines per provider order as clinically indicated for those with significant withdrawal symptoms.

2.3.13.1.5.    Enrollment in an ongoing assessment and treatment protocol specific to the substance causing withdrawal:

2.3.13.1.5.1.    Clinical Institute Withdrawal Assessment (CIWA-Ar)
2.3.13.1.5.2.    Clinical Institute Withdrawal Assessment Benzodiazepines (CIWA-B)
2.3.13.1.5.3.    Clinical Opiate Withdrawal Scale (COWS)

2.3.14.  Medication Assisted Treatment (MAT) Treatment Program

2.3.14.1.    Patients who are enrolled in a methadone maintenance program shall be evaluated for continuation while in the facility. Contractor shall partner with community agencies to provide treatment. Contractor shall establish and secure agreements from community partners to bring limited doses of methadone onsite for in-jail treatment. Alternately, Contractor and SDSD may elect to work toward licensure as an Opioid Treatment Program, in which case Contractor may provide methadone directly from its pharmacy.

2.3.14.2.    Contractor's onsite leadership shall perform Quality Assurance studies, to monitor the efficacy and consistency of the drug and alcohol withdrawal program. Contractor pharmacists shall work with the STATCare telehealth team to actively monitor patients under alcohol and withdrawal protocols. Review and Quality Assurance performed by Contractor pharmacy and STATCare team members will typically be performed by Contractor staff working offsite and remotely reviewing patient records in TechCare and interacting remotely with onsite nursing and clinical staff.

2.3.14.3.    Contractor shall implement a Medication Assisted Treatment (MAT) program. The MAT program shall include but not be limited to:

2.3.14.3.1.  Induction – upon request of incarcerated individual or patients identified at withdrawal, as well, as those currently residing in custody. MAT Induction shall be initiated within six months of the effective date of the contract.

2.3.14.3.2.  Maintenance – sustainment from community providers, as well as continuity of care during incarceration.

2.3.14.3.3.  Discharge planning – coordination with community resources to continue treatment upon release from Sheriff's custody.

2.3.14.4.  Contractor shall continue providing specialty staffing for onsite MAT services. In addition, coordination shall be made with local community partners to support the SDSD MAT Program.

2.3.14.5.  The developed approach to a comprehensive MAT program shall include:

2.3.14.5.1.  Multidisciplinary involvement to include, medical and mental health practitioners.

2.3.14.5.2.  Multimodal treatment with a combination of medication and counseling.

2.3.14.5.3.  Multiphasic, within the jail and in the community post-release.

2.3.14.5.4.  Some combination of approved MAT medications, including naltrexone (Vivitrol), buprenorphine and methadone, as appropriate and available.

2.3.14.6.  Contractor or SDSD staff shall conduct an initial screening for admission to the MAT program.

2.3.14.7.  Contractor shall assign patients to a MAT medication based on continuity of care or appropriate treatment for induction.

2.3.14.8.  Contractor shall partner with community providers to connect patients to comprehensive MAT and behavioral therapy upon release.

2.3.14.9.  Patients who are confirmed through testing to be pregnant and opioid addicted shall be treated with opioid maintenance medications.

2.3.14.10.  Contractor shall utilize appropriate community partners (e.g. Acadia HealthCare or another similar local provider or providers) for services and support for the SDSD MAT program. The community partner(s) will provide psychiatric and chemical dependency services. The community partner(s) shall have comprehensive treatment centers in the local area.

2.3.15.  Women's Health and Obstetric Services

2.3.15.1.  Contractor shall implement a program for women's health. This shall include, but is not limited to, preventative services, contraception, gynecologic care, and management.

2.3.15.2.  Contractor shall provide female healthcare in accordance with NCCHC and other generally accepted professional standards.

2.3.15.3.  Contractor shall directly employ a provider or utilize a subcontractor to provide 12 hours of weekly coverage by a Gynecological Provider (GP/NP) to provide regular access to care for the female patient population at the Las Colinas Detention and Reentry Facility.

2.3.15.4.  All females of childbearing age (15-54) shall receive a pregnancy test at the time of booking. Those with a positive pregnancy screening shall be referred by nursing to StatCare or an onsite

Case 3:25-cv-00410-W-MMP   Document 20   Filed 08/18/25   PageID.352   Page 113
of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

provider for initial orders after their arrival to the facility to ensure continuity of care. Referrals shall be prioritized based on risk factors. Contractor shall ensure onsite OBGYN sees each new intake on their next scheduled workday. Should volume warrant as determined by Sheriff, Contractor shall provide onsite OB services via telemedicine and shall expand services with an Obstetrician onsite for scheduled clinics.

2.3.15.5.   During the comprehensive health assessment, clinical staff shall take note of the following information for female patients:

2.3.15.5.1.   Menstrual cycle
2.3.15.5.2.   Unusual bleeding
2.3.15.5.3.   Current use of a contraceptive medication
2.3.15.5.4.   Presence of an I.U.D.
2.3.15.5.5.   Breast masses
2.3.15.5.6.   Nipple discharge
2.3.15.5.7.   Pregnancy history
2.3.15.5.8.   Gynecological history to include menstrual problems, STDs and risk factors, most recent pap smear and any history of irregular pap smear results

2.3.15.6.   If deemed medically necessary, a pelvic and breast examination shall be performed within a reasonable amount of time.

2.3.15.7.   Contractor policy shall comply with NCCHC standards and all other laws and statutes of the state. Contractor shall ensure women receive appropriate contraceptive services as clinically indicated.

2.3.15.8.   Contractor shall provide emergency contraception as clinically indicated, and contraception shall be made available upon request to females upon release.

2.3.15.9.   Contractor shall implement a program for both on/off-site obstetric care and services. Such a program should be comprehensive (prenatal through postpartum) and shall include provisions for community specialty care and maternal delivery at a community facility.

2.3.15.10.   Contractor shall facilitate comprehensive obstetric care and services. Onsite providers shall be responsible for ordering appropriate labs, ultrasounds, and consults with an Obstetrician per protocol.

2.3.15.11.   Contractor shall use appropriate provider for OB consulting, offsite deliveries, and urgent OB offsite needs.

2.3.15.12.   Contractor shall provide health care to address the unique needs of female patients regarding family planning, pregnancy, prenatal care, and postpartum care while incarcerated.

2.3.15.13.   Contractor shall ensure that pregnant patients receive appropriate prenatal care, obstetrical services for labor and delivery, and postpartum care.

2.3.15.14.   Contractor shall provide all pregnant patients with timely and appropriate prenatal obstetrical care consistent with the community standards of care.

2.3.15.15.   Contractor shall provide all pregnant patients with active opioid use disorder receive evaluation upon intake, including offering and providing medication-assisted treatment (MAT) with methadone and buprenorphine.

Case 3:25-cv-00410-W-MMP    Document 20    Filed 09/18/25    PageID.353    Page 114
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.15.16.  Female patients presenting at any time with signs or symptoms of pregnancy shall be offered a urine pregnancy test by Contractor.

2.3.15.17.  Contractor shall ensure emergency delivery kits are available in the facility.

2.3.15.18.  The advanced clinical provider shall evaluate the pregnant patient within seven days of notification of a positive pregnancy test.

2.3.15.19.  Contractor shall ensure pregnant women are given comprehensive counseling and assistance from either the medical/mental health staff or a community agency in accordance with their expressed desires regarding their pregnancy and whether they elect to keep the child, use adoption services, or have an abortion.

2.3.15.20.  Pregnant women with serious mental illness shall be offered specialized psychosocial and psychopharmacological monitoring by the mental health staff.

2.3.15.21.  Mental health providers shall consult with medical staff regarding any psychotropic medication use during pregnancy.

2.3.15.22.  When obstetrical care is provided by an outside contractor (e.g., OB/GYN physician), copies of pertinent diagnostic results and evaluations shall be requested and filed in the medical record.

2.3.15.23.  Contractor shall order appropriate preventive interventions, including the prescribing of prenatal vitamins and a pregnancy diet, for pregnant patients. The orders should continue throughout the postpartum period and during the period of lactation for those expressing breastmilk while in custody.

2.3.16.  Hospital Care Management

2.3.16.1.  Contractor shall manage hospital level care as needed. Hospital care includes but is not limited to concurrent review, utilization review and discharge planning as defined in the Glossary, Section 4.29.

2.3.16.2.  Contractor shall provide high quality healthcare onsite. This shall be accomplished through the creation and development of onsite general practice (urgent care) clinics, onsite ward rounds/bedside rapid consultation services, and onsite specialty clinics, advanced infirmary level care, specialty consult services, and telehealth in addition to hospital step-down, infirmary, and assisted living/managed care facilities onsite.

2.3.16.3.  This process shall include review and tracking of offsite care, to ensure that all care provided offsite is medically necessary. The process shall be managed within TechCare. When offsite care is required, Contractor's UM team shall collaborate daily with health services staff and offsite providers to ensure medically necessary and appropriate usage of healthcare services. The following shall be considered during the review process:

2.3.16.3.1.    Whether offsite trip is necessary or whether onsite care is more effective
2.3.16.3.2.    Medical necessity based on industry standards, and NCCHC Standards
2.3.16.3.3.    Maximization of onsite capabilities
2.3.16.3.4.    Care consistent with community standards, contractual, or legal mandates

Case 3:25-cv-00410-W-MMP   Document 20   Filed 08/18/25   PageID.354   Page 115
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.16.4.    The following services shall be reviewed by Contractor's UM team for all requests:

    2.3.16.4.1.    Hospitalizations—scheduled inpatient and observation
    2.3.16.4.2.    Outpatient surgical or non-surgical procedures
    2.3.16.4.3.    Specialty office visits and procedures
    2.3.16.4.4.    Diagnostics, durable medical equipment, and prosthetics
    2.3.16.4.5.    Course of outpatient treatment—physical therapy, dialysis, chemotherapy, radiation

2.3.16.5.    Contractor's On-site Medical Director, designated site staff, Chief Medical Officer or designee, and a dedicated utilization nurse shall review and discuss proposed non-emergent services to determine the most appropriate and medically sound approach to care. Resulting outcomes and planned courses of action shall be shared with the On-site Medical Director or designee and progress notes are documented in TechCare.

2.3.16.6.    Contractor and SDSD shall collaborate to provide Case Management and Utilization Review for hospitalized patients. Case management team expected to have one or more points of contact (POC) to interact/engage with community facilities/providers and assist with the following components:

    2.3.16.6.1.    Assistance with direct admissions
    2.3.16.6.2.    Assistance with community transfers (hospital to hospital movements)
    2.3.16.6.3.    Coordination of patient transfers to CDCR/DSHs
    2.3.16.6.4.    Coordination of hospital/community provided medication provision and release
    2.3.16.6.5.    Establishment of collaborative long & short-term goals for treatment 2.3.16.6.6. Discharge planning/ repatriation to facilities
    2.3.16.6.7.    Establishment of collaborative long and short-term goals for treatment
    2.3.16.6.8.    Optimization of medical unit beds
    2.3.16.6.9.    On-site SDSD nursing staff expected to be involved with the optimization of medical unit beds and 'medical step down' components as needed. If hospital medications are not available/provided, then on-site staff would need to obtain discharge notes/plans and coordinate follow up with a health care provider.

2.3.16.7.    Contractor's Utilization and Case Management team shall closely monitor patients diagnosed with chronic and complex illness. TechCare shall be utilized in this process by tracking the number of offsite visits by way of a watch list. Patient acuity level will be based on the severity of illness and subsequent offsite treatments.

2.3.16.8.    Contractor shall develop and implement a behavioral health/mental health acuity rating scale. This scale shall be utilized to assist in providing guidance for housing patients with mental health concerns.

2.3.16.9.    Emergency cases shall be immediately referred offsite and reviewed after the fact. For continuity of care, the Program Manager or designee shall submit notification immediately to the NaphCare corporate office utilization management team and site leadership. Upon return from an emergency room visit, including psychiatric visits, the appropriate Advanced Clinical Provider or designated staff shall schedule information and treatment recommendations, and issue follow-up orders as clinically indicated.

2.3.16.10.    Documentation of ED visits are tracked and monitored by site nurse via TechCare to identify site UM Request and further ensure continuity of care. Retrospective review occurs on all ED trips and for any questions or concerns that may arise regarding the quality and appropriateness of a patient's care. UM nurses and Contractor's Chief Medical Officer, or designee, review all emergency room visits and monitor the On-site Medical Director's appropriate use of the onsite resources.

Case 3:25-cv-00410-W-MMP    Document 20    Filed 08/18/25    PageID.355    Page 116
of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.16.11.    Contractor shall provide the following offsite reports routinely:

2.3.16.11.1.    Daily Hospitalization Report—including reason for admission and length of stay

2.3.16.11.2.    Monthly Detailed Utilization report—including detailed time frames for each process of the review

2.3.16.11.3.    Biweekly Inpatient & Outpatient statistical report by service and location

2.3.16.11.4.    Biweekly Specialty Services report—consults, procedures, and diagnostic services

2.3.16.11.5.    Biweekly ED Trips report—by service and location

2.3.16.11.6.    Monthly Utilization Review report—by disease classification

2.3.16.12.    Contractor's utilization management team shall conduct a monthly Utilization Management Meeting to identify and implement quality initiatives such as the readmission review process. Research is performed and shared with the committee, resulting in implementation of quality improvement processes. When necessary, cases are referred to the Chief Medical Officer for peer review and further recommendations for quality improvement. Utilization Management education shall be an ongoing process throughout the life of the contract.

2.3.16.13.    Individuals returning to the detention facility following offsite treatment encounters shall be evaluated by a registered nurse. Patients returning from an inpatient hospital stay shall be evaluated prior to placement in the general population. These patients shall see an onsite provider as soon as possible to ensure appropriate orders and follow-up.

2.3.17.    Emergency Care and Access to Emergency Department Services

2.3.17.1.    Contractor shall communicate and coordinate with sworn staff the need for emergency department (ED) services for incarcerated individuals.  Per SDSD policy, sworn staff can initiate a response from EMS when they deem necessary. Sworn staff will facilitate and manage emergency transport.

2.3.17.2.    Contractor Network Management Department shall contract with local hospitals to ensure access to their emergency departments for any SDSD patients requiring hospital and ED services.

2.3.17.3.    Contractor shall build a robust Hospital Network for the SDSD Detention Facilities, which may include, but is not limited to, the following:

2.3.17.3.1.    Tri-City Medical Center/ Palomar Medical Center

2.3.17.3.2.    UC San Diego Health - Hillcrest

2.3.17.3.3.    Sharp Chula Vista Medical Center

2.3.17.3.4.    Sharp Grossmont Hospital

2.3.17.3.5.    Alvarado Hospital

2.3.17.3.6.    Scripps Memorial Hospital (La Jolla)

2.3.17.3.7.    Sharp HealthCare

2.3.17.3.8.    Sharp Memorial Hospital (Grossmont)

2.3.17.3.9.    Scripps Mercy Hospital San Diego

2.3.17.3.10.    Scripps Mercy Hospital Chula Vista

2.3.17.3.11.    Sharp Mary Birch Hospital for Women & Newborns

2.3.17.3.12.    Kindred Hospital San Diego

2.3.17.3.13.    Paradise Valley Hospital

2.3.17.3.14.    UC San Diego Medical Center

2.3.17.3.15.    Sharp Coronado Hospital

EXHIBIT B

Case 3:25-cv-00410-W-MMP   Document 20   Filed 09/18/25   PageID.356   Page 117 of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.17.3.16.    Palomar Medical Center
2.3.17.3.17.    Psychiatric Hospital of San Diego County
2.3.17.3.18.    Tri-City Medical Center
2.3.17.3.19.    Vibra Hospital of San Diego

### 2.3.18.  Secure Locked Hospital/Ward

2.3.18.1.    Contractor shall procure and utilize a secure locked hospital/ward section specifically for inpatient hospitalization of incarcerated individuals. This shall include procedures for transfer of incarcerated individual patients from non-secure hospital beds to contracted secure hospital bed.

2.3.18.2.    Contractor shall maximize the use of secure medical units (e.g., Tri-City Medical Center, Alvarado Hospital), and transfer patients to the contracted hospital(s) as soon as logistically possible and medically safe to do so.

2.3.18.3.    Contractor shall put measures in place to coordinate timely patient transports to hospitals.

### 2.3.19.  Onsite and Offsite Specialty Care Services

2.3.19.1.    Contractor shall implement and manage an on-site and off-site specialty care services program. Specialty care services refers to specialist-provided health care as defined in the Glossary. This should include telemedicine options as well as off-site consultations.

2.3.19.2.    Contractor will provide onsite specialty services in the following specialties: Optometry, Cardiology, OBGYN, Infectious Disease, STD and HIV clinics, and Ultrasound. Should volume warrant as determined by Sheriff, Contractor shall provide onsite services via telemedicine and shall expand services onsite for scheduled clinics.

### 2.3.20.  eConsults – Specialty Care Consultations

2.3.20.1.    When onsite specialty clinics are not medically or economically feasible, Contractor shall use eConsults to engage a digital network of clinical specialists for consultation, clinical review, and assessment of necessity of care to inform offsite referral decisions. eConsults shall enable broader range of specialist care. eConsults shall be provided in conjunction with the comprehensive Utilization Management program.

2.3.20.2.    All eConsults specialists are active, board-certified clinicians who conform to NCQT (National Committee for Quality Assurance) guidelines. Board-certified specialists answer requests in less than 24 hours, and all consultations are documented in the patient's health record in TechCare.

2.3.20.3.    eConsults shall give providers access to more than 70 specialties and sub-specialties, including:

2.3.20.3.1.    Addiction Medicine
2.3.20.3.2.    Cardiology
2.3.20.3.3.    Endocrinology
2.3.20.3.4.    ENT
2.3.20.3.5.    Gastroenterology
2.3.20.3.6.    Hepatology


EXHIBIT B

Case 3:25-cv-00410-W-MMP    Document 20    Filed 09/18/25    PageID.357    Page 118
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

| | |
|---|---|
| 2.3.20.3.7. | General Surgery |
| 2.3.20.3.8. | Hematology |
| 2.3.20.3.9. | Geriatric Medicine |
| 2.3.20.3.10. | Infectious Diseases |
| 2.3.20.3.11. | Internal Medicine |
| 2.3.20.3.12. | Nephrology |
| 2.3.20.3.13. | Neurology |
| 2.3.20.3.14. | OB/GYN |
| 2.3.20.3.15. | Oncology |
| 2.3.20.3.16. | Ophthalmology |
| 2.3.20.3.17. | Orthopedic Surgery |
| 2.3.20.3.18. | Psychiatry |
| 2.3.20.3.19. | Pulmonary Medicine |
| 2.3.20.3.20. | Rheumatology |
| 2.3.20.3.21. | Urology |
| 2.3.20.3.22. | Vascular Surgery |

### 2.3.21.  Onsite Dialysis Services

2.3.21.1.    Contractor agrees to provide and manage onsite dialysis services at the San Diego Central Jail as part of the comprehensive healthcare program. Contractor shall provide effective management, skilled clinicians, and state-of-the-art nephrology arrangements, while also providing professional staffing and strong management support from the corporate office. Contractor may provide the service directly or contract with other provider for onsite dialysis services. In the event the UCSD or other provider is unable to provide onsite dialysis or the contract with the UCSD is terminated for any reason, Contractor will provide the service onsite.

2.3.21.2.    Contractor shall have an established quality assurance program for Nephrology and Dialysis services that assists in maximizing clinical outcomes in accordance with KDOQI (Kidney Disease Outcomes Quality Initiative) guidelines. Each month, the following core quality data, consistent with community providers, shall be gathered, analyzed, and evaluated for quality improvement:

| | |
|---|---|
| 2.3.21.2.1. | Dialysis Treatment Adequacy |
| 2.3.21.2.2. | Anemia Management |
| 2.3.21.2.3. | Nutrition Management |
| 2.3.21.2.4. | Bone Management |
| 2.3.21.2.5. | Dialysis Access Management (Fistulas, Grafts, Catheters) |
| 2.3.21.2.6. | Infection Control and Vaccination |
| 2.3.21.2.7. | Clinical Variances, Incidents, and Grievances/Complaints and timely responses |
| 2.3.21.2.8. | Hospitalization |

2.3.21.3.    Contractor's corporate office shall have available experienced professionals in correctional dialysis, including Contractor's Chief Operating Officer for Dialysis and Corporate Nephrologist, and shall be available to provide support and consultations for SDSD dialysis services if needed. Contractor's Chief Operation Officer-Dialysis and Director of Dialysis Operations, or designee, will be available 24-7 to answer any questions or concerns related to onsite dialysis.

### 2.3.22.  Telemedicine Capabilities

Case 3:25-cv-00410-W-MMP    Document 20    Filed 08/18/25    PageID.358    Page 119
of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.22.1.   Contractor shall provide telemedicine services for specialty consultation and referral and have such access available at all detention sites/facilities. Specialty telemedicine services shall include, but are not limited to, the disciplines of endocrinology, nephrology, psychology/psychiatry, orthopedics, urology, and infectious diseases.

2.3.22.2.   SDSD staff shall be trained by Contractor in all areas of telemedicine, to include patient confidentiality and HIPAA compliance, use of technology, scheduling, and procedures for patient care.

2.3.22.3.   Medical staff shall be thoroughly trained in the telemedicine services and the appropriate means to support/conduct a remote patient encounter. Training will include scheduling processes, equipment usage, patient preparation, as well as encounter documentation. Sheriff Managed care staff and/or individual medical providers will determine candidacy for remote/tele medicine services. In the event of triage/change in clinical presentation, facility staff will work with the managed care team to facilitate the change to an in-person medical assessment.

2.3.22.4.   Contractor shall provide telepsychiatry services to the SDSD facilities seven days per week when back-up psychiatric services are needed. Contractor has licensed staff members at the corporate offices who can provide telepsychiatry with simultaneous access to TechCare. Use of telepsychiatry shall not be a replacement for the onsite team or onsite care. The use of telepsychiatry, on-site coverage, and psychiatric provider on call coverage shall ensure Psychiatrist or Psychiatric Nurse Practitioner coverage is always available to SDSD patients.

2.3.23.   Long-term or Hospice Care

2.3.23.1.   Contractor and SDSD shall implement a program for rehabilitative services, long term care/assisted living support or hospice care as defined in the Glossary, Section 4.33.

2.3.23.2.   Contractor shall ensure SDSD nurses are specifically trained to handle patients that require convalescence, medical observation, and skilled nursing care. Contractor and SDSD nursing staff shall provide the necessary level of care needed to provide any long-term care in the SDSD facilities' medical units. Contractor shall ensure long-term care in a safe and sanitary manner. Contractor shall maintain all necessary equipment and supplies needed to provide care to all patients requiring extended care.

2.3.23.3.   Individualized treatment plans shall be developed for these patients, to be adjusted as needed, as they move to recovery or into a higher level of care. The long-term care patients shall be categorized by unique 'Long-Term Care' flags within TechCare so that patients within this group can be easily managed and monitored.

2.3.23.4.   Contractor shall collaborate with the SDSD to develop and implement an onsite and offsite hospice program. Contractor shall collaborate with the SDSD and community partners to identify potential candidates for hospice care, and allow for appropriate housing options, both in and outside of custody. Contractor will work with case management functionaries (SDSD, HHSA and 3rd party community partners) to assist with medical probation and compassionate program releases. The policy and procedure for hospice care shall include the establishment of policies addressing criteria for admission to the hospice program, special privileges for terminally ill patients, requirements for housing in palliative care settings, "do not resuscitate orders," and coordination with existing community hospice resources.

2.3.23.5.   Staff working in the hospice program shall be qualified healthcare professionals with training in basic hospice theory and techniques. The On-site Medical Director shall approve all transfers to

the hospice unit. The Hospice Program offers comprehensive multidisciplinary services to terminally ill patients. Specific core services are made available to every hospice patient and family where applicable regardless of age, color, creed, gender, nationality, sexual orientation, or handicap. These core services include:

2.3.23.5.1.    Physician services.
2.3.23.5.2.    Nursing services.
2.3.23.5.3.    Mental health services.
2.3.23.5.4.    Pastoral care.
2.3.23.5.5.    Bereavement counseling.
2.3.23.5.6.    Security services.
2.3.23.5.7.    Classification services.
2.3.23.5.8.    Volunteer services.
2.3.23.5.9.    Pharmacy services; and
2.3.23.5.10.   Other services as dictated by patient needs.

2.3.24. Patient Health Education

2.3.24.1.    Contractor and SDSD shall ensure health education in all aspects of patient care and treatment. This should include health counseling and education on condition, findings, treatment plan, and potential outcomes of compliance vs. non-compliance with recommended course of action given by providers. This also includes discharge planning as described in NCCHC Standards.

2.3.24.2.    In accordance with NCCHC standards, general education resources shall be available to all patients, and specific health education shall be provided to patients with serious health conditions.

2.3.24.3.    Contractor Program Manager shall coordinate with the County to determine any special needs and ensure that handouts are developed to meet such needs.

2.3.24.4.    Contractor's health improvement and disease prevention educational topics shall include, but are not limited to, the following:

2.3.24.4.1.    Medical Services/Resources
2.3.24.4.2.    Diet and Nutrition
2.3.24.4.3.    Management of Chronic Diseases
2.3.24.4.4.    Self-examination
2.3.24.4.5.    Communicable Diseases
2.3.24.4.6.    Management of Medication
2.3.24.4.7.    Family Planning/Contraception Counseling
2.3.24.4.8.    Personal Hygiene
2.3.24.4.9.    Substance Abuse
2.3.24.4.10.   Sexually Transmitted Diseases, HIV/TIDS, and Hepatitis
2.3.24.4.11.   Smoking Cessation
2.3.24.4.12.   Diabetes Management
2.3.24.4.13.   Stress Management
2.3.24.4.14.   Anger Management

2.3.25. Infectious Disease Prevention and Control Program

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.25.1.   Contractor shall implement an infectious disease prevention and control program as required by Title 15, NCCHC Standards, and SDSD policy. This should include but not limited to a comprehensive institutional program of surveillance (active and passive), prevention, contact investigation, epidemiological assessment, management of communicable diseases, and consultation and collaboration with the local health department.

2.3.25.2.   The program shall be based on universal precautions recommended by the Centers for Disease Control (CDC), the Occupational Safety and Health Administration (OSHA), the Association for Practitioners in Infection Control, and other nationally recognized infection control organizations.

2.3.25.3.   The Infection Control Program shall be implemented throughout the SDSD facilities to establish a comprehensive system of programming for surveillance and treatment of infectious diseases within the correctional environment.

2.3.25.4.   The Program Manager in coordination with the SDSD Infection Control Nurse shall oversee and implement infection control measures to monitor the incidence of infectious and communicable diseases, ensure proper handling and disposal of biological waste, and provide education to patients, correctional staff, and clinical staff on control, treatment, and prevention of infection. Infection control activities shall be monitored by the CQI committee.

2.3.25.5.   Contractor's Chief Medical Officer and Corporate Medical Directors shall be available to provide doctor-to-doctor consultations and guidance in establishing Infection Control Program Policies and Procedures.

2.3.25.6.   At a minimum, the Infection Control Program includes written policies, procedures, and practices to:

2.3.25.6.1.   Provide care and treatment to patients with communicable diseases, including the recommendation for special housing/isolation when medically indicated.
2.3.25.6.2.   Implement Bloodborne Pathogen Program.
2.3.25.6.3.   Monitor compliance with treatment regimens and continuity of care for patients with communicable diseases.
2.3.25.6.4.   Ensure confidentiality.
2.3.25.6.5.   Define decontamination of medical equipment and proper disposal of sharp instruments and biohazard wastes.
2.3.25.6.6.   Define strict adherence to universal precautions by all Contractor/Contracted staff to minimize the risk of exposure to blood and body fluids of patients
2.3.25.6.7.   Provide reports to designated authority of infectious diseases and nosocomial infections (infections that originate or occur in a hospital) in accordance with local, state, and federal laws and regulations.

2.3.25.7.   Contractor shall ensure quarterly meetings, or whenever an infection control issue requires immediate or continuing attention. A licensed healthcare provider is designated to serve as the Infection Control Coordinator. The infection control committee shall consist of the following members:

2.3.25.7.1.   On-site Medical Director or Physician.
2.3.25.7.2.   Dentist or representative, if applicable.
2.3.25.7.3.   Program Manager.
2.3.25.7.4.   SDSD Director of Nursing.
2.3.25.7.5.   Infection Control Coordinator.
2.3.25.7.6.   SDSD representative; and


EXHIBIT B

Case 3:25-cv-00410-W-MMP   Document 20   Filed 08/18/25   PageID.361   Page 122
of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.25.7.7.   Any other representatives, depending on issues for discussion as designated in conjunction with the Program Manager or Contractor Corporate Office.

2.3.25.8.   Contractor shall support SDSD COVID-19 protocols. Contractor shall follow CDC guidance to add or modify supplemental screening forms in TechCare as they relate to COVID-19.

2.3.25.9.   All staff members will receive a comprehensive introduction and overview of the infection control program. All new SDSD employees will receive the introduction during their orientation period, all current employees will receive training during on-site Inservice training, via NaphCare's training module, Contractor University. In addition, Contractor shall provide annual review and competency training of the infection control program for all site staff via Contractor University as well as onsite in-service training. Infectious disease education includes, but is not limited to blood-borne pathogens, air-borne pathogens, post-exposure management, proper hand washing technique, bio-hazardous waste handling, and MRSA. Contractor shall also provide patient education handouts that address MRSA, HIV/TIDS, and Hepatitis C for use in the facilities.

2.3.25.10.   SDSD staff shall document all vaccinations within the EHR as administration is completed. TechCare includes the capability to automatically submit vaccination administration to the California Immunization Registry (CAIRS) in addition to determining vaccination status of patients from CAIRS. Should SDSD not utilize that automation, or if alternative processes are required, SDSD staff shall manually complete such required reporting.

2.3.25.11.   As part of Contractor policy and procedure for Infection Control, delousing procedures shall be implemented in accordance with NCCHC standards. Patients entering the facility are examined and treated, if indicated, for ectoparasites to prevent possible institutional infestation.

2.3.26.   Continuous Quality Improvement (CQI) Program

2.3.26.1.   Contractor shall implement and manage a Continuous Quality Improvement (CQI) program in collaboration with the SDSD. Contractor shall, at a minimum, establish and maintain a CQI department which monitors provider performance metrics, clinical efficiency evaluations and provides ongoing monitoring of administrative and health care delivery programs in the facility. A committee shall be established that meets to discuss various topics related to the improvement of care delivery. This committee shall meet monthly and the SDSD Chief Medical Officer shall be the chairperson of the committee. Additional SDSD staff shall be part of this committee including but not limited to the SDSD Director of Mental Health and SDSD Director of Nursing. The Contractor shall at a minimum make their On-site Medical Director and mental health representative part of this committee. Findings from this committee shall be reported to SDSD management following each meeting. This committee shall meet all compliance indicators of NCCHC standards.

2.3.26.2.   Components of Contractor's CQI Program shall include the following:

2.3.26.2.1.   Credentialing and reappointment of healthcare staff,
2.3.26.2.2.   Peer review,
2.3.26.2.3.   Utilization management review,
2.3.26.2.4.   Health record review,
2.3.26.2.5.   Patient satisfaction surveys,
2.3.26.2.6.   Risk management activities,


EXHIBIT B

Case 3:25-cv-00410-W-MMP   Document 20   Filed 09/18/25   PageID.362   Page 123
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.26.2.7.    Mortality review, and
2.3.26.2.8.    Staff development.


2.3.26.3.    Contractor shall be responsible for conducting chart reviews of all licensed/credentialed providers on a semi-annual basis (every 6 months). Each provider will have a quantity (fixed amount or percentage to be discussed) of charts evaluated by the contracted clinical medical director. Results/findings to be discussed and shared with SDSD in a protected forum.

2.3.26.4.    Contractor shall institute a Medical Audit Committee (MAC). The committee includes a multidisciplinary team to incorporate medicine, nursing, dental, mental health, substance abuse, and facility administration, as well as any other client designated representatives. The committee shall be chaired by Contractor's designee. SDSD committee members shall include SDSD CMO, Director of Nursing, Mental Health Director, Chief Mental Health Clinicians, and facility supervising registered nurses. Contractor shall keep meeting minutes and distribute them with an agenda prior to all meetings. Minutes and copies of reports reviewed shall be submitted to all committee members. The quality improvement committee shall evaluate patient complaints and grievances. The Onsite Medical Director shall attend the MAC meeting monthly.

2.3.26.5.    Contractor shall coordinate with SDSD representatives to include sworn facility administration to meet monthly to conduct MAC meetings. Reports shall be tailored to include all information requested by the administration. To ensure contract compliance and the quality of healthcare provided in the facilities, these joint meetings shall be held to monitor performance and make recommendations for improvement. Chaired by Contractor's Program Manager, the meeting shall foster open communication and cooperative efforts between SDSD personnel and our personnel. Contractor's Program Manager shall review trends and internal findings with the appropriate jail leadership. Contractor personnel shall conduct quarterly medical audits to include:


2.3.26.5.1.    Chart Reviews
2.3.26.5.2.    Occurrence Screens
2.3.26.5.3.    Indicator-Driven Reviews
2.3.26.5.4.    Drug Usage Evaluations
2.3.26.5.5.    Morbidity and Mortality Reviews


2.3.26.6.    Ongoing Quality Assurance activities shall focus on the following goals: 2.3.26.6.1.


    Monitoring utilization, resource consumption and clinical practice patterns.
2.3.26.6.2.    Ensuring appropriate admissions to internal or external skilled nursing facilities, including community hospitals, with adequate justification for length of stay.
2.3.26.6.3.    Ensuring the timely collection and reposting of accurate information for clinical and financial decision making.
2.3.26.6.4.    Implementing discharge-planning efforts to streamline hospitalizations.
2.3.26.6.5.    Identifying high-risk patients.
2.3.26.6.6.    Providing quality care; and
2.3.26.6.7.    Recommending quality issues that may be appropriate for clinical updates, policy and/or procedure change.


2.3.26.7.    The CQI Program shall be comprised of the following reviews and studies:

2.3.26.7.1.   Independent Review: The evaluation of a healthcare professional's compliance with discipline- specific and community standards, including an analysis of trends in a practitioner's clinical practice.

2.3.26.7.2.   Peer Review: A process wherein, at set intervals or by special requests, the medical practices and management of a given practitioner are reviewed by another practitioner at the same or higher level. The clinical performance of the facility's primary care providers is reviewed annually. The On-site Medical Director shall provide oversight and quality chart checks every six months.

2.3.26.7.3.   Process Quality Improvement Study: Examines the efficiency of the healthcare delivery process. Primary focus of a study may be on "high-volume," "high-risk," or "problem-prone" services of care. One example of an annual process study that Contractor performs is the process of documentation on the electronic medication administration record (eMAR) in TechCare. The expected process is for the nurse to enter documentation on the eMAR for every scheduled medication administration (without exception).

2.3.26.7.4.   Outcome Quality Improvement Study: Examines whether expected outcomes of patients' healthcare were achieved. Primary focus of a study may be on "high-volume," "high-risk," or "problem-prone" services of care. For example, Contractor is currently conducting outcome studies regarding our patients with diabetes to track the positive effect of mandated interventions on blood sugar values.

2.3.26.8.   Pharmacists shall perform a comprehensive medication review to identify, resolve, and prevent medication-related problems, including adverse drug events.

2.3.26.9.   Duplicate Therapy Avoidance: Contractor pharmacy staff shall be trained to promptly report unanticipated problems involving risk to patients. Pharmacists shall identify possible duplicate therapy orders and prevent prescribing medications of the same class for those patients.

2.3.26.10.   Dosing Recommendations: Contractor pharmacists shall provide dosing recommendations and medication information to ensure that patients' medications are given effective doses that are appropriate for the patient and the condition being treated, in order to prevent doses that are not therapeutic or may be toxic to the patient.

2.3.26.11.   Drug Interaction Avoidance: Through its prescription profiling activities, Contractor shall identify potentially severe or life-threatening reactions that could result from the actions of some medications when used together. Upon identification of possible adverse effects, the pharmacy staff shall notify the site staff within 24-hours.

2.3.26.12.   Continuous Monitoring of Medicated Patients: Through its CQI system, Contractor shall monitor patients' blood-pressures during drug administration.  Contractor shall notify providers of all patients with elevated blood pressure or blood glucose readings, and ensure appropriate clinical action is taken. The pharmacy shall alert the onsite medical staff when immediate action needs to be taken to proactively promote patient safety of individuals that are being closely monitored through Contractor's medical records system.

2.3.26.13.   Identification of Chronic Care Patients: Using TechCare, the pharmacy staff shall analyze profiles with chronic care medications, identify chronic care patients who may not have been identified yet, and update the patient medical record, in order to ensure that patients are receiving adequate chronic care. Additionally, if a patient has been incarcerated for more than 30 days and has been receiving a chronic care medication but has not been flagged as a chronic care patient in the

Case 3:25-cv-00410-W-MMP    Document 20    Filed 08/18/25    PageID.364    Page 125
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NaphCare, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

medical record system, the pharmacy shall send out a second request for the patient to be re-assessed.

## 2.3.27. Peer Review

2.3.27.1.    Contractor shall ensure quality performance through a peer review process, random chart checks, and the utilization of the Focused Professional Practice Evaluation (FPPE) and the Ongoing Professional Practice Evaluation (OPPE).

2.3.27.2.    Contractor's procedures for Clinical Performance Reviews (Peer Reviews) shall comply with NCCHC Standards. The clinical performance enhancement process shall evaluate the appropriateness of the services provided by the facilities' contracted direct health care providers as defined in the Glossary, Section 4. The following provides a thorough description of Contractor's clinical performance reviews (also known as peer reviews), which are performed on required staff at least annually. Initial peer reviews on new staff occur within one year of their start date and no sooner than six (6) months from their date of hire. County employee peer reviews shall be conducted by designated county supervision.

2.3.27.3.    Clinical performance enhancement reviews are performed in the form of peer reviews and should include the name of the staff member being reviewed, the name and credentials of the reviewer, confirmation that the review was shared with the reviewed staff member, and a summary of the findings and corrective action, if necessary.

2.3.27.4.    All documentation regarding peer review activities is confidential and should be stamped "Peer Review" and filed in a secure place.

2.3.27.5.    A peer review log shall be maintained by the Program Manager and shall include the name of the individual being reviewed with credentials; the date of the last peer review; the initials and credentials of the person performing the review; and if a Corrective Action Plan (CAP) is required, the date that the CAP was done and when the CAP was completed.

2.3.27.6.    Reviews shall be documented on appropriate peer review forms, copies of which shall be held at the corporate office. The reviews shall determine compliance in areas such as:

2.3.27.6.1.    Completeness of necessary documentation.
2.3.27.6.2.    Appropriateness and thoroughness in addressing the health complaint.
2.3.27.6.3.    Documentation and appropriateness of the physical findings.
2.3.27.6.4.    Laboratory and diagnostic data and thoroughness of the care plan which should address all abnormal findings.
2.3.27.6.5.    Documentation of the need for consultations or other referrals to a higher level of care, where applicable.

## 2.3.28. Provider Competency and Compliance

2.3.28.1.    Contractor will be responsible for conducting clinical evaluations, providing oversight and review over subcontracted staff and providers, and will ensure the appropriateness of medical care. Contractor shall ensure medical treatments provided are commensurate with the community standard of care.  Contractor in collaboration with the SDSD CMO shall implement procedures aimed to improve the health care provider's competence, when necessary.

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.28.2.   Contractor shall work in collaboration with the SDSD to develop and implement key metrics and performance indicators. These key metrics and performance indicators shall include all health care related items required by this statement of work. Examples include but are not limited to:

2.3.28.2.1.    Timeliness of care
2.3.28.2.2.    Triage response time
2.3.28.2.3.    Specialty referral response time
2.3.28.2.4.    Chronic care management
2.3.28.2.5.    Preventative care
2.3.28.2.6.    Grievance types and response types
2.3.28.2.7.    Suicide and self-harm
2.3.28.2.8.    Behavioral health
2.3.28.2.9.    ED send outs
2.3.28.2.10.   Medication errors
2.3.28.2.11.   Infectious disease
2.3.28.2.12.   Health care compliance

2.3.28.3.   Contractor shall provide means of verifying/ensuring health services provider's competency and ongoing compliance with established policy and procedure in keeping with community standards. This shall include hands on and knowledge-based competency testing.

2.3.29.   Key Metrics and Performance Indicators

2.3.29.1.   Contractor shall monitor and meet all the areas of performance as set forth by the SDSD. Contractor shall ensure compliance at all SDSD detention facilities through the following:

2.3.29.1.1.    TechCare
2.3.29.1.2.    Policies and Procedures
2.3.29.1.3.    Quality Assurance Studies
2.3.29.1.4.    Contract Compliance Reports. This monthly report consists of the following data:
2.3.29.1.5.    Completed reception screens.
2.3.29.1.6.    Health assessments.
2.3.29.1.7.    Sick calls.
2.3.29.1.8.    TB tests.
2.3.29.1.9.    Yearly evaluations.
2.3.29.1.10.   Chronic care clinics.
2.3.29.1.11.   Off-site referrals.
2.3.29.1.12.   Pharmacy report.
2.3.29.1.13.   Lab reports.
2.3.29.1.14.   Diagnostic reports.
2.3.29.1.15.   Suicide watch.
2.3.29.1.16.   Medical Unit care.
2.3.29.1.17.   Detoxification numbers; and
2.3.29.1.18.   Other data requested by the SDSD.

2.3.29.2.   The Contract Monitor shall have access to offsite referral data, files, and data during the term of the agreement to monitor contract compliance. This data shall be readily available in a web-

accessible format, in which patient healthcare information can be viewed instantly. The Contract Monitor shall be notified of all patients who are receiving off-site care. TechCare captures all patient data, which allows reports to be modified should the SDSD's criteria change. Contractor shall submit statistical daily reports pertaining to medical services rendered, and a monthly contract compliance report to the Contract Monitor, to assist management with the efficient and direct correlation of contract compliance indicators.

2.3.29.3.   Standard management reports are a defined record of the status of workload, productivity, and patient activity in each facility. Contractor software implementation team shall work to configure these daily reports to meet the needs of the County. These reports can be viewed on a report dashboard within TechCare and/or sent securely to the management team via email on a scheduled basis. By default, the standard management reports shall contain the following details:

2.3.29.3.1.   Active patient counts
2.3.29.3.2.   Intakes completed
2.3.29.3.3.   Quantity and percentage of patients receiving care/medications for certain diagnosis
2.3.29.3.4.   Visits/Sick Call appointments/Chronic Care for Medical/Mental Health and Dental Care
2.3.29.3.5.   Scheduled by specialty and level of care (Provider, Nurse, etc.)
2.3.29.3.6.   Completed by specialty and level of care (Provider, Nurse, etc.)
2.3.29.3.7.   Medications
2.3.29.3.8.   Quantity ordered by category
2.3.29.3.9.   Quantity administered by category
2.3.29.3.10.   Quantity of missed or refused medications
2.3.29.3.11.   Quantity of non-formulary orders (approved and not approved)
2.3.29.3.12.   Diagnostic Labs/Radiology
2.3.29.3.13.   Quantity ordered/received/reviewed
2.3.29.3.14.   Quantity of non-formulary orders (approved and not approved)
2.3.29.3.15.   Quantity abnormal results
2.3.29.3.16.   Offsite/Hospitalization
2.3.29.3.17.   Quantity of patients hospitalized
2.3.29.3.18.   Offsite appointments scheduled for the day/town trips
2.3.29.3.19.   Patients sent to Emergency Room
2.3.29.3.20.   Observation/Medical Housing/Mental Health Housing
2.3.29.3.21.   Quantity of patients admitted/discharged to medical unit or observation
2.3.29.3.22.   Quantity of patients admitted/discharged to medical or mental health housing
2.3.29.3.23.   Average length of stay calculated by medical/mental health housing unit
2.3.29.3.24.   Productivity reports by facility, user, and user role.

2.3.29.4.   The information gathered and stored as part of these daily management reports shall be aggregated to form monthly, quarterly, and annual reports that clearly show trends and drive decision making.

2.3.29.5.   Statistical Daily Reports pertaining to medical services rendered are submitted to Administration, and a monthly healthcare compliance report to the Contract Monitor, administrators, and/or their designees, to assist management with the efficient and direct correlation of contract compliance indicators, including:

2.3.29.5.1.   Completed intake screens
2.3.29.5.2.   Sick calls
2.3.29.5.3.   TB tests
2.3.29.5.4.   Chronic care clinics

Case 3:25-cv-00410-W-MMP Document 20 Filed 09/18/25 PageID.367 Page 128
of 207
COUNTY CONTRACT NUMBER/568127
AGREEMENT WITH NaphCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

| | |
|---|---|
| 2.3.29.5.5. | Off-site referrals |
| 2.3.29.5.6. | Pharmacy report |
| 2.3.29.5.7. | Lab reports |
| 2.3.29.5.8. | Diagnostic reports |
| 2.3.29.5.9. | Suicide watch |
| 2.3.29.5.10. | Medical Unit care |
| 2.3.29.5.11. | Detoxification numbers |
| 2.3.29.5.12. | Other data requested by the facility |

2.3.29.6. Contractor shall provide full availability of information to all interested parties. The Contractor will utilize their chosen technical aid (TechCare EHR) to generate reports to address both operational and administrative concerns. The Contractor will directly contact the selected county representative for urgent operational concerns. Examples to include, but are not limited to:

| | |
|---|---|
| 2.3.29.6.1. | Missed medical and mental health screenings based on the population every 24 hours. |
| 2.3.29.6.2. | Abnormal blood pressure and blood glucose readings. Warnings are sent to the charge nurse for follow-up. |
| 2.3.29.6.3. | Medication exceptions are sent to the charge nurse for follow-up. |
| 2.3.29.6.4. | Changes in clinical presentation – patients with chronic care disease |
| 2.3.29.6.5. | Missing TB CXR or TST |

2.3.29.7. The Contractor will use TechCare to create automated reports and will coordinate with the QA/QI representatives and committee for administrative concerns. Examples to include, but are not limited to:

| | |
|---|---|
| 2.3.29.7.1. | Sick Call trends and issues, and timely completion of sick calls |
| 2.3.29.7.2. | Evaluation of ER send outs/hospital visits |
| 2.3.29.7.3. | Evaluation of the other statistical daily reports (SDR) |

2.3.29.8. Contractor shall coordinate with local hospitals, medical centers, and other on-site/residential community facilities to provide regular individualized updates on patient care and treatment. Examples to include, but are not limited to:

| | |
|---|---|
| 2.3.29.8.1. | Daily Hospitalization Report—including reason for admission and length of stay. |
| 2.3.29.8.2. | Regular progress notes for hospitalized patients |
| 2.3.29.8.3. | Detailed Monthly Utilization Report—including detailed time frames for each process of the review. |
| 2.3.29.8.4. | Inpatient and Outpatient Statistical Report—by service and location. |
| 2.3.29.8.5. | Specialty Services—consults, procedures, and diagnostic services. |
| 2.3.29.8.6. | ER Trips—by service and location. |
| 2.3.29.8.7. | Utilization Review—by disease classification. |

2.3.29.9. The SDSD can build reports within TechCare without having to contact Contractor separately. Contractor shall connect facility administrators with the medical team through TechCare, which provides full transparency and keeps SDSD informed of services throughout the detention facilities.

2.3.30. Onsite Medication Administration and Pharmaceutical Operations

2.3.30.1. Contractor shall develop and implement procedures for on-site medication administration and the management of comprehensive pharmaceutical operations. Contractor pharmaceutical operations shall include but are not limited to:

2.3.30.1.1. Immediate access to prescription medications for incarcerated individuals in SDSD custody from floor stock (non-patient specific) formulary medications, as well as provide timely filling (within 72 hours) of patient specific medications. The contractor will provide solid patient specific medications in blister pack packaging. The contractor will provide liquid, intravenous and injectable medications that include the necessary fluids and equipment for intravenous therapy.

2.3.30.1.2. Provide Twenty-four (24) hours seven days a week consultative services by a licensed pharmacist by phone.

2.3.30.1.3. Maintain accurate documentation and reporting pursuant to all current and new regulations pertaining to handling of all pharmaceuticals e.g., procurement, dispensing, packaging/repackaging, return/disposals, chain of custody as well as the operational deployment(prescribing/ordering/administering) of medications/pharmaceuticals.

2.3.30.2. Contractor will provide all necessary equipment, supplies, medication, and labor toward fulfillment of the services, pharmaceuticals, and other durable medical goods requirements.

2.3.30.3. Contractor will collaborate with SDSD Chief Medical Officer (CMO) for program design. Contractor's On-site Medical Director and corporate Chief Pharmacist shall be specific points of contact and coordination between Contractor and the SDSD CMO for program design of pharmaceutical operations.

2.3.30.4. SDSD will conduct daily medication inventory to include stock, controlled and medication carts.

2.3.30.5. Nursing staff will perform medication distribution functions at all sites in accordance with approved distribution schedules (e.g., 0800 hours and 2000 hours for BID dosing) or as otherwise prescribed by a licensed, credentialed health care provider. Distribution shall be conducted by SDSD Staff.

2.3.30.6. Contractor and SDSD will provide for accurate documentation and reporting pursuant to all current and new regulations pertaining to handling of all controlled substances and pharmaceuticals associated with the treatment/management of substance use disorders (e.g., MAT). Contractor shall be responsible for the procurement, dispensing, packaging/repackaging, turn/disposals, licensing, and the chain of custody associated with these products.

2.3.30.7. Contractor and SDSD shall develop and adhere to protocols for bridging medications (providing means of transitioning from stock medications to patient specific medications).

2.3.30.8. Continuity of care services - vendor shall demonstrate a means of identifying/verifying and restarting patient specific community prescribed medications through the use of SureScripts, CURES, San Diego Health Connect (or subsequent replacement) or through other means. Validated medications need to be restarted within 12 hours unless the use of specialized

pharmacies is required. Any delay in starting medications should be due to the validation process, not identifying/routing the request to a provider.

2.3.30.9.    Self-Administration and Keep-On-Person (KOP) Medication Services: Contractor shall collaborate with SDSD CMO with establishing and maintaining a self-dosed KOP medication program for all incarcerated individuals at all facilities who meet the criteria.

2.3.30.10.   All patients are eligible for participation in KOP Medication Services, except the following:

    2.3.30.10.1.    Any patient identified as ineligible by the health care staff for reasons including, but not limited to, non-adherence despite counseling; hoarding medication; exchanging medications with another patient; possession of an expired medication; possession of another patient's medication; abuse of self-administration guidelines; or any other reason which would interfere with the self-administration of medication or compliance with treatment plans.

    2.3.30.10.2.    Patients who have chronic or episodic symptoms of psychosis, significant and/or ongoing behavior patterns of self-injury, serious mood disorders, or impulse disorders affecting judgment.

    2.3.30.10.3.    Infirmary level care patients; and

    2.3.30.10.4.    Patients in segregation who are assessed to be at risk for self-injury.

2.3.30.11.   Stable patients receiving mental health treatment may self-administer non-psychotropic medication only with the documented order/consent of the treating mental health provider and approval of the On-site Medical Director if the mental health provider is not a Contractor employee.

2.3.30.12.   Documentation of the mental health provider's consent to self-administration of medications shall be listed on the patient problem list, along with the rationale explained in a progress note or mental health chart form.

2.3.30.13.   If applicable to the facility, the appropriate flag shall be assigned allowing or disallowing participation in the KOP Program. If no flag is available, then a treatment order shall be placed on the eMAR.

2.3.30.14.   The decision to allow self-administration of medication shall immediately be reversed should the patient become self-injurious. If the decision is reversed, "not Eligible for SAM (self-administered medication)/KOP program" shall be entered on the problem list. Appropriate flag and/or treatment order should be added/removed.

2.3.30.15.   Medications excluded from the self-administration program include, but are not limited to, the following:

    2.3.30.15.1.    Psychotropic medications (regardless of whether prescribed for mental or physical health reason(s).

    2.3.30.15.2.    Controlled substances.

    2.3.30.15.3.    Liquid and injectable medications.

    2.3.30.15.4.    Anti-retroviral medications.

    2.3.30.15.5.    INH and other tuberculosis medications.

    2.3.30.15.6.    Any situation where the On-site Medical Director or public health authority believes that directly observed therapy (DOT) is warranted; and

EXHIBIT B

Case 3:25-cv-00410-W-MMP   Document 20   Filed 08/18/25   PageID.370   Page 131 of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NaphCare, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.30.15.7.   Any other medication identified as causing potential harm or abuse within the individual facility as determined by the On-site Medical Director.

2.3.30.16.   All patients who are given self-administered medication must be asked to read and sign the Informed Consent-KOP form found in TechCare and on Contractor online under informed Consent-KOP. All paper consents shall be scanned into the health record. A copy of the consent shall be given to the patient to keep with the medication to show security if the need arises.

2.3.30.17.   All medications for self-administration shall be blister packaged except for some medications where blister packaging is determined by Sheriff to be unnecessary, such as nitroglycerin and medication received from a local approved source (i.e., health department). Efforts shall be made to have these medications blister packed if possible.

2.3.30.18.   All inhalers, ophthalmic or optic preparations, topical creams, ointments, soaps, etc. shall be dispensed in their original container with proper labeling for self-administration.

2.3.30.19.   Patients may request a refill of medication when current package is within five days of completion. The patient may possess up to a thirty-day supply of each medication in addition to the remaining five days' supply in the previous packages. After the patient receives the refill, and the remaining five-day supply is finished, the empty package shall be returned. If the remaining medication is for greater than five days, the patient shall be instructed to complete the medication and then exchange the package for the refill.

2.3.30.20.   Nursing staff shall review medication refill requests and determine whether the medication is a chronically administered medication (i.e., Hypertension) and shall consult with an advanced clinical provider regarding the renewal order.

2.3.30.21.   If the medication refill request is clearly not one to be renewed the request shall be returned to the patient with instruction to return to sick call to discuss medication renewal.

2.3.30.22.   SAM/KOP medications shall be provided during regular medication pass times. Medical staff shall sign the eMAR indicating that the medication has been provided.

2.3.30.23.   Medical staff shall determine whether the patient is segregated or has been released or transferred. Any KOP medication not picked up within three days shall be returned to the medication room and properly disposed of following mutually agreed upon policies and procedures.

2.3.30.24.   Contractor shall conform to applicable state and federal regulations regarding prescribing, dispensing, administering, procuring, and disposing of pharmaceuticals.

2.3.30.25.   Contractor's pharmacy management policies and procedures shall ensure the following:

2.3.30.25.1.   Efficient, accurate pharmaceutical ordering – ensures adequate and appropriate supplies & minimal use of emergency ordering.
2.3.30.25.2.   Storage & security of drugs, syringes, needles, dispensing instruments, & instruments.
2.3.30.25.3.   Close monitoring of drug prescribing patterns.
2.3.30.25.4.   Maintenance of patient profiles at the pharmacy with drug allergies & drug interaction alerts noted.
2.3.30.25.5.   Control inventory.
2.3.30.25.6.   Renew prescriptions to avoid any interruption or delay in drug dispensing.

Case 3:25-cv-00410-W-MMP    Document 20    Filed 08/18/25    PageID.371    Page 132
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.30.25.7.  Develop and utilize quality improvement tools to monitor psychotropic drug usage and poly-pharmacy issues.

2.3.30.25.8.  All prescriptions shall be labeled in accordance with applicable state and federal regulations. Contractor shall provide for electronic submission and prescriptions tracking.

2.3.30.25.9.  Routine reporting of current prescriptions that shall expire within five days, unless the prescription was specified as a one-time prescription, and

2.3.30.25.10.  Proper disposal of all unused drugs.

2.3.30.26.  Contractor pharmacists shall provide a thorough clinical review of drug orders as new prescriptions are electronically sent to the Contractor Pharmacy.

2.3.30.27.  Contractor will verify real-time prescriptions for safe dosage, allergies, specified length of time, need for drug, and duplications.

2.3.30.28.  Clinical Pharmacist Quality Assurance Management Process: Contractor shall provide clinical and administrative pharmacy support, to include all stated NCCHC standards and criteria for facility/site inspections.

2.3.30.29.  When incarcerated individuals first enter the detention facility, onsite Contractor staff shall identify any current or needed medications as part of the Receiving Screening. Medication orders are entered into the TechCare eMAR, ensuring that all medication activities are tracked.

2.3.30.30.  When the provider reviews and approves orders in the TechCare eMAR, the Pharmacy Quality Assurance Management Process shall begin. Contractor's pharmacists shall review all orders for accuracy. All activities that compose the Clinical Pharmacist Quality Assurance Management Process shall be completed within 24 hours of when the order is entered into TechCare Mondays through Friday and within 48 hours for orders entered into TechCare Saturday and Sunday.

2.3.30.31.  Contractor shall assign a dedicated pharmacy team to each facility. This team shall be available to assist with clinical questions, make medication recommendations, monitor psychiatric and chronic care medication compliance, and assist the on-site staff with any medication-related questions or requests.

2.3.30.32.  Contractor shall adhere to a comprehensive drug formulary allowing medical practitioners and psychiatrists to follow generally accepted clinical practice patterns in their medical management of incarcerated individual patients.

2.3.30.33.  A formulary of drugs shall be made available, inclusive of psychiatric drugs and drugs for the treatment of HIV.

2.3.30.34.  Records of non-formulary requests and responses shall be maintained for the term of the contract for trending and analysis purposes.

2.3.30.35.  Contractor shall actively participate and assist in maintaining and enforcing drug formulary, protocols, policies & procedures and shall work to manage the formulary to control costs and ensure effective clinical care. Clinical experts shall share information regarding the 'best practices' in formulary management techniques based on experience with clients and healthcare organizations.  Where non-formulary medications are requested, Contractor's pharmacy reviews the order to determine whether the non-formulary medication is justified. The pharmacy either approves the non-formulary medication or refers the order to a physician to discuss with the prescribing provider. Contractor typically approves non-formulary orders.

Case 3:25-cv-00410-W-MMP   Document 20   Filed 08/18/25   PageID.372   Page 133
of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.30.36.   Contractor and SDSD shall develop an efficient, structured medication pass process for the SDSD facilities that uses electronic medication administration record (eMAR) and complies with NCCHC standards. Medication Administration, including refusals, disbursement of KOP medications, and re-ordering medications shall be accomplished utilizing the eMAR.

2.3.30.37.   Contractor's eMAR is included within TechCare as part of Agreement 558056.

2.3.30.38.   Contractor and SDSD shall develop policies and procedures for provision of medications to patients leaving the jail facilities upon discharge for continuity of care, and Contractor will provide discharge medications accordingly. Contractor will provide discharge medications at its costs up to a total annual cost of $108,000 per year. Any cost of discharge medications in excess of this cost will be billed back to the County at Contractor's cost without addition of markup or fees.

## 2.3.31.  Diagnostic Services

2.3.31.1.   Contractor shall provide and utilize diagnostic services when clinically indicated and ordered by a provider. This shall include the provision of all necessary onsite and off-site diagnostic services for patient care and make provisions for the interpretation and support of imaging studies and lab support. This will include staff training for Point of Care Testing (POCT) as defined in the Glossary, Section 4.

2.3.31.2.   Contractor shall ensure each SDSD facility operates in accordance with the California Department of Health, Division of Radiation Safety and Environmental Management (DRSEM). This includes all regulatory requirements as it pertains to the following:

2.3.31.2.1.   Radiation Safety: Develop, document, and implement a radiation protection program with the use of X-ray machines to ensure compliance with regulations.

2.3.31.2.2.   Inspections/Audits: Maintain documentation of required physicist testing and calibrations of each X-ray producing unit.

2.3.31.2.3.   Licensure: Submit required applications to possess radiation producing equipment, such as X-ray machines.

2.3.31.2.4.   Quality Control/Assurance Management: Maintain documentation required daily testing of each Radiation producing equipment.

2.3.31.3.   The following details the workflow process within TechCare, the Picture Archiving Communication System (PACS), and the Contractor Portal to achieve the full life cycle of an image diagnostic and result:

2.3.31.3.1.   Order Placement: Like the laboratory diagnostic order process followed by the County, Contractor shall update the TechCare application to better manage the initial order of radiology and ultrasound studies.

2.3.31.3.2.   Order Management: All image diagnostic orders shall be managed on this dashboard which shall allow for action to be taken on the status of the order such as approving orders placed by a non-provider. This workflow can be customized to the County's process.



Case 3:25-cv-00410-W-MMP   Document 20   Filed 08/18/25   PageID.373   Page 134 of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.31.3.3.　　Schedule: Approved orders shall be automatically sent to the PACS system including scheduling details, modalities, and other details pertinent to the study.

2.3.31.3.4.　　Acquisition: County staff shall use PACS to manage the acquisition of studies and to store the images.

2.3.31.3.5.　　Update: PACS shall inform the TechCare system when studies have been acquired and shall allow for automated alerting and reporting of the radiology staff.

2.3.31.3.6.　　Read: Using the Contractor Secure Portal, radiology staff shall review the studies and provide results in the PACS system.

2.3.31.3.7.　　Results: Results shall be automatically sent to TechCare from PACS and stored directly in the patients' chart and the provider dashboard for review and sign-off following the County's workflow.

2.3.31.4.　　To accomplish the above workflow, Contractor has implemented an interface between PACS and TechCare.

2.3.31.5.　　As a part of included services for the interface and workflow described, Contractor shall provide the following additional items:

2.3.31.6.　　Real-time, 24/7 Monitored Interface – Contractor shall proactively monitor the interface between TechCare and the PACS system and address issues before they impact care.

2.3.31.7.　　Single Point of Contact – As the maintainer of the TechCare system, Contractor shall be the single point of contact for all items related to the provision of radiology services. Contractor shall work directly with PACS should the need arise.

2.3.31.8.　　TechCare Upgrade – The contractor shall provide necessary system upgrades to the TechCare EHR system as it relates to Radiology Services and image diagnostic management within TechCare. This module shall be customized for the County without additional cost and shall be a part of ongoing services. This includes:

2.3.31.8.1.　　Smart Approval Dashboard
2.3.31.8.2.　　Direct discussion/alerts with ordering provider
2.3.31.8.3.　　Simple view of full audit trail
2.3.31.8.4.　　Efficient Review Process

2.3.31.9.　　Contractor's laboratory services will be provided by Quest Laboratories or a similar vendor to provide offsite routine and STAT diagnostic labs.

2.3.31.10.　　Contractor shall procure and provide the facilities with access to point of care testing. County and/or contracted staff will provide the function for the following:

2.3.31.10.1.　　COVID Antigen Testing (when availability allows)
2.3.31.10.2.　　Pregnancy
2.3.31.10.3.　　Drug Testing
2.3.31.10.4.　　Fentanyl Testing
2.3.31.10.5.　　PT/INR Testing
2.3.31.10.6.　　Hemoglobin (Hgb)Testing
2.3.31.10.7.　　Blood Glucose Testing
2.3.31.10.8.　　Hgb A1C Testing
2.3.31.10.9.　　Urine Dip Testing


EXHIBIT B

Case 3:25-cv-00410-W-MMP    Document 20    Filed 09/18/25    PageID.374    Page 135 of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.32.  Vaccinations and Immunization Program

2.3.32.1.    Contractor shall implement and provide an immunization program. Vaccinations shall be offered and provided as clinically indicated in compliance with the Center for Disease Control (CDC) immunization schedule guidelines. SDSD infection control nurse is responsible for this program currently.

2.3.32.2.    Contractor shall coordinate with the SDSD infection control staff and other county public health entities as needed or required (HHSA, PHL, epidemiology, etc.). The immunization program shall follow CDC guidelines and includes the following actions:

2.3.32.2.1.    Flu shots are administered seasonally, first to all high-risk individuals, then to the general population as the vaccine is available.
2.3.32.2.2.    Tetanus immunizations are updated with any injury as clinically indicated.
2.3.32.2.3.    Pneumococcal vaccinations are offered to high-risk patients after evaluation with a provider during chronic care clinics, as clinically indicated.
2.3.32.2.4.    All other vaccinations to include COVID vaccines shall be offered and discussed during the intake process. All others shall be offered and discussed as clinically appropriate during a clinical encounter or during their annual preventative visit with a provider. Contractor shall not be financially responsible for providing the COVID vaccine and/or booster.
2.3.32.2.5.    Immunization documentation shall take place in the patient's EHR in TechCare and in the San Diego Immunization Registry (SDIR).

2.3.32.3.    Any other vaccinations or immunization programs requested after the initial execution of contract shall be through an amendment process and costs will be negotiated between Contractor and SDSD.

2.3.33.  Health Care Clinics

2.3.33.1.    Contractor shall operate and manage onsite face-to-face health care clinics. This shall include SDSD nursing clinics and provider clinics.

2.3.33.2.    Contractor and SDSD shall implement site-specific sick call throughout the SDSD detention facilities. The daily sick call process shall meet the amended NCCHC 2018 standards, which require nursing face-to-face triage with the patient within 24 hours of receipt of a healthcare request.  Furthermore, the daily sick call process shall meet any subsequent amendment of NCCHC standards that may occur in the future.

2.3.33.3.    Contractor shall provide flexible and timely scheduling services, to allow for the triage of sick call services ensuring same day response to urgent patient requests for health care services.

2.3.33.4.    Nursing sick call is conducted seven days a week, and physician sick call is conducted according to a set schedule agreed upon by Contractor and the facility. If a patient's custody status precludes attendance at sick call, then onsite health staff shall consult with sworn staff to make access to healthcare services possible.



Case 3:25-cv-00410-W-MMP    Document 20    Filed 08/18/25    PageID.375    Page 136
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.34.  Vision Services Program

2.3.34.1.   Contractor shall implement a comprehensive vision services program. This shall include a comprehensive eye examination at the annual physical examination. Diagnostic and therapeutic plans for each problem area shall be developed and patient referred to specialty care services as clinically indicated.

2.3.34.2.   In the case of ophthalmological/ocular emergencies (lacerations, mechanical injuries, retinal detachment, chemical injury, or other trauma), Contractor shall refer the patient to ophthalmology, other physicians, or specialty services for care.

2.3.34.3.   Contractor's subcontracted provider is Institutional Eye Care (IEC) for the provision of prescription eyeglasses and onsite optometry services for the SDSD.  Contractor may elect in the future to utilize a different subcontractor or otherwise arrange for the provision of onsite optometry and prescription eyeglass services consistent with all applicable contract requirements.

2.3.35.  Radiology

2.3.35.1.   Contractor will provide on-site radiology services for incarcerated individuals in the custody of the SDSD consistent with the existing terms of Contract 563996, including continued use and maintenance of existing software interfaces.

2.3.35.2.   Contractor shall provide digital x-ray services at the designated detention facilities, cited in section 2.4, in accordance with x-ray clinic schedules.

2.3.35.3.   Additions and changes to the designated facilities may occur in the future and shall be provided to Contractor with advance 30-day notice. Additions and changes shall be at the sole discretion of the Sheriff's Department.

2.3.35.4.   Contractor shall provide coverage at pre-scheduled times and days at the designated facility. Additionally, Contractor shall have staffing available as replacement for unscheduled absences of regular staffing so as to not disrupt regularly scheduled facility x-ray clinics.

2.3.35.5.   Contractor's staff must be available for STAT requests on an as needed basis. STAT in this case means an x-ray exam that is required to be performed immediately (within 4 hours of requested time) as ordered by an attending physician.

2.3.35.6.   Contractor shall coordinate with medical staff that is responsible for scheduling the incarcerated individuals for examinations.

2.3.35.7.   Concurrent notification of all results shall be made to the Sheriff's Health Information Management Unit (HIM) staff and authorized medical staff to view all examination results, as well as download and print to CD or paper, the individual positive or negative results.

2.3.35.8.   Contractor shall administer and process x-ray exams on-site and transmit the images to an authorized diagnostic radiologist who will read the x-rays and provide diagnostic reports with the objective of obtaining a response within five minutes of examination. Reports and images shall be transmitted electronically via secured internet site for access by authorized medical staff.

2.3.35.9.   Workload and Schedule


EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NaphCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.35.9.1.    Contractor shall provide services on the schedules that are outlined in Section 2.3.35.9.3. Strict compliance to the published schedules is required.

2.3.35.9.2.    Contractor shall provide and maintain up-to-date Points of Contact information which includes a central phone number and designated staff name(s) that shall function as scheduler, coordinator, and trainer to respond to Sheriff's staff inquires during any equipment failure or any non-conformance to required clinic schedules. Response times in these cases shall be within the hour.

2.3.35.9.3.    Contractor shall provide radiology services based on the average number of exams (based on January 1, 2019, to December 31, 2019, average exams) administered in the table below and according to the schedule below:

| ON SITE DIGITAL X-RAY SERVICE CLINIC SCHEDULE (ALL TIMES IN 24-HOUR CLOCK) | | | | | | | |
|---|---|---|---|---|---|---|---|
| FAC | MON | TUE | WED | THU | FRI | SAT | SUN |
| SDCJ | 0800-1700 2000-0300 | 0800-1700 2000-0300 | 0800-1700 2000-0300 | 0800-1700 2000-0300 | 0800-1700 2000-0300 | 0800-1500 2000-0300 | 0800-1500 2000-0300 |
| VDF | 0800-1700 2000-0300 | 0800-1700 2000-0300 | 0800-1700 2000-0300 | 0800-1700 2000-0300 | 0800-1700 2000-0300 | 0800-1500 2000-0300 | 0800-1500 2000-0300 |
| LCDRF | 0800-1700 2000-0300 | 0800-1700 2000-0300 | 0800-1700 2000-0300 | 0800-1700 2000-0300 | 0800-1700 2000-0300 | 0800-1500 2000-0300 | 0800-1500 2000-0300 |
| GBDF | 0700-1200 | NONE | 0700-1200 | NONE | NONE | NONE | NONE |
| SBDF | NONE | NONE | NONE | 0700-1200 Every Other Thursday Only | NONE | NONE | NONE |

| Facility | Estimated Monthly Ave # of Exams |
|---|---|
| EMRF/FAC8 | Included with GBDF Estimate |
| GBDF | 139 |
| LCDRF | 633 |
| SBDF | 9 |
| SDCJ | 1745 |
| VDF | 842 |
| FORENSIC EXAMS | 334 |
| TOTAL ESTIMTED MONTHLY AVERAGE | 3,702 |

Notes:

SDCJ: San Diego Central Jail

VDF: Vista Detention Facility

LCDRF: Las Colinas Detention and Reentry Facility

GBDF: George Baily Detention Facility (included EMRF & FAC 8)

SBDF: South Bay Detention Facility


EXHIBIT B

Case 3:25-cv-00410-W-MMP   Document 20   Filed 09/18/25   PageID.377   Page 138
of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NaphCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

**SDCJ, LCDRF, and VDF are designated booking facilities. Schedules vary by facility.**

**STAT REQUESTS MAY BE REQUESTED AND SHALL BE PROVIDED WITHIN THE TIME FRAME SPECIFIED IN THE STATEMENT OF WORK (Contract Number 563996).**

*All X-Ray clinic schedules (includes weekends and holidays) are daily except when indicated. Schedules may only be changed as necessary and shall be at the sole discretion of the Sheriff's Department. Schedules for the three booking facilities (SDCJ, VDF, and LCDRF) are quite rigid and do not allow too much flexibility for changes and deviations.*

2.3.35.10.   Reports

2.3.35.10.1.   Contractor shall provide complete statistical reports monthly to the Contracting Officer's Representative ("COR") or his/her representative. Statistics shall include the number, type of all x-ray exams provided, including results (Positive/Negative), for each facility.

2.3.35.10.2.   A copy of this report shall also be attached to the monthly invoices sent to the Sheriff's Department and is subject to verification prior to payment.

2.3.35.10.3.   Contractor shall have in place a Quality Assurance (QA) review process which shall include measurement of accuracy of radiologist readings and must provide a QA written report to the Sheriff upon request.

2.3.35.10.4.   All radiology reports prepared and submitted by Contractor shall be subject to quality review by the Sheriff's Chief Medical Officer (CMO) or his designee. The Sheriff's CMO may at any time (at least on quarterly basis) request from the Contractor a quality review meeting to discuss and evaluate radiology reports previously submitted for accuracy.

2.3.35.10.5.   Dosimeter Reports shall be submitted to the COR or designated representative on a quarterly basis electronic means for all facilities. If an outside company has been delegated by the contractor to perform dosimeter readings, the Sheriff's COR must be notified of the company's information and results of dosimeter readings shall be furnished upon request at no cost.

2.3.35.10.6.   Contractor shall provide any other special reports pertaining to utilization/results upon request as required by the Sheriff at no additional cost to the County. This shall include individual request by Sheriff's medical staff and other parties (only as specifically authorized by the Sheriff) for retrieval of specific x-ray exam result(s) and digital image(s) downloaded onto CD/DVD or any other acceptable computer media.

2.3.35.11.   Maintenance of Files and Close-Out

2.3.35.11.1.   Contractor shall store and maintain within the State of California all radiographic records, both hardcopy and electronic, for a period of at least eight (8) years after the date of last radiographic examination performed under this contract and shall make these records available upon request.

2.3.35.11.2.   Contractor shall provide ready access to all archived reports and examination results to authorized medical staff via internet or downloaded files onto appropriate media (e.g. CD, DVD, flash drives) at no additional cost.

Case 3:25-cv-00410-W-MMP    Document 20    Filed 08/18/25    PageID.378    Page 139 of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.35.11.3.    On completion or termination of contract, Contractor shall return all records to the COR or his/her representative within ten (10) working days all material constituting or containing confidential information. Contractor shall not thereafter use, reproduce, or disclose such information to any third party.

2.3.35.12.    Additional Service Agreements

2.3.35.12.1.    Contractor shall administer digital x-rays of any body part on an incarcerated individual on an as needed basis upon request by authorized law enforcement staff from the Sheriff's Detention Investigation Unit (DIU) in connection with forensic investigations.

2.3.35.12.2.    The request for forensic x-ray exam shall be originated by staff for the Sheriff's DIU Unit. Forensic x-ray exams shall be performed during existing regularly scheduled x-ray clinics within the respective detention facility on an as needed basis.

2.3.35.12.3.    The forensic x-ray exam reports shall be identified as such in the monthly reports and invoice documentations.

2.3.36.  Patients with Disabilities and Americans with Disabilities Act (ADA) Requests

2.3.36.1.    Contractor shall implement a program that identifies and provides services for patients with disabilities as defined by the Americans with Disabilities Act (ADA). This would include processes for the administration, issuance and use of durable medical equipment.

2.3.36.2.    Contractor shall work closely with the County and its facilities to ensure patients protected under the ADA have access to medical services, programs, and activities and do not suffer discrimination related to their disability.

2.3.36.3.    Contractor understands that compliance with accrediting bodies such as NCCHC does not guarantee compliance with ADA requirements. Staff training programs, treatment guidelines, and policies and procedures shall address ADA requirements and incorporate them into the health services programs to ensure the needs of patients with disabilities are met and services under this Agreement comply with the ADA.

2.3.36.4.    Contractor shall communicate special needs patient issues and needs to the SDSD through participation in a Special Needs Committee, as part of routine multidisciplinary meetings, and any other agreed upon method of communication.

2.3.36.5.    Contractor shall ensure the MAT program developed for and with the SDSD fully meets any ADA requirements to provide substance use treatment to patients with an opioid use disorder as found by the courts in these decisions.

2.3.36.6.    Contractor shall be required to respond to all ADA requests from the California Department of Corrections and Rehabilitation and attorneys representing ADA complainants. Contractor shall respond to patient and family requests as necessary.

Case 3:25-cv-00410-W-MMP    Document 20    Filed 08/18/25    PageID.379    Page 140
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.36.7.    Contractor shall provide access to medical and mental health care 24 hours per day, seven (7) days per week at all facilities via on-site providers when necessary, STATCare, telemedicine, and on-call services. This shall include the use of SDSD staff.

2.3.36.8.    Contractor shall provide interpreting over the phone in more than 240 languages, as well as video remote interpreting for the deaf and hard of hearing.

## 2.3.37.  24/7 Access to Care

2.3.37.1.    Contractor shall provide 24 hour/seven days a week coverage by licensed and/or certified health care professionals at all detention facilities.  24 hour/seven days a week coverage by licensed and/or certified health care professionals will be required at EMRF and SBD once SDSD vacancies are filled for those facilities.

2.3.37.2.    Contractor personnel shall be in good standing and maintain unencumbered licenses, certifications and registrations required by the State of California to perform services.

## 2.3.38.  Coordination and Communication with SDSD Employees

2.3.38.1.    Contractor shall coordinate and communicate with designated SDSD employees to ensure cross-discipline collaboration, coordination, and integration of all requirements detailed in the Statement of Work. This shall include case planning, training, facility operations, and any other operationally significant activity. This shall also include coordination, communication, and collaboration with San Diego County Health and Human Services Agency as directed by the SDSD.

2.3.38.2.    Contractor shall identify personnel who shall work collaboratively with sworn personnel in implementing the plan of care safely, timely and consistent with security regulations described in SDSD policy. Contractor's staff shall coordinate closely and communicate regularly with facility administration and security. Contractor's staff shall participate in regular Multidisciplinary Collaboration Team (MCT) meetings that include sworn administration, classifications, housing officers, medical administration, mental health providers and staff, and infection control personnel.

2.3.38.3.    Contractor shall establish a daily communication protocol with SDSD administrative staff and coordinate closely with the administrative and sworn staff in the facilities regarding sick call, off-site appointments, medication distribution and other medical services.

2.3.38.4.    Contractor's onsite Program Manager shall serve as a point of contact for sworn personnel in coordinating services. The Program Manager shall coordinate with the SDSD on facility security workflows for clinical operations.

2.3.38.5.    Contractor shall work with the SDSD to establish a system of regular communication and collaboration. Examples include the following:

2.3.38.5.1.    Regularly scheduled overall Service Delivery Meetings with tangible metrics and clear follow-up action items.

2.3.38.5.2.    Recurring Domain-specific Meetings (i.e., Radiology, Mental Health, JBCT) aimed at areas of opportunity for advancement.

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.38.5.3.  Consultation and support to SDSD (i.e., NCCHC Preparation, PLO Auditing, etc.)

2.3.38.5.4.  Joint recruiting efforts and events to include nursing, medical care, mental health care, corrections, etc.

2.3.38.5.5.  Joint employee events with Contractor and the SDSD to build team unity and boost morale.

2.3.38.5.6.  Joint training opportunities and events (Contractor, sworn staff, Nursing, Mental Health Crisis).

2.3.38.6.  Contractor shall attend SDSD meetings when requested to understand goals, directives, and needs from the SDSD for consolidated healthcare services. Contractor shall participate in SDSD committees as requested.

2.3.38.7.  Likewise, Contractor shall ensure appropriate SDSD representation is requested for participation in required meetings and committees to include the following:

2.3.38.7.1.  CQI Committee

2.3.38.7.2.  Infection Control Committee

2.3.38.7.3.  Medical Audit Committee

2.3.38.7.4.  Morbidity and Mortality Committee

2.3.38.7.5.  Special Needs Committee

2.3.38.8.  Contractor's onsite program leadership shall serve as liaisons with SDSD to ensure coordination and communication across onsite services.

2.3.38.9.  Contractor's onsite leadership includes the following positions:

2.3.38.9.1.  Program Manager

2.3.38.9.2.  Medical Director

2.3.38.9.3.  Mental Health Director

2.3.39.  Unimpeded Access to Health Care

2.3.39.1.  Contractor shall provide health care to patients in a timely manner and with privacy while practicing within the scope of each employee's professional licensure, remaining in compliance with NCCHC Standard J-A-01, Access to Care.

2.3.39.2.  The Program Manager/designee shall notify the corporate office of any potential barriers to access of care.

2.3.39.3.  Contractor shall work with sworn staff to address any access to care issues, including centralizing patients undergoing withdrawal, to the extent possible.

2.3.40.  Responsibility for Costs Associated with Provision of Comprehensive Health Care

Case 3:25-cv-00410-W-MMP    Document 20    Filed 09/18/25    PageID.381    Page 142
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.40.1.    Contractor shall be responsible for all costs associated with the provision of comprehensive health care to individuals in the custody of San Diego Sheriff's Department except for the following:

2.3.40.1.1.    County shall be responsible for all costs associated with SDSD staff including, but not limited to, the costs of salary, benefits, and overtime.

2.3.40.1.2.    Contractor shall not be responsible for any costs incurred prior to booking of individuals into the SDSD facilities. Costs, prior to booking, will be assumed by the patient's insurance company or corresponding hospital who admitted patient.

2.3.40.1.3.    Should the annual cost of providing discharge medications exceed $108,000 per year, Contractor will bill back to the County any costs above $108,000 for reimbursement at Contractor's actual cost without any added markup or fees.

2.3.40.1.4.    County will reimburse Contractor for the cost of any COVID testing or COVID vaccinations or the cost of any additional testing or vaccinations required by the Health Department or the County.

2.3.40.1.5.    Contractor will not bear any financial responsibility for mental health offsite hospitalization including any costs incurred for mental health hospitalization at a State of California, Department of State Hospitals facility.

2.3.40.1.6.    Contractor will provide medical records for secure download electronically from the NaphCare cloud.

2.3.40.1.7.    Contractor will continue to bill SDSD for the Electronic Health Record System pursuant to the terms of Agreement 55806 and all amendments thereto, which will remain in full force and effect.

2.3.40.1.8.    Contractor will continue to bill the County for radiology services consistent with the terms of existing Contract No. 563996 and all amendments thereto, the terms of which are fully incorporated into this agreement, such that on the effective date of this Agreement, the existing Agreement No. 563996 will no longer be in effect and its relevant terms and conditions will be fully incorporated and reflected in this agreement as set forth below.

2.3.40.1.9.    Contractor will not be responsible for costs associated with the non-emergency transportation of incarcerated individuals. Contractor will not be financially responsible for transplants and/or experimental procedures. Contractor will be financially responsible for the maintenance of patients who have had transplants prior to custody. Contractor will not be financially responsible for the provision of elective medical care to incarcerated individuals. Contractor will not be responsible, financially or otherwise, for providing health care services to an infant following birth.

2.3.40.2.    Payment for the services performed under this Agreement shall be in accordance with Exhibit C, unless other payment methodologies are negotiated and agreed to by both Contractor and County. Contractor shall submit approved invoices monthly to the Contracting Officer's Representative ("COR") for work performed in the monthly period, accordingly. Contractor's monthly invoices shall be completed and submitted in accordance with written COR instruction.

Case 3:25-cv-00410-W-MMP   Document 20   Filed 08/18/25   PageID.382   Page 143 of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.40.3.   County agrees to pay Contractor in arrears only after receipt and approval by COR of properly submitted, detailed and itemized original invoice referencing the Agreement number pursuant to Exhibit C. Invoice will be based on the unit price for each line item as set forth in Exhibit C. Payment shall be NET 30 days from receipt and approval of invoice unless otherwise stated.

2.3.40.4.   Contractor shall be entitled only to compensation, benefits, reimbursements, or ancillary services specified in this Agreement. Payment shall be NET 30 days from receipt and approval of invoice unless otherwise stated.

2.3.41.   Financial Responsibility for Equipment or Facility Damage

2.3.41.1.   Contractor shall assume the responsibility for current SDSD equipment and supplies and become the sole comprehensive healthcare provider related to the delivery of healthcare services. This shall include information about procurement, maintenance, and replacement of health care equipment. Contractor shall not be financially responsible for the purchase of any equipment or supplies from the County.  Contractor will accept full financial responsibility for maintenance and repair of all County-owned equipment, and such equipment will continue to be the property of the County until such time as it is replaced. Contractor understands that all equipment utilized by the current medical, mental health and dental vendors is owned by the County.  Contractor understands that medication carts are currently owned by the County's current pharmacy vendor. Contractor will either purchase medication carts from the pharmacy vendor or purchase new carts. Contractor will accept full financial responsibility for purchase of any new equipment as needed to replace County-owned equipment that has reached the end of its useful life, and Contractor shall maintain ownership of any new equipment purchased at Contractor's expense. Contractor shall maintain an inventory of equipment and the ownership status of each item.  See Contractor's Cost/Price Exhibit, submitted under separate cover for details and line-item pricing.

2.3.42.   Quality, Cost-Effective Healthcare Services

2.3.42.1.   Contractor shall provide quality, cost effective health care services to all incarcerated individuals in custody of the SDSD as outlined in their Technical Exhibit, price narrative, and line-item pricing charts.

2.3.42.2.   Contractor shall work with SDSD management and staff to ensure all patients have access to health care for medical, dental, and mental health needs in a timely fashion to include treatment for opioid and other substance use disorders as clinically indicated.

2.3.43.   Operational Space Needs

2.3.43.1.   Contractor shall coordinate with the SDSD regarding operational space needs, availability, and limitations. The SDSD has final authority for space needs.

2.3.44.   Operational Changes


EXHIBIT B

2.3.44.1.  The SDSD reserves the right to change the current location, configuration, and population of incarcerated individuals at each facility utilized by SDSD. Should there be a significant change or modification to state or federal laws or regulations, incarcerated individuals census, standards of care, scope of services, or the number of correctional facilities, coverage of such changes are not included in Contractor's proposal will be mutually negotiated between parties.

2.3.45.  Responsibility and Maintenance for Equipment and Supplies

2.3.45.1.  Contractor shall be financially responsible for all equipment or facility damage caused by their employees, subcontractors, or volunteers.

2.3.45.2.  In accordance with NCCHC J-D-03, Contractor shall ensure that supplies, equipment, and space allocations are sufficient to deliver all health care. The SDSD health care clinic areas shall be equipped and maintained to allow adequate private examination of patients and appropriate space for patients waiting for healthcare services.

2.3.45.3.  The Program Manager or designee shall be responsible for establishing supply and equipment inventories, reordering supplies as necessary, arranging equipment repair, conducting monthly checks of health care areas, and conducting weekly monitoring of the major inventory of sharps and tools.

2.3.45.4.  The following equipment and supplies shall be available in each treatment area (at a minimum):

2.3.45.4.1.  Hand-washing facilities or an alternative means of hand sanitizer.
2.3.45.4.2.  Examination tables, including the ability and supplies to perform a pelvic exam if females are housed on-site.
2.3.45.4.3.  Examination light (goose neck).
2.3.45.4.4.  Scales.
2.3.45.4.5.  Thermometer (manual and/or electronic).
2.3.45.4.6.  Sphygmomanometer.
2.3.45.4.7.  Stethoscope.
2.3.45.4.8.  Ophthalmoscope.
2.3.45.4.9.  Otoscope.
2.3.45.4.10.  Wheelchair, cane, walker, crutches, stretcher, etc.
2.3.45.4.11.  Oxygen.
2.3.45.4.12.  Automated external defibrillator.
2.3.45.4.13.  Pulse oximeter.
2.3.45.4.14.  Transportation equipment (e.g., wheelchair, stretcher).
2.3.45.4.15.  Biohazard and non-biohazard trash containers; and,
2.3.45.4.16.  Personal protective equipment.
2.3.45.4.17.  Medical and nursing manuals shall be available at each facility to all staff.

2.3.45.5.  Contractor shall be responsible for equipment and supplies needed to provide the services outlined in this Statement of Work at all facilities. Computers, printers, copy machines, fax machines, or peripherals that connect to the SDSD network are EXCLUDED from this requirement. For infrastructure security reasons, these items shall be supplied by the SDSD.

2.3.45.6.  Contractor partners with Edge Biomed, a national biomedical service company, to perform annual maintenance and calibration of medical equipment at manufacturer recommended intervals. Contractor shall utilize EDGE Biomed to perform equipment inventory, and regularly scheduled

inspections and calibrations of all the medical equipment. In the event that Edge Biomed is unavailable, Contractor shall obtain a replacement company to perform inspections, maintenance, calibration, and inventory of medical equipment.

## 2.3.46.  Software Compatibility

2.3.46.1.  Contractor shall ensure all software is 100% compatible with all current generation releases of the Operating System, Security Software, and Standard Computer Images within 90 days after the public release of the Operating System, Security Software, and 90 days after the first release of any new Desktop Computer Image (including Operating System, Security Software and Standard Office Applications) produced by the SDSD Data Services Division for general release within the SDSD Infrastructure. SDSD data services has final authority regarding installation and use of software.

## 2.3.47.  Unexpected Situations and Critical Incidents

2.3.47.1.  Contractor shall implement procedures to deal with unexpected situations and/or critical incidents. Contractor shall immediately notify designated SDSD staff of any unusual or extraordinary health event at the SDSD facilities including but not limited to an incarcerated individual's death, serious injury that may lead to death, or other serious health condition that might impact Contractor's staff or SDSD incarcerated individual(s).

2.3.47.2.  Contractor shall have a reporting system in place for staff to report incidents, occurrences, and near misses in a non-punitive, non-judgmental manner. Contractor's Policy and Procedure shall outline requirements for the following:

2.3.47.2.1.  Incident Reporting – events such as staff, patient, or visitor injury, emergency patient transports
2.3.47.2.2.  Occurrence Reporting – includes sentinel events such as patient death, serious illness or injury, serious suicide attempts
2.3.47.2.3.  Medication Variance Reports – medication errors, adverse medication reactions

2.3.47.3.  Contractor shall provide parallel oversight and corporate committees that are actively involved in Patient Safety. Committee functions shall include:

2.3.47.3.1.  Morbidity and Mortality
2.3.47.3.2.  Infection Control
2.3.47.3.3.  Environmental Safety
2.3.47.3.4.  Continuous Quality Improvement
2.3.47.3.5.  Compliance

2.3.47.4.  All patient deaths shall require the performance of a thorough clinical mortality review.

2.3.47.5.  Contractor shall conduct a formal mortality review process at both the site and corporate level wherein all relevant clinical aspects and treatment are reviewed by the site and corporate committees. Contractor shall meet NCCHC standards in all mortality reviews; policy and

procedure for Patient Deaths has been developed and written in compliance with NCCHC Standard J-A-09, Procedure in the Event of an Incarcerated Individuals Death.

2.3.47.6.   Patient deaths that occur under unusual circumstances shall also be investigated in accordance with state and local regulations. Contractor shall ensure accurate information and timely reporting and investigation of any patient death that occurs within the detention facility as well as ascertain appropriateness of clinical care and identify any trends requiring further study.

2.3.47.7.   Contractor's Mortality Review process shall include a review of the incident and preceding treatment, a root cause analysis, review of relevant procedures and documentation, pertinent service reports, and recommendations for corrective action. The goal is to identify, evaluate, and improve the quality and efficiency of health care; ensure accurate and timely reporting; and reduce morbidity and mortality.

2.3.47.8.   Contractor shall complete a Clinical Mortality Review within 30 days of an incarcerated individual's death. The review shall provide a summary of the facts surrounding the patient's death to determine compliance with Contractor's standard of care and to identify any deficiencies, training, and/or policies that may have contributed to the patient death.

2.3.47.9.   Sentinel events shall be identified and reported from the site level to the corporate office as per the Patient Safety policy. Incident statements shall be received from all involved staff members as soon as possible and prior to the employee leaving the facility.

2.3.47.10.   At the corporate level, sentinel events shall be tracked and monitored for identifiable trends and are subject to Root Cause Analysis to determine what, if any, actions can be taken to prevent future occurrences. At the site level, these occurrences shall also be tracked and, in conjunction with the corporate group, analyzed for corrective action.

2.3.47.11.   In the event of a patient death, the medical record shall be closed. Any final documentation for the health record not in the file at the time of death must be placed in the record by the Program Manager, along with the date and time of placement and signature. The Program Manager is responsible for ensuring appropriate and complete documentation is entered into the health record as soon as possible after a patient death, ideally within 24 hours. This record shall then be locked by placing the "Inmate Death" flag. Once a record has been locked, no additional information can be entered into the record. The record cannot be unlocked at the site level once the flag has been set.

2.3.47.12.   The advanced clinical provider in the patient's overall treatment shall complete a "Death Summary – Physician" within seven business days of the death. The death summary shall review the clinical care received by the patient and make any suggestion for improvement in retrospect. The advanced clinical provider shall review the patient's medical record as well as any other documents during the review process. Once completed, the report shall be sent to the corporate office.

2.3.47.13.   Contractor shall perform a systems-based "Root Cause Analysis" review, through which a thorough analysis attempts to identify fundamental problems that led to the immediate issue. The goal for critical incident analysis is to solve problems before they escalate and prevent future problems through promotion of a risk avoidance attitude among the healthcare staff.

2.3.47.14.   In the event of a patient death, the first responsibility of site staff is to cooperate with and notify appropriate authorities, including jail command staff and the Medical Services Division Executive Team. Contractor site leadership and corporate staff shall also be notified. Involved staff shall complete incident reports, and the On-site Medical Director shall prepare a case

summary and analysis of the care, with any recommendations for improvement. In the event of a suicide, the mental health director shall prepare a psychological autopsy.

2.3.47.15.    Analysis in the local committee shall take place in two stages. If a concern with the emergency response or immediate care is voiced, a first meeting shall be held as soon as practical and always within 30 days of the event, to allow for rapid correction of identified issues. A second meeting may be held at a future time once all relevant documentation, such as hospital records and autopsy reports, is available.

2.3.47.16.    Critical Incident Debriefing – Any staff who have been negatively affected by the self-harm, suicidal act or in-custody death shall be aided by trained mental health professionals in a timely manner.

2.3.48.    Health Insurance Coverage

2.3.48.1.    Contractor shall identify all incarcerated individuals with health insurance coverage, including Medi-Cal, using information provided by SDSD or information obtained in the intake process or health screening procedure.

2.3.49.    Utilizing Private Health Insurance Providers

2.3.49.1.    Contractor shall utilize private health insurance providers, including Health Maintenance Organizations (HMOs), when applicable for health services.

2.3.50.    Administrative Services Organization
2.3.50.1.    Contractor shall operate and manage an Administrative Services Organization as a prime or through a subcontract for the SDSD Medical Services.

2.3.51.    Administration of Services Related to Health Services Program

2.3.51.1.    Contractor shall perform the day-to-day administration of specific services related to each of the health service programs covered in this contract including but not limited to the following:

2.3.51.1.1.    Acting as the fiscal intermediary for SDSD health care programs described in this request
2.3.51.1.2.    Administrating and managing of data collection and analysis
2.3.51.1.3.    Enrolling and eligibility verification
2.3.51.1.4.    Processing claims and finances
2.3.51.1.5.    Responding to complaints, grievance and appeals as required by law or SDSD policy
2.3.51.1.6.    Managing provider reimbursement funds
2.3.51.1.7.    Documenting service delivery and utilization
2.3.51.1.8.    Maintaining of provider networks to ensure network adequacy and access
2.3.51.1.9.    Providing utilization management

2.3.52.    Uninsured Incarcerated Individuals

Case 3:25-cv-00410-W-MMP Document 20 Filed 08/18/25 PageID.387 Page 148 of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.52.1.   Contractor shall address uninsured incarcerated individuals. Current State Law allows the use of Medi-Cal for in-custody incarcerated individuals admitted to hospitals for acute care services (in-patient), and for incarcerated individuals in a detention facility awaiting adjudication previously eligible for Medi-Cal.  Contractor shall assist the County in ensuring that eligible in-patient hospital care is billed directly to the California Department of Health Care Services. Contractor shall work to enroll uninsured incarcerated individuals for Medi-Cal – either through the assistance of the hospital or onsite staff.

2.3.53.   Medi-Cal Enrollment Assistance

2.3.53.1.   Contractor shall provide Medi-Cal enrollment assistance for eligible incarcerated individuals. Any assistance provided shall not lead to a conflict of interest regarding payments received for medical care or violate any local, State, or Federal law or regulation. SDSD does not currently bill for Medi-Cal. Contractor shall work with contracted hospitals for enrollment of eligible inpatients. If the hospital does not assist with enrollment, discharge planning staff shall be available to assist patients with Medi-Cal enrollment.

2.3.54.   Medi-Cal County Inmate Program (MCIP)

2.3.54.1.   The County participates in the Medi-Cal County Inmate Program (MCIP). Contractor shall work with the SDSD regarding the Medi-Cal County Inmate Program (MCIP). This program provides federal Medicaid funds for eligible in-patient services. Under MCIP, Medi-Cal service providers are paid directly by the California Department of Health Care Services (DHCS) for eligible in-patient services and County reimburses DHCS for the nonfederal share of the MCIP costs as well as a proportionate share of the administrative costs of the program.

2.3.55.   Health Care Waste Disposal

2.3.55.1.   Contractor shall be responsible for health care waste disposal and associated costs. Contractor shall meet the responsibility of gathering and containing all trash and garbage generated by the medical/oral care and mental health services program including biohazard waste. Medical/oral care and mental health waste shall be handled according to pertinent waste disposal regulations and contained in appropriate and labeled containers that are provided by Contractor. At times, sworn staff may deem items as biohazard waste and utilize Contractor's waste containers. If Contractor or SDSD determines the usage of Contractor's waste containers by sworn staff materially impacts Contractor's budget, County shall reimburse Contractor for additional costs. Waste containers shall always be kept in a clean and satisfactory condition and emptied as often as necessary by Contractor to maintain sanitary conditions. Contractor's Program Manager, or designee, shall monitor and ensure sharps and biohazardous wastes are handled, stored, and disposed of in a safe and sanitary manner consistent with local, state, and federal regulations.

2.3.55.2.   Contractor shall utilize a qualified vendor to come to the facilities on a regularly scheduled basis to pick up and remove all medical, dental, and pharmaceutical waste.

2.3.55.3.   Contractor shall provide for the following at all facilities:

2.3.55.3.1.    All patient care areas and rooms (medical/dental) shall have a red trash can for disposal of medical waste.

2.3.55.3.2.    All patient care areas and rooms (medical/dental) shall have a red container for disposal of sharps.

2.3.55.3.3.    The pharmacy and medications rooms shall have a special container for the disposal of pharmaceutical waste (Both hazardous and non-hazardous).

2.3.55.3.4.    Dental care areas shall have an additional container for the disposal of any regulated dental waste.

2.3.55.3.5.    All waste containers shall be monitored and emptied or replaced as needed by assigned personnel.

2.3.55.3.6.    Staff shall also receive the required OSHA and Cal/OSHA training as it relates to medical waste management practices.

2.3.56.  Trash Removal

2.3.56.1.    SDSD shall provide for all trash removal except medical/oral care waste.

2.3.57.  Shredding Services

2.3.57.1.    Contractor shall be responsible for shredding services for documents containing protected health information (PHI).

2.3.57.2.    Paper-based PHI is to be rendered unreadable and beyond reconstruction via shredding (P4 cross-cut standard), burning, pulping, or pulverizing.

2.3.57.3.    Electronic PHI on electronic media is to be rendered unreadable by being overwritten, purged, or destroyed via disintegration, pulverization, melting, incineration, or shredding.

2.3.58.  Inspections, Permit Fees, Equipment Calibration

2.3.58.1.    Contractor shall be responsible for any relevant inspections, permit fees, and equipment calibration for health care clinic areas. This includes any environmental inspections. Contractor shall implement a process to remedy any unsatisfactory inspection findings.

2.3.58.2.    Onsite staff shall perform regular environmental inspections to self-identify and correct any areas of non-compliance. If any areas of non-compliance are found on a NCCHC (or other auditing body) inspection, Contractor's corporate team shall develop and implement corrective action plans to remedy any areas of non-compliance.

2.3.59.  Applicable Federal, State, and Local Laws, Regulations, Policies and Procedure

2.3.59.1.    Contractor shall comply with all applicable Federal, State, and local laws, regulations, policies, and procedure, including but not limited to:

2.3.59.1.1.    Title 15, California Code of Regulations, Minimum Standards for Inmate Facilities and Local Detention Facilities.

Case 3:25-cv-00410-W-MMP   Document 20   Filed 08/18/25   PageID.389   Page 150
of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

| | |
|---|---|
| 2.3.59.1.2. | Sheriff's Medical Services Policies and Procedures |
| 2.3.59.1.3. | California Penal Code |
| 2.3.59.1.4. | California Welfare & Institutions Code |
| 2.3.59.1.5. | California Government Code |
| 2.3.59.1.6. | California Health & Safety Code |
| 2.3.59.1.7. | Americans with Disabilities Act 2.27.8 42 U.S.C. 1396a |
| 2.3.59.1.8. | HIPAA/HITECH Acts |

2.3.59.2.    Should a change in the applicable Federal, State, and local laws, regulations, policies, and procedures cause the costs to provide health care services to increase to Contractor, the parties will meet and confer and adjust contract services, staffing and pricing as necessary.

2.3.60.  NCCHC Accreditation and Certification

2.3.60.1.    Contractor shall ensure services meet all applicable and current compliance indicators and standards for the National Commission on Correctional Healthcare (NCCHC) accreditation. The applicable standard as of the execution date of this contract is the NCCHC's 2018 Standards for Health Services. In the event a change in NCCHC guidelines or state standards (including but not limited to the applicable laws listed in Section 2.27 of RFP # 10827), Contractor and County shall meet and confer to negotiate the revision of services, staffing and pricing as necessary to remain in compliance with the new standards.

2.3.60.2.    Contractor shall cooperate and participate in the NCCHC accreditation process. Contractor's corporate Accreditation Department shall assist all SDSD sites in achieving and maintaining accreditation. The corporate accreditation staff shall maintain accreditation files and documents and shall operate a proactive system of always maintaining all requirements for accreditation. Contractor staff shall monitor each site for upcoming surveys and begin final preparation for the survey six months prior to the NCCHC visit. Preparation steps include an initial mock survey, development of a corrective plan to address all findings, and a final mock survey conducted by corporate employees that are trained NCCHC surveyors. County shall fully cooperate with Contractor and take measures to ensure that County employees follow Contractor recommendations regarding best practices to remain in compliance with all applicable NCCHC standards.

2.3.60.3.    Contractor shall adapt services in compliance with new or amended laws or regulations, changes in the NCCHC accreditation standards, or adoption of new best practices in the health care field mutually agreed upon by the Contractor and the SDSD. Should a change in laws, regulations, standards, or practices result in an increase of costs to Contractor, the parties will meet and confer and adjust contract pricing as necessary.

2.3.60.4.    Contractor shall be required to attain National Commission on Correctional Health Care (NCCHC) accreditation and certification within twelve (12) months of full operational transition. SDSD shall collaborate with Contractor as needed to attain NCCHC accreditation for each facility.

2.3.60.5.    Should a change in the applicable standards cause the costs to provide health care services to increase to Contractor, the parties will meet and confer and adjust contract services, staffing and pricing as necessary.

Case 3:25-cv-00410-W-MMP    Document 20    Filed 08/18/25    PageID.390    Page 151
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.61.  Prison Rape Elimination Act

    2.3.61.1.  Contractor shall adopt and comply with the Prison Rape Elimination Act of 2003, 42 U.S.C. 15601 et seq. (PREA), any applicable PREA standards (including 28 C.F.R. 115 et seq.), and any related County ordinances or Sheriff's Department policies regarding PREA for preventing, detecting, monitoring, investigating, and eradicating any form of sexual abuse. Such PREA standards require that all volunteers, officers, employees, agents, and subcontractors who have contact with residents under this contract receive training pursuant to 28 C.F.R. 115.332. Contractor shall provide Sheriff with documentation confirming that all volunteers, officers, employees, agents, and subcontractors understand the training they have received. Contractor acknowledges that the County shall monitor Contractor's compliance with PREA, any applicable PREA standards, and County ordinances or Sheriff's Department policies relating to sexual abuse and may conduct announced and/or unannounced compliance monitoring to include "on-site" monitoring. Failure to comply with PREA, including PREA Standards and County PREA policies, may result in termination of the contract.

    2.3.61.2.  During the intake process, Contractor shall include a Prison Rape Elimination Act (PREA) question that includes screening for any history of emotional or physical abuse in or out of custody. Those that may qualify as a PREA event will be flagged and referred to both custody for investigation and medical and mental health services as clinically indicated for follow up. During the intake process patients shall be informed of available PREA medical and mental health resources.

2.3.62.  Precedence in Disputes

    2.3.62.1.  The SDSD Chief Medical Officer, the SDSD Director of Mental Health, or the San Diego County Public Health Officer's determinations shall take precedence in any disputes concerning appropriate health care standards and/or provision of care. This includes interpretation of applicable standards.

2.3.63.  Compliance with Applicable Laws and Regulations

    2.3.63.1.  Contractor shall implement a program to ensure compliance with all applicable laws and regulations, including but not limited to identifying how Contractor plans to stay updated on new legal requirements.

    2.3.63.2.  Contractor's Chief Legal Officer shall be responsible for ensuring legal compliance in the contract with SDSD.

2.3.64.  Electronic Health Record System (EHR)

    2.3.64.1.  The EHR shall be the single source of health information about an incarcerated individual. The EHR system is the legal medical record and shall contain all elements of the designated record set.

    2.3.64.2.  Contractor shall utilize TechCare as the Electronic Health Record System (EHR). Agreement 558056 for TechCare EHR stays separate and unaffected by this agreement.

Case 3:25-cv-00410-W-MMP    Document 20    Filed 08/18/25    PageID.391    Page 152
of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.3.64.3.   Contractor shall coordinate with SDSD to create a seamless system of care between all onsite clinical staff utilizing the electronic health record system.

2.3.64.4.   Contractor shall document all patient care entries and patient related documentation into the EHR as required by SDSD policies and procedures, including the NCCHC Health Records Standard (J-A-08) and Title 15 (CCR § 1205. Health Care Records).

2.3.64.5.   Paper documents shall be digitally scanned and stored in the EHR by the ancillary staff upon receipt.

2.3.64.6.   Contractor shall execute and adhere to the specific health information privacy provisions outlined in the Business Associate Agreement (BAA). SDSD shall represent the Covered Entity, and Contractor shall represent the Business Associate in the BAA.

2.3.64.7.   Contractor shall ensure the use, confidentiality, and access to protected health information by limiting access to role-specific permissions in the EHR.

2.3.64.8.   Contractor shall address health care complaints and grievances in a timely manner and in accordance with SDSD policies and procedures; respective laws; and accreditation requirements. This shall include responses to third party complainants, attorneys, or other government agencies.

2.3.64.9.   Contractor shall document health care complaints and grievance responses/actions into TechCare and ensure designated SDSD staff are aware of all health care complaints and grievances.

2.3.64.10.  Contractor shall develop procedures for documenting patient care in the event the EHR is temporarily offline. These procedures shall include any after outage work that shall be done to upload information into the EHR. This procedure shall be reviewed annually for compliance and feasibility, updating as necessary.

2.3.64.11.  Any future changes to the TechCare EHR system which are requested by County shall be modified by mutual agreement of Parties and follow the process and associated costs defined in Exhibit 16.4 of Agreement 558056. Any future changes to the TechCare EHR system which are requested by Contractor or which support NCCHC accreditation shall be at the sole expense of the Contractor. County agrees to stay on the current version of the application and shall deploy updated versions of the application to County workstations on Contractor's set schedule. SDSD will utilize Contractor's preferred version of the application to meet NCCHC standards and their policies and procedures.

2.3.64.12.  SDSD shall ensure that all applicable Contractor and SDSD staff have simultaneous access to the patient's record within TechCare. SDSD shall provide access to TechCare for all on-site and remote Contractor employees. On-site access of Contractor staff shall be provided via county managed computers with Contractor staff being provided County accounts for access. Remote access of Contractor staff to TechCare shall be provided by Contractor computers located in Birmingham, AL and Las Vegas, NV which have the TechCare EHR application installed and have a static, persistent, secure network path to the production TechCare servers within SDSD. Use of client-based VPNs or other County-provided remote access is not permitted by Contractor. Contractor shall manage TechCare accounts for Contractor Remote staff. SDSD shall manage TechCare and Computer accounts for on-site Staff. This provision is required in order to provide the services herein.

## 2.3.65. Staffing

2.3.65.1.   Contractor and SDSD shall provide staffing levels as set forth in the detailed staffing schedule showing how coverage shall be provided for all required positions in Exhibit C ("staffing matrix"). This schedule includes both contractor and County staff. The schedule is by facility and shows all required shifts, hours they are working and what position are assigned to them. The Schedule also includes all administrative staff. Contractor may, with approval of SDSD, provide staffing that exceed the levels set forth in the staffing matrix. Contractor and SDSD may also, by mutual agreement, alter staffing schedules and levels in the best interest of meeting the patient care needs of the SDSD facilities.  For example, with approval of SDSD, Contractor may alter staffing schedules so long as the total staffing levels provided for all facilities, aggregated on a weekly or biweekly basis, meet or exceed the total staffing levels in the matrix.  By mutual agreement, the parties may agree to convert onsite hours to telehealth or telemedicine or to convert to telehealth or telemedicine hours to onsite hours. Additionally, by mutual agreement with SDSD, Contractor may substitute physician for midlevel provider time for medical or mental health provider positions, or vice versa, at mutually agreed upon ratios.  Unless otherwise agreed, typically any such mutually-agreed-upon substitution of physician time for nurse practitioner time, will be at a 1 to 2 ratio, and any such agreed-upon substitution of nurse practitioner time for physician time will typically be at a 2 to 1 ratio.

2.3.65.2.   The Contractor shall implement procedures and notification protocols on the process of Contractor staffs' absences and how vacancies with be covered.

2.3.65.3.   Contractor shall use Relief Staff to cover absences of Contractor's staff when necessary. Contractor shall maintain a team of corporate and site-based nurse practitioners who are licensed in California and able to travel to work hours onsite. Contractor may use PRN staffing or staffing agencies with correctional healthcare experience or staffing agencies with exceptional references.

2.3.65.4.   Contractor shall determine staffing required at each site in collaboration with designated SDSD staff and according to established administrative and operational task requirements, as well as health care needs based on individual facility requirements. SDSD reserves the right to alter or update task requirements as needed.

2.3.65.5.   Contractor staff schedules shall be reviewed and approved by designated SDSD staff. Any changes to the approved staffing schedule shall be approved by designated SDSD staff. The schedule plan shall include a description of coverage to ensure uninterrupted health services for planned and unplanned leave of contract staff.

2.3.65.6.   Contractor shall provide a list identifying all staff working specific assignments during specific time periods daily and at any time when requested by the SDSD.

2.3.65.7.   The County of San Diego and the SDSD value diversity. The Contractor shall strive to ensure a diverse workforce reflective of the population of San Diego County. Contractor shall deliver services in a culturally and linguistically appropriate manner that are reflective of the diverse population of San Diego County. Contractor shall provide health care translation services at its expense to ensure quality health care for patients who do not speak English.

2.3.65.8.   Contractor shall provide up to date copies of all professional licenses, certifications and/or registrations for SDSD review and filing.

2.3.65.9.   Contractor shall ensure that qualified personnel operate within the scope of their license(s), certification(s), and practice.

2.3.65.10.     All personnel shall be required to wear uniforms while on duty at all facilities. Uniforms can be scrub type clothing for clinical personnel and professional attire for other personnel. These uniforms should allow for the easy identification of said personnel. Due to security concerns, uniforms shall not be solid blue, solid green, solid white, or solid tan (since those colors are similar to SDSD incarcerated individual uniforms). SDSD has final approval authority regarding uniforms. Contractor shall provide uniforms to its employees and to all its subcontracted employees at its sole expense.

2.3.65.11.     Contractor shall bear the total cost of clinical Personal Protective Equipment and protective clothing (PPE) for all health staff, including Contractor's employees and subcontracted employees. Contractor will provide PPE to SDSD employees upon request and bill the County for the actual cost of providing PPE.

2.3.65.12.     At contract onset, Contractor specific personnel, the healthcare services administrator, the program managers for the facilities, and required staff, need to be hired/on-site and ready to be onboarded.

2.3.65.13.     Contractor shall appoint a Program Manager who shall serve as the primary point of contact and coordination between Contractor and the SDSD.

2.3.65.14.     Contractor shall select an On-site Medical Director who shall be responsible for the overall delivery of health care by Contractor staff or subcontractors at the facilities in accordance with Title 15 and NCCHC standards. The On-site Medical Director shall be a physician as defined in the Glossary, Section 4.46. This On-site Medical Director shall work in collaboration with the SDSD Chief Medical Officer.

2.3.65.14.1.     Contractor's On-site Medical Director shall adhere to the following requirements:
2.3.65.14.2.     Available Monday-Friday during business hours (8:00 am-5:00 pm)
2.3.65.14.3.     Back up Medical Director when primary is unavailable
2.3.65.14.4.     Responsible for the clinical conduct of Contractor employees
2.3.65.14.5.     Responsible for ensuring the completion of all assigned clinics
2.3.65.14.6.     After business hours contact
2.3.65.14.7.     Ensure all medical services follow the requirements of NCCHC, Title 15, and professional medical standards.

2.3.65.15.     Contractor shall select a Mental Health Director who shall be responsible for the overall delivery of mental health care by Contractor staff or subcontractors at the facilities in accordance with Title 15 and NCCHC standards. The Mental Health Director shall be a physician, psychologist, or other doctoral level mental health professional. This Mental Health Director shall work in collaboration with the SDSD Director of Mental Health.

2.3.65.15.1.     Contractor's Mental Health Director shall adhere to the following requirements:
2.3.65.15.2.     Available Monday-Friday during business hours (8:00 am-5:00 pm)
2.3.65.15.3.     Back up Mental Health Director when primary is unavailable
2.3.65.15.4.     Responsible for the clinical conduct of Contractor employees
2.3.65.15.5.     Responsible for ensuring the completion of all assigned clinics
2.3.65.15.6.     After business hours contact
2.3.65.15.7.     Ensure all mental health services follow the requirements of NCCHC, Title 15, and professional medical standards.

2.3.65.16. The Sheriff's Department reserves the right to request and receive additional professional medical type classifications throughout the term of the contract. Any new staff classifications requested after the initial execution of contract shall be through an amendment process and pricing will be in accordance with initial contract Exhibit C pricing formatting. Pricing shall be based on the median BLS pricing for San Diego Metropolitan area at the time of the amendment.

2.3.66. Conduct of Contractor's Employees

2.3.66.1. Contractor shall report any personnel or professional complaints to the SDSD designated COR immediately.

2.3.66.2. Contractor's employees shall always conduct themselves in a manner consistent with SDSD and County policies and procedures. Contractor's employees shall be courteous to the public, fellow employees, and employees of the SDSD. Contractor's employees shall be tactful in the course of their duties, shall control their tempers, and exercise patience and discretion even in the face of extreme provocation. Contractor's employees shall not use coarse, profane, or violent language. Any breaches in conduct by Contractor's employees, as determined by SDSD staff, shall not be repeated by the offending employees. If in Sheriff's determination the breach is serious enough or continues after the initial breach, access to the SDSD facility may be revoked by the SDSD.

2.3.66.3. Contractor's employees designated as requiring access to Criminal Offender Record Information (CORI) or California Law Enforcement Telecommunications System (CLETS) information shall successfully complete training in conformance with SDSD policy and all applicable laws and regulations, including Exhibit D to this Agreement.

2.3.66.4. Contractor's employees shall avoid social contacts with incarcerated individuals, refrain from overfamiliarity with incarcerated individuals, and maintain professional distance from incarcerated individuals. This includes social media platforms. If an incarcerated individual is personally known to Contractor's employee, notification to SDSD is required immediately.

2.3.66.5. Contractor's employees shall have no correspondence with incarcerated individuals unless approved by designated SDSD staff. Approved correspondence shall be professionally written.

2.3.66.6. Contractor's employees shall have no unnecessary physical contact with incarcerated individuals.

2.3.66.7. Contractor's employees shall immediately report improper incarcerated individual conduct to the SDSD staff.

2.3.66.8. The Sheriff's Department reserves the right to reject any Contractor's staff from working in the detention facilities regardless of satisfactory background results. The Sheriff's Department may remove any Contractor staff for violating Sheriff's Department's Policies & Procedures (P&P) or for not meeting Sheriff's Department's standards and expectations. Contractor shall immediately remove and replace any employee who is determined to be unsatisfactory by the Sheriff's Department.

2.4. MEDICAL RECORDS/HEALTH INFORMATION MANAGEMENT

2.4.1. Contractor shall provide an electronic option for the convenient transfer of protected health information to support and fulfill authorized requests for medical records received by County. Medical records securely

Case 3:25-cv-00410-W-MMP    Document 20    Filed 09/18/25    PageID.395    Page 156
of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

uploaded to the Contractor Cloud shall be made available to the authorized requesting party within 24-hours or the next business day, and in compliance with HIPAA Privacy and Security Rules, including applicable state/federal laws and regulations.

2.4.2. Requesting Records: requestor shall sign and submit a County authorization form which is to be received at a County-specific email address to be processed by County employees. Designated County employees shall have access to upload and maintain medical records in the Contractor's Cloud.

    2.4.2.1.    Types of Requests: Contractor's Cloud shall accommodate release of information requests both for incoming and outgoing medical record requests. Release of information requests include but are not limited to requests related to continuity of health care; patient's personal use; public benefit claims; and authorized third party requestors. Contractor's Cloud shall be accessible to all respective requestors. Contractor shall provide full support to requestors attempting to access Contractor's Cloud for records.

2.4.3. Record Retrieval: Once a County employee has deposited the requested medical record in the Contractor's Cloud, it shall be available for authorized requestors to download. The record shall be available for thirty (30) days following the date of upload.

2.4.4. The Contractor's Cloud delivery system shall allow for the detailed control of files including the ability to restrict the number of times it is downloaded; restrict forwarding the file; and expiration of the file following download. The cloud solution shall be fully managed by Contractor's Legal Department and with guaranteed uptime metrics. All designated County employees shall be fully trained on its proper usage. Contractor shall provide full support to requestors accessing Contractor's Cloud for records. The Contractor's Cloud delivery system shall be fully compliant with HIPAA Privacy and Security Rules, including applicable state/federal laws and regulations.

2.4.5. Contractor shall obtain copies of all diagnosis, treatments, treatment plans, final medical records, discharge summaries, and other medical record information related to the offsite referral.

2.4.6. When the medical records are received, they are scanned without reasonable delay into TechCare by Contractor. Appropriate personnel can view medical records and print a hard copy for each appointment or medical service provided. As a quality assurance measure, the records stay on the On-site Medical Director's TechCare 'Doctor's Queue' until they are reviewed by the ordering physician. In addition, distribution of hospital reports, discharge summaries, and consult reports ensures compliance with program review requirements.

2.4.7. TechCare ensures security and privacy compliance with all state and federal laws and regulations by utilizing industry standards of security.

## 2.5. TRAINING

2.5.1. Contractor shall provide a catalog of available training courses, including web-based, on-site (hands-on with equipment such as computers, mobile devices, etc.), and train-the-trainer.

2.5.2. Contractor shall participate in disaster planning training provided by the SDSD.

2.5.3. Contractor shall require all licensed health care providers to receive training commensurate with their licensure. Documentation shall be forwarded to the designated SDSD staff on a quarterly basis.

2.5.4. Contractor shall provide training and education in several forms: written material, formal classroom training, hands-on training, and web-based training via NaphCare University.

2.5.5. Contractor shall provide training and continuing education to County staff and enroll them in the appropriate courses. This includes continuing education and annual and periodic training.

2.5.6. If requested by the SDSD, Contractor shall provide training to sworn staff on topics relating to health care, as appropriate to their duties in accordance with NCCHC standards. A health-related training program may be developed and provided, in collaboration with the Detentions In-Service Training Unit, to non-medical sworn staff at least every two (2) years.

2.5.7. Contractor shall provide a detailed plan on how they shall ensure their staff obtain all required training and maintain their license.

2.5.8. Contractor shall provide a contingency plan and/or business continuity plan for unexpected events. Unexpected events can include, but are not limited to, natural disasters, emergencies, riots, or employee job actions.

2.5.9. Contractor shall provide the SDSD with Surescripts Medication History. Contractor shall provide on-site training to all necessary staff in the use of Surescripts.

2.5.10. Contractor shall provide StatCare telehealth and all related training to applicable SDSD staff. Contractor shall provide on-site training to all necessary staff in the use of StatCare.

2.5.11. Contractor shall provide additional mental health training for SDSD health staff and sworn staff, via live training sessions, virtual training, and its website, NaphCare Online. The courses shall provide officers with training on how to recognize a developing or present mental health condition, how to assess for risk of suicide or harm, how to respond and who to notify. Courses include: Suicide Prevention in Jails, Basics and Beyond; Correctional Mental Health Communication; Non-Clinical Jail Suicide; and Hot Topics in Suicide Prevention in Jail Settings. All training content and materials shall be reviewed and approved by SDSD CMO and Mental Health Director.

2.5.12. Contractor and SDSD Staff shall develop a Suicide Prevention Plan consistent with NCCHC standards. The key components of the plan are as follows:

2.5.12.1. Staff Training – intensive training of all medical, and mental health staff on:
2.5.12.2. Signs and symptoms to recognize
2.5.12.3. Risk Factors



     2.5.12.4.   Management of suicidal patients

     2.5.12.5.   Review of policies and procedures in dealing with suicidal patients

     2.5.12.6.   Ongoing training and annual review of training to keep up to date

## 2.6. OPERATIONS MANUAL REQUIREMENTS

2.6.1. At the onset of the contract, Contractor shall review current policies and procedures and work with sworn staff and facility leadership to tailor a program that fits the needs of the facility.

2.6.2. Contractor shall collaborate with the SDSD in the development of a written Operations Manual that defines the extent to which health care shall be provided at each facility.

2.6.3. All policies and procedures will be reviewed collaboratively by both SDSD and contractual staff on a regular basis. SDSD will have final approval of the policies and procedures.

2.6.4. Such a review process will be performed at least annually, or more frequently if new updates or information is available.

2.6.5. Contractor shall submit policies and procedures to SDSD prior to project implementation and transition.

2.6.6. Operations Manual Committee

     2.6.6.1.   Contractor shall participate in monthly SDSD Operations Manual committee meetings. The SDSD CMO, SDSD Director of Mental Health, and SDSD Director of Nursing shall participate as part of the committee.

2.6.7. Business Records Retention

     2.6.7.1.   Contractor shall create an Operations Manual section to ensure retention of all business records produced. These records shall be provided to the SDSD for retention in accordance with the County Record Retention Policy.

2.6.8. Operations Manual Maintenance

     2.6.8.1.   Contractor shall maintain all Operations Manuals, program manuals, reports and protocols required by accreditation standards set by NCCHC, Title 15 Guidelines, and the SDSD. An Operations Manual shall be provided for each facility which the Contractor shall review annually.

2.6.9. Provision of Operations Manuals



EXHIBIT B

Case 3:25-cv-00410-W-MMP   Document 20   Filed 08/18/25   PageID.398   Page 159 of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.6.9.1.    Contractor shall provide the designated SDSD staff with updated Operations Manual for all facility sites annually.

2.6.10.  Health Education

2.6.10.1.    Contractor shall develop a written Operations Manual section to assure that age and gender appropriate health education and disease prevention programs are offered to incarcerated individuals. The education program shall be updated as necessary to address current health priorities and meet the needs of the confined population.

2.6.11.  Sick Call

2.6.11.1.    Contractor shall develop and implement an Operations Manual section which provides access to daily sick call for all incarcerated individuals seven days per week, at all facilities unless otherwise indicated by the SDSD. Contractor shall implement a process for regularly retrieving and reviewing all sick call requests. A face-to-face encounter shall be conducted by a qualified health care professional within 24 hours of receipt by health staff. Provision shall be made to ensure that any incarcerated individual requesting medical attention be given such attention by licensed or certified health care personnel appropriate to address the incarcerated individual's health issue. Access to appropriate medical care shall always be unimpeded.

2.6.12.  Refusal of Healthcare Services

2.6.12.1.    Contractor's Operations Manual shall make provision for allowing any competent adult to refuse in writing both emergency and non-emergency health care services. For purposes of this section, a competent adult is an adult whose right to make health related decision has not been removed or limited by statue or court order.

2.6.13.  First Aid and Advanced Life Support

2.6.13.1.    Contractor shall develop and implement an Operations Manual section to assure immediate access to first aid and advanced life support. This includes procedures to ensure timely inspection and upkeep of equipment.  Onsite staff shall be trained to immediately initiate a response to emergency health-related situations. The training program shall be conducted on an annual basis.

2.6.14.  Prostheses and Other Orthopedic Devices

2.6.14.1.    Contractor shall develop and implement an Operations Manual section approved by the SDSD to provide medically necessary splints, braces, and prosthetics, including, but not limited to dentures, eyeglasses and hearing aids when medically indicated and ordered by Contractor's medical, oral care, and optometric personnel.

Case 3:25-cv-00410-W-MMP    Document 20    Filed 08/18/25    PageID.399    Page 160
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.6.15.  Pharmaceutical Management

    2.6.15.1.    Contractor shall develop and implement an Operations Manual section for pharmaceutical management, including, but not limited to secure storage, inventory management, controlled administration of all drugs, proper disposal, and clearly defined employee responsibilities including restricted access. Contractor shall provide maximum security for any DEA controlled substances, needles, syringes, and other items. Contractor shall manage pharmaceuticals in accordance with Title 15 and NCCHC Standards or recommendations.

2.6.16.  Food Handlers

    2.6.16.1.    Contractor shall develop and implement an Operations Manual section for screening incarcerated individuals assigned to work assignments that have health care implications, such as food handlers. All prospective food handlers shall be screened for vaccinations to include Hepatitis A, influenza and other infectious diseases as directed by the SDSD. All prospective food handlers shall undergo a physical examination to screen for infectious disease.

2.6.17.  Vermin Control

    2.6.17.1.    Contractor shall develop and implement an Operations Manual section for the control and treatment of vermin-infested incarcerated individuals, including screening and control of ectoparasites.

2.6.18.  Suicide Prevention

    2.6.18.1.    Contractor shall work collaboratively with SDSD to develop an Operations Manual section to include a suicide prevention plan, with language requiring staff to be trained to identify incarcerated individuals who present a suicide risk, appropriately monitor their condition, and ensure access to the necessary housing, referral, treatment, and follow-up. At a minimum, suicide prevention training should be conducted every two years.

2.6.19.  Notification of Deaths in the Facility

    2.6.19.1.    Notification of Deaths in the Facility: Contractor, in cooperation with the SDSD, shall develop an Operations Manual section to ensure that there shall be a medical review of in custody incarcerated individual deaths.

2.6.20.  SDSD Disaster Planning Training

    2.6.20.1.    Contractor shall prepare an Operations Manual section that ensures compliance with SDSD safety and security policies. The SDSD Facility Commanders are the final authority regarding facility safety and security for their respective sites.

2.6.20.2.   Contractor shall prepare an Operations Manual section for the handling of medical emergencies within the detention facilities. Emergency care shall be provided by appropriately trained clinical staff. Staff are expected to respond in a clinically indicated manner. Contractor staff shall also respond immediately to medical emergencies involving SDSD employees or visitors within the detention facilities. An Emergency Services Response Plan shall include the following:

2.6.20.2.1.   Health aspects of the emergency plan will be approved by the responsible health authority and facility administrator, and will include:

2.6.20.2.1.1.   Responsibilities of health staff;
2.6.20.2.1.2.   Procedures for triage for multiple casualties;
2.6.20.2.1.3.   Predetermination of the site for care;
2.6.20.2.1.4.   Emergency transport of the patient(s) from the facility;
2.6.20.2.1.5.   Use of an emergency vehicle;
2.6.20.2.1.6.   Telephone numbers and procedures for calling health staff and the community emergency response system (e.g., hospitals, ambulances);
2.6.20.2.1.7.   Use of one or more designated hospital emergency departments or other appropriate facilities;
2.6.20.2.1.8.   Emergency on-call physician, dental, and mental health services when the emergency healthcare facility is not nearby;
2.6.20.2.1.9.   Security procedures for the immediate transfer of patients for emergency care;
2.6.20.2.1.10.   Procedures for evacuating patients in a mass disaster;
2.6.20.2.1.11.   Alternate back-ups for each of the plans elements;
2.6.20.2.1.12.   Time frames for response; and
2.6.20.2.1.13.   Notification for the patient that is legally responsible.

2.6.20.3.   At least one mass disaster drill will be conducted annually so that over a three-year period each shift, to include mental health staff, has participated.

2.6.20.4.   The disaster drill is critiqued using the Emergency Response Critique Form and shared with staff. Critiques are documented in the staff meeting minutes and scanned into the respective NCCHC electronic folder. Recommendations for health staff are acted upon.

2.6.20.5.   A man-down drill will be practiced annually per shift where health staff are regularly assigned. All training of staff for these drills will be documented on the Education Log.

2.6.20.6.   All man-down drills will be documented using Contractor's Medical Emergency Code Report.

2.6.20.7.   All man-down drills are critiqued using the Man Down Drill Critique Form and shared with staff.

2.6.20.8.   Critiques are documented in the staff meeting minutes and scanned into the respective NCCHC electronic folder. Recommendations for health staff are acted upon.

2.6.21.   Provider/Staff Training

2.6.21.1.   Contractor shall develop and implement an Operations Manual section to ensure staff receive training as designated by their licensure or SDSD requirement. Staff training shall include annual onsite instruction and return demonstrations of emergency response. Contractor shall provide remediation training for staff that do not meet the standards of practice and advise the SDSD via

Case 3:25-cv-00410-W-MMP Document 20 Filed 08/18/25 PageID.401 Page 162 of 207

COUNTY CONTRACT NUMBER 568137
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

the submittal of training documentation identifying the type of training, the type of remediation training completed, and the result. This shall be forwarded to the designated SDSD staff monthly.

### 2.6.22. Compliance for Informed Consent, Health Information Privacy Rights, and Protection of Inmate Rights

2.6.22.1. Contractor shall develop NCCHC-compliant policies and procedures for all services carried out by SDSD nursing and mental health clinician staff.

2.6.22.2. Contractor Operations Manual shall ensure compliance with all laws, regulations, and approved SDSD policies and procedures.

### 2.6.23. Preventing Lapses in Medical Coverage

2.6.23.1. Contractor shall develop and implement an Operations Manual section to ensure that there are no lapses in required medical coverage including backup for licensed or certified medical staff for vacation, sick leave, holidays, labor actions, disruptions in public transportation (i.e., a disaster plan), unusually heavy caseload demands, or other operational situations.

### 2.6.24. Notification for Disruption in Services

2.6.24.1. Contractor shall develop an Operations Manual section requiring immediate notification to the affected facility watch commander and the designated SDSD MSD staff of any potential disruption in normal services.

### 2.6.25. Continuity of Operations Plan

2.6.25.1. The SDSD has determined the continuity of health care services in SDSD detention facilities are vital and necessary during a state of emergency. Contractor shall prepare a written Continuity of Operations Plan (COOP) within sixty (60) days of contract execution to ensure that clinical staff remains in or are available to respond to the impacted facility or facilities to continue to provide health care during unexpected events. The Contractor shall consult with the SDSD to help ensure that Contractor's COOP is consistent with the disaster plan for the SDSD facilities. Contractor's COOP shall designate a COOP point of contact at each facility with at least one backup. On an annual basis no later than January 1st, Contractor shall submit an updated COOP to the SDSD for approval.

### 2.6.26. Project Implementation and Transition Plan

2.6.26.1. Contractor shall provide on-site project management support to include the following:

2.6.26.1.1. Ancillary Services

2.6.26.1.1.1. Initial Approach


EXHIBIT B

Case 3:25-cv-00410-W-MMP   Document 20   Filed 08/18/25   PageID.402   Page 163 of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.6.26.1.1.2.    Establish oxygen vendor
2.6.26.1.1.3.    Determine large equipment needs, and place order
2.6.26.1.1.4.    Order medical, dental, office supplies, copiers, printers, MFPs
2.6.26.1.1.5.    Recruitment, Community Networks, and Policy
  2.6.26.1.1.5.1.  Ensure that Lab training and supplies are on schedule
  2.6.26.1.1.5.2.  Track supply deliveries & any backorders
  2.6.26.1.1.5.3.  Coordinate scrub & embroidery RQMT's / Order
  2.6.26.1.1.5.4.  Establish shredding services
  2.6.26.1.1.5.5.  Establish waste removal services
  2.6.26.1.1.5.6.  Establish translation services

2.6.26.1.1.6.    On-Boarding and Training
  2.6.26.1.1.6.1.  Finalize HSA Purchasing Manual
  2.6.26.1.1.6.2.  Verify that all ancillary agreements are finalized and fully executed
  2.6.26.1.1.6.3.  Track supply deliveries/receive in Inventory Management System

2.6.26.1.1.7.    Final Site Preparation
  2.6.26.1.1.7.1.  Distribute Purchasing Manual
  2.6.26.1.1.7.2.  Send scrubs out to site

2.6.26.1.1.8.    Transition Closeout
  2.6.26.1.1.8.1.  Confirm all supplies available, supply chains operating correctly
  2.6.26.1.1.8.2.  Confirm performance of all ancillary providers

2.6.26.1.2.    Human Resources

2.6.26.1.2.1.    Initial Approach
  2.6.26.1.2.1.1.  Complete eVerification on New Employees, add to HR and Payroll Systems, enter Benefit elections
  2.6.26.1.2.1.2.  Create Personnel Files, Initiate Tracking and Automated Notice of Missing Information
  2.6.26.1.2.1.3.  Obtain EE documents and provide to Corporate HR for Processing
  2.6.26.1.2.1.4.  Send "Welcome to NaphCare" communication to all hired staff with critical information

2.6.26.1.2.2.    Recruitment, Community Networks, and Policy
  2.6.26.1.2.2.1.  Hiring, recruitment, credentialing of current and new staff
  2.6.26.1.2.2.2.  Staff orientation package distribution (benefits, 401K, insurance, etc.)

2.6.26.1.2.3.    On-Boarding and Training
  2.6.26.1.2.3.1.  NaphCare University user setup, notification, and training
  2.6.26.1.2.3.2.  HR and Administration Training

2.6.26.1.2.4.    Final Site Preparation
  2.6.26.1.2.4.1.  Complete UM training for AA, HSA
  2.6.26.1.2.4.2.  NaphCare University user setup, notification, and training

2.6.26.1.2.5.    Transition Closeout
  2.6.26.1.2.5.1.  Audit Clearance and Training Processes
  2.6.26.1.2.5.2.  Formalize HR and Onboarding Processes for Post-Transition Hires

2.6.26.1.3.    Information Technology

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.6.26.1.3.1.    Initial Approach
    2.6.26.1.3.1.1.    Complete network design for connectivity between County and NaphCare Corporate Offices
    2.6.26.1.3.1.2.    Conduct onsite visit for new hardware placement & design as needed
    2.6.26.1.3.1.3.    Initiate contact with new interface vendors (pharmacy, Lab)
    2.6.26.1.3.1.4.    Place order for any external connectivity or internal connectivity needed
    2.6.26.1.3.1.5.    Set up TechCare Training Environment for New Employees

2.6.26.1.3.2.    Recruitment, Community Networks, and Policy
    2.6.26.1.3.2.1.    Configure and test network connectivity between County and NaphCare Corporate Offices
    2.6.26.1.3.2.2.    Coordinate equipment placement at Jails with onsite IT contact
    2.6.26.1.3.2.3.    Review TechCare Application Changes necessary for NaphCare Operations
    2.6.26.1.3.2.4.    Set up TechCare access for NaphCare Corporate team members

2.6.26.1.3.3.    On-Boarding and Training
    2.6.26.1.3.3.1.    Complete follow-up on-site visits to each jail
    2.6.26.1.3.3.2.    Complete necessary TechCare Changes needed by NaphCare Operations
    2.6.26.1.3.3.3.    Confirm any application or interface changes are completed, tested, and ready for activation

2.6.26.1.3.4.    Final Site Preparation
    2.6.26.1.3.4.1.    Deploy Corporate Connectivity Solution (as permitted)
    2.6.26.1.3.4.2.    Establish on-site IT Transition Team for support during transition of services
    2.6.26.1.3.4.3.    Set up NaphCare Corporate Users in TechCare
    2.6.26.1.3.4.4.    Work with County IT to create new staff user accounts for TechCare based on roles

2.6.26.1.3.5.    Transition Closeout
    2.6.26.1.3.5.1.    Establish IT Monitoring in Compliance with County IT Policies
    2.6.26.1.3.5.2.    Provide On-Site Support and TechCare Assistance

2.6.26.1.4.    Medical

2.6.26.1.4.1.    Initial Approach
    2.6.26.1.4.1.1.    Attend meetings with key hospitals and physician groups
    2.6.26.1.4.1.2.    Confirm with Information Technology all Computers, Access Methods to EHR are Suitable for Environment
    2.6.26.1.4.1.3.    Interview & hire qualifying physicians, NPs, Dentist, and psych providers
    2.6.26.1.4.1.4.    Logistically Review all Intake Areas for Implementation of NaphCare Processes
    2.6.26.1.4.1.5.    Meet with all Physicians, NPs, Dentists and MH Providers to discuss NaphCare Proactive Philosophy
    2.6.26.1.4.1.6.    Meet with County Medical Director
    2.6.26.1.4.1.7.    Review current nursing protocols and medical templates/forms for potential updates
    2.6.26.1.4.1.8.    Review mid-level provider prescribing and scope of practice laws

2.6.26.1.4.2.    Recruitment, Community Networks, and Policy
    2.6.26.1.4.2.1.    Attend meetings with key hospitals and physician groups to review operational processes and address concerns
    2.6.26.1.4.2.2.    Confirm off-site provider network information is loaded into internal systems.


EXHIBIT B

Case 3:25-cv-00410-W-MMP    Document 20    Filed 09/18/25    PageID.404    Page 165 of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.6.26.1.4.2.3.   Continue interviewing & hiring providers

2.6.26.1.4.3.    On-Boarding and Training
2.6.26.1.4.3.1.   Begin provider training in UM procedures
2.6.26.1.4.3.2.   Confirm previously scheduled off-site appointments are accurately loaded Offsite Management Billing System
2.6.26.1.4.3.3.   Meet with NaphCare and County Medical Directors
2.6.26.1.4.3.4.   Start provider training in TechCare, Formulary, and Off-Site Request processes
2.6.26.1.4.3.5.   Train providers in the NaphCare medical care philosophy, P&P

2.6.26.1.4.4.    Final Site Preparation
2.6.26.1.4.4.1.   Complete Final Provider Training Sessions
2.6.26.1.4.4.2.   Identify patients in need of special/urgent medical attention upon assumption of care: infirmary, high acuity, etc.
2.6.26.1.4.4.3.   Reassess potential nursing and provider educational gaps following standard training plan execution
2.6.26.1.4.4.4.   Review current medication usage

2.6.26.1.4.5.    Transition Closeout
2.6.26.1.4.5.1.   Audit Review of all Intakes, High Acuity Patients to Ensure Care Protocols Followed
2.6.26.1.4.5.2.   Continue on-site Provider Training


2.6.26.1.5.      Mental Health

2.6.26.1.5.1.    Initial Approach
2.6.26.1.5.1.1.   Document plans for NaphCare MH model implementation with Corrections
2.6.26.1.5.1.2.   Meet with all MH staff and discuss NaphCare MH philosophy
2.6.26.1.5.1.3.   Review any MH housing units, access needs, workflow changes
2.6.26.1.5.1.4.   Review Intake Areas for MH Considerations, Detox, Observation, etc.

2.6.26.1.5.2.    Recruitment, Community Networks, and Policy
2.6.26.1.5.2.1.   Identify community mental health resources to begin discharge planning and re-entry programs
2.6.26.1.5.2.2.   Review and ensure consistency between Jail and NaphCare P&P

2.6.26.1.5.3.    On-Boarding and Training
2.6.26.1.5.3.1.   Begin MH provider and professional training in TechCare
2.6.26.1.5.3.2.   Perform MH Provider and professional training in NaphCare P&P, Formulary
2.6.26.1.5.3.3.   Train MH professionals and providers in NaphCare mental health philosophy

2.6.26.1.5.4.    Final Site Preparation
2.6.26.1.5.4.1.   Finalize MH Provider Training Sessions
2.6.26.1.5.4.2.   Identification of patients in need of MH intervention upon assumption of care

2.6.26.1.5.5.    Transition Closeout
2.6.26.1.5.5.1.   Continue on-site Provider Training


2.6.26.1.6.      Operations

2.6.26.1.6.1.       Initial Approach



2.6.26.1.6.1.1. Conduct Final Stage Interviews & Complete Hiring of Management Staff
2.6.26.1.6.1.2. Identify Jail facility operational Needs, Concerns, and Integrate into Plan
2.6.26.1.6.1.3. NaphCare and Facility contact information exchanged
2.6.26.1.6.1.4. Obtain Jail Facility Clearances for NaphCare Staff
2.6.26.1.6.1.5. Schedule re-occurring onsite meeting with Jail Leadership

2.6.26.1.6.2. Recruitment, Community Networks, and Policy
2.6.26.1.6.2.1. Data Collection: HSR reports & identification of reports required by Jail
2.6.26.1.6.2.2. Exchange Jail & NaphCare P&Ps, develop site-specific LOPs
2.6.26.1.6.2.3. Finalize TechCare Updates (ex: forms, nursing protocols, receiving screen, sick call)
2.6.26.1.6.2.4. Review sick call, intake, and all other onsite critical medical processes
2.6.26.1.6.2.5. Training: NCCHC, TechCare, off-site management, QA, HR, Admin

2.6.26.1.6.3. On-Boarding and Training
2.6.26.1.6.3.1. Identify and implement narcotic and key exchange procedures
2.6.26.1.6.3.2. Orientation of NaphCare staff, P&P, website access, Proactive Care Plan
2.6.26.1.6.3.3. Re-occurring onsite meeting with essential staff for weekly updates

2.6.26.1.6.4. Final Site Preparation
2.6.26.1.6.4.1. Identify and implement safety procedures (e.g. sharps count)
2.6.26.1.6.4.2. Off-site Operations: TechCare Online training completed, start-up manual provided, support staff assignments made and relayed to Jail
2.6.26.1.6.4.3. Purge Jail of Historical forms, P&P, and ensure that NaphCare's material is available to all staff

2.6.26.1.6.5. Transition Closeout
2.6.26.1.6.5.1. Continue on-site Training
2.6.26.1.6.5.2. Deploy NaphCare SWAT Transition Team 2 Days Prior to Cutover
2.6.26.1.6.5.3. Formalize Ongoing Meetings/Communications with Jail, County, Sheriff Leadership
2.6.26.1.6.5.4. Operations Corporate Leadership Remain On-Site with SWAT to Ensure Stability, Care Continuity

2.6.26.1.7. Pharmacy

2.6.26.1.7.1. Initial Approach
2.6.26.1.7.1.1. Coordinate transfer of existing drug inventory to enable continued care to patients
2.6.26.1.7.1.2. Identify professional consultant licensed by the state to serve the Jail
2.6.26.1.7.1.3. Initiate Transition with existing provider, Meetings
2.6.26.1.7.1.4. Schedule Onsite Transition and Training Plan
2.6.26.1.7.1.5. Setup NaphCare Pharmacy Software, Including Interface with TechCare

2.6.26.1.7.2. Recruitment, Community Networks, and Policy
2.6.26.1.7.2.1. Identify locations of local back-up and specialty providers
2.6.26.1.7.2.2. Obtain Pharmacy license and DEA number
2.6.26.1.7.2.3. Pharmacy P&P, design procedures & logs for narcotic utilization & inventory, medication room supplies
2.6.26.1.7.2.4. Secure prescription storage system for initial stock of meds
2.6.26.1.7.2.5. Set up back-up pharmacy process. InMedRx Information

2.6.26.1.7.3. On-Boarding and Training

Case 3:25-cv-00410-W-MMP   Document 20   Filed 08/18/25   PageID.406   Page 167
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.6.26.1.7.3.1.   Assess utilization requirements. Examine stock on hand, intentions of current provider, current refill process
2.6.26.1.7.3.2.   Estimate drugs required for floor stock based on current usage
2.6.26.1.7.3.3.   Formalize the Process for Patients' Personal Medications including Storage and Documentation
2.6.26.1.7.3.4.   Implement dispensing requirements upon discharge
2.6.26.1.7.3.5.   Obtain shipping address and confirm the Jail's receiving process
2.6.26.1.7.3.6.   Prepare Pharmacy Training Manual, Forms, Instructions, Logs, and Documents

2.6.26.1.7.4.   Final Site Preparation
2.6.26.1.7.4.1.   Complete hiring and training of pharmacist consultant
2.6.26.1.7.4.2.   Initial drug shipment sent to secure site 48 hours prior to start date
2.6.26.1.7.4.3.   NaphCare Pharmacy given orders for initial fill 4 days prior to start date
2.6.26.1.7.4.4.   Provide in-service training for on-site RN and Pharmacy Teams 2.6.26.1.7.4.5. Record control drug inventory with exiting provider and record into NaphCare control drug books
2.6.26.1.7.4.6.   Review all supplies and medications to identify remaining needs prior to go-live date

2.6.26.1.7.5.   Transition Closeout
2.6.26.1.7.5.1.   Monitor Inventory, Prescribing, Site Specific Protocols
2.6.26.1.7.5.2.   Provide On-Site Support

2.6.26.1.8.   Utilization Management

2.6.26.1.8.1.   Initial Approach
2.6.26.1.8.1.1.   Contact all providers with outstanding appointments to discuss transition plan, continuity of care
2.6.26.1.8.1.2.   Develop off-site network needs initiated prior to bid submission
2.6.26.1.8.1.3.   Draft LOA compliant with site contract and for approval by legal
2.6.26.1.8.1.4.   Secure preferred provider listing from site for contracting
2.6.26.1.8.1.5.   Secure site contract sheet/information from NaphCare legal department

2.6.26.1.8.2.   Recruitment, Community Networks, and Policy
2.6.26.1.8.2.1.   Continue network development for preferred hospitals, physician groups, & ancillary partners
2.6.26.1.8.2.2.   Make corporate-based assignments for UM, Scheduling and Medical Records
2.6.26.1.8.2.3.   Off-site management, provider information is loaded into internal systems, in-person meeting with hospitals to review operational processes and services
2.6.26.1.8.2.4.   Prepare hospital manual for meetings

2.6.26.1.8.3.   On-Boarding and Training
2.6.26.1.8.3.1.   Conduct hospital in-service orientation (use hospital manual as a guide)
2.6.26.1.8.3.2.   Create and Finalize Provider Directory for Site and Corporate Staff
2.6.26.1.8.3.3.   Review off-site process with UM, Scheduling and Contracting

2.6.26.1.8.4.   Final Site Preparation
2.6.26.1.8.4.1.   Assist schedulers with consultation requests related to network gaps
2.6.26.1.8.4.2.   Conduct web-based training for TechCare Online for AA, HSA
2.6.26.1.8.4.3.   Continue network development

2.6.26.1.8.5.   Transition Closeout
2.6.26.1.8.5.1.   Audit all Off-Site Encounter Processes to Ensure Continuity of Transition

Case 3:25-cv-00410-W-MMP   Document 20   Filed 09/18/25   PageID.407   Page 168
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NaphCare, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

2.6.26.2.    Contractor is responsible to ensure Health Services Administrator is an active participant for SDSD training and is readily available for on-site or virtual on-boarding support.

2.6.26.3.    Contractor shall provide on-site training personnel for first 90 days of operation; online training may be administered with the approval of SDSD.

## 3.   SDSD BACKGROUND CHECK

3.1.  Contractor shall ensure all onsite contracted, subcontracted, and volunteer staff submit to a SDSD background check, which shall be completed within fourteen (14) working days, at the Contractor's expense (e.g., any related travel and incidental costs). County will not charge Contractor for background checks. For Contractor remote staff, Contractor will conduct its own background checks in accordance with County's standards for access to the EHR system.

3.2.  All Contractor staff who perform services at any County Detention Facilities will be required to undergo background checks with favorable results before they can perform such services. The background check shall be administered by the Sheriff's Department. The cost of the background check and Livescan shall be borne by the County. Prior to clearing the background process, Contractor's staff will not be allowed to attend start up training or orientations at Sheriff's Facilities. Post clearance staff will attend training at Medical Services Administration and then will be allowed to attend facility orientations and fill shifts.

## 1.   GLOSSARY

| | |
|---|---|
| Access to Care: | A patient is seen by a qualified health care professional, is rendered a clinical judgment and receives care that is ordered in a timely manner. |
| Accreditation: | The National Commission on Correctional Healthcare (NCCHC) has determined and certified that all standards and compliance indicators for accreditation are met. |
| Ancillary Services: | Professional services in a hospital or other inpatient/outpatient health program. These may include x- ray, drug, laboratory, or other services. |
| Behavioral Health: | The blending of prevention and treatment for substance use, sexual, and mental health disorders for the purpose of providing comprehensive services. |
| Care Management: | A collaborative process that assesses, plans, implements, coordinates, monitors, and evaluates the options and services required to meet the patient health and human service needs. |
| Chronic Care: | An integrated care approach to managing illness which includes screenings, check-ups, monitoring and coordinating treatment, and patient education. As defined by NCCHC. |
| Clinically Indicated: | Involving or relating to the direct medical treatment or testing of patients. Relating to objective findings (either through physical examination, testing or laboratory study) that would aid in the determination of a care or treatment plan. |
| Clinical Practice Guidelines: | "Clinical practice guidelines are systematically developed statements to assist practitioner and patient decisions about appropriate health care for specific clinical circumstances." (Institute of Medicine, 1990) |


EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

|  |  |
|---|---|
|  | These statements are issued by third-party organizations and define the role of specific diagnostic and treatment modalities in the diagnosis and management of patients. The statements contain recommendations that are based on evidence from a rigorous systematic review and synthesis of the published medical literature. For practical purposes they are commensurate with the establishment of the community standard of care. |
| Concurrent Review: | A review of medically necessary decisions made while the patient is currently in an acute or post- acute setting. However, concurrent reviews happen during active management of a condition, be it inpatient or ongoing outpatient care. The focus of concurrent review is to ensure that the patient is getting the right care in a timely and cost- effective way. |
| Communicable Disease: | Those diseases that are capable of being transmitted from one person or species to another. |
| CQI Program: | A Comprehensive Quality Improvement program to improve both service and access to patients. It is designed to monitor and evaluate the quality and safety of healthcare services delivered in a clinical setting through outcome measurements and reporting criteria. |
| Contractor: | The entity who enters into a contract with the County of San Diego to provide all services as described in the Request for Proposal. |
| Dental Examination: | Includes the taking or review of the patient's dental history, charting of teeth, examination, and x- rays if needed for diagnosis. |
| Discharge Plan: | Planning and referral for patients with serious health needs. The patient's proposed treatment, medications, and other important information is to be provided to a contact in the community upon the release of the patient. |
| Dispensing of Medication: | System of delivery and storage of, and accounting for drugs from the source of supply to the facility drug rooms or to the point of storage at which they are administered to the patient. |
| Ectoparasites: | A parasite that lives on or in the skin but not within the body. |
| Electronic Health Records (EHR) System: | A database that collects patient health information including, but not limited to; patient demographics, progress notes, problem lists, medications, vital signs, past medical history, immunizations, health assessments, and more data which creates an electronic repository to store information. |
| Emergency Care: | Care for an acute illness or unexpected health care need where the absence of immediate medical attention could reasonably be expected to result in (1) Placing the patient's health in serious jeopardy; (2) Serious impairment to bodily functions; (3) Serious dysfunction of any bodily organ or part. |
| Evidence Based Practices (EBP): | Therapeutic interventions for which there is consistent scientific evidence that shows improvement in patient outcomes. |
| Full Operational Transition: | Is accomplished when Contractor has assumed all operational and administrative functions required by executed contract. |
| Forensic Imaging: | An x-ray of the body of an incarcerated individual to detect effectively and quickly contraband hidden within a human body cavity. |

EXHIBIT B

| | |
|---|---|
| Grievance: | A verbal or written complaint or protest of an action or inaction. This is the process in which a patient appeals an action or decision related to their health care. |
| Health Assessment: | The process whereby the health status of a patient is evaluated. The extent of the health assessment, including medical examination after obtaining health history contains at least the items noted by NCCHC standards. |
| Health Care: | The sum of all actions, preventive and therapeutic, taken for the physical and mental well-being of a population. Health Care includes all services provided under the Statement of Work and any other services that are medically necessary. |
| Health Care Provider: | Any individual that provides, or assists in the provision of, health care, including but not limited to a physician, nurse practitioner, qualified health care professional, qualified mental health care professional, or Mid-Level Provider. This term also includes a health care facility. |
| Hospice: | A program designed to provide palliative care, counseling, and emotional support to the terminally ill with the goal of maintaining quality of life. |
| Hospital: | An institution separate and outside of a detention facility that is built, staffed, and equipped for the diagnosis of disease, treatment, both medical and surgical of the sick and injured; and for their housing during this process. |
| Hospital Level of Care: | Individual, inpatient care and treatment, physically within or housed inside a community medical facility or center. Care and treatment determined or conducted by a medical provider who is responsible for a localized anatomic or physiologic area or region. Typically serves in the role of a consultant or advisor to the primary care provider or physician and does not actually assume care or responsibility for the patient as a whole. |
| Initial Health Assessment: | The first health assessment whereby a patient's individual health status is evaluated, meeting minimum requirements as specified by NCCHC. |
| Keep-On-Person (KOP) Medications: | Medications that patients will be given the privilege of being responsible for themselves by order of a physician, mid-level provider, or registered nurse. |
| Lab Support: | A clinical licensed laboratory equipped for running tests on samples from the human body (such as fluids, tissues, or cells) for the purpose of providing information on diagnosis, prognosis, prevention, or treatment of disease. |
| Long Term Care: | A variety of services designed to meet a person's health and personal care needs for those patients with such medical or psychologic conditions who are unable to perform such services on their own. |
| Medication Administration: | The act in which a single dose of a prescribed medication or biological is given by application, injection, inhalation, ingestion, or any other means to an incarcerated individual by an authorized person in accordance with all laws and regulations governing the administration of medications and biologicals. Also refers to guidelines that healthcare professionals follow in medication management, ensuring that drugs are administered safely and legally. |
| Medication Assisted Treatment (MAT): | Use of medications in combination with counseling and behavioral therapies to provide a "whole patient" approach to treatment of substance use disorders. |

Case 3:25-cv-00410-W-MMP    Document 20    Filed 09/18/25    PageID.410    Page 171
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

| | |
|---|---|
| Medication Services Program: | Medications are administered or delivered to the incarcerated individual in a timely and safe manner. Prescription medications are given only by order of legally authorized individual. Maintenance of a formulary with a documented process for obtaining nonformulary medications in a timely manner as well as all other minimum requirements defined by NCCHC. |
| Mental Health Treatment: | The evaluation and treatment for a mental disorder. |
| Mental Health Screening: | Performed by qualified mental health professionals or qualified health professionals. Includes but not limited to structured interview with inquiries into medication history, substance abuse, suicidal behavior, victimization, sexual abuse, etc. as outlined in NCCHC standards. |
| Medically Necessary: | Services or supplies that are proper and needed for diagnosis, or treatment of a medical condition, are provided for the diagnosis, direct care, and treatment of a medical condition that meets the standards of health care practice in the health care community of a local area; and are not mainly for the convenience of the patient or physician. |
| Special Needs: | Patients with health conditions that require development of an individualized treatment plan. |
| Supervised Withdrawal and Treatment: | Medical management of patients under the influence of or undergoing withdrawal from alcohol, sedatives, opioids, and/or other substances. |
| Medical Ward: | An area established within the confines of a correctional facility in which organized healthcare and services are maintained and operated to accommodate patients for purpose of providing skilled nursing care for persons who are not in need of hospitalization but require health care provider monitoring and specialized services. |
| Mid-level Provider: | Health care workers with training less than that of a physician but greater than that of nurses and other medical assistants. |
| Oral Care Services: | Includes instruction in oral hygiene, examination, and treatment of dental problems. |
| Oral Hygiene: | Clinical procedures taken to protect the health of the mouth and chewing apparatus, minimum compliance is met by instruction in the proper brushing of teeth. |
| Oral Screening: | Part of the initial health assessment which includes visual observation of the teeth and gums. |
| On-site Medical Director: | Specific point of contact and coordination between NaphCare and the SDSD CMO. |
| On-site Services: | All health care services performed inside of a detention facility. |
| Off-site Services: | Health care services performed in the community setting, which include hospital, medical clinic, laboratory, or physical therapy/gym. |
| Palliative Care: | The medical and therapeutic management of the symptoms and incurred side effects of a terminal disease and its treatment. |

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

| | |
|---|---|
| Pharmaceutical Operations: | An operation in compliance with applicable state and federal regulations regarding prescribing, dispensing, administering, procuring, and disposing of pharmaceuticals as defined by NCCHC. |
| Physical Examination: | An objective, hands-on evaluation of an individual. It involves inspection, palpitation, auscultation, and/or percussion of a patient's body to determine the presence or absence of physical signs of illness. |
| Phlebotomy Services: | The drawing of blood (as by venipuncture) for diagnostic testing and the completion of all requisitions required by the outside laboratory. |
| Physician: | A person who is legally qualified to practice medicine and has earned a corresponding medical degree. |
| Point of Care Testing (POCT): | Diagnostic patient testing activities provided outside the physical facilities of the clinical laboratory. |
| Policy: | A written official position on a particular issue related to an organization's operations. |
| Procedure: | Describes in detail, sometimes in sequence, how a policy is to be carried out. |
| Program Manager: | Point of contact and coordination between NaphCare and the SDSD Director of Nursing and nursing staff.  Contractor may give the title of Health Services Administrator or other appropriate title to the Program Manager position. |
| Protocols: | Written instructions for physicians and nurse practitioners which have been approved by a state regulatory board or by the responsible health care authority for the prison system. |
| Qualified Health Care Professional: | Includes physicians, nurse practitioners, nurses, psychiatrists, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the medical health needs of the patient. |
| Qualified Mental Health Professional: | Includes clinical social workers, licensed mental health clinicians, psychologists, nurse practitioners, psychiatrists, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients. |
| Quality Improvement Committee: | A multi-disciplinary group of health care providers working at the facility (the responsible physician and representatives of other departments) who meet to share the information collected, aggregated, analyzed, and presented to representatives of the organization. Committee is responsible for defining, prioritizing, overseeing, and monitoring the performance improvement activities, including patient and environmental safety, within the detention setting. |
| Rehabilitative Services: | Rehabilitation is the action of restoring someone to health or normal function through training and therapy after injury, addiction, or illness. Services would include physical therapy and occupational therapy, and specialized referral services (e.g. speech, vestibular therapy) as needed. |
| Release of Information (ROI): | A statement signed by the patient authorizing a specified entity to divulge the patient's healthcare information to a different specified entity. |

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A – STATEMENT OF WORK

| | |
|---|---|
| <u>Receiving Screening</u>: | A system of structured inquiry and observation designed to prevent newly arrived patients who pose a health or safety threat to themselves or others from being admitted to the facility's general population and to identify those newly admitted patients in need of health care. This process is also referred to as initial or intake health screening. |
| <u>Serious Mental Illness</u>: | A mental, behavioral, or emotional disorder resulting in serious functional impairment, which substantially interferes with or limits one or more major life activities. |
| <u>Sick Call</u>: | On-site health care services rendered to a patient with health care complaints that are evaluated and treated during regularly scheduled appointment times. |
| <u>Specialty Care Services</u>: | Healthcare services, consultations, procedures, or other treatments that require special clinical skills and results in appointments both on-site and off-site with higher level of health care providers. |
| <u>Substance Use Disorder</u>: | A disease that affects a person's brain and behavior and leads to an inability to control the use of a legal or illegal drug or medication. |
| <u>Treatment Plan</u>: | A therapeutic strategy that may incorporate patient education, dietary adjustment, an exercise program, drug therapy, and the participation of nursing and allied health professionals. Treatment plans are especially important in the optimal management of complex or chronic illnesses. |
| <u>Utilization Review</u>: | A set of formal techniques designed to monitor the use of or evaluate the clinical necessity, appropriateness, efficacy, or efficiency of health care services, procedures, or settings. |
| <u>Ultrasound Services</u>: | On-site diagnostic or screening imaging tool to confirm medical disorders or to assist in the performance of medical procedures. |
| <u>Vision Services</u>: | Services necessary to habilitate or rehabilitate the effects of (visual) sensory impairment. Includes optometry as well as ophthalmology. |
| <u>Women's Health Services</u>: | Organized medical services to manage the effect of gender on disease and health that encompasses a broad range of biological and psychosocial issues, to include general practice, reproductive health and obstetrical care and services. |
| <u>Radiology Services</u>: | Screening or diagnostic imaging studies with interpretive consultation component performed for the purpose of medical evaluation and patient care and treatment. |

EXHIBIT B

## EXHIBIT A-1 STATEMENT OF WORK

1. PROGRAM ELEMENTS

  1.1. Referral Document Collection Prior to Admission

    1.1.1. The DSH Patient Management Unit (PMU) shall coordinate with the committing court to ensure all required documents listed under Penal Code section 1370, subdivision (a)(3) is provided by the court for all male patient incarcerated individuals upon admission.

  1.2. Referrals Determined to be Not Suitable for Admission

    1.2.1. Should Contractor determine, based on clinical or custodial considerations, that a male felony 1ST referral is not suitable for admission into the JBCT program, Contractor shall inform the DSH Contract Manager and the PMU immediately in writing or by phone.

  1.3. Removal of Patient Incarcerated individuals No Longer Clinically Suitable

    1.3.1. Upon admission, Contractor shall assess each male Patient Inmate to ascertain if trial competence is likely and medical issues would not pose a barrier to treatment. At the discretion of the DSH Contract Manager, and if requested in writing, Contractor shall review and agree upon new male Patient Incarcerated individuals being forwarded for admission and/or retention into the JBCT program, which may contraindicate fast-track jail treatment.

    1.3.2. Should Contractor determine, based on clinical considerations or other factors, that a male Patient Inmateadmitted into the JBCT program is no longer clinically suitable for participation in the program, Contractor shall contact the DSH Contract Manager to discuss treatment options. Contractor agrees that the decision to remove such a Patient Inmate from the JBCT program is at the sole discretion of the DSH,and the DSH shall not unreasonably withhold such permission.

    1.3.3. Should Contractor and the DSH determine a male Patient Inmate should be removed from the JBCT program, Contractor shall continue to provide treatment until arrangements are made to admit the male Patient Inmate to a state hospital. Within seven days of making this determination, Contractor shall alsoprovide the following additional documents to the PMU including, but not limited to:

      1.3.3.1.    Transfer Notification Letter
      1.3.3.2.    Court Reports, if due or submitted
      1.3.3.3.    90-Day Progress Report, if due or submitted
      1.3.3.4.    Psychiatry Intake Assessment
      1.3.3.5.    The three most recent Psychiatry Progress Notes
      1.3.3.6.    Psychology Intake Assessment
      1.3.3.7.    30-Day Psychologist Competency Reassessments
      1.3.3.8.    Social Work/Clinician Intake Assessment
      1.3.3.9.    Nursing Intake Assessment.
      1.3.3.10.   Informed Consent

EXHIBIT B



Case 3:25-cv-00410-W-MMP    Document 20    Filed 09/18/25    PageID.414    Page 175
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A-1 − JAIL BASED COMPETENCY TREATMENT PROGRAM

1.3.3.11.   Medication Orders
1.3.3.12.   Laboratory Results, if any
1.3.3.13.   Discharge Summary

## 1.4. Psychological Assessment Protocol

1.4.1. Contractor shall administer a battery of individualized psychological assessments and testing upon admission. Standardized and semi-structured psychological tests shall be utilized to complete a preliminary assessment of the male Patient Inmate's current functioning, likelihood of malingering, and current competency to stand trial. Impediments to trial competency shall be ascertained using the following preliminary assessment instruments including, but not limited to:

1.4.1.1.   Clinical Interview. The psychologist shall obtain information pertaining to the male Patient Inmate's psychosocial, psychiatric, and legal history as well as barriers to competency. *The Mental Status Exam* (MSE) shall also be included in the interview.
1.4.1.2.   Assessment of Malingering (as clinically indicated). Miller Forensic Assessment o/Symptoms  (M•FAST).
1.4.1.3.   Assessment of Trial Competence. Evaluation of Competency to Stand Trial-Revised (ECST-R), the MacArthur Competence Tool - Criminal Adjudication (MacCAT-CA), and/or the Competence Assessment/or Standing Trial/or Defendants with Mental Retardation (CAST-MR); and
1.4.1.4.   Severity of Psychiatric Symptoms. Brief Psychiatric Rating Scale (BPRS).

1.4.2. Contractor shall complete additional malingering-specific assessments, integrating additional observable data reported by various disciplines on a 24/7 basis if preliminary assessment suggests presence of malingering. If the screening instruments administered during the preliminary assessment raise suspicion that the primary barrier to trial competency is malingering, the following may also be utilized including, but not limited to:

1.4.2.1.   Structured Interview of Reported Symptoms -Second Edition (SIRS-2)
1.4.2.2.   Test of Memory Malingering (TOMM)
1.4.2.3.   Georgia Atypical Presentation (GAP)
1.4.2.4.   Structured Inventory of Malingered Symptomatology (SIMS)
1.4.2.5.   lnventory of Legal Knowledge (ILK).

1.4.3. Contractor may administer further cognitive assessments based on the specific cognitive deficit identified during the preliminary assessment. If the screening instruments administered during the preliminary assessment raise suspicion that the primary barrier to trial competency is cognitive deficits, the following may also be utilized including, but not limited to:

1.4.3.1.   Repeatable Battery for the Assessment (Neuropsychological Status (RBANS)
1.4.3.2.   Wide Range Achievement Test -I (WRAT-1)
1.4.3.3.   Montreal Cognitive Assessment (MoCA).

1.4.4. Contractor may administer additional instruments assessing personality to complete further assessment of psychological functioning including, but not limited to:

Case 3:25-cv-00410-W-MMP    Document 20    Filed 08/18/25    PageID.415    Page 176
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A-1 – JAIL BASED COMPETENCY TREATMENT PROGRAM

1.4.4.1.    Personality Assessment lnvent01y (PAI)

1.4.4.2.    Minnesota Multiphasic Personality lnventory-2 (MMPl-2)

1.4.5. Contractor shall administer follow-up assessments of the male Patient Inmate's current competency to stand trial at 30-day intervals or more frequently as needed using any of the following including, but not limited to:

1.4.5.1.    Evaluation of Competency to Stand Trial-Revised (ECST-R)

1.4.5.2.    Revised Competency Assessment Instrument (R-CA/)

1.4.5.3.    MacArthur Competency Assessment Tool-Criminal Adjudication (MacCAT-CA); or

1.4.5.4.    Competence Assessment for Standing Trial for Defendants with Mental Retardation (CAST-MR)

1.5.  Individualized Treatment Program

1.5.1. Contractor shall identify specific deficits that result in incompetence to stand trial upon admission. Each deficit shall be listed on the individualized treatment plan and shall be targeted in the male Patient Inmate's treatment. Contractor shall use current standardized competency assessment tools, such as the MacArthur Competency Assessment Tool, after considering the totality of clinical and forensic circumstances.

1.5.2. Contractor shall provide an individualized restoration program according to the treatment approach subscribed to by the individual treatment teams and indicated by the male Patient Inmate's psychiatric condition, level of functioning, and legal context.

1.5.3. Contractor shall tailor individualized treatment regimens to the male Patient Inmate's specific barrier(s) to trial competency. Deficits identified in the competency assessment upon admission to the JBCT program shall be listed in the individual treatment plan and addressed by specific treatment interventions.

1.5.4. Contractor shall conduct case conferences weekly or as needed to reassess male Patient Incarcerated individuals' progress toward restoration of competence to allow the treatment teams to measure whether their treatment interventions are working, and whether additional treatment elements need to be incorporated into male Patient Incarcerated individuals' treatment plans.

1.6. Multi-modal, Experiential Competency Restoration Educational Experience and Components

1.6.1. Contractor shall provide educational materials presented in multiple learning formats by multiple staff to each male Patient Inmate, e.g., a simple lecture format may be replaced with learning experiences involving discussion, reading, video, and experiential methods of instruction, such as role-playing or mock trial.

1.6.2. Contractor shall address the following elements in the education modalities of the competency

Case 3:25-cv-00410-W-MMP    Document 20    Filed 08/18/25    PageID.416    Page 177
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NaphCare, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A-1 – JAIL BASED COMPETENCY TREATMENT PROGRAM

restoration program including, but not limited to:

1.6.2.1.    Criminal charges
1.6.2.2.    Severity of charges, namely Felony vs. Misdemeanor
1.6.2.3.    Sentencing
1.6.2.4.    Pleas including, Guilty, Not Guilty, Nolo Contendere and Not Guilty by Reason of Insanity
1.6.2.5.    Plea bargaining
1.6.2.6.    Roles of the courtroom personnel
1.6.2.7.    Adversarial nature of trial process
1.6.2.8.    Evaluating evidence
1.6.2.9.    Court room behavior
1.6.2.10.    Assisting counsel in conducting a defense
1.6.2.11.    Probation and Parole
1.6.2.12.    Individualized instruction as needed

1.6.3. Contractor shall provide additional learning experience through increased lecture time, as well as individual instruction to male Patient Incarcerated individuals who are incompetent due to specific knowledge deficits and by low intelligence, but who may be restored to competence with additional exposure to the educational material.

## 1.7.  Medication Administration and Consent

1.7.1. Contractor shall obtain proper authorization (e.g., informed consent for treatment, medication issues) from the male Patient Inmate as soon as possible in accordance with professional standards of care and court practices.

1.7.2. Contractor shall provide strategies to promote and incentivize voluntary psychotropic medication compliance.

1.7.3. If involuntary psychotropic medication is not ordered by the court at time of commitment of a male patient to the JBCT program and the treating psychiatrist determines that psychotropic medication has become medically necessary and appropriate, Contractor shall request that the court make an order for the administration of involuntary psychotropic medication.

1.7.4. Contractor shall administer involuntary psychotropic medication utilizing the San Diego Sheriff's Department Pharmacy formulary when medically necessary and appropriate upon the issuance of the court order.

## 1.8.  Data Deliverables

1.8.1. The DSH shall provide a standardized data collection template. Contractor shall complete and submit this data collection to the DSH on a weekly basis with a deadline to be determined by the DSH. The template includes, but is not limited to, the following data elements:

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH RxI²HCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A-1 – JAIL BASED COMPETENCY TREATMENT PROGRAM

| Term | Definition |
|---|---|
| Patient Name: | Last and First name of patient |
| Case number: | Court assigned case number for each individual court case. It can typically include letters and numbers. |
| Booking number: | Number that county jail issues to an individual (per Forensics) |
| Gender: | Male or Female or Non-binary |
| Date of Birth: | Birthdate, Age can be determined using this date |
| Ethnicity: | Type of social group that has a common national or cultural tradition. *Caucasian/White, African American/Black, American Indian/Alaska Native, Asian, Native Hawaiian/Other Pacific Islander, Hispanic, Other* |
| Language Spoken: | Type of language spoken |
| Interpretative Services Utilized (YES/NO) | Was Interpretive services utilized? Yes or No |
| Referring County: | County of referral and/or commitment |
| Commitment Date: | Date of Commitment |
| Packet Received Date: | Date Packet received (including incomplete required documents) |
| Packet Completed Date: | Date Packet completed (including all completed required documents) |
| Reason for Ongoing Pending Status: | Provide a detailed reason why the delay of admission |
| Screening Evaluation Completed Date: | Date Screening Evaluation was completed |
| Screening Outcome: | Outcome results of patient screened. Accepted or Rejected |
| Reason for Screening Rejection: | Detail regarding reason for screening rejection. Bypassed/Triaged, Non-Roc, Medication, Substance-Related, Higher Level-of-Care, Other |
| Admission Date: | Date of Admission |
| Involuntary Medication Order (YES/NO): | Is there a current court order IMO in place? Yes or No |
| IMO Effective Date: | Date IMO was effective on, this is the same as their 1370 commitment date |
| Medication Adherence: | Whether patient takes their medications as prescribed. Fully Adherent, Intermittently Adherent, Refusing. (If applicable to program) |
| Did I/P receive involve meds (YES/NO): | Was involuntary medication administered |
| Disposition of Discharge/Transfer: | Final determination of patient's status. Restored or DSH |
| Reason for Discharge/Transfer: | Detail regarding reason for patient's discharge or transfer |
| Date Referred to DSH for Transfer: | Date of Discharge and or Date of Transfer |
| Discharge/Transfer location: | Location where patient will be discharged to. Jail, Atascadero SH, Coalinga SH, Metropolitan SH, Napa SH, Patton SH, Other: Must update notes with specific location |
| Reason for delayed Discharge: | Provide a detailed reason why the delay of discharge |
| Date ROC Certificate submitted to Court: | Date that ROC Certificate was submitted to Court |
| Primary diagnosis at Admission: | Patients primary Diagnosis at time Admission |
| Diagnosis at Discharge: | Patients primary Diagnosis at time of Discharge |
| Diagnosis of Malingering? (YES/NO) | Did patient have a Malingering Diagnosis at any point during their stay in JBCT? (YES/NO) |

1.8.2. Contractor shall submit daily census reports to the DSH upon the first male Patient Inmate admission, unless otherwise requested by the DSH.

1.8.3. Contractor shall submit a summary performance report within 30 days of the end of the contract term

EXHIBIT B

Case 3:25-cv-00410-W-MMP    Document 20    Filed 09/18/25    PageID.418    Page 179
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A-1 – JAIL BASED COMPETENCY TREATMENT PROGRAM

to include, but not be limited to, the information stated above and:

|  |  |
|---|---|
| 1.8.3.1. | The total number of individuals restored to competency |
| 1.8.3.2. | The average number of days between program admission and discharge |
| 1.8.3.3. | The total cost of the program by budget category: personnel, operating expenses, administrative expense, custody and housing, and other direct operating costs as well as overall cost per male Patient Inmate treated and the costs for those found to be malingering |
| 1.8.3.4. | The cost per cycle of treatment |
| 1.8.3.5. | A description of all implementation challenges |
| 1.8.3.6. | Special incident reports and notification to the DSH of emergencies |

1.9. Reporting Requirements

1.9.1. Contractor shall submit a written report to the court, the community program director of the county or region of commitment, and the DSH Contract Manager concerning the male Patient Inmate's progress toward recovery of trial competence within 90 days of a commitment. The report shall include a description of any antipsychotic medication administered to the male Patient Inmate and its effects and side effects, including effects on the male Patient Inmate's appearance or behavior that would affect the male Patient ability to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a reasonable manner.

1.9.2. Contractor shall verbally report any escape within 24 hours to the court that made the commitment, the prosecutor in the case, the Department of Justice, and the DSH Contract Manager, with a written report to follow within five business days.

1.9.3. Contractor shall file a certificate of restoration with the court that made the commitment when the Program Director or their designee determines that the male Patient Inmate has regained trial competence.

2. TREATMENT PROTOCOL

2.1. JBCT is an intensive, milieu-based treatment program that quickly facilitates competency through a combination of group and individual therapy.

2.2. Group therapy is central to the restoration process, and Contractor shall provide treatment daily to male patient. Group content should include one of the four group treatment domains: competency education, understanding and management of mental illness, physical exercise, and mental/social stimulation. Many group topics can be assimilated into the groupings, e.g., mock trial, music-based competency treatment, etc.

2.3. Contractor shall provide individual sessions per day to each male. Individual sessions may be used to check-in with male Patient Incarcerated individuals and/or discuss key legal elements of the individual's case that may be too sensitive for group discussion. Specific competency issues can best be addressed individually, e.g., a male patient understands court proceedings but struggles to apply the knowledge to their individual case.

2.4. Contractor's psychiatrist shall see each male patient weekly. A psychiatric assessment is a component of the admission process, and more frequent appointments shall be available as needed.

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT A-1 – JAIL BASED COMPETENCY TREATMENT PROGRAM

2.5.  Together on a weekly basis, the multi-disciplinary treatment team shall review:

2.5.1. Progress of all male incarcerated individuals admitted within (30 days)
2.5.2. At subsequent 14-day intervals thereafter
2.5.3. When a male is under consideration for discharge

2.6.  The multi-disciplinary treatment team shall be responsible for providing the committing court progress reports pursuant to Penal Code section 1370 subdivision (b)(I).

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NaphCare, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT B – INSURANCE REQUIREMENTS

**INSURANCE REQUIREMENTS FOR CONTRACTORS**

Without limiting Contractor's indemnification obligations to County, Contractor shall provide at its sole expense and maintain for the duration of this contract, or as may be further required herein, insurance against claims for injuries to persons or damages to property which may arise from or in connection with the performance of the work hereunder and the results of the work by the Contractor, his agents, representatives, employees or subcontractors.

**1. Minimum Scope of Insurance**

Coverage shall be at least as broad as:

A. Commercial General Liability, Occurrence form, Insurance Services Office form CG0001.

B. Automobile Liability covering all owned, non owned, hired auto Insurance Services Office form CA0001.

C. Workers' Compensation, as required by State of California and Employer's Liability Insurance.

D. Medical and Hospital Professional Liability (Errors & Omissions) insurance appropriate to the Contractor's Profession, including, but not limited to medical administration, counseling and legal services.

E. Improper Sexual Conduct including sexual harassment, sexual abuse and sexual misconduct applying to bodily injury, property damage or personal injury arising out of the actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of the insured or as a result of the negligent employment, investigation, hiring & supervision or the reporting or failure to report to proper authorities of a person for whom any insured is or ever was legally responsible.

F. Cyber/Information Security Liability shall cover all of Contractor's employees, officials and agents. Coverage shall be sufficiently broad to respond to the duties and obligations as is undertaken by Contractor in this agreement and shall apply to any dishonest, fraudulent, malicious or criminal activities that affect, alter, copy, corrupt, delete, disrupt or destroy a computer system or to obtain financial benefit for any party; to steal, take or provide unauthorized access of either electronic or non-electronic data, including publicizing confidential electronic or non-electronic data; causing electronic or non-electronic confidential electronic data to be accessible to unauthorized persons; transfer of computer virus, Trojan horse, worms or any other type of malicious or damaging code; and for Third-Party Liability encompassing judgments or settlement and defense costs arising out of litigation due to a data breach and data breach response costs for customer notification and credit monitoring service fees.

**2. Minimum Limits of Insurance**

Contractor shall maintain limits no less than:

A. Commercial General Liability including Premises, Operations, Products and Completed Operations, Contractual Liability, and Independent Contractors Liability: $5,000,000 per occurrence for bodily injury, personal injury and property damage. The General Aggregate limit shall be $10,000,000.

B. Automobile Liability: $1,000,000 each accident for bodily injury and property damage.

C. Employer's Liability: $1,000,000 each accident for bodily injury or disease. Coverage shall include waiver of subrogation endorsement in favor of County of San Diego.

D. Medical and Hospital Professional Liability (Errors & Omissions): $5,000,000 per claim with an aggregate limit of not less than $10,000,000. Coverage shall include contractual liability coverage. This coverage shall be maintained for a minimum of three years following termination or completion of Contractor's work pursuant to the Contract.

E. Improper Sexual Conduct: $1,000,000 per claim with an aggregate limit of not less than $2,000,000.

F. Cyber/Information Security Liability. $2,000,000 per claim with an aggregate limit of not less than $2,000,000.

If the contractor maintains broader coverage and/or higher limits than the minimums shown above, the County requires and shall be entitled to the broader coverage and/or higher limits maintained by the Contractor. As a requirement of this contract, any available insurance proceeds in excess of the specified minimum limits and coverage stated above, shall also be available to the County of San Diego.



EXHIBIT B

Case 3:25-cv-00410-W-MMP   Document 20   Filed 08/18/25   PageID.421   Page 182
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NaphCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT B – INSURANCE REQUIREMENTS

**3. Self-Insured Retentions**

Any self-insured retention must be declared to and approved by County Risk Management. At the option of the County, either: the insurer shall reduce or eliminate such self-insured retentions as respects the County, the members of the Board of Supervisors of the County and the officers, agents, employees and volunteers; or the Contractor shall provide a financial guarantee satisfactory to the County guaranteeing payment of losses and related investigations, claim administration, and defense expenses.

**4. Other Insurance Provisions**

The insurance policies are to contain, or be endorsed to contain, the following provisions:

A. Additional Insured Endorsement

The County of San Diego, the members of the Board of Supervisors of the County and the officers, agents, employees and volunteers of the County, individually and collectively are to be covered as additional insureds on the Medical and Hospital Professional Liability (Errors & Omissions) and General Liability policies with respect to liability arising out of work or operations performed by or on behalf of the Contractor, or that should have been performed by or on behalf of the Contractor, including, without limitation, materials, parts, or equipment furnished in connection with such work or operations and automobiles owned, leased, hired or borrowed by or on behalf of the Contractor. General Liability coverage can be provided in the form of an endorsement to the Contractor's insurance (at least as broad as ISO from CG 2010 11 85 or **both** CG 2010, CG 2026, CG 2033, or CG 2038; **and** CG 2037 forms if later revisions used).

B. Primary Insurance Endorsement

For any claims related to this Contract, Contractor's insurance coverage, including any excess liability policies, shall be primary insurance at least as broad as ISO CG 20 01 04 13 as respects the County, the members of the Board of Supervisors of the County and the officers, agents, employees and volunteers of the County, individually and collectively. Any insurance or self-insurance maintained by the County, its officers, employees, or volunteers shall be excess of the Contractor's insurance and shall not contribute with it.

C. Notice of Cancellation

Each insurance policy required above shall state that coverage shall not be canceled, except with notice to the County.

D. Severability of Interest Clause

Coverage applies separately to each insured, except with respect to the limits of liability, and that an act or omission by one of the named insureds shall not reduce or avoid coverage to the other named insureds.

## General Provisions

**5. Qualifying Insurers**

All required policies of insurance shall be issued by companies which have been approved to do business in the State of California by the State Department of Insurance, and which hold a current policy holder's alphabetic and financial size category rating of not less than A, VII according to the current Best's Key Rating guide, or a company of equal financial stability that is approved in writing by County Risk Management.

**6. Evidence of Insurance**

Prior to commencement of this Contract, but in no event later than the effective date of the Contract, Contractor shall furnish the County with a copy of the certificates of insurance and amendatory endorsements effecting coverage required by this clause. Renewal certificates and amendatory endorsements shall be furnished to County within thirty days of the expiration of the term of any required policy. Contractor shall permit County at all reasonable times to inspect any required policies of insurance.

**7. Failure to Obtain or Maintain Insurance; County's Remedies**

Contractor's failure to provide insurance specified or failure to furnish certificates of insurance and amendatory endorsements or failure to make premium payments required by such insurance shall constitute a material breach of the Contract, and County may, at its option, terminate the Contract for any such default by Contractor.

**8. No Limitation of Obligations**

The foregoing insurance requirements as to the types and limits of insurance coverage to be maintained by Contractor, and any approval of said insurance by the County are not intended to and shall not in any manner limit or qualify the liabilities and obligations otherwise assumed by Contractor pursuant to the Contract, including, but not limited to, the provisions concerning indemnification.

**9. Review of Coverage**



Case 3:25-cv-00410-W-MMP    Document 20    Filed 09/18/25    PageID.422    Page 183 of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT B – INSURANCE REQUIREMENTS

County retains the right at any time to review the coverage, form and amount of insurance required herein and may require Contractor to obtain insurance reasonably sufficient in coverage, form and amount to provide adequate protection against the kind and extent of risk which exists at the time a change in insurance is required.

**10. Self-Insurance**

Contractor may, with the prior <u>written</u> consent of County Risk Management, fulfill some or all of the insurance requirements contained in this Contract under a plan of self-insurance. Contractor shall only be permitted to utilize such self-insurance if in the opinion of County Risk Management, Contractor's (i) net worth, and (ii) reserves for payment of claims of liability against Contractor, are sufficient to adequately compensate for the lack of other insurance coverage required by this Contract. Contractor's utilization of self-insurance shall not in any way limit liabilities assumed by Contractor under the Contract.

**11. Claims Made Coverage**

If coverage is written on a "claims made" basis, the Certificate of Insurance shall clearly so state. In addition to the coverage requirements specified above, such policy shall provide that:

    A.   The policy retroactive date coincides with or precedes Contractor's commencement of work under the Contract (including subsequent policies purchased as renewals or replacements).

    B.   Contractor will make every effort to maintain similar insurance during the required extended period of coverage following expiration of the Contact.

    C.   If insurance is terminated for any reason, Contractor shall purchase an extended reporting provision of at least three years to report claims arising in connection with the Contract.

    D.   The policy allows for reporting of circumstances or incidents that might give rise to future claims.

**12. Subcontractors' Insurance**

Contractor shall require and verify that all subcontractors maintain insurance meeting all the requirements stated herein, and Contractor shall ensure that County is an additional insured on insurance required from subcontractors. Such Additional Insured endorsement shall be attached to the certificate of insurance in order to be valid and on a form at least as broad as ISO from CG 2010 11 85 or both CG 2010, CG 2026, CG 2033, or CG 2038; and CG 2037 forms if later revisions used. Licensed professionals providing medical services must have Professional Liability insurance in an amount of not less than $1,000,000 each occurrence and $3,000,000 aggregate. If any sub contractor's coverage does not comply with the foregoing provisions, Contractor shall defend and indemnify the County from any damage, loss, cost, or expense, including attorneys' fees, incurred by County as a result of subcontractor's failure to maintain required coverage.

**13. Waiver of Subrogation**

Contractor hereby grants to County a waiver of their rights of subrogation which any insurer of Contractor may acquire against County by virtue of the payment of any loss. Contractor agrees to obtain any endorsement that may be necessary to affect this waiver of subrogation. The Workers' Compensation policy shall be endorsed with a waiver of subrogation in favor of the County for all work performed by the Contractor, its employees, agents and subcontractors.



COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE

| Line Item Description | RFP Reference | Technical Proposal Reference | Occurrence | Base Year 1 | Optional Year 1 | Optional Year 2 |
|---|---|---|---|---|---|---|
| Personnel Expense (Salary, Benefits) | Attachment A-1 | 2.2, Staffing Plan | Continuous | $ 21,236,526.00 | $ 21,873,621.78 | $ 22,529,830.43 |
| Medical Supplies Expense | Attachment A, 2.13 | 2.13, Equipment and Supplies | Continuous | $ 500,000.00 | $ 515,000.00 | $ 530,450.00 |
| Pharmaceutical Expense | Attachment A, 2.2.27 | 2.2.27, Pharmacy | Continuous | $ 7,600,000.00 | $ 7,828,000.00 | $ 8,062,840.00 |
| Offsite Expense | Attachment A. 2.2.18 | 2.2.18, Offsite | Continuous | $ 17,000,000.00 | $ 17,510,000.00 | $ 18,035,300.00 |
| Onsite Diagnostic Services | Attachment A, 2.2.28 | 2.2.28, Diagnostic Services | Continuous | $ 424,000.00 | $ 436,720.00 | $ 449,821.60 |
| Onsite Specialty Services (Dialysis, Physical Therapy, Vision Services, etc.) | Attachment A. 2.2.18 | 2.2.18. Onsite Specialty Care Services | Continuous | $ 575,000.00 | $ 592,250.00 | $ 610,017.50 |
| Medical Equipment and Maintenance | Attachment A, 2.8 | 2.13, Equipment and Supplies | Continuous | $ 150,000.00 | $ 154,500.00 | $ 159,135.00 |
| Office Supplies | Attachment A, 2.13 | 2.13, Equipment and Supplies | Continuous | $ 25,000.00 | $ 25,750.00 | $ 26,522.50 |
| Healthcare Waste Disposal | Attachment A, 2.23 | 2.23, Health Care Waste | Continuous | $ 100,000.00 | $ 103,000.00 | $ 106,090.00 |
| Start Up Expenses | Attachment A, 2.35.23 | 2.35.23, Transition | Continuous | $ 110,000.00 | $ 110,000.00 | $ 110,000.00 |
| Insurance Expense | Exhibit B | Section 5 – Insurance Requirements | Continuous | $ 1,200,000.00 | $ 1,236,000.00 | $ 1,273,080.00 |
| Taxes and Licenses | Attachment A-1, Section 1 | 2.27-28, Licenses, Certifications, Registrations | Continuous | $ 100,000.00 | $ 103,000.00 | $ 106,090.00 |
| Administrative Overhead Expense | Attachment A, 2.18 | 2.19, Administration of Services | Continuous | $ 1,678,000.00 | $ 1,728,340.00 | $ 1,780,190.20 |
| Margin | | | Continuous | $ 986,000.00 | $ 1,015,580.00 | $ 1,046,047.40 |
| Additional Insurance* | | | Continuous | $ 2,843,412.00 | $ 2,843,412.00 | $ 2,843,412.00 |
| | | | Total | $ 54,527,938.00 | $ 56,075,173.78 | $ 57,668,826.63 |

*This line item will be reviewed annually by the Parties and revised as appropriate by mutual agreement of the Parties.

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE

| Line Item Description | RFP Reference | Technical Proposal Reference | Occurrence | Optional Year 3 | Optional Year 4 | Optional Year 5 |
|---|---|---|---|---|---|---|
| Personnel Expense (Salary, Benefits) | Attachment A-1 | 2.2, Staffing Plan | Continuous | $ 23,205,725.35 | $ 23,901,897.11 | $ 24,618,954.02 |
| Medical Supplies Expense | Attachment A, 2.13 | 2.13, Equipment and Supplies | Continuous | $ 546,363.50 | $ 562,754.41 | $ 579,637.04 |
| Pharmaceutical Expense | Attachment A, 2.2.27 | 2.2.27, Pharmacy | Continuous | $ 8,304,725.20 | $ 8,553,866.96 | $ 8,810,482.96 |
| Offsite Expense | Attachment A, 2.2.15 | 2.2.18, Offsite | Continuous | $ 18,576,359.00 | $ 19,133,649.77 | $ 19,707,659.26 |
| Onsite Diagnostic Services | Attachment A, 2.2.28 | 2.2.28, Diagnostic Services | Continuous | $ 463,316.25 | $ 477,215.74 | $ 491,532.21 |
| Onsite Specialty Services (Dialysis, Physical Therapy, Vision Services, etc.) | Attachment A, 2.2.14 | 2.2.18, Onsite Specialty Care Services | Continuous | $ 628,318.03 | $ 647,167.57 | $ 666,582.59 |
| Medical Equipment and Maintenance | Attachment A, 2.8 | 2.13, Equipment and Supplies | Continuous | $ 163,909.05 | $ 168,826.32 | $ 173,891.11 |
| Office Supplies | Attachment A, 2.13 | 2.13, Equipment and Supplies | Continuous | $ 27,318.18 | $ 28,137.72 | $ 28,981.85 |
| Healthcare Waste Disposal | Attachment A, 2.23 | 2.23, Health Care Waste | Continuous | $ 109,272.70 | $ 112,550.88 | $ 115,927.41 |
| Start Up Expenses | Attachment A, 2.35.23 | 2.35.23, Transition | Continuous | $ 110,000.00 | $ 110,000.00 | $ 110,000.00 |
| Insurance Expense | Exhibit B | Section 5 - Insurance Requirements | Continuous | $ 1,311,272.40 | $ 1,350,610.57 | $ 1,391,128.89 |
| Taxes and Licenses | Attachment A-1, Section 1 | 2.27-28, Licenses, Certifications, Registrations | Continuous | $ 109,272.70 | $ 112,550.88 | $ 115,927.41 |
| Administrative Overhead Expense | Attachment A, 2.18 | 2.19, Administration of Services | Continuous | $ 1,833,595.91 | $ 1,888,603.78 | $ 1,945,261.90 |
| Margin | | | Continuous | $ 1,077,428.82 | $ 1,109,751.69 | $ 1,143,044.24 |
| Additional Insurance* | | | Continuous | $ 2,843,412.00 | $ 2,843,412.00 | $ 2,843,412.00 |
| | | | Total | $ 59,310,289.09 | $ 61,000,995.40 | $ 62,742,422.89 |

*This line item will be reviewed annually by the Parties and revised as appropriate by mutual agreement of the Parties.

Contract 566117

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE

| Line Item Description | RFP Reference | Technical Proposal Reference | Occurrence | Optional Year 6 | Optional Year 7 | Optional Year 8 | Optional Year 9 |
|---|---|---|---|---|---|---|---|
| Personnel Expense (Salary, Benefits) | Attachment A-1 | 2.2, Staffing Plan | Continuous | $25,357,522.64 | $26,118,248.32 | $26,901,795.77 | $27,708,849.64 |
| Medical Supplies Expense | Attachment A, 2.13 | 2.13, Equipment and Supplies | Continuous | $ 597,026.15 | $614,936.93 | $633,385.04 | $ 652,386.59 |
| Pharmaceutical Expense | Attachment A, 2.2.27 | 2.2.27, Pharmacy | Continuous | $ 9,074,797.45 | $9,347,041.38 | $9,627,452.62 | $ 9,916,276.20 |
| Offsite Expense | Attachment A. 2.2.15 | 2.2.18, Offsite | Continuous | $20,298,889.04 | $20,907,855.71 | $21,535,091.38 | $22,181,144.13 |
| Onsite Diagnostic Services | Attachment A, 2.2.28 | 2.2.28, Diagnostic Services | Continuous | $ 506,278.17 | $ 521,466.52 | $ 537,110.51 | $ 553,223.83 |
| Onsite Specialty Services (Dialysis, Physical Therapy, Vision Services, etc.) | Attachment A. 2.2.14 | 2.2.18, Onsite Specialty Care Services | Continuous | $ 686,580.07 | $707,177.47 | $ 728,392.80 | $ 750,244.58 |
| Medical Equipment and Maintenance | Attachment A, 2.8 | 2.13, Equipment and Supplies | Continuous | $ 179,107.84 | $184,481.08 | $ 190,015.51 | $ 195,715.98 |
| Office Supplies | Attachment A, 2.13 | 2.13, Equipment and Supplies | Continuous | $ 29,851.31 | $30,746.85 | $ 31,669.25 | $ 32,619.33 |
| Healthcare Waste Disposal | Attachment A, 2.23 | 2.23, Health Care Waste | Continuous | $ 119,405.23 | $ 122,987.39 | $ 126,677.01 | $ 130,477.32 |
| Start Up Expenses | Attachment A, 2.35.23 | 2.35.23, Transition | Continuous | $ 110,000.00 | $ 110,000.00 | $ 110,000.00 | $ 110,000.00 |
| Insurance Expense | Exhibit B | Section 5 - Insurance Requirements | Continuous | $1,432,862.76 | $1,475,848.64 | $ 1,520,124.10 | $1,565,727.82 |
| Taxes and Licenses | Attachment A-1, Section 1 | 2.27-28, Licenses, Certifications, Registrations | Continuous | $ 119,405.23 | $ 122,987.39 | $ 126,677.01 | $ 130,477.32 |
| Administrative Overhead Expense | Attachment A, 2.18 | 2.19, Administration of Services | Continuous | $ 2,003,619.75 | $ 2,063,728.35 | $ 2,125,640.20 | $ 2,189,409.40 |
| Margin | | | Continuous | $ 1,177,335.56 | $ 1,212,655.63 | $1,249,035.30 | $1,286,506.36 |
| Additional Insurance* | | | Continuous | $ 2,843,412.00 | $ 2,843,412.00 | $ 2,843,412.00 | $ 2,843,412.00 |
| | | | Total | $ 64,536,093.20 | $66,383,573.66 | $68,286,478.50 | $70,246,470.50 |

*This line item will be reviewed annually by the Parties and revised as appropriate by mutual agreement of the Parties.

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH RXXHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE: JBCT PRICING

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **\*Allocated - Minimum 25 Beds** | | | | | | | |
| | Per Diem Rate | | Total Beds | | Days in Treatment | | Total | |
| **Base Year** | $ 181.65 | x | 25 | x | 365 | = | $ 1,657,556.25 | |
| | **\*Non-Allocated - Up to 5 Additional Beds** | | | | | | | |
| | Per Diem Rate | | Total Beds | | Days in Treatment | | Total | |
| | $ 181.65 | x | 5 | x | 365 | = | $ 331,511.25 | |

| Total Base Year | $ 1,989,067.50 |
|---|---|

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **\*Allocated - Minimum 25 Beds** | | | | | | | |
| | Per Diem Rate | | Total Beds | | Days in Treatment | | Total | |
| **Option Year 1** | $ 187.10 | x | 25 | x | 365 | = | $ 1,707,282.94 | |
| | **\*Non-Allocated - Up to 5 Additional Beds** | | | | | | | |
| | Per Diem Rate | | Total Beds | | Days in Treatment | | Total | |
| | $ 187.10 | x | 5 | x | 365 | = | $ 341,456.59 | |

| Total Option Year 1 | $ 2,048,739.53 |
|---|---|

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **\*Allocated - Minimum 25 Beds** | | | | | | | |
| | Per Diem Rate | | Total Beds | | Days in Treatment | | Total | |
| **Option Year 2** | $ 192.71 | x | 25 | x | 365 | = | $ 1,758,501.43 | |
| | **\*Non-Allocated - Up to 5 Additional Beds** | | | | | | | |
| | Per Diem Rate | | Total Beds | | Days in Treatment | | Total | |
| | $ 192.71 | x | 5 | x | 365 | = | $ 351,700.29 | |

| Total Option Year 2 | $ 2,110,201.71 |
|---|---|

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **\*Allocated - Minimum 25 Beds** | | | | | | | |
| | Per Diem Rate | | Total Beds | | Days in Treatment | | Total | |
| **Option Year 3** | $ 198.49 | x | 25 | x | 365 | = | $ 1,811,256.47 | |
| | **\*Non-Allocated - Up to 5 Additional Beds** | | | | | | | |
| | Per Diem Rate | | Total Beds | | Days in Treatment | | Total | |
| | $ 198.49 | x | 5 | x | 365 | = | $ 362,251.29 | |

| Total Option Year 3 | $ 2,173,507.76 |
|---|---|

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **\*Allocated - Minimum 25 Beds** | | | | | | | |
| | Per Diem Rate | | Total Beds | | Days in Treatment | | Total | |
| **Option Year 4** | $ 204.45 | x | 25 | x | 365 | = | $ 1,865,594.16 | |
| | **\*Non-Allocated - Up to 5 Additional Beds** | | | | | | | |
| | Per Diem Rate | | Total Beds | | Days in Treatment | | Total | |
| | $ 204.45 | x | 5 | x | 365 | = | $ 373,118.83 | |

| Total Option Year 4 | $ 2,238,712.99 |
|---|---|

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE: JBCT PRICING

| | *Allocated - Minimum 25 Beds | | | | | |
|---|---|---|---|---|---|---|
| **Option Year 5** | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | **Total** |
| | $ 210.58 | x | 25 | x | 365 | = $ 1,921,561.99 |
| | *Non-Allocated - Up to 5 Additional Beds | | | | | |
| | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | **Total** |
| | $ 210.58 | x | 5 | x | 365 | = $ 384,312.40 |

| **Total Option Year 5** | $ 2,305,874.38 |
|---|---|

| | *Allocated - Minimum 25 Beds | | | | | |
|---|---|---|---|---|---|---|
| **Option Year 6** | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | **Total** |
| | $ 216.90 | x | 25 | x | 365 | = $ 1,979,208.85 |
| | *Non-Allocated - Up to 5 Additional Beds | | | | | |
| | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | **Total** |
| | $ 216.90 | x | 5 | x | 365 | = $ 395,841.77 |

| **Total Option Year 6** | $ 2,375,050.62 |
|---|---|

| | *Allocated - Minimum 25 Beds | | | | | |
|---|---|---|---|---|---|---|
| **Option Year 7** | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | **Total** |
| | $ 223.41 | x | 25 | x | 365 | = $ 2,038,585.11 |
| | *Non-Allocated - Up to 5 Additional Beds | | | | | |
| | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | **Total** |
| | $ 223.41 | x | 5 | x | 365 | = $ 407,717.02 |

| **Total Option Year 7** | $ 2,446,302.13 |
|---|---|

| | *Allocated - Minimum 25 Beds | | | | | |
|---|---|---|---|---|---|---|
| **Option Year 8** | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | **Total** |
| | $ 230.11 | x | 25 | x | 365 | = $ 2,099,742.67 |
| | *Non-Allocated - Up to 5 Additional Beds | | | | | |
| | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | **Total** |
| | $ 230.11 | x | 5 | x | 365 | = $ 419,948.53 |

| **Total Option Year 8** | $ 2,519,691.20 |
|---|---|

| | *Allocated - Minimum 25 Beds | | | | | |
|---|---|---|---|---|---|---|
| **Option Year 9** | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | **Total** |
| | $ 237.01 | x | 25 | x | 365 | = $ 2,162,734.95 |
| | *Non-Allocated - Up to 5 Additional Beds | | | | | |
| | **Per Diem Rate** | | **Total Beds** | | **Days in Treatment** | **Total** |
| | $ 237.01 | x | 5 | x | 365 | = $ 432,546.99 |

| **Total Option Year 9** | $ 2,595,281.93 |
|---|---|

*Contractor will invoice a fixed monthly amount for 25 beds as described above.  If the bed count increases by up to 5 beds, Contractor will invoice County a fixed additional monthly amount per bed for up to the additional 5 beds as set forth above

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE: RADIOLOGY PRICING

| # | DESCRIPTION | UNIT OF MEASURE | ESTIMATED QUANTITY PER YEAR | BASE TERM Date of Award - 6/30/2021 UNIT PRICE | 1ST OPTION YEAR 7/1/2021-4/30/2022 UNIT PRICE | 2ND OPTION YEAR 6/1/2022-5/31/2023 UNIT PRICE | 3RD OPTION YEAR 6/1/2023-5/31/2024 UNIT PRICE | 4TH OPTION YEAR 6/1/2024-5/31/2025 UNIT PRICE |
|---|---|---|---|---|---|---|---|---|
| 1 | X-RAYS PROCESSING | EA | 44,424 | $11.22 | $11.56 | $11.90 | $12.26 | $12.63 |
| 2 | X-RAY TECHNICIAN | HOUR | 17,758 | $49.12 | $50.59 | $52.11 | $53.67 | $55.28 |
| 3 | STAT | EA | 120 | $100.00 | $103.00 | $106.09 | $109.27 | $112.55 |

Notes: NUMBERS ARE ESTIMATES ONLY AND NOT GUARANTEED.

| # | DESCRIPTION | EXTENDED PRICE BASE TERM | EXTENDED PRICE 1ST OPTION YEAR | EXTENDED PRICE 2ND OPTION YEAR | EXTENDED PRICE. 3RD OPTION YEAR | EXTENDED PRICE. 4TH OPTION YEAR |
|---|---|---|---|---|---|---|
| 1 | X-RAYS PROCESSING | $498,437.28 | $513,541.44 | $528,645.60 | $544,638.24 | $561,075.12 |
| 2 | X-RAY TECHNICIAN | $872,272.96 | $898,377.22 | $925,369.38 | $953,071.86 | $981,662.24 |
| 3 | STAT | $12,000.00 | $12,360.00 | $12,730.80 | $13,112.40 | $13,506.00 |
|  | TOTAL | $1,382,710.24 | $1,424,278.66 | $1,466,745.78 | $1,510,822.50 | $1,556,243.36 |

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE: STAFFING MATRIX

| Position Title | Staff Provider | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
|---|---|---|---|---|---|---|---|---|---|---|
| **San Diego Jail**<br>**NaphCare Staffing Support** | | | | | | | | | | |
| STATCare Nurse Practitioners (Telehealth) | NaphCare | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| STATCare Auditors (Quality Assurance) | NaphCare | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | | | 80 | 2.000 |
| RN Trainers | NaphCare | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | | | 80 | 2.000 |
| Pharmacy Team at Corporate (Manage detox patients) | NaphCare | 4.000 | 4.000 | 4.000 | 4.000 | 4.000 | | | 20 | 0.500 |
| Psych Nurse Practitioner | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psych Nurse Practitioner | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Medical Nurse Practitioner | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Mental Health Program Director | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Administrative Assistant | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| **Night Shift** | | | | | | | | | | |
| STATCare Nurse Practitioners (Telehealth) | NaphCare | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |

**Total FTEs    13.700**

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE: STAFFING MATRIX

| Position Title | Staff Provider | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
|---|---|---|---|---|---|---|---|---|---|---|
| **San Diego Central Jail - SDCJ** **NaphCare Staffing - ADP 721** | | | | | | | | | | |
| **Day Shift** | | | | | | | | | | |
| Program Manager (Over all sites) | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Medical Director (Over all sites) | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| General Clinic Provider | NaphCare | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| NP/CIWA/MAT/General Clinic | NaphCare | 10.000 | 10.000 | 10.000 | 10.000 | 10.000 | | | 50 | 1.250 |
| Health Info. Mgmt Tech | County | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | | | 120 | 3.000 |
| Medical Director | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Office Assistant | County | 48.000 | 48.000 | 48.000 | 48.000 | 48.000 | | | 240 | 6.000 |
| Pharmacy Technician | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Mental Health Clinician | County | 64.000 | 64.000 | 64.000 | 64.000 | 64.000 | | | 320 | 8.000 |
| Mental Health Clinician (CF) | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| LVN | County | 40.000 | 40.000 | 40.000 | 40.000 | 40.000 | 32.000 | 32.000 | 264 | 6.600 |
| RN | County | 112.000 | 112.000 | 112.000 | 112.000 | 112.000 | 80.000 | 80.000 | 720 | 18.000 |
| Supervisor Nurse | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| QMHP | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| Psychologist | NaphCare | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | | | 80 | 2.000 |
| Psychiatrist - General | NaphCare | 10.000 | 10.000 | | | | | | 20 | 0.500 |
| Psychiatrist - PSU | NaphCare | | | 10.000 | 10.000 | | | | 20 | 0.500 |
| Psych NP/PA | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psych Behavioral Tech - PSU | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Dentist | NaphCare | | | 4.000 | | | | | 4 | 0.100 |
| Dental Assistant | NaphCare | | | 4.000 | | | | | 4 | 0.100 |
| **Evening Shift** | | | | | | | | | | |
| LVN | County | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 168 | 4.200 |
| RN | County | 104.000 | 104.000 | 104.000 | 104.000 | 104.000 | 80.000 | 80.000 | 680 | 17.000 |
| Supervisor Nurse | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| QMHP | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| Psych Behavioral Tech - PSU | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| **Night Shift** | | | | | | | | | | |
| LVN | County | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 168 | 4.200 |
| RN | County | 104.000 | 104.000 | 104.000 | 104.000 | 104.000 | 80.000 | 80.000 | 680 | 17.000 |

**Total FTEs**     103.350

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE: STAFFING MATRIX

| Las Colinas Detention and Reentry Facility - LCDRF NaphCare Staffing - ADP 494 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Day Shift** | | | | | | | | | | |
| Position Title | Staff Provider | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
| General Clinic Provider | NaphCare | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| NP/CIWA/MAT/General Clinic | NaphCare | 10.000 | 10.000 | 10.000 | 10.000 | 10.000 | | | 50 | 1.250 |
| Health Info. Mgmt. Tech | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Occupational/Physical Therapist | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Office Assistant | County | 40.000 | 40.000 | 40.000 | 40.000 | 40.000 | | | 200 | 5.000 |
| Pharmacy Technician | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Recreational Therapist | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Mental Health Clinician | County | 56.000 | 56.000 | 56.000 | 56.000 | 56.000 | | | 280 | 7.000 |
| Mental Health Clinician (CF) | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| LVN | County | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | 224 | 5.600 |
| RN | County | 88.000 | 88.000 | 88.000 | 88.000 | 88.000 | 88.000 | 88.000 | 616 | 15.400 |
| Supervisor Nurse | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psychologist | NaphCare | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | | | 80 | 2.000 |
| Psychiatrist | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psychiatrist | NaphCare | 10.000 | 10.000 | | | | | | 20 | 0.500 |
| Psych NP/PA | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| QMHP | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| Psych Behavioral Tech - PSU | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Dentist | NaphCare | | 8.000 | | | | | | 8 | 0.200 |
| Dental Assistant | NaphCare | | 8.000 | | | | | | 8 | 0.200 |
| **Evening Shift** | | | | | | | | | | |
| LVN | County | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 32.000 | 32.000 | 184 | 4.600 |
| RN | County | 72.000 | 72.000 | 72.000 | 72.000 | 72.000 | 72.000 | 72.000 | 504 | 12.600 |
| QMHP | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| Psych Behavioral Tech - PSU | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| **Night Shift** | | | | | | | | | | |
| LVN | County | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | 112 | 2.800 |
| RN | County | 64.000 | 64.000 | 64.000 | 64.000 | 64.000 | 64.000 | 56.000 | 440 | 11.000 |

**Total FTEs     83.050**

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE: STAFFING MATRIX

| George Bailey Detention Facility - GBDF/Facility 8 NaphCare Staffing - ADP 1,270 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Day Shift** | | | | | | | | | | |
| Position Title | Staff Provider | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
| General Clinic Provider | NaphCare | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| General Clinic - Addition/Adseg Provider | NaphCare | | | | 8.000 | | | | 8 | 0.200 |
| Health Info. Mgmt. Clerk | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Health Info. Mgmt. Tech | County | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | | | 80 | 2.000 |
| Sr. Health Info. Mgmt. Tech | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Office Assistant | County | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | | | 160 | 4.000 |
| Pharmacy Technician | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Mental Health Clinician | County | 48.000 | 48.000 | 48.000 | 48.000 | 48.000 | | | 240 | 6.000 |
| LVN | County | 32.000 | 32.000 | 40.000 | 32.000 | 32.000 | 32.000 | 32.000 | 232 | 5.800 |
| RN | County | 72.000 | 72.000 | 72.000 | 72.000 | 72.000 | 72.000 | 72.000 | 504 | 12.600 |
| Supervisor Nurse | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psychologist | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psychiatrist | NaphCare | | | | | | 8.000 | | 8 | 0.200 |
| Psych NP | NaphCare | 8.000 | 8.000 | | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| Psych Tech | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Discharge Planner | NaphCare | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | | | 80 | 2.000 |
| Dentist | NaphCare | 8.000 | | | 8.000 | | | | 16 | 0.400 |
| Dental Assistant | NaphCare | 8.000 | | | 8.000 | | | | 16 | 0.400 |
| **Evening Shift** | | | | | | | | | | |
| LVN | County | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | 224 | 5.600 |
| RN | County | 72.000 | 72.000 | 72.000 | 72.000 | 72.000 | 64.000 | 64.000 | 488 | 12.200 |
| Psych NP | NaphCare | 8.000 | 8.000 | | 8.000 | 8.000 | | 8.000 | 40 | 1.000 |
| **Night Shift** | | | | | | | | | | |
| LVN | County | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | 224 | 5.600 |
| RN | County | 72.000 | 72.000 | 72.000 | 72.000 | 72.000 | 64.000 | 64.000 | 488 | 12.200 |

**Total FTEs    79.700**

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE: STAFFING MATRIX

| East Mesa Reentry Facility - EMRF NaphCare Staffing | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Day Shift | | | | | | | | | | |
| Position Title | Staff Provider | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
| General Clinic Provider | NaphCare | | 8.000 | | | 8.000 | | | 16 | 0.400 |
| RN | County | 40.000 | 40.000 | 40.000 | 40.000 | 40.000 | 40.000 | 40.000 | 280 | 7.000 |
| Psych NP | NaphCare | | 8.000 | | 8.000 | | | | 16 | 0.400 |
| Dentist | NaphCare | | | | | 8.000 | | | 8 | 0.200 |
| Dental Assistant | NaphCare | | | | | 8.000 | | | 8 | 0.200 |

**Total FTEs        8.200**

| South Bay Detention Facility - SBDF NaphCare Staffing | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Day Shift | | | | | | | | | | |
| Position Title | Staff Provider | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
| General Clinic Provider | NaphCare | | | 8.000 | | | | | 8 | 0.200 |
| RN | County | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | | | 120 | 3.000 |

**Total FTEs        3.200**

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT C – PAYMENT SCHEDULE: STAFFING MATRIX

| Vista Detention Facility - VDF NaphCare Staffing | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Day Shift** | | | | | | | | | | |
| Position Title | Staff Provider | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
| General Clinic Provider | NaphCare | 14.000 | 14.000 | 14.000 | 14.000 | 14.000 | 8.000 | 8.000 | 86 | 2.150 |
| Health Info. Mgmt. Clerk | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Office Assistant | County | 32.000 | 32.000 | 32.000 | 32.000 | 32.000 | | | 160 | 4.000 |
| Mental Health Clinician | County | 48.000 | 48.000 | 48.000 | 48.000 | 48.000 | | | 240 | 6.000 |
| LVN | County | 24.000 | 16.000 | 24.000 | 16.000 | 24.000 | 16.000 | 16.000 | 136 | 3.400 |
| RN | County | 56.000 | 56.000 | 56.000 | 56.000 | 48.000 | 48.000 | 48.000 | 368 | 9.200 |
| Supervisor Nurse | County | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psychologist | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psychiatrist | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psych NP | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| QMHP | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| Psych Tech | NaphCare | | | | | | | | 0 | 0.000 |
| Dentist | NaphCare | | | 4.000 | | | | | 4 | 0.100 |
| Dental Assistant | NaphCare | | | 4.000 | | | | | 4 | 0.100 |
| **Evening Shift** | | | | | | | | | | |
| LVN | County | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | 112 | 2.800 |
| RN | County | 48.000 | 48.000 | 48.000 | 48.000 | 48.000 | 48.000 | 48.000 | 336 | 8.400 |
| QMHP | NaphCare | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 56 | 1.400 |
| **Night Shift** | | | | | | | | | | |
| LVN | County | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | 16.000 | 112 | 2.800 |
| RN | County | 48.000 | 48.000 | 48.000 | 48.000 | 48.000 | 48.000 | 48.000 | 336 | 8.400 |

**Total FTEs   55.150**

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NaphCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D – CORI / CLETS REQUIREMENTS

1. **ACCESSING ADULT CRIMINAL JUSTICE INFORMATION**.

In accordance with the Federal Bureau of Investigations' (FBI) Criminal Justice Information Services (CJIS) Security Policy, Title 28, Code of Federal Regulations, Part 20, and the California Department of Justice's California Law Enforcement Telecommunications System (CLETS) Policies, Practices and Procedures Manual (PPP), the following must be completed and agreed to by both parties:

1.1. Purpose. CONTRACTOR requires access to criminal offender record information as defined by California Penal Code section 11075 and 13102, including local summary criminal offender record information (collectively, "CORI"), or a facility that maintains CORI or CLETS while carrying out its duties under this Agreement of providing medical and mental health services for jail inmates for the COUNTY. CORI may also include information from the California Law Enforcement Telecommunications System ("CLETS"). CORI and CLETS shall collectively be referred to as Criminal Justice Information Systems ("CJIS")

1.2. Reserved.

1.3. Fingerprint Background Check.  All persons of CONTRACTOR having direct or indirect access to information from a CJIS database must complete a fingerprinting background check by the Sheriff per CJIS section 5.12 and PPP section 1.9.2 prior to allowing unescorted access to CJIS , including but not limited to research staff, IT staff, and system administrators;

1.3.1. Security Control:  COUNTY has the ability to set, maintain and enforce Standards for the selection, supervision and termination of personnel.  This does not grant hiring/firing authority to County, only the authority to grant the CJIS access to personnel who meet these standards and deny it to those who do not.

1.4. Training.  All persons having access to information from the CJIS, must be trained in the operation, policies and procedures of each file that may be accessed or updated within six (6) months of employment or assignment.  Training can only be provided by the CLETS subscribing agency's certified CLETS/NCIC trainer, and must meet all the CLETS training requirements per CJIS section 5.2 and PPP section 1.8.2. Biennially, provide retesting and reaffirm the proficiency of all the CORI and CLETS operators, if applicable.  CONTRACTOR shall complete Attachment 1 Training Request and send to Sheriff;

1.4.1. Maintenance of Training Records.  CONTRACTOR shall maintain records of all training testing and proficiency affirmation in accordance with section 1.8.3.A.3 of the PPP and shall be made available for inspection, upon request by COUNTY.  An individual computerized or written log must be maintained on each full access operator.  Such logs may be destroyed three years after the operator is separated from the agency.  Training records for less than full access operators, practitioners, administrators and other sworn/non-sworn law enforcement personnel shall be maintained on a computerized or written group log.  Less than full access operator group logs shall be retained indefinitely by the agency.  The examinations may be discharged upon entry of the required information in the appropriate log.

1.5. Employee/Volunteer Statement Form:  Pursuant to PPP section 1.5.1, all contractor, employees, agents,

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D – CORI / CLETS REQUIREMENTS

volunteers and subcontractor personnel with direct or indirect access to CJIS shall sign the Employee/Volunteer Statement Form (Attachment 2) and return to Sheriff;.

1.6. <u>Private Management Control Agreement</u>.  In order to access facilities and areas in which CJIS and its information are contained, CONTRACTOR shall sign the Private Management Control Agreement, incorporated into this agreement, (Attachment 3).

1.7. <u>Security Addendum</u>.  The FBI CJIS Security Addendum shall be signed and incorporated into this agreement.  (Attachment 4)

1.8. <u>Changes to Access</u>.  CONTRACTOR shall notify Sheriff of any changes in writing when employees, agents, volunteers or subcontractors assigned to this Agreement are added or removed within thirty days of assignment or termination.

1.9. <u>Security Controls</u>.  CONTRACTOR must take reasonable precautions to protect CJIS from unauthorized access.  CONTRACTOR is required to submit to Sheriff a detailed plan of the security measures in place to guard against unauthorized access of hard copies or electronic files containing CJIS.  It is incumbent on CONTRACTOR to prevent disclosure of CORI from unauthorized users throughout the duration of this Agreement and to immediately report any security breach to Sheriff.

1.9.1.  Policies governing the operation of computers, access devices, circuits, hubs, boundary protection devices and other components that make up and support a telecommunications network and related CA DOJ criminal justice databases used to process, store or transmit criminal justice information, guaranteeing the priority, integrity and availability of service needed by the criminal justice community.

1.9.2.  Security control includes, but is not limited to, the supervision of applicable equipment, systems design, programming and operating procedures associated with the development, implementation and operation of any computerized message-switching or database systems utilized by the served law enforcement agency or agencies.  Computer sites must have adequate physical security to protect against any unauthorized viewing or access to computer terminals, access devices or stored/printed data.

1.9.3.  <u>Reporting Requirements for Unauthorized Access</u>.  It is incumbent upon CONTRACTOR to prevent disclosure of CORI from unauthorized users throughout the duration of this Agreement and to immediate report any security breach to Sheriff.

1.10.  <u>Penalties for Misuse</u>.  CJIS and related data, by its very nature, is very sensitive and has potential for great harm if misused.  Access to criminal offender record information and related data is therefore limited to the purpose(s) provided for in this Agreement. Misuse of the system by, among other things: accessing it without authorization; accessing it by exceeding authorization; accessing it for an improper purpose; using, disseminating or secondary dissemination of information received as a result of this contract for a purpose other than that envisioned by the contract, may subject persons to administrative criminal penalties.  *Such exposure for misuse includes, but is not limited to, suspension or termination of this Agreement and prosecution for state and federal crimes.*

1.11.  <u>Record Retention of CORI</u>.  CONTRACTOR must destroy any information and records received

EXHIBIT B

Case 3:25-cv-00410-W-MMP   Document 20   Filed 08/18/25   PageID.437   Page 198
of 207
COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D – CORI / CLETS REQUIREMENTS

from CJIS, in accordance with California Code of Regulations (CCR) section 708(a) of Chapter 7 of Division 1 of Title 11 after the research project is completed. When the CJIS is furnished in an electronic format, the CJIS must be deleted from any electronic storage medium in which it was stored after the research project is completed. The medium, by which the information was furnished, such as disc or tape, must be destroyed or disabled so that any access to the information is not possible. Any hard copies made from electronic records must be destroyed in accordance with section 708(a) of Chapter 7of Division 1 of Title 11 of the CCR.

1.12.    <u>Audit Right</u>. COUNTY has the responsibility and authority to monitor, audit and enforce the implementation of this agreement. Periodic unannounced site inspections and scheduled audits may be performed by Sheriff to ensure compliance with the CJIS and PPP policies and regulations.

1.13.    <u>Publication</u>: When data derived from CJIS is used or referenced in any publication, a copy of that publication must be furnished to each party of this Agreement. Under Penal Code section 13202, any disclosure of information received from CJIS shall not contain any identifying information.

1.14.    <u>Application</u>: In order to ensure the safety of program offenders and the integrity of this program, this section 1, Access to Adult Criminal Justice Information, shall apply to all employees, volunteers, interns and subcontractors with access or potential access to CJIS. Direct, indirect or potential access to CLETS and CORI, can be in the form of hardcopy documentation, verbal communication, or other forms of information sharing, as well as unescorted access to County facilities where CLETS and CORI is created, stored, processed, handled, transmitted, or discussed.

**2.      USE OF COUNTY DATA/INFORMATION**

Contractor staff assigned to this contract may have access to County information systems. The County of San Diego requires all Contractor staff to read, sign, and comply with the "Summary of Policies Regarding County Data/Information and Information Systems." These policies include the County Administrative Manual Items 0400-11 (COUNTY DATA/INFORMATION – CLASSIFICATION, PROTECTION LEVEL, AND PROPER SECURITY), 0400-01 (COUNTY INFORMATION SYSTEMS – MANAGEMENT AND USE), and 0400-07 (TELECOMMUNICATIONS SYSTEMS – MANAGEMENT AND USE. Contractor shall obtain these policies from the COR

2.1   Contractor shall require its staff assigned to this contract to read and sign the "Summary of Policies Regarding County Data/Information and Information Systems" (Attachment 5).

2.2   Contractor shall maintain documentation of compliance with requirement.

2.3   Contractor shall require its staff assigned to this contract to comply with the County procedures and regulations cited in the "Summary of Policies Regarding County Data/Information and Information."

**3.      PRISON RAPE ELIMINATION ACT (PREA)**

Contractor shall adopt and comply with the Prison Rape Elimination Act of 2003, 42 U.S.C. 15601 et seq. (PREA), any applicable PREA standards (including 28 C.F.R. 115 et seq.), and any related County ordinances or Sheriff Department policies regarding PREA for preventing, detecting, monitoring, investigating and eradicating any form of sexual abuse. Such PREA standards require that all volunteers, officers, employees, agents and subcontractors who have contact with residents under this contract receive training pursuant to 28 C.F.R. 115.332. Contractor shall provide Sheriff with documentation confirming that all volunteers, officers, employees, agents, and subcontractors understand the training they have received. Contractor acknowledges that the County will monitor Contractor's compliance with PREA, any applicable PREA standards, and County ordinances or Sheriff

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D – CORI / CLETS REQUIREMENTS

Department policies relating to sexual abuse, and may conduct announced and/or unannounced compliance monitoring to include "on-site" monitoring.  Contractor agrees that it will pay any and all evaluation and treatment costs arising from sexual abuse of offenders and as a result of confinement during the term of this agreement, as required by applicable laws and regulations including, but not limited to, Title 28 of the Code of Federal Regulations, sections 115.282 and 115.283.  Failure to comply with PREA, including PREA Standards and County PREA policies, may result in termination of the contract.  If the County determines that a PREA violation contributes to the curtailment of an essential service or poses an immediate threat to life, health or property, County may terminate the contract immediately upon issuing oral or written notice to the Contractor without any prior notice or opportunity to cure.

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NaphCare, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D – CORI / CLETS REQUIREMENTS
ATTACHMENT 1 – CORI TRAINING REQUEST FORM

**Criminal Offender Record Information (CORI) Training Requirement:**

Penal Code Section 11075 and 11077(d) requires the County to ensure that only a certified CLETS/NCIC trainer initially trains all sworn/non-sworn, non-criminal justice, **volunteer and contractor personnel**, with "physical and logical access" to CLETS, NCIC and CORI within six months of assignment. <u>CORI training has to be scheduled within 30 days of assignment.</u>

**<u>Contract Staff Information:</u>**

Request to Enroll the Following Staff in CORI Training: ☐ Contract   ☐ VIP   ☐ Other: _____

First and Last Name (Print): _____

Staff E-mail Address (Print): _____

Program Name: _____

Date Assigned to Program: _____

Work Address: _____

Contractor or VIP Group: _____

If Contract Staff is Replacing Someone, Print First & Last Name: _____

Contract Supervisor First and Last Name _____

Contract Supervisor Signature:   x _____   Date: _____

Contract Supervisor E-mail Address _____

_____

**<u>Sheriff COR/Designee:</u>**

Type of CORI Training: ☐ 1½ Hour   ☑ 4 Hour

Contract Analyst First and Last Name (Print): _____

COR/Designee First and Last Name (Print): _____

COR/Designee Signature:   x _____   Date: _____

_____

**<u>Contractor:</u>** *Please forward to COR/County Designee*

EXHIBIT B

Case 3:25-cv-00410-W-MMP   Document 20   Filed 09/18/25   PageID.440   Page 201 of 207

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH RADYHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D – CORI / CLETS REQUIREMENTS
ATTACHMENT 2 – EMPLOYEE/VOLUNTEER STATEMENT



STATE OF CALIFORNIA
HDC 0009
(Orig. 05/2001; Rev. 03/2010)

DEPARTMENT OF JUSTICE
PAGE 1 of 1

## CLETS EMPLOYEE/VOLUNTEER STATEMENT

### Use of information from the California Law Enforcement Telecommunications System (CLETS) and the Department of Motor Vehicles record information

As an employee/volunteer of _____ , you may have access to confidential criminal records, the Department of Motor Vehicle records or other criminal justice information, much of which is controlled by statute. All information from the CLETS is based on the "need-to-know" and the "right-to-know" basis. The misuse of such information may adversely affect an individual's civil rights and violates the law and/or CLETS policies.

Penal Code (PC) section 502 prescribes the penalties relating to computer crimes. PC sections 11105 and 13300 identify who has access to state and local summary criminal history information and under which circumstances it may be released. PC sections 11141-11143 and 13302-13304 prescribe penalties for misuse of state and local summary criminal history information. Government Code section 6200 prescribes the felony penalties for misuse of public records and information from the CLETS. California Vehicle Code section 1808.45 prescribes the penalties relating to misuse of the Department of Motor Vehicle record information.

Penal Code sections 11142 and 13303 state:

> **"Any person authorized by law to receive a record or information obtained from a record who knowingly furnishes the record or information to a person not authorized by law to receive the record or information is guilty of a misdemeanor."**

Any employee/volunteer who is responsible for the CLETS misuse is subject to immediate dismissal from employment. Violations of the law may result in criminal and/or civil action.

*I HAVE READ THE ABOVE AND UNDERSTAND THE POLICY REGARDING MISUSE OF ALL INFORMATION FROM THE CLETS.*

_____        _____
Signature                              Print Name

_____
Date

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D – CORI / CLETS REQUIREMENTS
ATTACHMENT 3 – PRIVATE MANAGEMENT CONTROL AGREEMENT



STATE OF CALIFORNIA
HDC 0004B
(Orig. 11/2005; Rev. 03/2010)

DEPARTMENT OF JUSTICE
PAGE 1 of 2

## CLETS PRIVATE CONTRACTOR
## MANAGEMENT CONTROL AGREEMENT

Agreement to allow California Law Enforcement Telecommunications System (CLETS) access by

_____ , _____
(Public law enforcement/criminal justice agency)                              (ORI)

to  _____
(Private Contractor)

to perform _____ services on its behalf.
(Type of service)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Access to the CLETS is authorized to public law enforcement and criminal justice agencies (*hereinafter referred to as the CLETS subscribing agency*) only, which may delegate the responsibility of performing the administration of criminal justice functions (e.g., dispatching functions or data processing/information services) in accordance with the Federal Bureau of Investigation's (FBI) Criminal Justice Information Services (CJIS) Security Addendum to a private contractor. The private contractor may access systems or networks that access the CLETS on behalf of the CLETS subscribing agency to accomplish the above-specified service(s). This agreement must be received by the California Department of Justice (CA DOJ) prior to the subscribing agency permitting access to the CLETS. The performance of such delegated services does not convert that agency into a public criminal justice agency, not automatically authorize access to state summary criminal history information. Information from the CLETS is confidential and may be used only for the purpose(s) for which it is authorized. Violation of confidentiality requirements or access authorizations may be subject to disciplinary action or criminal charges.

Pursuant to the policies outlined in the *CLETS Policies, Practices, and Procedures (PPP)* and the Federal Bureau of Investigation's (FBI) *CJIS Security Policy*, it is agreed the CLETS subscribing agency will maintain responsibility for security control as it relates to the CLETS access. Security control is defined as the ability of the CLETS subscribing agency to set, maintain, and enforce:

1.  Standards for the selection, supervision, and termination of personnel. This does not grant hiring/firing authority to the CLETS subscribing agency, only the authority to grant CLETS access to personnel who meet these standards and deny it to those who do not.

2.  Policies governing the operation of computers, access devices, circuits, hubs, routers, firewalls, and other components that make up and support a telecommunications network and related CA DOJ criminal justice databases used to process, store, or transmit criminal justice information, guaranteeing the priority, integrity, and availability of service needed by the criminal justice community.

Security control includes, but is not limited to, the supervision of applicable equipment, systems design, programming, and operating procedures associated with the development, implementation, and operation of any computerized message-switching or database systems utilized by the served law enforcement agency or agencies. Computer sites must have adequate physical security to protect against any unauthorized viewing or access to computer terminal, access devices, or stored/printed data.

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH KNAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D – CORI / CLETS REQUIREMENTS
ATTACHMENT 3 – PRIVATE MANAGEMENT CONTROL AGREEMENT



STATE OF CALIFORNIA
HDC 0004B
(Orig. 11/2005; Rev. 03/2010)

DEPARTMENT OF JUSTICE
PAGE 2 of 2

## CLETS PRIVATE CONTRACTOR
## MANAGEMENT CONTROL AGREEMENT

Additionally, it is the responsibility of the CLETS subscribing agency to ensure that all private contractors receiving information from the CLETS meet the minimum training, certification, and background requirements that are also imposed on the CLETS subscribing agency's staff. The minimum requirements are applicable also to staff having access to record storage areas containing information from the CLETS. The minimum requirements include, but are not limited to:

1. Prior to allowing the CLETS access, train, functionally test, and affirm the proficiency of all the CLETS computer operators to ensure compliance with the CLETS and the FBI's National Crime Information Center (NCIC) policies and regulations, if applicable. Biennially, provide testing and reaffirm the proficiency of all the CLETS operators, if applicable.

2. State and FBI criminal offender record information searches must be conducted prior to allowing access to the CLETS computers, equipment, or information. If the results of the criminal offender record information search reveal a record of any kind, access will not be granted until the CLETS subscribing agency can review the matter to decide if access is appropriate. If a felony conviction of any kind is found, access shall not be granted.

3. Each individual must sign a CLETS Employee/Volunteer Statement form (HDC 0009) prior to operating or having access to CLETS computers, equipment, or information.

In accordance with CLETS/NCIC policies, the CLETS subscribing agency has the responsibility and authority to monitor, audit, and enforce the implementation of this agreement by the private contractor. The private contractor agrees to cooperate with the CLETS subscribing agency in the implementation of this agreement and to accomplish the directives for service under the provisions of this agreement. The CLETS Management Control Agreement (HDC 0004B) shall be updated when the head of either agency changes or immediately upon request from the CA DOJ.

By signing this agreement, the vendors and private contractors certify they have read and are familiar with the contents of (1) the FBI's CJIS Security Addendum, (2) the NCIC 2000 Operating Manual, (3) the FBI's CJIS Security Policy, (4) Title 28, Code of Federal Regulations, Part 20, and (5) the CLETS PPP and agree to be bound by their provisions. Criminal offender record information and related data, by its very nature, is sensitive and has potential for great harm if misused. Access to criminal offender record information and related data is therefore limited to the purpose(s) for which the CLETS subscribing agency has entered into the contract. Misuse of the system by, among other things: accessing it without authorization; accessing it by exceeding authorization; accessing it for an improper purpose; use, dissemination, or secondary dissemination of information received as a result of this contract for a purpose other than that envisioned by the contract, may subject me to administrative and criminal penalties. Accessing the system for an appropriate purpose and then using, disseminating, or secondary dissemination of information received for another purpose other than execution of the contract also constitutes misuse. Such exposure for misuse includes, but is not limited to: suspension or loss of employment and prosecution for state and federal crimes.

_____
Signature (CLETS Subscribing Agency Head)

_____
Signature (Private Contractor Agency Head)

_____
Print Name and Title

_____
Print Name and Title

_____
Date

_____
Date

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NaphCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D — CORI / CLETS REQUIREMENTS
ATTACHMENT 4 – CJIS SECURITY ADDENDUM



STATE OF CALIFORNIA
HDC 0012
(Orig. 02/2009; Rev. 04/2016)

**FEDERAL BUREAU OF INVESTIGATION
CRIMINAL JUSTICE INFORMATION SERVICES
SECURITY ADDENDUM**

DEPARTMENT OF JUSTICE
PAGE 1 of 1

| PRINT | RESET |

## CERTIFICATION

I hereby certify that I am familiar with the contents of (1) the Security Addendum, including its legal authority and purpose; (2) the NCIC Operating Manual; (3) the CJIS Security Policy; and (4) Title 28, Code of Federal Regulations, Part 20, and agree to be bound by their provisions.

I recognize that criminal history record information and related data, by its very nature, is sensitive and has potential for great harm if misused. I acknowledge that access to criminal history record information and related data is therefore limited to the purpose(s) for which a government agency has entered into the contract incorporating this Security Addendum. I understand that misuse of the system by, among other things: accessing it without authorization; accessing it by exceeding authorization; accessing it for an improper purpose; using, disseminating or re-disseminating information received as a result of this contract for a purpose other than that envisioned by the contract, may subject me to administrative and criminal penalties. I understand that accessing the system for an appropriate purpose and then using, disseminating or re-disseminating the information received for another purpose other than execution of the contract also constitutes misuse. I further understand that the occurrence of misuse does not depend upon whether or not I receive additional compensation for such authorized activity. Such exposure for misuse includes, but is not limited to, suspension or loss of employment and prosecution for state and federal crimes.

_____          _____
Printed Name/Signature of Contractor Employee                              Date

_____          _____
Printed Name/Signature of Contractor Representative                        Date

_____
Organization and Title of Contractor Representative

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D — CORI / CLETS REQUIREMENTS
ATTACHMENT 5 – SUMMARY OF POLICIES REGARDING COUNTY DATA/INFORMATION
AND INFORMATION SYSTEMS

 **COUNTY OF SAN DIEGO**

### Summary of Policies
### *Regarding County Data/Information and Information Systems*

To aid in the performance of their regular job assignments and duties, County employees, volunteers, agents and contractors are provided access to many County tools and resources. In the electronic age, these tools and resources include County "data/information" in various formats (e.g. on electronic media, paper, microfiche) and County "information systems" (e.g. computers, servers, networks, Internet access, fax, telephones and voice mail), whether owned, provided or maintained by or on behalf of the County.

The County has established policies and procedures based on best business practices to support the performance of the County's business and to protect the integrity, security and confidentiality of the County's data/information and information systems. Users[1] of these resources play a critical role. By carrying out their regular assignments and duties in compliance with all applicable County's policies and procedures, best practices are maintained.

This summary helps users know their responsibilities by highlighting important aspects of policies that govern access to and use of County data/information and information systems. The policies themselves provide further detailed information governing the use of County data/information and information systems and should be reviewed. Most notably, the County Chief Administrative Officer (CAO) Policy *Acceptable Use of County Data/Information* provides additional guidance on protecting County data/information; the CAO Policy *County Information Systems – Management and Use* provides guidance in controlling and using County information systems; and the CAO Policy *Telecommunications – Management and Use* provides guidance in using desktop and cellular telephones.

Access to County data/information or information systems is necessary to the performance of regular assignments and duties. Failure to comply with these policies and procedures may constitute a failure in the performance of regular assignments/duties. Such failure can result in the temporary or permanent denial of access privileges and/or in discipline, up to and including termination, in accordance with Civil Service Rules.

1. County data/information in all formats and information systems are for authorized County use only. Personal use of County information systems is prohibited unless specifically authorized by the Appointing Authority.

2. As part of their regular assignments and duties, users are responsible for protecting any data / information and information systems provided or accessible to them in connection with County business or programs.

3. Users cannot share data/information with others outside of their regular duties and responsibilities unless specifically authorized to do so.

4. Users have no expectation of privacy regarding any data/information created, stored, received, viewed, accessed, deleted or input via County information systems. The County retains the right to monitor, access, retrieve, restore, delete or disclose such data/information.

---

[1] *For purposes of this summary, the term "user" shall refer to any person authorized to use County data/information and information systems to perform work in support of the business, programs or projects in which the County is engaged. It also applies to users accessing other networks, including the Internet, through County information systems.*

(Rev 7/01/08)

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT D — CORI / CLETS REQUIREMENTS
ATTACHMENT 5 – SUMMARY OF POLICIES REGARDING COUNTY DATA/INFORMATION
AND INFORMATION SYSTEMS

5. Attempts by users to access any data or programs contained on County information systems for which they do not have authorization will be considered a misuse.

6. Users shall not share their County account(s) or account password(s) with anyone, use another's account to masquerade as that person, or falsely identify themselves during the use of County information systems.

7. The integrity and security of County data/information depends on the observation of proper business practices by all authorized users. Users are requested to report any weaknesses in County information system security and any incidents of possible misuse or violation of County IT policies to the appropriate County representative.

8. Users shall not divulge Dial-up or Dial-back modem phone numbers to anyone.

9. Users shall not make copies of system configuration files (e.g. password files) for their own unauthorized use or to provide to other people/users for unauthorized uses.

10. Users shall not make copies of copyrighted software or information, except as permitted by law or by the owner of the copyright.

11. Users shall not engage in any activity that harasses, defames or threatens others, degrades the performance of information systems, deprives an authorized County user access to a County resource, or circumvents County security measures.

12. Users shall not download, install or run security programs or utilities that reveal or exploit weaknesses in the security of a County information system. For example, County users shall not run password cracking or network scanning programs on County information systems.

Misuse of workplace tools and resources, including County data/information and/or County information systems, will be reported to a user's management. Misuse may constitute a failure to perform regular duties and assignments. Such failure may result in short-term or permanent loss of access to County data/information or information systems and/or disciplinary action in accordance with Civil Service Rules, up to and including termination. For non County employees, including volunteers and employees of County contractors, misuse may result in a suspension or withdrawal of your access rights, termination of your participation in County programs, or appropriate against the contractor under the contract's terms, or any combination of all or some of the above consequences.

**Acknowledgement:**
I have received and read the County of San Diego's Summary of Policies Regarding County Data/information and Information Systems.

Print Name:

_____

Signature: _____    Date Signed: _____

Supervisor / Manager / Witness: _____    Date Signed: _____

_____

| | |
|---|---|
| **ALL SIGNERS:** | Keep a copy of this summary for your reference. |
| **COUNTY SIGNERS:** | Department Personnel Representative --- file the original of this form in the authorized user's agency or department personnel file. |
| **NON-COUNTY SIGNERS:** | Contract administrator --- file the original form along with the contract |

(Rev 7/01/08)

EXHIBIT B

COUNTY CONTRACT NUMBER 566117
AGREEMENT WITH NAPHCARE, INC. FOR
SHERIFF'S DEPARTMENT CONSOLIDATED HEALTH CARE DELIVERY
EXHIBIT E – TRANSITION PLAN

**<u>Transition plan dated March 1, 2022</u>**

EXHIBIT B